IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, v. <br><br> JAMES HUYSER, MATTHEW KINLEY, KENNETH BOYLE, JEFFREY W. CARTER, and JWC INVESTMENTS, L.C., <br><br> Defendants. | Case No. 23-cv-144 <br><br><br> **ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANT KENNETH BOYLE** |

COMES NOW, Defendant, Kenneth Boyle ("Mr. Boyle"), by and through the undersigned counsel, and for his Answer and Affirmative Defenses to Plaintiff's Complaint, states as follows:

**Nature of the Action**

1.      In this action, the United States seeks to pierce the corporate veil of the Iowa LLC, Alternative Carbon Resources, LLC ("ACR") to obtain money judgments, jointly and severally against the individual members of ACR, Defendants **James Huyser, Matthew Kinley, Kenneth Boyle,** and **Jeffrey W. Carter** (*collectively* "**Member Defendants**"), and **JWC Investments, L.C.** ("**JWC**") an entity that operated as Jeffrey Carter's alter ego and received funds from ACR on his behalf. Alternatively, the United States seeks money judgments against each Defendant as a fraudulent transferee for funds each received from ACR.

>      **ANSWER:**  Mr. Boyle admits that this paragraph characterizes the Plaintiff's requests in this lawsuit.  Mr. Boyle denies that the Plaintiff is entitled to such relief against him.

2.      The Member Defendants formed ACR to claim federal alternative fuel mixture credits and did so by purchasing waste (generated as a byproduct of ethanol production), mixing

the waste with a small amount of diesel fuel, and claiming to sell this mixture as an "alternative fuel mixture" eligible for the credits. ACR sold this alternative fuel mixture to digester clients that used the fuel to power their facilities or to power the digester's customers to power their businesses.

> **ANSWER:**  Mr. Boyle denies that ACR was formed to claim federal alternative fuel mixture credits, although he admits that ACR did in fact claim such credits. Mr. Boyle further denies that this paragraph fully describes the business activity of ACR.

3.     The Member Defendants caused ACR to claim and receive $19 million in federal alternative fuel mixture credits and ceased active operations as soon as the fuel mixture tax credits expired under statute in 2011. Soon after receipt of the payments, the Defendants cumulatively directed at least $10 million paid to themselves.

> **ANSWER:**  Mr. Boyle denies that he personally caused ACR to claim and receive $19 million in federal tax credits.  He further denies he directed payment to any of the defendants.

4.     ACR was not entitled to claim or receive the $19 million in alternative fuel mixture credits.

> **ANSWER:**  Mr. Boyle admits that the U.S. Court of Federal Claims entered a judgment to the effect of this paragraph.  Mr. Boyle denies that he was personally aware that ACR was not entitled to claim the credits.

5.     In March 2018, the U.S. Court of Federal Claims entered a money judgment against ACR in the amount of $59,320,179 (less any payments made and plus statutory interest and additions accruing according to law) in excise taxes assessed for the improperly claimed alternative fuel mixture credits and for assessed excessive claim penalties.

> **ANSWER:**  Mr. Boyle admits that the U.S. Court of Federal Claims entered a money judgment against ACR, and he refers the Court to the money judgment for a complete and accurate statement of its contents.

6. By the time the United States had obtained its money judgment against ACR, the Member Defendants had long since emptied ACR's bank accounts, shuttered all operations, and all the Defendants had personally pocketed millions in improperly claimed alternative fuel mixture credits. The United States' judgment against ACR remains unpaid.

> **ANSWER:**  Mr. Boyle denies that he "emptied ACR's bank accounts, shuttered all operations, … [and] pocketed millions in improperly claimed alternative mixture credits."  Mr. Boyle admits that the judgment against ACR is unpaid.

7. The United States asserts four claims for relief against the respective Defendants (as set forth in Counts I through IV below). First, the United States seeks a judgment declaring that the ACR corporate form is disregarded under the "piercing the corporate veil doctrine" and each Defendant (and JWC as Carter's alter ego) is liable for the debts of ACR because ACR was a sham corporation, serving no legitimate business purpose, and was used primarily as a vehicle to promote an injustice by improperly obtaining alternative fuel mixture credits to enrich the Defendants.

> **ANSWER:**  This paragraph asserts legal conclusions for which no response is required.  To the extent any factual assertions are made, they are denied.

8. In the alternative, the United States seeks money judgments against the Defendants individually in the amounts of funds they received from ACR because they received such funds as fraudulent transferees under the Iowa Uniform Fraudulent Transfer Act.

> **ANSWER:**  This paragraph asserts legal conclusions for which no response is

required.  To the extent any factual assertions are made, they are denied.

9.      This action has been requested and authorized by the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury of the United States, and is brought at the direction of a delegate of the Attorney General of the United States, pursuant to 26 U.S.C. § 7401.

> **ANSWER:** This paragraph asserts legal conclusions for which no response is required.  To the extent any factual assertions are made, Mr. Boyle lacks sufficient information to admit or deny.

### Jurisdiction and Venue

10.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1340 and 1345, and 26 U.S.C. §§ 7401 and 7402(a).

> **ANSWER:**  This paragraph asserts legal conclusions for which no response is required.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)because Defendants reside in this judicial district. Moreover, a substantial portion of the conduct alleged in this complaint occurred in this judicial district.

> **ANSWER:**  This paragraph asserts legal conclusions for which no response is required.  To the extent any factual assertions are made, Mr. Boyle lacks sufficient information about the other Defendants to admit or deny.  He admits that he resides in the Southern District of Iowa.

### Parties

12.      The Plaintiff is the United States of America.

> **ANSWER:** Admitted.

13.     **James Huyser ("Huyser")** resides in Iowa and is subject to this Court's jurisdiction. He is named as a defendant to Count I of this Complaint. Huyser formed and organized ACR. He also served as ACR's registered agent, managing member, and served as an officer of ACR as the Authorized Member Representative.

> **ANSWER:** This paragraph asserts legal conclusions for which no response is required. To the extent any factual assertions are made, Mr. Boyle lacks sufficient information about the other Defendants to admit or deny.

14.     **Matthew Kinley ("Kinley")** resides in Iowa and is subject to this Court's jurisdiction. He is named as a defendant to Count II of this Complaint. Kinley is a Certified Public Accountant, was a member of ACR, and served as an officer of ACR as the Assistant Authorized Member Representative.

> **ANSWER:** This paragraph asserts legal conclusions for which no response is required. To the extent any factual assertions are made, Mr. Boyle lacks sufficient information about the other Defendants to admit or deny.

15.     **Kenneth Boyle ("Boyle")** resides in Iowa and is subject to this Court's jurisdiction. He is named as a defendant to Count III of this Complaint. Boyle holds a Master's Degree in Business Administration, was a member of ACR, and served as an officer of ACR as the Secretary.

> **ANSWER:** This paragraph asserts legal conclusions for which no response is required. Mr. Boyle admits that he holds an MBA degree, was a member of ACR, and held the officer title of Secretary.

16.     **Jeffrey W. Carter ("Carter")** resides in Iowa and is subject to this Court's jurisdiction. He is named as a defendant to Count IV of this Complaint. Carter has a degree in finance. He helped Huyser develop the idea to form ACR and personally served as a member of

ACR while it operated.

> **ANSWER:**   This paragraph asserts legal conclusions for which no response is required.  To the extent any factual assertions are made, Mr. Boyle lacks sufficient information about the other Defendants to admit or deny.

17.     **JWC Investments, L.C. ("JWC")** is a limited liability company  ("LLC") created under the laws of Iowa and is subject to this Court's jurisdiction. JWC is named as a defendant to Count IV of this Complaint. JWC was formed by Jeffrey W. Carter. Carter serves as the registered agent and managing member, and he holds 99.1% ownership interest in JWC. Carter directed that any funds paid to him from ACR be paid to JWC.

> **ANSWER:**   This paragraph asserts legal conclusions for which no response is required.  To the extent any factual assertions are made, Mr. Boyle lacks sufficient information about the other Defendants to admit or deny.

### ACR'S BUSINESS OPERATIONS

**ACR was formed to receive alternative fuel mixture credits from the United States.**

18.     Section 6426 of the Internal Revenue Code (U.S. Title 26) allows taxpayers to claim a tax credit for "producing any alternative fuel mixture for sale or use in a trade or business of the taxpayer."

> **ANSWER:**  Admitted.

19.     During the time ACR actively operated, these alternative fuel mixture credits were available for the 2011 calendar year, from <u>January 1, 2011 through December 31, 2011</u>.

> **ANSWER:**  Admitted.

20.     In early 2010, Huyser and Carter began to investigate the feasibility of a business that would convert waste products from the production of ethanol into a mixture that may qualify

as an "alternative fuel mixture" under Section 6426.

> **ANSWER:** Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

21.    In early 2010, Huyser and Carter each worked in Iowa in industries involving waste disposal. They observed that there was an excess of ethanol waste being produced in Iowa.

> **ANSWER:** Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

22.    Huyser and Carter explored whether ethanol waste product could be deposited in **anaerobic digesters**. Anaerobic digester systems are used by, for example, wastewater treatment plants or on farms to degrade or break down organic matter or other waste. On May 19, 2010, Huyser filed ACR's Certificate of Organization as a Limited Liability Company with the Iowa Secretary of State listing himself as its organizer and registered agent.

> **ANSWER:** Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response

23.    On May 19, 2010, Huyser filed ACXR's Certificate of Organization as a Limited Liability Company with the Iowa Secretary of State listing himself as its organizer and registered agent.

> **ANSWER:** Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response

24.    Jeffrey W. Carter, Matthew Kinley, and Kenneth Boyle subsequently also became members of ACR.

> **ANSWER:** Admitted.

25.    On March 1, 2011, Huyser, Carter, Kinley, and Boyle each executed an Amended

and Restated Operating Agreement for ACR ("**ACR Operating Agreement**").

   **ANSWER:** Mr. Boyle admits that he executed an Amended and Restated Operating Agreement.  He lacks sufficient information to admit or deny the exact date when he or others signed the agreement.

  26. The ACR Operating Agreement set forth that Boyle, Kinley, and Carter had individually each acquired an ownership interest in ACR.

   **ANSWER:** Mr. Boyle refers to the ACR Operating Agreement for a complete and accurate statement of its contents.

  27. Huyser, Kinley, Boyle, and Carter each personally signed the ACR Operating Agreement as members. A true and correct copy of the signature page for the ACR Operating Agreement is reproduced below:

   **ANSWER**:  Admitted.

28.     The ACR Operating Agreement also named officers for ACR. Boyle was named Secretary, Huyser as the Authorized Member Representative, and Kinley was the Assistant Authorized Member Representative.

**ANSWER:**  Mr. Boyle refers to the ACR Operating Agreement for a complete and accurate statement of its contents.

**The Defendants paid a net of $250.00 in capital contributions in exchange for their membership interests in ACR.**

29.     Huyser, Carter, Kinley, and Boyle served as the only members of ACR during its time in operation.

**ANSWER:**  Admitted.

30.     Huyser held 500 Voting Series A Units and 250 Voting Series B Units in ACR. In exchange for these Units, he made a $2,000 capital contribution to ACR in the form of two $1,000 checks—one dated January 21, 2011 and one dated March 13, 2011.

**ANSWER:** Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

31.     Jeffrey W. Carter held 500 Non-Voting Series A Unit and 250 Non-Voting Series B Units in ACR. Carter made his capital contribution to ACR in the form of two cashier's checks payable to ACR – one check dated February 14, 2011 and purchased by JWC and one check purchased by Jeffrey Carter dated March 16, 2011.

**ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

32.     Within weeks of making their final capital contributions, Huyser and Carter reimbursed themselves for their capital contributions when Huyser issued two ACR checks dated March 26, 2011 for $2,000 each: one paid to himself and the other to Carter, by check payable to

{02101149.DOCX}

JWC.

>**ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

33.     In March 2011, Matthew Kinley acquired 100 Voting Series B Units and 150 Non-Voting Series B Units in ACR by making a $250 capital contribution by check dated March 1, 2011.

>**ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

34.     Kenneth Boyle acquired 100 Voting Series B Units and 150 Non-Voting Series B Units in ACR. While the ACR Operating Agreement stated that Boyle had received his units in ACR in exchange for a $250 capital contribution, Boyle never made any contribution of $250 in exchange for his ACR units or the subsequent distributions he received.

>**ANSWER:**  Mr. Boyle admits that this paragraph accurately describes his capital contributions.

35.     In total, the Defendants made $4,250 in capital contributions in exchange for their respective membership interests in ACR and a net $250 in capital contributions after Huyser and Carter reimbursed themselves.

>**ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

36.     Other than the funds contributed by Huyser, Carter, and Kinley when it was organized, ACR had no other sources of capital at the time of its formation.

>**ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response

**ACR only actively operated by transporting its waste / diesel mixture during the 2011 calendar year.**

37.     In 2011, the Member Defendants began active operations through ACR.

**ANSWER:**  Mr. Boyle denies this paragraph as vague, particularly as to what is meant by "active operations" and the beginning of such operations.

38.     The Member Defendants implemented the following operations model for ACR:

    a.    ACR purchased ethanol waste, also called feedstock, from a supplier which was picked up by a trucking company contracted by ACR;

    b.    The trucking company added a small amount of diesel fuel to the ethanol waste to create a waste/diesel mixture; and

    c.    The trucking company delivered the waste/diesel mixture to an anaerobic digester operator.

**ANSWER:**  Insofar as this paragraph alleges that Mr. Boyle personally implemented these operations, this paragraph is denied.  As to other defendants, Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

39.     While in operation, ACR's primary operating <u>expenses</u> consisted of:

    a.    Paying to purchase ethanol waste and diesel;

    b.    The costs for contracting truck drivers to pick up the ethanol waste, mix in the diesel, and deliver the waste / diesel mixture to digester operators; and

    c.    Paying the digester operators fees to take the waste / diesel mixture and deposit it in their digesters.

**ANSWER:**  Mr. Boyle admits that these expenses were the largest categories of expenses for ACR in 2011.  "Primary" is a vague descriptive term, and therefore, the paragraph as worded is denied.

40.     While in operation during 2011, ACR had one primary source of <u>income</u> - the

millions in alternative fuel mixture credit payments it improperly claimed and received from the United States' Treasury.

> **ANSWER:**  Mr. Boyle admits that the tax credit payments were the largest source of income for ACR in 2011.  "Primary" is a vague descriptive term, and therefore, the paragraph as worded is denied.

**The Member Defendants actively participated in the operations of ACR.**

41.    The Member Defendants actively participated in the operations of ACR.

> **ANSWER:**  Mr. Boyle denies this paragraph as to himself.

42.    As described in paragraphs 13, 20-23 above, Huyser developed the ACR "business model" and served as ACR's registered agent, managing member, and as the Authorized Member Representative.

> **ANSWER:**  Admitted.

43.    Huyser signed documents on behalf of ACR. He wrote and cashed checks on behalf of ACR and otherwise managed its financial accounts.

> **ANSWER:**  Admitted.

44.    Huyser managed much of the day-to-day operations of ACR, including contracting with the trucking company that transported, and mixed, the waste/diesel mixture.

> **ANSWER:**  Admitted.

45.    As described in paragraphs 14-28 above, Kinley served as Assistant Authorized Member Representative. He also aided in finding and communicating with digester operators for ACR as locations for ACR to deposit the waste/diesel mixture.

> **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

46.     In the first two quarters of 2011, Kinley worked 20-30 hours a week on ACR-related activities and, in the last two quarters of 2011, he worked 15-20 hours a week.

> **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

47.     As described in paragraphs 15-28 above, Boyle served as the Secretary of ACR.

> **ANSWER:**  Mr. Boyle admits that he was designated as the Secretary of ACR. This paragraph is otherwise denied.

48.     Boyle reviewed and checked the accounting books and records of ACR.

> **ANSWER:**  Denied.   No, I did not check the books and records.  Huyser has sole access to all financials, bank records, etc.  Late in the process, there was an IRS edit of the accounting records which was completely handled by Jim Huyser and the accounting firm he managed.  I was invited to the meeting after the audit was completed to hear a summary.  I was not present nor invited to the actual audit and meeting with the IRS agent.  This process of limited access was typical by Huyser.

49.     Boyle aided in finding and communicating with digester operators for ACR. He also communicated with suppliers of the ethanol waste purchased by ACR.

> **ANSWER:**  Mr. Boyle admits that this paragraph accurately describes in general terms some of his involvement in the ACR business.

50.     At times in 2011, Boyle worked as much as 30-40 hours a week on ACR business.

> **ANSWER:**  Mr. Boyle admits that there were certain times in 2011 when this statement was true.

51.     Carter also aided in finding and communicating with digester operators for ACR.

> **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or

information sufficient to form a response.

52.     Carter also found and communicated with suppliers of ethanol waste that ACR purchased as the base for the waste/diesel mixture.

> **ANSWER:** Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

53.     Throughout 2011, Carter was also the primary ACR contact working and communicating with ACR's tax advisor, Greg Sanderson.

> **ANSWER:** Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

**The Member Defendants, through ACR, wrongfully claimed and received over $19 million in alternative fuel credits from the United States.**

54.     The Member Defendants contracted with a certified public accountant ("CPA") to provide bookkeeping services and prepare and submit the paperwork to the IRS to claim the alternative fuel mixture tax credits.

> **ANSWER:** Mr. Boyle admits that Mr. Huyser, acting on behalf of ACR, contracted with a CPA to provide bookkeeping services and tax advice and submit paperwork to the IRS to claim the alternative fuel mixture tax credits. This paragraph is otherwise denied.

55.     To claim the credit, ACR's CPA reported the volume of fuel (in gallons) "sold" for use as fuel to digester operators and then calculated the credit at the value of $0.50 (50 cents) per gallon "sold."

> **ANSWER:** Admitted.

56.     The amount of the credit payment was based on the *volume* of waste/diesel mixture transported.

**ANSWER:**  Admitted.

57.     The Member Defendants caused ACR to submit claims to the IRS for alternative fuel mixture credit payments on an almost weekly basis throughout 2011.

> **ANSWER:**  Mr. Boyle denies that he personally did anything to cause ACR to submit claims to the IRS.  The remainder of this paragraph is denied due to lack of precise knowledge or information sufficient to form a response.

58.     By the end of 2011, ACR was filing claims with the IRS seeking hundreds of thousands of dollars of credits at a time.

> **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

59.     For example, on December 7, 2011, ACR claimed a credit of almost $800,000 for transporting 1.5 million gallons of its waste / diesel mixture.

> **ANSWER:**     Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

60.     In total, the Member Defendants caused ACR to submit over 40 claims to the IRS for waste/diesel mixture transported in 2011 and improperly received over **$19 million** from the United States' Treasury in alternative fuel mixture credits.

> **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

61.     All Member Defendants actively participated in the operations of ACR.

> **ANSWER:**  Denied.

## ACR WAS A SHAM CORPORATION AND ITS CORPORATE VEIL SHOULD BE PIERCED

62.     The Member Defendants formed ACR solely as a sham corporation to improperly claim federal alternative fix mixture credits and enrich themselves personally.

>       **ANSWER:** Denied.

63.     The ACR corporate form should be set aside, and its veil pierced, because it was undercapitalized from the start and throughout its operations, the Member Defendants failed to follow corporate formalities, Member Defendants transferred themselves ACR assets without fair consideration, and/or ACR was a sham corporation with no legitimate business purpose, as described below.

>       **ANSWER:**  This paragraph asserts legal conclusions for which no response is required.  To the extent any factual assertions are made, they are denied.

**When it was started, and throughout its operations, ACR was undercapitalized.**

64.     At the time ACR it commenced operations, the total net capital contributions from the Defendants for all of ACR's business operations was $250.

>       **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

65.     ACR was undercapitalized from the start of its operations because $250 is an insufficient amount of capital in relation to the nature and size of ACR operations and because ACR held an insufficient amount of capital to satisfy ACR's liabilities and expenses.

>       **ANSWER:** Denied.

66.     Throughout its active operations, ACR continued to be undercapitalized because, as alleged below, the Member Defendant caused ACR to make large distributions and other payments to themselves from ACR's net operating income.

>       **ANSWER:** Denied.

67.     For example, in 2011 ACR recorded in its books and records that it had $10.5 million of net operating income and the Defendants caused ACR to pay over $6 million to themselves during the same period.

>    **ANSWER:**    Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

68.     In 2012, in its books and records, ACR reported over $215,000 in net operating *loss* and yet the Defendants caused ACR to pay over $4 million to themselves that same year.

>    **ANSWER:**   Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

69.     Aside from the Defendants' net $250 in initial funding, the primary source of funds available to pay ACR's expenses were the millions of dollars that ACR received from the federal alternative fuel mixture credits it improperly claimed and received from the IRS.

>    **ANSWER:**  Denied.

**The Defendants failed to follow corporate formalities in operating ACR.**

70.     Throughout its operations, the Member Defendants did not follow corporate formalities required by Iowa law and the ACR Operating Agreement.

>    **ANSWER:**   This paragraph asserts legal conclusions for which no response is required.  To the extent any factual assertions are made, they are denied.

71.     Article 10.01 of the ACR Operating Agreement provides that ACR shall keep meeting minutes of the Company. But the Secretary of ACR, Kenneth Boyle, maintained no notes or minutes of meetings.

>    **ANSWER:**  Mr. Boyle refers to the ACR Operating Agreement for a complete and accurate statement of its contents.  Mr. Boyle does not recall a formal meeting of ACR in which minutes would have been prepared.  Thus, he denies the suggestion

that he willfully avoided maintenance of minutes of a formal meeting of ACR.

72.     Article 5.02 of the ACR Operating Agreement provides that members are not entitled to reimbursement of their capital contributions. But as described in paragraphs 30-35 above, in March 2011, Huyser issued checks to himself and to Carter, by making the checks payable to JWC, reimbursing themselves for their $2,000 capital contributions.

     **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

73.     Article 6.02 of the ACR Operating Agreement provides that distributions to members may be made of excess funds in amounts that do not jeopardize the company and that the Authorized Member Representative cannot make any distributions that would render ACR insolvent.

     **ANSWER:**  Mr. Boyle refers to the ACR Operating Agreement for a complete and accurate statement of its contents.

74.     As described in paragraphs 64-68 above, the Member Defendants caused ACR to make distributions in amounts that did economically jeopardize the company and which resulted in ACR's expenses exceeding its income thereby rending it insolvent.

     **ANSWER:**  Denied.

75.     ACR was required to file a Biennial Report with the Iowa Secretary of State.

     **ANSWER:**  This paragraph asserts legal conclusions for which no response is required.

76.     ACR filed Biennial Reports when they were due in 2011, 2013, 2015, 2017, and 2019.

     **ANSWER:**  Admitted based on the publicly available records from the Iowa

Secretary of State.  Mr. Boyle had no involvement in these filings.

77.     In 2021, ACR failed to file its next Biennial Report when it was due.  As a result, on September 7, 2021, the Iowa Secretary of State administratively dissolved ACR for failing to deliver the required Report.

>    **ANSWER**:  Admitted based on the publicly available records from the Iowa Secretary of State.  Mr. Boyle had no involvement in these filings.

78.     Upon administrative dissolution, ACR continues to exist as an entity, but, under Iowa law, only may carry on activities necessary to wind up its activities, liquidate assets, and notify persons and entities that may have claims against it.

>    **ANSWER**:  This paragraph asserts legal conclusions for which no response is required.

79.     ACR never took any steps to formally wind up its business under Iowa law.

>    **ANSWER**:  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

**The Member Defendants operated ACR as a sham corporation formed solely to claim and receive federal alternative fuel mixture credits.**

80.     ACR was a sham corporation formed to obtain alternative fuel mixture credits.

>    **ANSWER**:  Denied.

81.     From the time it was created to until its administrative dissolution, ACR never had any employees.

>    **ANSWER**:  Mr. Boyle admits that ACR never had any W-2 employees.

82.     ACR's purported personnel expenses consisted of contracting with accountants to claim tax credits and consultants to help it find additional operators to take its waste/diesel mixture.

>    **ANSWER**:  Mr. Boyle denies that these are "purported" expenses.

83.     All of ACR's purported personnel expenses were incurred to <u>increase</u> the amount of the federal tax credits it could claim and to facilitate receipt of those credit payments.

(a)     For example, ACR's contracted consultant sought out additional digester operators where it could deposit its waste/diesel mixture and accordingly increase the amount of alternative fuel mixture credits that ACR could claim and receive for transporting the mixture.

(b)     As another example, ACR's accountant was contracted to prepare and submit claims for the federal alternative fuel mixture credit calculated based on the volume of waste/diesel mixture transported.

**ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

84.     ACR never had a business premises of its own.

**ANSWER:**  Denied.

85.     From its founding until its administrative dissolution, ACR's "business address" was at 2047 Hickory Trail, Pella, Iowa 50219. This address is, and was, the home address of Defendant James Huyser. In March 2014, Huyser transferred title to this real property to the "James Huyser Revocable Trust" while he continues to reside there.

**ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

86.     The Member Defendants structured ACR's "business" operations to include a circular payment structure that resulted in no net funds exchanged and no actual sale of fuel taking place as described below.

**ANSWER:**  Mr. Boyle denies this paragraph as to himself.  As to how other defendants viewed the business operation structure, Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

87.     The Member Defendants structured ACR's operations so that:

a. ACR received a small fixed annual fee paid to them by its digester operators (the anaerobic digester operators that received and deposited the waste / diesel mixture at their facilities); and

b. This small fixed annual fee was <u>cancelled out</u> by an additional administrative fee paid by ACR to the same digester operators.

**ANSWER:**  Mr. Boyle denies this paragraph as to himself.  As to how other defendants viewed the business operation structure, Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

88.    For example, ACR charged a $950 fixed annual fee to one digester operator (purportedly to "purchase" the waste/diesel mixture) and then the same operator charged ACR a $950 administrative fee back thus offsetting ACR's charge. As a result, the fee paid by the operator plus the administrative fee paid by ACR resulted in a wash.

**ANSWER:**  Mr. Boyle admits that this paragraph is generally consistent with his understanding of how fees would be charged, but Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

89.    However, at the same time, ACR actually paid over a million dollars to digester operators just to receive and deposit the waste / diesel mixture at their facilities – so-called "disposal fees."

**ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

90.    In 2011, the Defendants structured ACR's operations so that ACR paid over <u>$1.6 million</u> to its operators to <u>take</u> the waste / diesel mixture (as described in paragraph 39(c) & 89), but ACR received only <u>$8,950.00</u> in fixed annual fees from the same operators for the purported "sale" of ACR's alternative fuel.

**ANSWER:**  Mr. Boyle denies this paragraph as to himself.  As to how other defendants viewed the business operation structure, Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

## THE MEMBER DEFENDANTS CAUSED ACR TO PAY MILLIONS IN IMPROPERLY CLAIMED TAX CREDITS TO THEMSELVES

91.     In March 2011, ACR began receiving payments from the United States' Treasury pursuant to the alternative fuel mixture credit claims it submitted to the IRS. The first tax credit checks issued to ACR were made payable to "Alternative Carbon Resources James Edward Huyser Mbr," and totaled over half a million dollars.

**ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

92.     James Huyser endorsed and deposited the checks into a checking account titled in the name of ACR.

**ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

93.     Between March 2011 and April 2012, and usually within a matter of days of receiving each tax credit payment from the IRS, the Member Defendants caused ACR to distribute the funds to themselves.

**ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

94.     While defendant Carter served as a member of ACR, Carter directed that all of the distributions payable to him personally were paid to defendant JWC, an entity that Carter organized and controlled.

> **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

95.     Huyser signed all the checks referred to above to himself, Kinley, Boyle, and Carter (by payment to JWC).

> **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

96.     For example, after ACR received large tax credit payments from the United States' Treasury in late October 2011, the Member Defendants caused ACR to pay themselves and JWC $700,000 over several days.

> **ANSWER:**  Mr. Boyle denies that he caused ACR to make any distribution payments.  As to the remainder of this paragraph, Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

97.     **Table 1** below is a true and correct summary of the tax credit deposits and subsequent payments to the Defendants between October 28 and November 3, 2011:

**Table 1: October 28 – Nov. 3, 2011 Payments**

| Date | Tax Credit Deposit | Payment Date | Payment Amt. | Recipient |
|---|---|---|---|---|
| 10/28/2011 | $ 590,062.50 | | | |
| 10/31/2021 | $ 590,775.00 | | | |
| | | 11/1/2011 | $ 50,000.00 | JWC |
| | | 11/1/2011 | $ 50,000.00 | Boyle |
| | | 11/1/2011 | $ 150,000.00 | Huyser |
| | | 11/1/2011 | $ 50,000.00 | Kinley |
| | | 11/2/2011 | $ 50,000.00 | JWC |
| | | 11/2/2011 | $ 50,000.00 | Huyser |
| | | 11/3/2011 | $ 100,000.00 | Huyser |
| | | 11/3/2011 | $ 100,000.00 | JWC |
| | | 11/3/2011 | $ 50,000.00 | Boyle |
| | | 11/3/2011 | $ 50,000.00 | Kinley |
| | | | $ 700,000.00 | |

> **ANSWER:** Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

98.     ACR ceased active operations by December 31, 2011, when the alternative fuel mixture credit then expired.

> **ANSWER:** Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

99.     By December 31, 2011, ACR stopped purchasing diesel fuel and ethanol waste, stopped hiring trucks to transport any waste/diesel mixture, and stopped making any deliveries to digester operators.

> **ANSWER:** Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

100.     Despite stopping operations, the Member Defendants caused ACR to pay themselves and JWC distributions from funds they continued to receive for the 2011 alternative fuel mixture credits improperly claimed.

{02101149.DOCX}

> **ANSWER:**  Mr. Boyle denies that he caused ACR to make any distribution payments.  As to the remainder of this paragraph, Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

101.    In late January 2012, ACR received a final $1.9 million alternative fuel mixture credit payment from the United States' Treasury in the form of two checks dated January 23, 2012 for $1,083,703 .00 and $849,257.50.

> **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

102.    From January to April 2012, the Member Defendants caused ACR to pay themselves (and in the case of Carter, JWC) over $4 million.

> **ANSWER:**  Mr. Boyle denies that he caused ACR to make any distribution payments.  As to the remainder of this paragraph, Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

103.    **Table 2** below is a true and correct summary of the tax credit deposits and subsequent payments to the Defendants bet ween from January 6 to April 2, 2012:

**Table 2: Jan. 6 -April 2, 2012 Payments**

| Date | Tax Credit Deposit | Payment Date | Payment Amt. | Recipient |
|---|---|---|---|---|
| | | 1/6/2012 | $ 100,000.00 | JWC |
| | | 1/6/2012 | $ 100,000.00 | Huyser |
| | | 1/6/2012 | $ 50,000.00 | Boyle |
| | | 1/6/2012 | $ 50,000.00 | Kinley |
| | | 1/11/2012 | $ 11,180.00 | Boyle |
| 1/13/2012 | $ 793,112.50 | | | |
| | | 1/24/2012 | $ 300,000.00 | JWC |
| | | 1/24/2012 | $ 300,000.00 | Huyser |
| 1/27/2012 | $ 1,932,960.50 | 1/27/2012 | $ 254,274.50 | Kinley |
| | | 1/27/2012 | $ 255,773.49 | Boyle |
| | | 1/27/2012 | $ 750,000.00 | JWC |
| | | 1/27/2012 | $ 750,000.00 | Huyser |
| | | 2/3/2012 | $ 225,000.00 | Huyser |
| | | 2/9/2012 | $ 450,000.00 | Huyser |
| | | 2/9/2012 | $ 50,000.00 | JWC |
| | | 2/9/2012 | $ 50,000.00 | Huyser |
| | | 2/9/2012 | $ 450,000.00 | JWC |
| | | 4/2/2012 | $ 30,000.00 | Kinley |
| | | 4/2/2012 | $ 30,000.00 | Boyle |
| | | 4/2/2012 | $ 65,000.00 | JWC |
| | | 4/2/2012 | $ 65,000.00 | Huyser |
| | | | $ 4,336,227.99 | |

> **ANSWER:** Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

104.    In total, in 2011 and 2012, the Member Defendants caused ACR to pay them , and JWC, *at least* $10 mill ion of the $19 million in federal tax credits claimed and received *(hereinafter* **"Transfers").**

> **ANSWER:** Mr. Boyle denies that he caused ACR to make any distribution payments.  As to the remainder of this paragraph, Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

105 .    In 2011, the Transfers to the Defendants were made in the following amounts:

a.         Over $2.5 million to Huyser;

b.         Over $2.5 million to Carter through payments to JWC;

c.          $500,000 to Kinley; and

d.          $500,000 to Boyle.

> **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

106.      In 2012, the Transfers to the Defendants were made in the following amounts:

a.          Over $1.7 million to Huyser;

b.          Over $1.7 million to Carter through payments to JWC;

c.          Over $300,000 to Kinley; and

d.          Over $300,000 to Boyle.

> **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

107.      The Member Defendants caused ACR to pay themselves, and JWC, *at least as much as $10 million*, but they may have transferred more of the $19 million in federal tax credit funds to themselves.

> **ANSWER:**  Mr. Boyle denies that he caused ACR to make any distribution payments.  As to the remainder of this paragraph, Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

108.      ACR never resumed active operations.

> **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

109.      As described in paragraphs 35, 41-53 & 104-107 above, the Member Defendants paid themselves at least $10 million after making only $250 in total contributions and performing day-to-day tasks for the corporation. The Member Defendants transferred ACR assets to

themselves for less than fair consideration.

> **ANSWER:** Denied, and Mr. Boyle refers to his responses to the paragraphs referenced above.

110.    Further, ACR was used as a vehicle to improperly obtain payments from the United States' Treasury through applications for alternative fuel mixture credits. The Member Defendants dissipated all of ACR's assets when they caused ACR to make payments to Huyser, Kinley, Boyle, and Carter (through payments to his alter ego JWC).

> **ANSWER:** Denied.

111.    The Member Defendants knew, or should have known, that ACR would not resume operations and the Transfers left ACR without assets to pay its creditors, including the United States.

> **ANSWER:** Denied.

112.    The Member Defendants actively participated in ACR corporate affairs and provided inadequate capitalization for ACR and its operations. The Member Defendants established and carried out ACR business operations which could not be sustained without the alternative fuel mixture credit payments. The Members Defendants used the ACR corporate form to enrich themselves and shield themselves from personal liability.

> **ANSWER:** Denied.

113.    The ACR corporate form, through the actions of the Member Defendants, was used to perpetrate an injustice on the United States by claiming and receiving over $19 million in improper alternative fuel mixture credits from the United States' Treasury and enriching the individual Member Defendants by making the large Transfers to themselves (and JWC) and leaving ACR unable to pay its debts to the United States.

**ANSWER:** Denied.

## ACR OWES OVER $70 MILLION TO THE UNITED STATES

**After the Defendants halted ACR's operations, the United States obtained a large money judgment against ACR for the improperly claimed alternative fuel mixture credits.**

114.    On April 18, 2014, a delegate of the Secretary of the Treasury made excise tax assessments against ACR in the amount of the improperly claimed alternative fuel mixture credits it had received, plus interest, and associated penalties.

> **ANSWER:** Mr. Boyle admits that one or more assessments were made against ACR, and he refers the Court to the assessment(s) for a complete and accurate statement of its contents.

115.    In March 2015, ACR filed a complaint in the U.S. Court of Federal Claims against the United States. In its suit, ACR sought a refund of a partial payment it made against the excise tax assessments (referenced in paragraph 114 above) in order to challenge its assessed tax liability. *See* Case No. 15-155, *Alternative Carbon Resources, LLC v. United States* (*hereinafter* the "**Refund Suit**").

> **ANSWER:** Mr. Boyle admits that ACR filed a complaint and refers the Court to the complaint for a complete and accurate statement of its contents.

116.    The United States responded to ACR's complaint in the Refund Suit and asserted its own counterclaim – seeking entry of a money judgment against ACR in the full amount of the assessed excise taxes plus penalties, less any prior payments based on the improperly obtained alternative fuel mixture credits.

> **ANSWER:** Mr. Boyle admits that the United States filed a response and refers the Court to the response for a complete and accurate statement of its contents.

**The Court of Federal Claims found that ACR was not entitled to alternative fuel mixture tax credits and was liable for $59,320,179.00 in tax and penalties.**

117.    Subsequently, the Court of Federal Claims entered summary judgment in favor of

the United States and against ACR in *Alternative Carbon Resources, LLC v. United States,* 137 Fed. Cl. 1 (2018) in the Refund Suit.

> **ANSWER:**  Mr. Boyle admits that a summary judgment order was entered and refers the Court to that order for a complete and accurate statement of its contents.

118.    In the Refund Suit, the Court of Federal Claims held that ACR failed to meet either of the two requirements for eligibility for the alternative fuel mixture credit because: (1) ACR's waste/diesel mixture was not *used* as fuel; and (2) ACR's waste/diesel mixture was not *sold* as fuel. 137 Fed. Cl. at 26-29.

> **ANSWER:**  Mr. Boyle admits that the Court of Federal Claims issued an order resolving the Refund Suit, and he refers the Court to that opinion for a complete and accurate statement of its contents.

119.    In the Refund Suit, the Court of Federal Claims further found that the "alternative fuel mixture credit suppl[ied] the profit motive for [ACR's] business model, but [ACR's] transactions were not bona fide sales supported by consideration." 137 Fed. Cl. at 28.

> **ANSWER:**  Mr. Boyle admits that the Court of Federal Claims issued an order resolving the Refund Suit, and he refers the Court to that opinion for a complete and accurate statement of its contents.

120.    In the Refund Suit, on March 28, 2018, the Court of Federal Claims reduced the federal excise tax assessments to judgment and entered an amended judgment against ACR in the amount of **$59,320,179.00** (the "**Federal Claims Judgment**") – less payments made and plus statutory interest and additions accruing according to law. This judgment consists of **$19,773,393.00 in excise taxes assessed** pursuant to 26 U.S.C. §§ 6206 & 6427 (for the improperly claimed credits / credit payments received) and **$39,546,786.00 in excessive claim penalties**

assessed pursuant to 26 U.S.C. §§ 6206 & 6675 (calculated at 200% of the improperly claimed credits).

> **ANSWER:**  Mr. Boyle admits that the Court of Federal Claims issued an order resolving the Refund Suit, and he refers the Court to that opinion for a complete and accurate statement of its contents.

121.   ACR appealed the Federal Claims Judgment and, on September 26, 2019, the United States Court of Appeals for the Federal Circuit <u>affirmed</u> the judgment entered against ACR in the Refund Suit in *Alternative Carbon Resources, LLC v. United States,* 939 F.3d 1320 (Fed. Cir. 2019).

> **ANSWER:**  Mr. Boyle admits that the Federal Circuit issued an opinion in the Refund Suit, and he refers the Court to that opinion for a complete and accurate statement of its contents.

122.   As of the date of this complaint, <u>the outstanding balance of the Federal Claims Judgment against ACR is over $70 million (including interest)</u>.

> **ANSWER:**  Mr. Boyle admits that the judgment against ACR is outstanding but he lacks sufficient information to admit or deny the total amount outstanding.

**The Defendants actively participated in the Refund Suit litigation.**

123.   Defendants Huyser, Carter, Kinley, and Boyle were members of ACR throughout the Refund Suit and the appeal to the Court of Federal Claims.

> **ANSWER:**  Admitted.

124.   Huyser, Carter, Kinley, and Boyle actively participated in the Refund Suit.

> **ANSWER:**  Mr. Boyle denies this paragraph because "actively participated" is a vague allegation.

125.   In the Refund Suit, Huyser and other Member Defendants participated in seeking

out and hiring counsel for ACR; aided in selecting and hiring expert witnesses; aided in making decisions in the litigation; aided counsel in drafting and responding to discovery requests; and authorized and contributed funds for payments of legal fees to ACR's counsel.

> **ANSWER:**  Mr. Boyle states that the substance of these allegations invades the attorney-client privilege, and therefore, this paragraph is denied.  This paragraph is also vague as to what is meant with each predicate act of participation or making decisions.

126.    Huyser, Kinley, and Boyle also aided in responding to discovery requests issued by the United States to ACR in the Refund Suit and provided responsive documents to ACR's attorneys.

> **ANSWER:**  Mr. Boyle admits that he reviewed drafts of discovery requests and provided documents.  Mr. Boyle denies the remainder of this paragraph due to lack of precise knowledge or information sufficient to form a response.

127.    Defendant Huyser signed April 2016 interrogatory responses in his role as a Member of ACR in the Refund suit.

> **ANSWER:**  Admitted.

128.    Defendants Kinley and Carter (through JWC) also produced documents in response to Rule 45 subpoenas in the Refund Suit.

> **ANSWER:**  Admitted.

129.    Defendants Huyser, Carter, Kinley, and Boyle, sat for depositions and gave testimony under oath in the Refund Suit.

> **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

130.    Defendants Huyser, Carter, Kinley, and Boyle executed affidavits submitted in support of ACR's two motions for summary judgment in the Refund Suit.

> **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

131.    In the Refund Suit, Huyser and the other individual Defendants participated in the decision to appeal the Federal Claims Judgment and participated in the appeal process.

> **ANSWER:**  Mr. Boyle denies this paragraph because the content of this paragraph invades the attorney-client privilege.  Further, it is vague as to what is meant by "participated in the appeal process."

132.    Since entry of the Federal Claims Judgment against ACR was affirmed by the Federal Circuit in 2019, ACR has not made any payments towards the outstanding Federal Claims judgment.

> **ANSWER:**  Admitted.

## ALTERNATIVELY, THE FUNDS DEFENDANTS RECEIVED FROM ACR WERE FRAUDULENT TRANSFERS AS TO THE UNITED STATES

### The Transfers made by ACR to the Defendants were fraudulent because they were made with actual intent to hinder, delay, or defraud.

133.    As set forth in paragraphs 104-107 above, in 2011 and 2012, ACR made at least $10 million in transfers to its members (the "**Transfers**") in the form of payments made to Huyser, Kinley, Boyle, and Carter (through his alter ego, JWC).

> **ANSWER:**  Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

134.    The ACR Transfers to the Defendants were fraudulent because they were made with actual intent to hinder, delay, or defraud the United States as shown below.

**ANSWER:**  Denied.

### *The Transfers Were Made to ACR Insiders*

135.    The ACR Transfers were all made to ACR insiders.

   **ANSWER:**  This paragraph states a legal conclusion to which no response is required.

136.    Huyser, Kinley, and Boyle are insiders as each served as officers of ACR.

   **ANSWER:**  This paragraph states a legal conclusion to which no response is required.

137.    Huyser, Carter, Kinley, and Boyle, as ACR's sole members, also constitute insiders in control of ACR.

   **ANSWER:**  This paragraph states a legal conclusion to which no response is required.

138.    Carter indirectly received transfers of funds as a member of ACR with control over the corporation. He directed that his payments be made to JWC – the entity he created and exclusively controlled. For this reason, any transfers to JWC were transfers due to Carter, an insider.

   **ANSWER:**  This paragraph states a legal conclusion to which no response is required.

### *The Transfers Constituted Substantially All of ACR's Assets*

139.    The ACR Transfers to the Defendants constituted substantially all of ACR's assets.

   **ANSWER:**  Admitted.

140.    As described paragraphs 67-68 above, by 2012, the Transfers to the Defendants exceeded the net operating income of ACR resulting in a net operating loss.

   **ANSWER:**  Admitted.

141.     ACR's cash on hand constituted its only asset. ACR transferred substantially all of its assets through the Transfers and, afterwards, ACR had insufficient cash on hand to pay for its legal and accounting fees.

**ANSWER:**  Denied.

142.     For example, <u>in September 2013</u>, Huyser contacted Kinley, Boyle, and Carter to raise $100,000 for ACR accounting and legal fees. At this time, ACR did not have sufficient assets available to pay these expenses.

**ANSWER:**  Mr. Boyle admits that in September 2013 he was contacted by Huyser to raise money for ACR's accounting and legal fees, and ACR did not have sufficient cash at that time to pay for those expenses.  This paragraph is otherwise denied.

143.     In 2014, Boyle and Huyser initiated a lawsuit in Iowa state court against Carter and JWC demanding Carter pay a share of ACR accounting and legal expenses incurred over the previous year.

**ANSWER:**  Mr. Boyle admits that he initiated a lawsuit against Carter and JWC, and he further refers to the filings in the lawsuit for a complete and accurate statement of its contents

*The Transfers Were Not For Reasonably Equivalent Value*

144.     The ACR Transfers were made to the Defendants without ACR receiving reasonably equivalent value in exchange from the Defendants because:

a.     As alleged above, Huyser actually contributed $0 to ACR for his membership interest and then directed over $4 million to himself from ACR.

b.     As alleged above, Carter actually contributed $0 to ACR for his membership

interest and then directed over $4 million paid to his limited liability company, JWC.

      c.      Kinley made a single $250 capital contribution to ACR for his membership interest and then directed over $800,000 in paid to himself from ACR.

      d.      Boyle did not make *any* capital contribution for his membership interest and then directed over $800,000 paid to himself from ACR.

> **ANSWER:**   Mr. Boyle denies the premise that a business organization's distribution to its members must be matched with "reasonably equivalent value." As to the specific allegations, Mr. Boyle denies that he directed any distributions to himself from ACR. He denies the remainder of this paragraph due to lack of precise knowledge or information sufficient to form a response.

145.     The (at least) $10 million transferred to Huyser, Kinley, Boyle, and Carter (through payments to JWC) was not of reasonably equivalent value for any work the Member Defendants performed for ACR *nor* reasonably equivalent value for the net $250 in capital contributions made by the Defendants to ACR.

> **ANSWER:**   Mr. Boyle denies the premise that a business organization's distribution to its members must be matched with "reasonably equivalent value." As to the specific allegations, Mr. Boyle denies that he directed any distributions to himself from ACR. He denies the remainder of this paragraph due to lack of precise knowledge or information sufficient to form a response.

### *The Transfers Rendered ACR Insolvent*

146.     ACR was insolvent or became insolvent shortly after the Transfers were made to the Defendants.

> **ANSWER:** Denied.

147.    Absent the federal tax credits improperly claimed and received, ACR was insolvent as of the end of the first quarter of 2011 (March 31, 2011) and continued to be insolvent through the final quarter of 2012 (December 31, 2012).

> **ANSWER:**  Denied.

148.    Absent the federal tax credits claimed and received, as of the end of the first quarter of 2011 and the final quarter of 2012, ACR had inadequate cash flow, and inadequate borrowing capacity, to meet their obligations as they came due.

> **ANSWER:**  Denied.

149.    Further, as described above in paragraphs 67-68 above, the ACR Transfers to the Defendants constituted a transfer of substantially all of ACR's assets.

> **ANSWER:**  Denied.

150.    At the time of Transfers, or soon thereafter, ACR's debts and liabilities, including the large federal tax liabilities that arose upon ACR's improper receipt of the federal tax credits, exceeded ACR's assets.

> **ANSWER:**  This paragraph asserts legal conclusions for which no response is required.  To the extent any factual assertions are made, they are denied.

### *The Transfers Were Made Shortly After ACR Incurred a Substantial Debt*

151.    At the time ACR (directed by the Member Defendants), improperly claimed and received the credit for the alternative fuel mixture, it became liable to the United States for the amount of each tax credit payment made to ACR.

> **ANSWER:**  This paragraph asserts legal conclusions for which no response is required.  To the extent any factual assertions are made, they are denied.

152.    ACR submitted its first claim to the IRS in February 2011. ACR received its first tax credit payment by check dated March 23, 2011, which was deposited in an ACR account on

March 26, 2011.

>**ANSWER:** Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

153. ACR submitted its final claim to the IRS on or about January 9, 2012 for waste/diesel mixture transported through December 31, 2011 and deposited its final tax credit check on or about January 27, 2012.

>**ANSWER:** Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

154. From on or around March 26, 2011 (the date of ACR's first tax credit payment was received and deposited) onward, ACR had incurred a substantial tax debt in the amount of the federal alternative fuel mixture credits it improperly claimed and received, and continued to improperly claim and receive.

>**ANSWER:** This paragraph asserts legal conclusions for which no response is required. To the extent any factual assertions are made, they are denied.

155. As described in paragraph 60 above, in total, ACR improperly claimed and received over $19 million in federal tax credit payments.

>**ANSWER:** This paragraph asserts legal conclusions for which no response is required. To the extent any factual assertions are made, they are denied.

156. Further, as detailed in Tables 1 & 2 above, ACR, controlled by the Member Defendants, made larges distributions and payments to its Members at or around the time it received each of the federal tax credit deposits.

>**ANSWER:** Mr. Boyle denies that he caused ACR to make any distribution payments. As to the remainder of this paragraph, Mr. Boyle denies this paragraph

{02101149.DOCX}

due to lack of precise knowledge or information sufficient to form a response.

157.     Accordingly, ACR, at the direction of the Member Defendants, made the Transfers shortly *after* ACR had incurred a substantial debt due to the United States.

> **ANSWER:**  This paragraph asserts legal conclusions for which no response is required.  To the extent any factual assertions are made, they are denied.  Mr. Boyle specifically denies that he caused ACR to make any distribution payments.  As to the remainder of this paragraph, Mr. Boyle denies this paragraph due to lack of precise knowledge or information sufficient to form a response.

**The Transfers made by ACR to the Defendants were also constructively fraudulent because they were made without receiving a reasonably equivalent value in exchange.**

158.     As described in paragraphs 144-145 above, ACR's transfer of funds to the Defendants was also constructively fraudulent as to its creditor the United States because the large distributions were made without ACR receiving a reasonably equivalent value in exchange for the transfer and ACR would incur, or reasonably should have believed it would incur, debts beyond its ability to pay.

> **ANSWER:**  This paragraph asserts legal conclusions for which no response is required.  To the extent any factual assertions are made, they are denied.

159.     At the time of the Transfers, ACR, and its Defendant members, knew it would incur, or reasonably should have believed it would incur, debts beyond its ability to pay because:

a.     As soon as it began claiming alternative fuel mixture credits in February 2011, ACR, and the Member Defendants, knew, or reasonably should have known, that ACR may have incurred debts to the United States for any improper tax credit funds claimed and received.

b.     In June 2011, ACR received a detailed questionnaire from the IRS about its business operations regarding its qualifications for the alternative fuel mixture credit.

c.      On July 6, 2011, Huyser forwarded a copy of the IRS questionnaire to ACR members Boyle and Kinley by email. In response, Boyle emailed Kinley: "Very pointed questions! I can't imagine this is a positive event for ACR."

d.      On August 19, 2011, the IRS issued an IRS Chief Counsel Advisory Letter (dated July 12, 2011) stating that alternative fuel mixtures deposited in anaerobic digester tanks were not "used as fuel" under 26 U.S.C. § 6426, and, therefore, were not eligible for the alternative fuel mixture credit. IRS Chief Counsel Advisory, IRS CCA 2011133010, 2011 WL 3636293 (July 12, 2011).

e.      At or around the time it was issued, ACR and the Member Defendants were aware of the IRS August 19, 2011 Chief Counsel Advisory Letter and its contents and yet continued to improperly claim and receive alternative fuel mixture credits throughout 2011.

f.      The Member Defendants continued to direct transfers to themselves, and JWC, in 2012 (*supra* Table 2) when the alternative fuel mixture credit was no longer available and ACR no longer had any income in the form of the tax credit payments.

> **ANSWER:**  This paragraph asserts legal conclusions for which no response is required.  To the extent any factual assertions are made, they are denied.

160.    Under these circumstances, ACR, and the Member Defendants, reasonably should have believed that, at the time of Transfers, ACR would incur debts beyond its ability to pay as they became due.

> **ANSWER**: Denied.

## COUNT I: Claim Against James Huyser

161.    The United States incorporates the allegations made in paragraphs 1- 13, 18-160 above.

**ANSWER:** Mr. Boyle incorporates his responses to the paragraphs referenced above.

162.     Because, as described in paragraphs 25-131 above, ACR operated as shell, served no legitimate business purpose, and was primarily used as a vehicle to promote injustice (in improperly obtaining alternative fuel mixture credits to enrich the Member Defendants), the United States is entitled to a judgment setting aside the corporate form and piercing the corporate veil of ACR to collect the Federal Claims Judgment against the individual members of ACR, including Defendant Huyser.

**ANSWER:** The allegations contained in Paragraph 162 are not directed to Mr. Boyle. To the extent any factual allegations are made against Mr. Boyle, they are denied for lack of precise knowledge or information sufficient to form a response.

163.     In the alternative, the Transfers to Huyser, described in paragraphs 133-160, were fraudulent transfers as to the United States because the Transfers were made with actual intent to hinder, delay, or defraud the United States and/or because the Transfers were constructively fraudulent because they were made to Huyser without ACR receiving a reasonably equivalent value in exchange and ACR would incur, or reasonably should have believed it would incur, debts beyond its ability to pay.

**ANSWER:** The allegations contained in Paragraph 163 are not directed to Mr. Boyle. To the extent any factual allegations are made against Mr. Boyle, they are denied for lack of precise knowledge or information sufficient to form a response.

164.     The United States is entitled to hold Huyser liable and obtain a money judgment against him in the amount of the funds he received as a fraudulent transferee.

**ANSWER:** The allegations contained in Paragraph 164 are not directed to Mr.

Boyle. To the extent any factual allegations are made against Mr. Boyle, they are denied for lack of precise knowledge or information sufficient to form a response.

## COUNT II: Claim Against Matthew Kinley

165.    The United States incorporates the allegations made in 1-12, 14 & 18- 160 above.

**ANSWER:**  Mr. Boyle incorporates his responses to the paragraphs referenced above.

166.    Because, as described in paragraphs 25-131 above, ACR operated as a mere shell, served no legitimate business purpose, and was primarily used as an intermediary to promote injustice (in improperly obtaining alternative fuel mixture credits to enrich the Member Defendants), the United States is entitled to a judgment setting aside the corporate form and piercing the corporate veil of ACR to collect the Federal Claims Judgment against the individual members of ACR, including Defendant Kinley.

**ANSWER:**    The allegations contained in Paragraph 166 are not directed to Mr. Boyle. To the extent any factual allegations are made against Mr. Boyle, they are denied for lack of precise knowledge or information sufficient to form a response.

167.    In the alternative, the Transfers to Kinley, described in paragraphs 133-160, constituted fraudulent transfers as to the United States because the Transfers were made with actual intent to hinder, delay, or defraud the United States and/or because the Transfers were constructively fraudulent because they were made to Kinley without ACR receiving a reasonably equivalent value in exchange and ACR would incur, or reasonably should have believed it would incur, debts beyond its ability to pay.

**ANSWER:**    The allegations contained in Paragraph 167 are not directed to Mr. Boyle. To the extent any factual allegations are made against Mr. Boyle, they are

denied for lack of precise knowledge or information sufficient to form a response.

168.    The United States is entitled to hold Kinley liable and obtain a money judgment against him in the amount of the funds he received as a fraudulent transferee.

> **ANSWER:**    The allegations contained in Paragraph 168 are not directed to Mr. Boyle. To the extent any factual allegations are made against Mr. Boyle, they are denied for lack of precise knowledge or information sufficient to form a response.

## COUNT III: Claim Against Kenneth Boyle

169.    The United States incorporates the allegations made in paragraphs 1- 12, 15 & 18-131 above.

> **ANSWER:**    Mr. Boyle incorporates his responses to the paragraphs referenced above.

170.    Because, as described in paragraphs 25-131 above, ACR operated as a mere shell, served no legitimate business purpose, and was primarily used as an intermediary to promote injustice (in improperly obtaining alternative fuel mixture credits to enrich the Member Defendants), the United States is entitled to a judgment setting aside the corporate form and piercing the corporate veil of ACR to collect the Federal Claims Judgment against the individual members of ACR, including Defendant Boyle.

> **ANSWER:**  Denied.

171.    In the alternative, the Transfers to Boyle, described in paragraphs 133-160, constituted fraudulent transfers as to the United States because the Transfers were made with actual intent to hinder, delay, or defraud the United States and/or because the Transfers constructively fraudulent because they were made to Boyle without ACR receiving a reasonably equivalent value in exchange and ACR would incur, or reasonably should have believed it would incur, debts

beyond its ability to pay.

**ANSWER:**  Denied.

172.     The United States is entitled to hold Boyle liable and obtain a money judgment against him in the amount of the funds he received as a fraudulent transferee.

**ANSWER:**  Denied.

**COUNT IV: Claim Against JWC Investments, L.C. and Jeffrey W. Carter**

173.     The United States herein incorporates the allegations made in paragraphs 1-12 & 16-160 above.

**ANSWER:**     The allegations contained in Paragraph 173 are not directed to Mr. Boyle. To the extent any factual allegations are made against Mr. Boyle, they are denied for lack of precise knowledge or information sufficient to form a response.

**Carter operated JWC as his alter ego**

174.     JWC is an Iowa limited liability company formed by Jeffrey W. Carter in 2008. Carter serves as its registered agent and is a member.

**ANSWER:**     The allegations contained in Paragraph 174 are not directed to Mr. Boyle. To the extent any factual allegations are made against Mr. Boyle, they are denied for lack of precise knowledge or information sufficient to form a response.

175.     As described in paragraphs 23-28 & 94 above, Jeffrey W. Carter individually served as a member of ACR, and Carter directed that ACR transmit his share of member distributions payable to JWC.

**ANSWER:**     The allegations contained in Paragraph 175 are not directed to Mr. Boyle. To the extent any factual allegations are made against Mr. Boyle, they are denied for lack of precise knowledge or information sufficient to form a response.

176. To the extent JWC received Carter's individual member distributions from ACR, JWC received those distributions as the alter ego of Carter.

> **ANSWER:**   The allegations contained in Paragraph 176 are not directed to Mr. Boyle. To the extent any factual allegations are made against Mr. Boyle, they are denied for lack of precise knowledge or information sufficient to form a response.

177. JWC is the alter ego of Carter because Carter alone influenced and governed the operations of JWC as its sole controlling member and remained in control and retained possession of the funds even after transfer to JWC.

> **ANSWER:**   The allegations contained in Paragraph 177 are not directed to Mr. Boyle. To the extent any factual allegations are made against Mr. Boyle, they are denied for lack of precise knowledge or information sufficient to form a response

178. JWC is the alter ego of Jeffrey Carter as further shown below.

a. Carter personally made decisions about what entrepreneurial business ventures he wanted to join and used JWC and JWC funds to make such investments.

b. Carter controlled JWC funds and assets and chose to use $1,000 from JWC funds to make half of his personal $2,000 capital contribution to ACR (described in paragraphs 31 & 32 above).

c. Carter determined what funds he would receive as income from JWC.

d. Carter used JWC as a holding company for his own personal real property. For example, in 2011, Carter arranged for legal title of his personal residence at 9475 Lincoln Avenue in Clive, Iowa, 50325 (the "Lincoln Avenue Property") to be transferred to JWC in 2011 for no consideration. In 2021, Carter caused JWC to transfer legal title of the Lincoln Avenue Property back to himself. Yet, between 2011 and 2021, up until the present, Carter and/or his family

{02101149.DOCX}

continued to reside at the Lincoln Avenue Property uninterrupted.

> **ANSWER:**   The allegations contained in Paragraph 178 are not directed to Mr. Boyle. To the extent any factual allegations are made against Mr. Boyle, they are denied for lack of precise knowledge or information sufficient to form a response.

**Carter and his alter ego JWC should be held jointly and severally liable for the debts of ACR**

179.    As described in paragraphs 25-131 above, because ACR operated as a mere shell, served no legitimate business purpose, and was primarily used as a vehicle to promote injustice (in improperly obtaining alternative fuel mixture credits to enrich the Member Defendants), the United States is entitled to a judgment setting aside the corporate form and piercing the corporate veil of ACR to collect the Federal Claims Judgment against the individual members of ACR, including Defendant Carter and his alter ego entity JWC.

> **ANSWER:**   The allegations contained in Paragraph 179 are not directed to Mr. Boyle. To the extent any factual allegations are made against Mr. Boyle, they are denied for lack of precise knowledge or information sufficient to form a response.

180.    In the alternative, the ACR transfers to JWC, made at the direction of Carter, as set forth above in paragraphs 133-160 above, constituted fraudulent transfers as to the United States because the Transfers were made with actual intent to hinder, delay, or defraud the United States and/or because the Transfers were constructively fraudulent because they were made without ACR receiving a reasonably equivalent value in exchange and ACR would incur, or reasonably should have believed it would incur, debts beyond its ability to pay.

> **ANSWER:**   The allegations contained in Paragraph 180 are not directed to Mr. Boyle. To the extent any factual allegations are made against Mr. Boyle, they are

denied for lack of precise knowledge or information sufficient to form a response.

181.     The United States is entitled to hold Carter, and his alter ego JWC, liable and obtain a money judgment against JWC and Carter, jointly and severally, in the amount of the funds Carter received as a fraudulent transferee and then directed to JWC.

> **ANSWER:**   The allegations contained in Paragraph 181 are not directed to Mr. Boyle. To the extent any factual allegations are made against Mr. Boyle, they are denied for lack of precise knowledge or information sufficient to form a response.

182.     In the event the Court finds that JWC (and not Carter individually) served as a member of ACR and that JWC is not the alter ego of Carter, the United States alternatively seeks a money judgment against JWC as a member and fraudulent transferee of ACR.

> **ANSWER:**   The allegations contained in Paragraph 182 are not directed to Mr. Boyle. To the extent any factual allegations are made against Mr. Boyle, they are denied for lack of precise knowledge or information sufficient to form a response.

## **AFFIRMATIVE DEFENSES**

Defendant Kenneth Boyle states the following affirmative defenses:

1.     The Plaintiff's claims are barred, in whole or in part, by the applicable statute(s) of limitations.

2.     The Plaintiff's claims are barred, in whole or in part, by the equitable doctrine of laches.

3.     Mr. Boyle reserves the right to allege additional affirmative defenses as discovery occurs.

THE WEINHARDT LAW FIRM

By  /s/ Todd M. Lantz
    Todd M. Lantz               AT0010162
    2600 Grand Avenue, Suite 450

{02101149.DOCX}

Des Moines, IA  50312
Telephone: (515) 244-3100
E-mail:tlantz@weinhardtlaw.com

ATTORNEYS FOR DEFENDANT
KENNETH BOYLE

PROOF OF SERVICE

The undersigned certifies that the foregoing instrument
was served upon the parties to this action by serving a
copy upon each attorney of record on June 16, 2023 by
CM/ECF.

Signature:     /s/ Lisa Murrill
            _____

{02101149.DOCX}