## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

JAMES HUYSER,
MATTHEW KINLEY,
KENNETH BOYLE,
JEFFREY W. CARTER, *and*
JWC INVESTMENTS, L.C.,

    Defendants.

Case No. 4:23-cv-00144-SHL-WPK

## BRIEF IN SUPPORT OF UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT APPLYING ISSUE PRECLUSION & FINDING JWC INVESTMENTS LC IS THE ALTER EGO OF JEFFREY W. CARTER

Respectfully submitted,

DAVID A. HUBBERT
Deputy Assistant Attorney General

/s/ Gretchen Ellen Nygaard
GRETCHEN ELLEN NYGAARD
D.C. Bar No. 1006292
ALLISON RICE
D.C. Bar No. 1671160
WILLIAM CHANG
D.C. Bar No. 1030057
Trial Attorneys, Tax Division
Department of Justice
P.O. Box 7238, Ben Franklin Station
Washington, D.C.
Telephone: 202-305-1672
Fax: 202-514-6770
Gretchen.E.Nygaard@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

I.     INTRODUCTION ............................................................................................. 1

II.    SUMMARY OF FACTUAL BACKGROUND ................................................. 3

   A.  The Defendants formed and operated the entity ACR to claim
alternative fuel mixture credits. .......................................................................... 3

   B.  The Court of Federal Claims adjudged that ACR improperly claimed
and received $19 million in alternative fuel mixture credits and found
ACR liable for an additional $39 million in excessive claim penalties. ...... 4

   C.  The Court of Federal Claims held that ACR's mixtures were not used
as a fuel, that ACR did not sell its fuel, and that ACR did not have
reasonable cause to claim the tax credits. .......................................................... 6

   D.  Jeffrey W. Carter maintained absolute control over his investment
entity, JWC Investments LC, and operated it as his alter ego. .................... 7

III.   ARGUMENT ..................................................................................................... 9

   A.  Defendants are precluded from relitigating the same issues of fact
and law actually litigated and determined in the Refund Suit under the
doctrine of issue preclusion, also known as collateral estoppel. ................. 9

      1.    Element 1 - The Defendants here are in privity with ACR, the Plaintiff in
the Refund Suit. ................................................................................................. 11

      2.    Element 2 - The facts determined on the Fuel Issue, Sale Issue, and
Penalty issue in the Refund Suit are the same facts that are relevant to the
United States' claims to pierce the veil and/or to set aside fraudulent transfers
in this case. ......................................................................................................... 25

      3.    Element 3 - The issues subject of preclusion were actually litigated in the
Refund Suit. ....................................................................................................... 34

      4.    Element 4 - The issues subject of preclusion here were determined by a
valid and final judgment in the Refund Suit....................................................... 35

      5.    Element 5 - The determination of the issues subject of preclusion were
essential to the judgment in the Refund Suit. .................................................... 35

6.    In conclusion, all five elements of issue preclusion are present with respect to the Defendants.................................................................... 36

**B.  Defendant JWC is the alter ego of Defendant Jeffrey W. Carter and, because of this, Carter and JWC should be treated as one and the same in this litigation and for purposes of issue preclusion in this case. ......... 37**

1.    Carter and JWC have jointly, and conclusively, admitted that Carter individually served as a member of ACR. .......................................... 37

2.    JWC is the alter ego of Carter and the Court should find there is no legal distinction between Defendants Carter and JWC for application of both issue preclusion here and liability at trial. ................................. 38

**IV.    CONCLUSION ................................................................................. 49**

# TABLE OF AUTHORITIES

## Cases

*Adam v. Mt. Pleasant Bank & Tr. Co.,* 355 N.W. 2d 868 (Iowa 1984)........... 40, 41, 47

*Algreen v. Gardner*, 2018 WL 3057438, 919 N.W.2d 768 (Table) (Iowa Ct. App. 2018) .................................................................................................................... 27

*Allen v. McCurry,* 449 U.S. 90 (1980)..................................................... 11, 23

*Al-Sabah v. World Bus. Lenders, LLC,* 2023 WL 6541249  (D. Md. 2023)............... 18

*Alt. Carbon Resources LLC v. United States,* Case No. 15-155T, 137 Fed. Cl. 1 (Fed. Cl. 2018)........................................................................................ *passim*

*Alt. Carbon Resources LLC v. United States*, 939 F.3d 1320 (Fed. Cir. 2019) .. *passim*

*ARcare Inc. v. Qiagen N. Am. Holdings, Inc.*, 2018 WL 337749 (E.D. Ark. 2018).... 13

*Briggs Transp. Co. v. Starr Sales Co.*, 262 N.W. 2d 805 (Iowa 1978)...................... 26

*Butler v. Moore*, 2015 WL 1409676 (D. Mass. 2015) ................................... 19

*Century Hotels v. United States,* 952 F.2d 107 (5th Cir. 1992)................................. 39

*Columbine Shipping, Inc. v. China Metallurgical Imp. & Exp. Corp.*, 1998 WL 23229 (S.D.N.Y. 1998) ........................................................................ 45

*Comm'r v. Sunnen*,  333 U.S. 591 (1948) ................................................ 25

*Cont'l W. Ins. v. Fed. Hous. Fin. Agency*, 83 F. Supp. 3d 828 (S.D. Iowa 2015).. 13, 16

*Cornice & Rose Int'l v. Four Keys, LLC*, 76 F.4th 1116 (8th Cir. 2023)...................... 9

*Crest Hill Land Development LLC v. City of Joliet,* 396 F.3d 801 (7th Cir. 2005).... 37

*Davis v. A.G. Edwards & Sons, Inc.,* 823 F.2d 105 (5th Cir. 1987) .................... 22, 37

*Eckhardt v. United States,* 463 Fed. Appx. 852 (11th Cir. 2012).............................. 40

*Flanagan Corp. v. Lake Cabin Partners, LLC*, 2019 WL 13254093 (Iowa Dist. May 23, 2019) ........................................................................................ 45

*Fofana v. Mayorkas*, 4 F.4th 668 (8th Cir. 2021) ....................................... 33

*Gen. Elect. Med. Sys. Eur. v. Prometheus Health*, 394 F. Appx. 280 (6th Cir. 2010) 34

iv

*Gen. Foods Corp. v. Mass. Dept. of Pub. Health*, 648 F.2d 784 (1st Cir. 1981) ......... 14

*Griswold v. County of Hillsborough*, 598 F.3d 1289 (11th Cir. 2010) ....................... 18

*Grynberg v. Bar S Services, Inc.*, 527 Fed. Appx. 736 (10th Cir. 2013) .................... 37

*Heartland Academy Community Church v. Waddle*, 595 F.3d 798 (8th Cir. 2010).. 10

*Hinson v. United States*, 994 F.2d 843 (Table) (8th Cir. 1993)...................... 38, 39, 40

*HOK Sport, Inc. v. FC Des Moines, L.C.*, 495 F.3d 927 (8th Cir. 2007).. 26, 27, 38, 39, 40, 41

*Horton Dairy, Inc. v. United States*, 986 F.2d 286 (8th Cir.1993) ........... 39, 40, 45, 46

*In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 54 F.4th 912 (6th Cir. 2022) ................................................................................................................. 23

*In re Gottheiner*, 703 F.2d 1136 (9th Cir. 1983) ........................................................ 18

*In re Keaty*, 397 F.3d 264 (5th Cir. 2005)................................................................... 33

*John Morrell & Co. v. Loc. Union 304A of United Food & Com. Workers, AFL-CIO*, 913 F.2d 544 (8th Cir. 1990) ................................................................................. 34

*Keith Smith, Inc. v. Bushman,* 873 N.W. 2d 776 (Table), 2015 WL 8364910 (Iowa Ct. App. 2015)............................................................................................................ 47

*Kreager v. Gen. Elec. Co.*, 497 F.2d 468 (2d Cir. 1974)............................................. 18

*Lakota Girl Scout Council, Inc. v. Havey Fund–Raising Mgmt., Inc.*, 519 F.2d 634 (8th Cir. 1975) ...................................................................................................... 27

*Lane v. Peterson*, 899 F.2d 737  (8th Cir. 1990)......................................................... 25

*Levitt v. Comm'r*, 1995 WL 570439 (Tax Ct. 1995) .................................................... 18

*Mandich v. Watters,* 970 F.2d 462 (8th Cir. 1992) ..................................................... 35

*Midwest Disability Initiative v. JANS Enterprises, Inc.,* 929 F.3d 603 (8th Cir. 2019) ......................................................................................................................... 12, 16

*Milligan v. City of Red Oak,* 1999 WL 33457826, at \*7 (S.D. Iowa 1999)................. 35

*Missouri Hous. Dev. Com'n v. Brice,* 919 F.2d 1306 (8th Cir. 1990).......................... 37

*Montana v. United States*, 440 U.S. 147 (1979)................................................ 9, 17, 20

*Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322 (1979) .............................. 10, 23, 25

*Politte v. United States,* 2012 WL 965996 (S.D. Cal. 2012) ....................................... 41

*Postscript Enterprises v. City of Bridgeton*, 905 F.2d 223 (8th Cir. 1990) ................. 21

*Purgess v. Sharrock*, 33 F.3d 134 (2d Cir. 1994) ......................................................... 21

*Reach Communications Specialists, Inc. v. Williams*, 655 F. Supp. 3d 351 (E.D. Pa. 2023) ....................................................................................................................... 13, 16

*Richards v. Jefferson Cty., Ala.,* 517 U.S. 793 (1996) ........................................... 12, 16

*Robinette v. Jones*, 476 F.3d 585 (8th Cir. 2007) ......................................................... 10

*Schnell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260 (1961) ....................................... 17

*Shades Ridge Holding Co. v. United States*, 888 F.2d 725 (11th Cir. 1989) ............. 39

*Souffront v. Compagnie des Sucreries,* 217 U.S. 475 (1910) ..................................... 20

*State of Ohio, ex rel. Tri-State Group, Inc.,* 2004 WL 1882567 (Ohio App. 7 Dist. 2004) ............................................................................................................................. 45

*Taylor Steel, Inc. v. Keeton*, 417 F.3d 598 (6th Cir. 2005) ......................................... 45

*Taylor v. Sturgell*, 553 U.S. 880 (2008) ....................................................... 9, 11, 12, 17

*Towe Antique Ford Foundation v. IRS,* 999 F.2d 1387 (9th Cir. 1993) ......... 39, 40, 42

*Twin City Pipe Trades Serv. Ass'n, Inc. v. Wenner Quality Servs., Inc.,* 869 F.3d 672 (8th Cir. 2017) ................................................................................................ 18, 23, 34

*Union Ins. v. Hull & Co.*, 831 F. Supp. 2d 1060 (S.D. Iowa 2011) ............................. 27

*United States v. Copeland*, 321 F.3d 582 (6th Cir. 2003) ........................................... 45

*United States v. Cornwell*, 2020 WL 674092 (M.D. Fla. 2020) .................................. 41

*United States v. Huyser, __* F. Supp. 3d ___, 2023 WL 6476532 (S.D. Iowa 2023) .... 9, 11, 25, 32

*United States v. Maricopa County,* 151 F. Supp. 3d 998 (D. Ariz. 2015) ................... 12

*United States v. Rigler,* 885 F. Supp. 2d 923 (S.D. Iowa 2012) ...................... 38, 39, 40

*United States v. Scherping,* 187 F.3d 796 (8th Cir. 1999) ................. 38, 39, 40, 45, 48

*United States v. Shaw*, 2018 WL 4682333 (D. Nev. 2018) ........................................ 39

*United States v. Stauffer Chem. Co.,* 464 U.S. 165 (1984) ........................................ 25

*United States v. Walton*, 909 F.2d 915 (6th Cir.1990)............................ 39, 40, 42, 43

*United States v. Webber,* 396 F.2d 381 (3d Cir. 1968)........................................ 18, 22

*United States v. Wolff*, 2010 WL 6238029 (D. Wyo. 2010) ........................................ 39

*Valley Fin., Inc. v. United States*, 629 F.2d 162 (D.C. Cir. 1980) ................. 39, 43, 48

*Virnich v. Vorwald,* 664 F.3d 206 (7th Cir. 2011) ..................................................... 18

*Walker v. Maschner,* 2005 WL 8141553 (S.D. Iowa 2005) ........................................ 35

*Wolfe v. United States*, 798 F.2d 1241 (9th Cir. 1986) ............................................... 48

*Wyly v. Weiss,* 697 F.3d 131 (2d Cir. 2012) ................................................................. 9

*Yankton Sioux Tribe v. U.S. Dept. Health & Human Servs.,* 533 F.3d 634 (8th Cir. 2008) ......................................................................................................... 12, 16

(*continued on the following page*)

**Statutes**

26 U.S.C. § 6426 ................................................................................................ 6

Iowa Code Ann. § 489.702 ............................................................................... 44

Iowa Code Ann. § 489.704 ............................................................................... 44

Iowa Code Ann. § 684.4.1 & 2 ........................................................................ 27

**Other Authorities**

I.R.S. Chief Counsel Advisory, IRS CCA 201133010, 2011 WL 3636293 (July 12, 2011) ................................................................................................................ 29

**Treatises**

18 Am. Jur. 2d Corporations § 38, "Close or Closely Held" ...................... 19

18A Wright, Miller & Cooper, *Prac. Proc. & Juris.* § 4451 (3d ed. 2023) ............... 17

Restatement (Second) of Judgments § 27 (1982) ................................... 34, 35

Restatement (Second) of Judgments § 59 (1982) ....................................... 19

## I.   INTRODUCTION

The United States seeks a partial summary judgment against Defendants **James Huyser, Matthew Kinley, Kenneth Boyle, Jeffrey W. Carter,** and **JWC Investments LC** that they are collaterally estopped from relitigating the issues and facts actually litigated and determined in the prior lawsuit titled *Alt. Carbon Resources LLC v. United States,* Case No. 15-155T, 137 Fed. Cl. 1 (Fed. Cl. 2018), *aff'd,* 939 F.3d 1320 (Fed. Cir. 2019)(*hereinafter* "**Refund Suit**"). <u>The Refund Suit ended in a $59 million dollar money judgment entered in favor of the United States and against Alternative Carbon Resources, LLC ("ACR") for improperly claiming millions in alternative fuel mixture credits</u>. Although they were not expressly named parties to the Refund Suit, Defendants Huyser, Kinley, Boyle, and Carter (and JWC Investments L.C. as Carter's alter ego) served as the only members of ACR (the Plaintiff in the Refund Suit). It was *they* who chose to bring the Refund Suit, controlled that litigation, chose to appeal the summary judgment entered against ACR, and then chose and caused ACR to *never* pay the $59 million owed to the United States.

In the above captioned case, the United States seeks to hold Defendants personally liable for the debts of ACR by piercing the corporate veil or, alternatively, finding that money transfers by ACR to the Defendants were fraudulent transfers. The issues determined in the Refund Suit – <u>that ACR's mixtures were not used as a fuel</u>, <u>that ACR did not sell fuel</u>, <u>that its business transactions had no economic substance</u>, and <u>that ACR's members had no</u>

1

<u>reasonable cause to claim the millions in federal tax credits</u> – were litigated to conclusion and are relevant to the United States' claims here (such as whether ACR was a sham business, among other claims).

The undisputed material facts show the federal doctrine of issue preclusion applies here, and that Defendants are properly considered in privity with ACR despite not being named parties in the prior Refund Suit. The United States therefore seeks partial summary judgment that the Defendants are precluded (*i.e.*, are estopped) from relitigating those issues and facts on which ACR already litigated and lost:

- (i) how ACR operated its business;

- (ii) that ACR's mixtures were not used as a fuel;

- (iii) that ACR did not sell fuel;

- (iv) that ACR's business transactions had no economic substance; and

- (v) that ACR's members did not reasonably rely on *anyone* in claiming the federal tax credits.

In addition, the United States also seeks entry of partial summary judgment against Defendants **Jeffrey W. Carter** and **JWC Investments LC** ("**JWC**") that: (1) Carter individually served as a member of ACR (as conclusively admitted in Carter and JWC's Joint Answer), and (2) that Carter operated JWC as his alter ego. Through this motion, the United States presents a material and undisputed factual record that Carter controlled and operated JWC as his alter ego and that Carter and JWC should be treated as a single entity for purposes of issue preclusion (collateral estoppel) and any subsequent determination of liability at trial.

In addition, should the Court not grant all the relief sought in this motion, then under Fed. R. Civ. P. 56(g), the United States requests that the Court enter an order stating any material fact that is not genuinely in dispute and treating those facts as established in this case.

## II.   SUMMARY OF FACTUAL BACKGROUND[1]

### A.   The Defendants formed and operated the entity ACR to claim alternative fuel mixture credits.

In 2010, James Huyser formed ACR as a limited liability company. (U.S. Statement of Undisputed Material Facts ("SUMF") ¶ 1.) In 2011, Defendants Kinley, Boyle, and Carter also joined ACR as members and, together with Huyser, served as its only members during its time in operation. (*Id.* ¶¶ 2-3.) Defendants formed ACR to claim federal alternative fuel mixture credits from the IRS.[2] (*Id.* ¶¶ 4-9.) The members of ACR operated a scheme through which ACR purchased ethanol waste (or other biowaste), mixed the waste with diesel fuel, transported the waste / diesel mixture to anaerobic digesters, paid digesters to receive the fuel, and

---

[1] Under Local Rule 56(a)(3), the United States submits its statement of material facts as to which there is no genuine issue with its motion and other supporting filings. This section of our Brief is a summary and references the statement throughout this motion, *hereinafter* SUMF ("Statement of Undisputed Material Facts.").

[2] Section 6426 (Title 26) of the Internal Revenue Code provided for credits for alternative fuel mixtures (liquid fuels derived from biomass) mixed with at least 0.1 percent by volume of "taxable fuel," such as diesel. *Alt. Carbon Res., LLC v. United States*, 137 Fed. Cl. 1, 4-6 (2018), *aff'd,* 939 F.3d 1320 (Fed. Cir. 2019). The statute also required that qualified fuel mixtures, for which the credit could be claimed, must be <u>sold as a fuel</u> *and* <u>used as a fuel</u>. *Id.*; *see also infra* Section II.C.

3

then claimed a 50 cents per gallon federal alternative fuel mixture credit for the
waste / diesel mixture it had transported and deposited. (*Id.* ¶¶ 4-6.) ACR stopped
actively operating (in transporting waste / diesel mixture) on December 31, 2011,
when it could no longer claim the tax credit and ACR never resumed operations in
purchasing and transporting its mixture.[3] (*Id.* ¶¶ 7-9.) During its short time in
active operation, Defendants caused ACR to claim and receive $19 million in federal
alternative fuel mixture credits from the U.S. Treasury. (*Id.* ¶¶ 10, 15.) But, during
these 2011 operations, ACR only invoiced its purported digester customers
$8,950.00 for the "sale" of the fuel mixture, and Defendants caused ACR to
distribute over $10 million to themselves from the cash credits ACR received from
the U.S. Treasury. (*Id.* ¶¶ 10-12, 52 ($4,332,000 to Huyser), ¶ 81 ($830,000 to
Kinley), ¶ 109 ($830,000 to Boyle) & ¶¶132-133 ($4,332,000 to Carter via JWC).)

**B.  The Court of Federal Claims adjudged that ACR improperly
claimed and received $19 million in alternative fuel mixture credits
and found ACR liable for an additional $39 million in excessive claim
penalties.**

In 2014, a delegate of the Secretary of Treasury assessed ACR with over $19
million in excise tax liabilities – the amount of the federal tax credits ACR had
claimed, received and deposited during its time in operation – and $39 million in

---

[3] Congress revived the alternative fuel mixture credits, under 26 U.S.C. § 6426, in
December 2010, providing a one-time opportunity to claim the credit retroactively
for 2010 and prospectively through December 31, 2011. *Alt. Carbon Res., LLC v.
United States*, 137 Fed. Cl. 1, 5 (2018), *aff'd,* 939 F.3d 1320 (Fed. Cir. 2019). This is
the period ACR operated and claimed the credit. But Congress did not renew the
credits before December 31, 2011 and later did not revive the credits until January
2, 2013. *Id.* at 7.

excessive claim penalties for improperly claiming the credit. (SUMF ¶¶ 15-16.) To contest ACR's liabilities for these assessments, in 2015, Defendants Huyser, Kinley, and Boyle caused ACR to file the Refund Suit in the Court of Federal Claims. (*Id.* ¶¶ 17, 30-31, 57, 88-89.) Huyser, Kinley, Boyle, and Carter were the *only* members of ACR (a closely held LLC) during its 2011 operations and during the Refund Suit. (*Id.* ¶¶ 3, 22.)

Huyser, Kinley, and Boyle controlled ACR in the Refund Suit. Huyser, Kinley, and Boyle selected ACR's attorneys, met with those attorneys, sat for depositions, aided in discovery, provided affidavits in support of summary judgment, and personally paid over $500,000 that ACR incurred in attorneys' fees for litigating that suit. (*Id.* ¶¶ 17, 22, 23, 30-44, 46-51, 57-69, 74-80, 86-108.) Huyser, Kinley, and Boyle chose to bring the Refund Suit because they knew it might have protected them from future personal liability for ACR's debts if successful. (*Id.* ¶¶ 51, 80, 108.)

Carter (and through him JWC) chose not to contribute personal funds to pay ACR attorney's fees in the Refund Suit, but Carter still participated and exerted control of ACR in the Refund Suit. *First,* in *joint* binding judicial admissions to this Court, Carter and JWC admitted that they participated in the Refund Suit and held "identical" interests with ACR. (*Id.* ¶¶ 112-115.) *Second*, Carter's actions in the Refund Suit exhibited his control and participation. Carter sat for a deposition, Carter (through JWC) responded to a subpoena, Carter voluntarily provided an affidavit in support of summary judgment, Carter hired counsel to represent him

and JWC, Carter entered a Contract for Legal Services with ACR's counsel during the Refund Suit, and agreed that he (Carter) had a "common interest with [ACR] and its other principals." (*Id.* ¶¶ 112-123.)

In the Refund Suit, the United States asserted a counterclaim against ACR to reduce to judgment the excise tax and penalty assessments referred to above. In 2018, after years of litigation, the Court of Federal Claims entered a $59 million money judgment against ACR on the United States' counterclaim holding that ACR had improperly claimed federal alternative fuel mixture credits and sustained the 200% excessive penalty claim because it was unreasonable for ACR to claim the credit. *See* 137 Fed. Cl. at 29-37; (SUMF ¶¶ 19-21).

### C.  The Court of Federal Claims held that ACR's mixtures were not used as a fuel, that ACR did not sell its fuel, and that ACR did not have reasonable cause to claim the tax credits.

Substantively, the Refund Suit involved three central issues: (1) the Fuel Issue; (2) the Sale Issue; and (3) the Penalty Issue.

- **Fuel Issue:** ACR claimed credits available under 26 U.S.C. § 6426. As a result, ACR had to prove that its "alternative fuel mixture" (or waste / diesel mixture) was used as a "fuel" under the Internal Revenue Code, and this required showing that it produced energy. *See* 26 U.S.C. § 6426(e)(2)(B); 137 Fed. Cl. at 6, 24-26.

- **Sale Issue:** Section 6426 also required that not only was the mixture used as a "fuel," but that the mixture was also <u>sold</u> as a fuel by the taxpayer claiming the credit. *See* 26 U.S.C. § 6426(e)(2)(A); 137 Fed. Cl. at 6, 26-27. ACR had to show that a sale took place.

- **Penalty Issue:** ACR had been assessed an excessive claim penalty under 26 U.S.C. § 6675 and could defend against the penalty by showing that it had "reasonable cause" to have claimed the credit. 137 Fed. Cl. at 6, 31.

6

In entering summary judgment for the United States and against ACR, the Court of Federal Claims resolved all three issues and held:

- ACR's mixture did not qualify as being "used" as fuel, 137 Fed. Cl. at 25-26;

- ACR's mixture transactions had no economic substance and resulted in no "sale" of fuel, *id*. at 27-29; and

- ACR (through its members) did not reasonably rely on any professional advice that ACR qualified for the credit and was liable for the excessive claim penalties, *id*. at 31-37.

In *this* case, the United States seeks to hold the Defendants individually liable for the assessed excise tax and penalty debts of ACR. While the United States' <u>claims</u> here are distinct from the Refund Suit (because here the United States is seeking to impose and collect ACR's liability from Defendants individually), the <u>issues</u> identified above were litigated in the Refund Suit and involve the same facts relevant to the United States' veil piercing and (alternative) fraudulent transfer claims. For this reason, as explained in Section III.A. below, the United States seeks partial summary judgment precluding Defendants from relitigating the Fuel Issue, Sale Issue, and Penalty Issue in this collection case.

### D.  Jeffrey W. Carter maintained absolute control over his investment entity, JWC Investments LC, and operated it as his alter ego.

In addition, as explained in Section III.B. below, the United States also seeks partial summary judgment, based on the record submitted with this motion, that Defendant Jeffrey Carter served as a member of ACR, that Defendant JWC was Carter's alter ego and, if liability is determined at trial, that Carter *and* JWC jointly be held liable for the debts of ACR because of their alter ego relationship.

Carter is a self-described entrepreneur and formed JWC around 2008 as a vehicle to make "high risk" investments. (SUMF ¶¶ 134-135, 138.) He alone had authority to make decisions for JWC, controlled JWC's financial accounts, transferred personal funds to JWC, and also transferred JWC funds and assets to himself for no consideration. (*Id.* ¶¶ 139, 141-147, 150-151, 160, 165-166, 169-170, 173.) Carter titled his personal residence in JWC's name and continued to live there. (*Id.* ¶¶ 160, 162.) Carter regularly paid for personal expenses for himself, his home, and his wife with JWC funds. (*Id.* ¶¶ 139, 140, 166.) After entry of the $59 million judgment against ACR, Carter (as the sole and controlling member of JWC) decided to close JWC and ordered the destruction all of JWC's business records. (*Id.* ¶¶ 127, 148, 158-159.) <u>Carter personally served as a member of ACR, but directed that all of *his* ACR member distributions, totaling over $4 million, be and were made payable to JWC.</u> (*Id.* ¶¶ 3, 131.) Due to his complete control over JWC, the United States seeks partial summary judgment that Defendants Carter and JWC be treated as one and the same in this suit for liability as well as for purposes of the collateral estoppel preclusion issue mentioned above.

## III.   ARGUMENT

### A.  Defendants are precluded from relitigating the same issues of fact and law actually litigated and determined in the Refund Suit under the doctrine of issue preclusion, also known as collateral estoppel.

The Defendants[4] joined ACR as members to carry out the alternative fuel mixture credit scheme and remained members during ACR's Refund Suit litigation in the Court of Federal Claims. (SUMF ¶¶ 1-3, 22.) The Refund Suit litigated to conclusion detailed facts about the operations of ACR, that ACR's mixture was not used to produce energy and was not used as a fuel, that ACR's transactions did not result in any sale or have any economic substance aside from its tax credit purpose, and that ACR's members did not reasonably rely on any advice in improperly claiming millions in federal tax credits.

The federal doctrine of issue preclusion, also known as collateral estoppel:

> [B]ars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim.

*Taylor v. Sturgell*, 553 U.S. 880, 892 (2008); *accord Cornice & Rose Int'l v. Four Keys, LLC*, 76 F.4th 1116, 1121 (8th Cir. 2023); *see also United States v. Huyser*, __

---

[4] Carter and JWC have jointly admitted that Carter served as a member of ACR and directed his ACR distributions paid to JWC. (SUMF ¶¶ 3 & 131.) Through this motion, the United States seeks to have the Court adjudge that JWC was Carter's alter ego and Carter and JWC can be treated as one and same for purposes of liability (determined at trial). For this reason, the United States collectively refers to "Defendants" as members of ACR throughout this motion (including Carter as a member of ACR and JWC deemed a member of ACR should the Court enter summary judgment on the alter ego issue).

F. Supp. 3d ___, 2023 WL 6476532, at *3 (S.D. Iowa 2023). Issue preclusion protects parties from "the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153-54 (1979).[5]

The elements required to find that issue preclusion under federal law applies in a successive suit are:

> (1) the party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit;
>
> (2) the issue sought to be precluded must be the same as the issue involved in the prior action;
>
> (3) the issue sought to be precluded must have been actually litigated in the prior action;
>
> (4) the issue sought to be precluded must have been determined by a valid and final judgment; and
>
> (5) the determination in the prior action must have been essential to the prior judgment.

*Robinette v. Jones*, 476 F.3d 585, 589 (8th Cir. 2007).[6]

---

[5] Because the Refund Suit involved questions of federal law (i.e., ACR's liability for the credits it improperly claimed and for the penalties imposed), and the issues were litigated in the Court of Federal Claims, the federal doctrine of issue preclusion applies. *Taylor,* 553 U.S. at 891; *see also Wyly v. Weiss,* 697 F.3d 131, 140 (2d Cir. 2012)("preclusive effect of a federal court's judgment pursuant to its federal-question jurisdiction is governed by the federal common law of preclusion").

[6] The United States seeks to apply collateral estoppel offensively against the Defendants here. Federal district courts hold broad discretion to decide whether to apply the doctrine of offensive collateral estoppel. *Heartland Academy Community*

(continued...)

As described below, all Defendants here should be precluded from relitigating the
Fuel Issue, the Sale Issue, and the Penalty Issue. <u>The United States addresses the
presence of each of the five elements of issue preclusion below.</u>

**1. Element 1 - The Defendants here are in privity with ACR, the
Plaintiff in the Refund Suit.**

In the Refund Suit, the parties were: (1) the Plaintiff / Counterclaim
Defendant ACR, and (2) the Defendant / Counterclaim Plaintiff United States.[7]
Non-parties to a prior lawsuit can be precluded from relitigating issues subject of
that lawsuit if the parties were in privity with a prior party. *Allen v. McCurry,* 449
U.S. 90, 95 (1980).[8] In *Taylor v. Sturgell,* the Supreme Court described six
categories of party / non-party relationships when the non-party, the Defendants
here, may be precluded in a successive suit. 553 U.S. at 893. The six categories are:
(1) when a non-party has agreed to be bound by a judgment; (2) when a non-party
has a preexisting substantive relationship to a party to the judgment, like assignee

---

*Church v. Waddle*, 595 F.3d 798, 811 (8th Cir. 2010); see also *Parklane Hosiery Co.,
Inc. v. Shore*, 439 U.S. 322, 331-32 (1979) (permitting offensive non-mutual
collateral estoppel and describing that "trial courts broad discretion to determine
when it should be applied").

[7] The individual Defendants here were not parties to the prior suit and could not be
a party under the Rules of the Court of Federal Claims. *United States v. Huyser,* __
F. Supp. 3d __, 2023 WL 6476532, at *7 (S.D. Iowa 2023).

[8] "[T]he [Supreme] Court has eliminated the requirement of mutuality in applying
collateral estoppel to bar relitigation of issues decided in earlier federal-court
suit…But one general limitation the Court has repeatedly recognized is that the
concept of collateral estoppel cannot apply when the party against whom the earlier
decision is asserted did not have 'full and fair opportunity' to litigate that issue in
the earlier case." *Allen,* 449 U.S. at 95 (internal citation and quotation omitted).

11

and assignor; (3) when a non-party was adequately represented in the first suit by someone with the same interests; (4) when a non-party assumed control of the prior litigation; (5) when a party seeks to relitigate issues through non-party proxy; and (6) when a statutory scheme prohibits successive litigation.[9] *Taylor,* 553 U.S. at 894-95. <u>At least two of these categories are present here between the individual Defendants and ACR</u>. Further, the existence of only one of these relationships is required. *Id.*

### a. ACR adequately represented the Defendants' interests in the Refund Suit.

A non-party is adequately represented, under issue preclusion, if "(1) the interests of the nonparty and her representative are aligned…and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of a nonparty" and (in some circumstances) the nonparty had notice of the suit. *Taylor*, 553 U.S. at 900 (*citing Richards v. Jefferson Cty., Ala.,* 517 U.S. 793, 801-02 (1996)); *Yankton Sioux Tribe v. U.S. Dept. Health & Human Servs.,* 533 F.3d 634, 640 (8th Cir. 2008).[10] Courts have found

---

[9] Notably, the Supreme Court in *Taylor* explains that these "substantive legal relationships justifying preclusion are sometimes collectively referred to as 'privity.' The term 'privity,' however, has come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground. To ward off confusion, we avoid using the term 'privity' in this opinion." 553 U.S. at 894 n. 8 (internal citation omitted).

[10] *See also, Midwest Disability Initiative v. JANS Enterprises, Inc.,* 929 F.3d 603, 608-09 (8th Cir. 2019) (in res judicata / claim preclusion context finding non-party was in privity (and barred from relitigation) because non-party had constructive

(continued...)

evidence of a party acting in a representative capacity can be inferred from conduct and when the relationship of the party and non-party was not one of "mere strangers," such as a parent company and subsidiary or a closely held business and its owner.[11]

In the Refund Suit, the interests of the Defendants were aligned with ACR, *and* ACR (as shown through its legal relationship with its sole members, the Defendants, and through its conduct in the Refund Suit) acted in a representative capacity for the Defendants. This is explained below.

---

notice of the prior suit, non-party was member of the plaintiff disability organization bringing prior suit, and suit was filed on behalf of the members against same defendants seeking same relief); *United States v. Maricopa County,* 151 F. Supp. 3d 998, 1027 (D. Ariz. 2015), *aff'd,* 889 F.3d 648 (9th Cir. 2018) (non-mutual offensive collateral estoppel found appropriate against Maricopa County when County had knowledge of prior lawsuit and jointly participated in submissions with named defendant in prior suit, Maricopa County Sheriff's Office).

[11] There need not be "explicit evidence" of the prior party acting in a representative capacity. *Cont'l W. Ins. V. Fed. Hous. Fin. Agency*, 83 F. Supp. 3d 828, 834-35, 839 (S.D. Iowa 2015) (finding subsidiary collaterally estopped from relitigating same issues subject of prior suit by parent company when "the parties have identical interest, a legal relationship, and the evidence shows [parent company] understood itself to be acting in a representative capacity on behalf of its wholly owned subsidiary [] in the first suit"); *see also Arcare Inc. v. Qiagen N. Am. Holdings, Inc.*, 2018 WL 337749, at *2 (E.D. Ark. 2018)(finding interests aligned between entity and subsidiary when prior suit was "vigorously defended," close corporate relationship supports finding of "extremely similar, if not identical" interests, each represented by same counsel, and in present case "advancing similar arguments" as in prior suit); *Reach Communications Specialists, Inc. v. Williams*, 655 F. Supp. 3d 351, 360-62 (E.D. Pa. 2023)(entity and owner in privity).

*First,* Defendants were the sole members of ACR. (SUMF ¶¶ 1-3, 22.)[12] All Defendants had notice of the Refund Suit. (*Id.* ¶¶ 31, 86, 88-89, 112, 114.)

*Second,* Huyser, Kinley, and Boyle, (as admitted in responses to Requests for Admission) and Carter and JWC (through direct judicial admissions) all held the same interest as ACR in the Refund Suit —to have the Claims Court rule that ACR was not liable for the millions in tax and penalty assessments against it. (*Id.* ¶¶ 51 (Huyser), 80 (Kinley), 108 (Boyle), 113 & 115 (Carter & JWC); *see also, id.* ¶¶ 61 (Kinley signed agreement reciting "common interest" with ACR).) It is undisputed that all Defendants knew that ACR's liabilities for the tax and penalty assessments may result in personal liability for its members and that the Refund Suit was both initiated by ACR and vigorously litigated to avoid that liability.[13] (*Id.* ¶¶ 46-51, 74-80, 101-108, & 112-115.)

---

[12] In examining whether non-party was "adequately represented" in prior litigation, "[C]ourts frequently find privity between a corporate entity and its controlling owner." *See also Reach Communications Specialists, Inc. v. Williams*, 655 F. Supp. 3d 351, 361-62 (E.D. Pa. 2023) (collecting cases and stating that "caselaw on this point often binds corporate shareholders to prior litigation involving the corporation"); *Cont'l W. Ins. V. Fed. Hous. Fin. Agency*, 83 F. Supp. 3d 828, 834-36 (S.D. Iowa 2015); *see also infra* Section III.A.2.b.

[13] *See* SUMF ¶¶ 46-51, 74-80, 101-108 (in response to Requests for Admission, Huyser, Kinley, and Boyle admitted that ACR's counsel, William Smith (discussed below) advised them that bringing and winning the Refund Suit was a way in which they could avoid personal liability) & 115 &124-127 (in 2018 state court trial testimony, Carter admitted that he and JWC were liable for the ACR judgment.) *See also id.* ¶¶ 12, 17-21, 23, 30-44, 57-70, 86-100, 112-123 (describing litigation and cross-motions for summary judgment and Huyser, Kinley, and Boyle paying over $500,000 in legal fees).

*Third,* Huyser, Kinley, and Boyle actively controlled and *funded* ACR in the Refund Suit. Huyser, Kinley, and Boyle personally funded the Refund Suit litigation and together paid over $500,000 in fees and expenses.[14] (*Id.* ¶¶ 23, 33-34 (Huyser $429,687), 58 (Kinley $99,680), 86-87 (Boyle $76,732).) They chose attorney William ("Bill") Smith to act as counsel for ACR. (*Id.* ¶¶ 14, 17, 31, 57, 60-61, 88.) Smith aided the Defendants in preparing for their depositions (and defending some). (*Id.* ¶¶ 41, 57, 67, 99.) Attorney Smith facilitated the filing of affidavits executed by each Defendant in support of ACR's motion for summary judgment. (*Id.* ¶¶ 42, 68, 117, 119-120.) And Smith met with Huyser, Kinley, and Boyle throughout the case. (*Id.* ¶¶ 30-32, 44 (Huyser) 57, 60-61, 63 (Kinley), 88, 93 (Boyle).) Further, in their *personal* capacities, Boyle and Huyser filed a state court lawsuit against Carter and JWC to try to have Carter and JWC pay a share of ACR's legal expenses in the Refund Suit. (*Id.* ¶¶ 37-38 (Huyser) & 90-92 (Boyle).)

*Fourth,* Carter also participated in the Refund Suit and admitted that ACR represented his (and JWC's) interests. (*Id.* ¶¶ 113 & 115.) While he chose not to contribute funds towards ACR legal expenses, Carter entered a Contract for Legal Services with ACR's counsel, William ("Bill") Smith, in which Carter agreed to his "common interest" with ACR in the Refund Suit. (*Id.* ¶¶ 119-121.)

---

[14] *See e.g.*, *Gen. Foods Corp. v. Mass. Dept. of Pub. Health*, 648 F.2d 784, 785-88 (1st Cir. 1981)(entity found in privity with plaintiff in prior suit (and interests adequately represented) when chose not to be a named plaintiff in prior suit, but still chose to contribute $1,000 & $2,500 towards legal expenses).

15

And in a motion filed in *this* case, Carter and JWC jointly admitted that they held overlapping interests with ACR in the Refund Suit: "to obtain abatement of all of the IRS's claims for taxes against ACR" and that the members of ACR "were representing ACR in the suit and protecting its and their <u>identical interests</u>" in the Refund Suit. (*Id.* ¶¶ 114-115 (emphasis added); *see also id.* ¶ 121.)

*Fifth and finally*, the Defendants are not "strangers" to ACR. Rather, as members, they wore two hats. ACR (through the Defendant members) actively brought the Refund Suit and to challenge its liability for the excise tax and penalty assessments *and* represented the Defendants' identical interest in ACR *not* being held liable to avoid any future personal liability.[15] As described above, the *Taylor v. Sturgell* elements for adequate representation are satisfied here:

- It is undisputed that Defendants had notice of the Refund Suit (in fact they chose to bring it);

- All Defendants held the same interest as ACR — for ACR to be found *not* liable for millions in tax and penalty assessments; and

- The factual circumstances show that ACR *did* represent the Defendants' interests in its vigorous litigation of ACR's liabilities in the Refund Suit.[16]

---

[15] *See Yankton Sioux Tribe,* 533 F.3d at 641; *Midwest Disability Initiative v. JANS Enterprises, Inc.*, 929 F.3d 603, 606 (8th Cir. 2019); *Cont'l W. Ins. V. Fed. Hous. Fin. Agency*, 83 F. Supp. 3d 828, 835 (S.D. Iowa 2015)(parent company and non-party subsidiary "not mere strangers" to each other); *cf. Richards,* 517 U.S. at 802 (finding not in privity when new plaintiff was "stranger" to earlier litigant).

[16] *Reach Communications Specialists, Inc. v. Williams*, 655 F. Supp. 3d 351 (E.D. Pa. 2023) is helpful persuasive authority. The individual owner of Reach Communications was criminally convicted for corruption and contract fraud. *Id.* at

(continued...)

### b.  The Defendants controlled ACR in the Refund Suit.

In addition, a second *Taylor v. Sturgell* relationship category is present here:
the Defendants controlled ACR in the Refund Suit and, as such, had the
opportunity to fully litigate the Fuel Issue, Sale Issue, and Penalty Issue. These
issues determined whether ACR could claim the credit or was liable for penalties in
unreasonably claiming the credit. *Taylor,* 553 U.S. at 895 (*citing Montana v. United
States,* 440 U.S. at 154 & *Schnell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 262
n.4 (1961).)[17] In these circumstances, courts have found that non-parties are subject
to issue preclusion when in the prior suit the non-parties participated in the
decision to file the prior lawsuit, paid the party's attorneys' fees in the earlier suit,
and participated in the decision to appeal, among other actions. *See Montana,* 440
U.S. at 154 (finding United States precluded from relitigating issues litigated in

---

358. In a later civil suit brought by Reach Communications, the company sought to
relitigate the validity of the contracts that had been found fraudulent in the
criminal case. *Id.* The Court found that the non-party, Reach, was collaterally
estopped from relitigating the validity of the contracts because it was adequately
represented in the prior suit. *Id.* at 361-62. Reach's interests had been adequately
represented because the record showed the entity was controlled by its sole
shareholder, and the shareholder (when disputing his criminal liability) "had every
incentive to argue – through any means possible – that the contracts between Reach
and the [locality] were valid and not rooted in public corruption." *Id.* at 363. The
record shows the Defendants controlled ACR as its only members *and* the
Defendants "had every incentive" to dispute ACR's liabilities for millions.

[17] "Preclusion is fair so long as the relationship between the nonparty in the current
suit and a party in the prior suit was such that the nonparty had the same practical
opportunity to control the course of the proceedings that would be available to a
party. If this measure of control is established, relitigation is no more justified for
the nonparty than for a party." 18A Wright, Miller & Cooper, *Prac.  Proc. & Juris.* §
4451 (Nonparty Control) (3d ed. 2023)(available on WestLaw).

17

prior suit brought by federal contractor when United States was not a party, but exhibited sufficient control over prior suit by paying legal fees and other litigation expenses, requesting that the complaint was filed, reviewing the complaint, directing that an appeal was filed, among other actions).[18]

Federal courts also regularly find that business owners (like the Defendants here) are collaterally estopped from relitigating issues that were the subject of judgments against closely held entities where owners exhibited control of the entity and had been involved in the corporate litigation. *Twin City Pipe Trades Serv. Ass'n, Inc. v. Wenner Quality Servs., Inc.,* 869 F.3d 672, 676-78 (8th Cir. 2017); *see also Griswold v. County of Hillsborough,* 598 F.3d 1289, 1293 (11th Cir. 2010)(on res judicata, finding party in privity when "had complete control over prior litigation as Companies' president and sole shareholder"); *In re Gottheiner,* 703 F.2d 1136, 1140 (9th Cir. 1983)(res judicata); *Kreager v. Gen. Elec. Co.*, 497 F.2d 468, 472 (2d Cir. 1974)(res judicata). [19]

---

[18] *See also, Iowa Elec. Light & Power Co. v. Mobile Aerial Towers, Inc.*, 723 F.2d 50, 52 (8th Cir. 1983) (collateral estoppel (under Iowa law) applied where non-party "Iowa Electric was sufficiently connected in interest with the individual plaintiffs [in original suit] as to have had a full and fair opportunity to litigate the negligence and strict liability issues in the earlier trial. Iowa Electric attended and participated in a number of depositions taken in the consolidated [] case; Iowa Electric also paid $26,889 for expenses incurred in connection with the [prior] claims. These facts demonstrate a sufficient connection to bind Iowa Electric to the prior outcome").)

[19] *See also United States v. Webber,* 396 F.2d 381, 387 (3d Cir. 1968)(finding partners of entity showed sufficient control to be in privity with it because record showed they made decisions about contracts entered into by entity, doubled their

(continued...)

ACR was a closely held entity owned and operated exclusively by Huyser, Kinley, Boyle, and Carter.[20] (SUMF ¶¶ 1-3, 22.) The Restatement of Judgments provides that "[t]he judgment in an action by or against the corporation is conclusive upon the holder of its ownership if he actively participated in the action on behalf of the corporation, unless his interests and those of the corporation are so different that he should have opportunity to relitigate the issue." *See* Restatement (Second) of Judgments § 59(3)(a) (1982). *See also Twin City Pipe Trades*, 869 F.3d at

---

own salaries, and caused themselves to be paid large bonuses); *Virnich v. Vorwald,* 664 F.3d 206, 216  (7th Cir. 2011)(applying Wisconsin privity law, finding issue preclusion applied against director and indirect owner of entity (from prior suit ordering receivership over entity) when business owner had contested the receivership in prior litigation); *Levitt v. Comm'r*, 1995 WL 570439, at *18 (Tax Ct. 1995) *aff'd,* 101 F.3d 691 (3d Cir. 1996)(collecting cases); *cf. Al-Sabah v. World Bus. Lenders, LLC,* 2023 WL 6541249, at *3 (D. Md. 2023)(when plaintiff obtained $7 million judgment against individual who, in part, used funds from World Business Lenders ("WBL") to defraud plaintiff, finding non-mutual offensive collateral estoppel improper against WBL when record showed "no direct financial or proprietary interest or that it exercised sufficient control over" trial resulting in money judgment in first suit).

[20] An entity classified as "closely held" is characterized by a small number of owners, no shares or stocks for sale on the public market, and "all or a substantial majority [of owners] participating in the management, direction, and operations of the [business]." 18 Am. Jur. 2d Corporations § 38, Close or Closely Held; *see, e.g., Butler v. Moore,* 2015 WL 1409676, at *60 (D. Mass. 2015)(LLC is "closely held" when it "had a small number of members; there was no ready market for equity interest in the LLC; and all of the members were intimately involved in the management, direction, and operations of the LLC.").

19

676 ("A closely held corporation is in privity with its shareholder")(citing

Restatement (Second) of Judgments § 59(3)(b) & cmt. e (1982)).[21]

The undisputed material facts show that the Defendants were the sole

members of the closely held entity, ACR, and each participated in and controlled the

Refund Suit litigation. *Montana*, 440 U.S. at 154 (*quoting Souffront v. Compagnie

des Sucreries,* 217 U.S. 475, 486-76 (1910)("persons for whose benefit and at whose

direction a cause of action is litigated cannot be said to be strangers to the cause").)

Here, the undisputed material facts show:

- ▪ <u>James Huyser</u>: Huyser personally participated in the day-to-day operations of ACR. (*Id.* ¶¶ 27-29.) Huyser selected Bill Smith as counsel for ACR, helped select and hire experts, aided in making litigation decisions, aided in responding to discovery, and authorized and contributed funds for payment of legal fees. (*Id.* ¶¶ 30, 31, 33-36.) He attended meetings with ACR's attorneys, coordinated payment of all legal fees, issued a capital call for more funds, and *personally* initiated a state court lawsuit to collect ACR legal fees from Carter and JWC. (*Id.* ¶¶ 30, 32-38.) He gave testimony under oath, signed interrogatory responses for ACR, and voluntarily executed affidavits in support of ACR's motion for summary judgment. (*Id.* ¶¶ 30, 39-42.) He participated in the decision to appeal to the Federal Circuit. (*Id.* ¶ 43.) Huyser traveled to Atlanta, Georgia, to meet ACR attorneys in person and travelled to attend appellate arguments in Washington, D.C. (*Id.* ¶¶ 44.) From 2013 to 2019, Huyser paid over $400,000 in ACR accounting and legal fees. (*Id.* ¶¶ 33-34.) Huyser chose to stop contributing to ACR expenses after ACR lost the appeal. (*Id.* ¶¶ 45.)

---

[21] Further, Comment e to Section 59 of the Restatement of Judgments provides: "[f]or the purpose of affording opportunity for a day in court on issues contested in litigation, however, **there is no good reason why a closely held corporation and its owners should be ordinarily regarded as legally distinct**. On the contrary, it may be presumed that their interests coincide and that one opportunity to litigate issues that concern them in common should sufficiently protect both." *Id.* cmt. e (emphasis added).

▪ <u>Matthew Kinley:</u> Kinley personally participated in the day-to-day operations of ACR and travelled around the country seeking out new business for ACR. (SUMF ¶¶ 54-56.) Kinley participated in the decision to contest the tax assessments made against ACR through filing the Refund Suit and personally paid a share of ACR's legal expenses. (*Id.* ¶¶ 57-59.) Kinley signed an agreement with ACR's counsel which described that he believed he had a "common interest" with ACR in the Refund Suit. (*Id.* ¶¶ 60-61.) Kinley attended meetings with Bill Smith, aided in locating documents for ACR to respond to discovery, and sat for a deposition. (*Id.* ¶¶ 62-63.) Bill Smith aided Kinley in preparing for his deposition. (*Id.* ¶¶ 66-67.) Kinley voluntarily executed affidavits submitted in support of ACR's summary judgment motion. (*Id.* ¶ 68.) He personally paid a portion of the expenses (including attorney's fees) to fund the appeal of the Federal Claims judgment. (*Id.* ¶ 70.) From 2013 to 2019, Kinley paid over $99,000 in ACR accounting and legal fees. (*Id.* ¶¶ 58.) A portion of Kinley's contributions to ACR expenses were used by ACR to make a partial payment of the excise tax assessments against ACR so it could file the Refund Suit. (*Id.* ¶ 59.) Finally, Kinley stopped contributing to ACR legal expenses once ACR lost its appeal. (*Id.* ¶¶ 71-73.)

▪ <u>Kenneth Boyle:</u> Boyle personally participated in the day-to-day operations of ACR and spent as much as 30-40 hours a week on ACR business in 2011. (*Id.* ¶¶ 83-85.) Boyle executed an agreement through which he, along with other ACR members, jointly retained ACR's counsel. (*Id.* ¶ 88.) Boyle attended meetings with Bill Smith, communicated with Carter about contributing to ACR legal fees, and *personally* initiated a state court lawsuit to collect ACR legal fees from Carter and JWC. (*Id.* ¶¶ 88-93.) Boyle aided ACR in discovery by searching his personal documents, email, and other documents and providing copies to ACR counsel. (*Id.* ¶¶ 94-96.) Boyle communicated with experts on behalf of ACR. (*Id.* ¶ 97.) Boyle was deposed, Bill Smith represented him at his deposition, and he voluntarily executed affidavits in support of ACR's motion for summary judgment. (*Id.* ¶¶ 98-99.) From 2013 to 2019, Boyle paid over $75,000 of his personal funds to pay ACR's accounting and legal fees. (*Id.* ¶ 87.)

▪ <u>Jeffrey Carter & JWC:</u> Carter personally participated in the day-to-day operations of ACR and spent as much as 20-30 hours a week on ACR business. (SUMF ¶ 111.) Carter entered a contract for legal services with ACR's counsel Bill Smith. (*Id.* ¶¶ 119-121.) Further, in Carter & JWC's joint motion to apply collateral estoppel against the United States in *this* case, Carter and JWC made the binding

judicial admissions that they "fully participated" in the Refund Suit and "participated in discovery, depositions, and defense of ACR." (SUMF ¶ 112, 114, 116 & ECF No. 35 at Appx. 631 & 35-001 at Appx. 639-641.) <u>Carter and JWC also jointly made the binding concession that Carter and JWC are in privity with ACR in the Refund Suit for the application of issue preclusion</u>. (SUMF ¶¶ 112-114; *see* ECF No. 35-001 at Appx. 639-640.) These clear and unambiguous statements of counsel in the brief submitted on behalf of Carter and JWC are judicial admissions that remove these facts from dispute here. *See Postscript Enterprises v. City of Bridgeton*, 905 F.2d 223, 228 (8th Cir. 1990) (treating statements in brief as judicial admission); *see also Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) ("Counsel's statement of fact constituted an admission of a party. It was made in a legal brief filed with the court subject to the penalty of sanctions. There can be little dispute, therefore, that defendant's counsel was acting in an authorized capacity when making the assertion."); *Davis v. A.G. Edwards & Sons, Inc.,* 823 F.2d 105, 108 (5th Cir. 1987) (judicial admissions are "conclusively binding on the party that made them")(internal citation omitted).

▪ Along with these conclusive and binding admissions, the undisputed facts also show Carter and JWC's active involvement in the Refund Suit and that Carter was one of the four members of the closely held entity, ACR (described *supra* Section II.A.2.a.), and their interests were fully represented in the Refund Suit. (*Id.* ¶¶ 112-123.)

▪ Finally, <u>ACR distributed $10 million to the Defendants during its short time in active operations</u>. Huyser and Carter (through JWC) received and deposited over $4 million each and Kinley and Boyle over $800,000. (*Id.* ¶¶ 52, 81, 109, 132-133.) Courts have found members of closely held entities paying themselves significant funds as further evidence of control of an entity.[22]

---

[22] *See e.g.*, *United States v. Webber*, 396 F.2d 381, 387 (3d Cir. 1968). Here, the Third Circuit highlighted the fact that individual members of the entity "doubled their salaries and caused themselves to be paid large bonuses." This evidence (showing the members control over what they chose to pay themselves) was a fact considered in finding the members had sufficient control to be in privity with the entity. *Id.*

As shown by the undisputed material facts, the Defendants are members ACR, and all participated in controlling ACR in the Refund Suit litigation. For these reasons, the Defendants are also properly found to be in privity with ACR.

### c. The application of non-mutual offensive collateral estoppel is not unfair in these circumstances.

In summary, it is undisputed that the Defendants' interests were adequately represented in the Refund Suit *and* that the Defendants controlled ACR in the Refund Suit. The remaining question in whether non-mutual collateral estoppel is appropriately applied here — whether the non-parties (here our Defendants) had a "full and fair opportunity" to litigate the issues in the Refund Suit. *See Allen,* 449 U.S. at 95.

In *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 330-31 (1979), the Supreme Court outlined when application of non-mutual offensive collateral estoppel may be inappropriate at the discretion of the trial court: (1) when the party did not have an incentive to fully litigate the first case or future litigation was not foreseeable; (2) if the prior judgment is inconsistent with other judgments; (3) if the second action affords procedural opportunities unavailable in first case; and (4) whether offensive estoppel would reward a private plaintiff who could have joined the prior suit.[23]

---

[23] *See also, In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 54 F.4th 912, 922, 927 (6th Cir. 2022)(examining four *Parklane Hosiery* fairness factors), cert. denied sub nom. 217 L. Ed. 2d 229 (2023).

None of the *Parklane Hosiery* circumstances are present here, and application of non-mutual offensive collateral estoppel is appropriate.[24]

As described above, (1) ACR *brought* the Refund Suit, had *every* incentive to fully litigate the case, and future litigation *was* foreseeable as the Defendants were aware that they may face personal liability later;[25] (2) multiple inconsistent judgments do not exist and, instead, there is only one judgment, the $59 million judgment against ACR and application of collateral estoppel will ensure consistent results; (3) there are no new procedural opportunities in this suit and, rather, ACR and its members chose the procedural venue for the first suit; and (4) there is no private plaintiff who could have joined the prior suit.

In these circumstances, this Court should hold, based on the partial summary judgment record presented here, that as a matter of law the Defendants (although non-parties to the Refund Suit) were in privity with ACR and had their full opportunity to litigate the Fuel Issue, Sale Issue, and Penalty issue in the Refund Suit and cannot do so again here.

---

[24] *See, e.g., Twin City Pipe Trades Serv. Ass'n, Inc. v. Wenner Quality Servs., Inc.*, 869 F.3d 672, 675-78 (8th Cir. 2017). In this suit, the Eighth Circuit affirmed the application of non-mutual collateral estoppel in the same posture as this suit – a plaintiff (party to both suits) seeking application of offensive collateral estoppel against non-mutual defendant in a second suit.

[25] *See, e.g.*, SUMF ¶¶ 46-51, 74-80, 103-108; *see* Ex. 171 at Appx. 496 (in May 22, 2014, ACR counsel advising bringing Refund Suit because "[a]t present it seems clear to us that all principals of ACR have a common interest in defeating the assessment and the varying degrees of 'danger' as it relates to ultimate personal liability for the various penalties and credits"); *see also* SUMF ¶ 115 (Carter & JWC jointly admitting they hold "identical interests" as ACR in Refund Suit.)

**2. Element 2 - The facts determined on the Fuel Issue, Sale Issue, and Penalty issue in the Refund Suit are the same facts that are relevant to the United States' claims to pierce the veil and/or to set aside fraudulent transfers in this case.**

This litigation involves the operations of ACR and its members (largely in 2011) and its operations after ACR stopped actively transporting its mixtures (from 2012 to the present). The United States does not contend that all issues or facts here are the same as those in the Refund Suit. That said, the matters submitted for determination and determined on the Fuel Issue, Sale Issue, and Penalty Issue are the same facts that are relevant to the United States' claims seeking to pierce the corporate veil or set aside transfers to Defendants as fraudulent under the Iowa Uniform Fraudulent Transfer Act ("UFTA"). <u>Thus, the Defendants should be precluded from contesting those facts and should be bound by the determination of those same facts in *this* proceeding.</u>

As stated by the Supreme Court:

> Under the doctrine of collateral estoppel [i.e. issue preclusion]…the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.

*Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326 n.5 (1979); *see also United States v. Huyser,* __ F. Supp. 3d __, 2023 WL 6476532, at *3, *5. A party may rely on collateral estoppel even though he or she is not bound by the judgment if the party

against whom it is used had a "full and fair" opportunity to litigate the issue in the prior action. *Parklane Hosiery,* 439 U.S. at 332.[26] These principles apply here.[27]

To explain, both the United States' veil piercing and alternative fraudulent transfer claims against Defendants here involve the operations of ACR and the roles Defendants played in running the entity. Moreover, the United States' claims here involve the same funds ACR received from the IRS (predicated upon the tax credit that was improperly and unreasonably taken by ACR). These issues were fully litigated in the Refund Suit.

As for the United States' veil piercing claims asserted here against Defendants, "[u]nder Iowa law, an entity's corporate form can be disregarded either by applying the alter ego doctrine or by piercing the corporate veil." *HOK Sport, Inc. v. FC Des Moines, L.C.,* 495 F.3d 927, 935 (8th Cir. 2007).[28] Courts under either test

---

[26] *Cf., Comm'r v. Sunnen,* 333 U.S. 591, 597–99, 601-02 (1948)("Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time."); *see also Lane v. Peterson,* 899 F.2d 737, 741-42, 745 (8th Cir. 1990).

[27] Further, since entry of judgment against ACR, there has been "no change in controlling facts or legal principles" since the Refund Suit. *United States v. Stauffer Chem. Co.,* 464 U.S. 165, 169 (1984).

[28] For the alter ego remedy, "[t]o further the public convenience, cure wrongs, protect against fraud, and advance the ends of justice, the alter ego doctrine disregards an entity's corporate form if the entity is 'merely an instrumentality or device set up to ensure the avoidance of the legal obligations'... A corporate entity is the alter ego of a person if (1) the person influences and governs the entity; (2) a unity of interest and ownership exists such that the corporate entity and the person cannot be separated; and (3) giving legal effect to the fictional separation between

(continued...)

look to evidence in support of the following non-exclusive factors to consider in

piercing the veil or for an alter ego finding:

> [I]f (1) the corporation is undercapitalized, (2) without
> separate books, (3) its finances are not kept separate from
> individual finances, individual obligations are paid by the
> corporation, (4) the corporation is used to promote fraud
> or illegality, (5) corporate formalities are not followed[,] or
> (6) the corporation is merely a sham.

*HOK,* 495 F.3d at 936; *Lakota Girl Scout Council, Inc. v. Havey Fund–Raising*

*Mgmt., Inc.*, 519 F.2d 634, 638 (8th Cir.1975); *Union Ins. v. Hull & Co.*, 831 F.

Supp. 2d 1060, 1065 (S.D. Iowa 2011).

As for the United States' alternative fraudulent transferee monetary claim

against Defendants, Iowa fraudulent transfer law (UFTA) sets forth non-exclusive

factors to consider whether a transfer should be set aside for actual intent "to delay,

hinder or defraud any creditor of the debtor," including whether the transfer was to

an insider, whether the value of the consideration received by the debtor was

reasonably equivalent to the value of the asset transferred, and so on. *See* Iowa

Code Ann. §§ 684.4.1 (a)-(b) and 684.4.2.a through k.; *Algreen v. Gardner*, 2018 WL

---

the corporate entity and the person would 'sanction a fraud or promote injustice.'"
*HOK,* 495 F.3d at 935 (citations omitted).

"Piercing the corporate veil is a common-law equitable remedy whereby an entity's
corporate form is disregarded to prevent an injustice…Under Iowa law,
disregarding an entity's corporate form by piercing the corporate veil is appropriate
if the corporation is a mere shell, serving no legitimate business purpose, and used
primarily as an intermediary to perpetuate fraud or promote injustice." *Id.* at 935-
36 (citations and internal quotations omitted); *Briggs Transp. Co. v. Starr Sales Co.*,
262 N.W.2d 805, 810 (Iowa 1978).

3057438, 919 N.W.2d 768 (Table) (Iowa Ct. App. 2018). In addition, the UFTA

provides a transfer can be set aside when the transferor did not receive reasonably

equivalent value for the transfer and, either:

> (1) The [transferor] was engaged or was about to engage
> in a business transaction for which the remaining assets
> of the [transferor] were unreasonably small in relation to
> the business or transaction. [or] (2) The [transferor]
> intended to incur, or believed or reasonably should have
> believed that the debtor would incur, debts beyond the
> debtor's ability to pay as they became due.

*See* Iowa Code Ann. §§ 684.4.1(b)(1)-(2).

As stated, the Refund Suit involved determination of many facts about the

operations of ACR and the activities of the Defendants in those operations and the

same facts as determined in the Refund Litigation should not have to be relitigated

here. As the Court of Federal Claims determined:

> ▪ ACR's business operations had three steps:
>
> First, [ACR] would purchase feedstock from a supplier,
> and the feedstock would be picked up by a trucking
> company contracted by [ACR].
>
> Next, the trucking company would add the required
> amount of diesel fuel to the load to create an alternative
> fuel mixture.
>
> Finally, the mixture would be delivered to the digester
> customer. The digester customer would "charge a
> processing fee to take the fuel." In addition, because
> [Greg] Sanderson [ACR's attorney] had advised plaintiff
> that it would "look better" if plaintiff charged its
> customers "anything," plaintiff would charge its
> customers various nominal amounts for the alternative
> fuel mixture.
>
> 137 Fed. Cl. at 9-10 (internal citation omitted).

28

- On January 21, 2011, Huyser emailed Greg Sanderson and explained that ACR's business model did not include a sale price for their waste / diesel mixture and rather the consideration for the sale of the mixture was the digester disposing of the materials. 137 Fed. Cl. at 13. Huyser also asked Sanderson at this time what IRS agent would be assigned an audit of ACR. *Id.*

- In summer 2011, ACR received an IRS questionnaire about the operations of ACR. 137 Fed. Cl. at 14-15; 939 F.3d at 1325.

- In early 2011, ACR and Des Moines Wastewater ("WRA"), one of ACR's digester customers, entered an agreement where WRA would pay $950 to ACR to "buy" the waste / diesel mixture and WRA would charge ACR $950 in an administrative fee. 137 Fed. Cl. at 16. ACR also agreed to pay WRA $125 per load of mixture deposited. *Id.*

- Another digester customer, Amana Farms, entered in an agreement to pay ACR $1,000 annually for receiving its waste / diesel mixture. *Id.* at 18. Amana agreed to receive 24,000 gallons of mixture a day (Monday through Friday) and receive $25 per ton of mixture delivered. *Id.*

- "Throughout 2011, [ACR] received $8,950.00 of income for the purchase of its alternative fuel mixtures and paid its customers a total of $1,678,029.07 in 'disposal fees.' Plaintiff did not charge sales tax on any portion of the $8,950.00 received for the alternative fuel mixtures it delivered to its customers." *Id.* at 18-19 (internal citation omitted).

- "Altogether, [ACR] 'sold' nearly 40 million gallons of alternative fuel mixtures for $8,950 in 2011." *Id.* at 28.

- "On July 12, 2011, the IRS issued an advisory letter stating that alternative fuel mixtures used in anaerobic digester tanks are not "used as a fuel" under § 6426. *See* I.R.S. Chief Counsel Advisory, IRS CCA 201133010, 2011 WL 3636293 (July 12, 2011)." 939 F.3d at 1325.

- "On March 12, 2012, the IRS conducted an 'initial audit' of [ACR's] claims for the alternative fuel mixture credit." 137 Fed. Cl. at 19.

- On April 18, 2014, the IRS (i.e., a delegate of the Secretary of the Treasury) assessed $19,773,393.00 against ACR in the amount of the federal tax credits claimed and received by ACR and $39,546,786 in excessive claim penalties. *Id.* .

The Refund Suit and ACR's appeal from the adverse $59 million judgment entered against it involved a number of mixed factual and legal findings on the Fuel Issue, Sale Issue, and Penalty Issue:

- Alternative fuel mixture, as defined by 26 U.S.C. § 6426(d)-(e), requires a net production of energy. *Id.* at 25. <u>ACR could not prove that its waste / diesel mixture created biogas that resulted in a net production of energy or the production of energy at all</u>. *Id.* at 26.

- <u>ACR's business transactions also did not involve any sale of the mixture</u>. "Despite the 'small sales price' paid by most of [ACR's digester] customers, the economic reality of the exchanges was that plaintiff paid its customers to take its alternative fuel mixtures. Further, [ACR] cannot rely on being 'relieved of its obligation to dispose of the by-products,' as consideration to support its alleged sales." *Id.* at 26.

- The small fixed annual fees that ACR charged its digester customers lacked any economic substance and did not constitute a sale:

  > [T]he 'small sales price' that [ACR] collected from its customers lacked economic substance because those nominal amounts were collected solely for the purpose of receiving tax credits. [ACR's] agreement with the WRA contains a classic example of a sale price that is devoid of substance. [ACR's] sale price of $950 for all of its alternative fuel mixtures was intentionally offset by a $950 administrative fee that the WRA charged so that the sale price and fee would be 'a wash.' 'In other words, the parties intended for there to be no substantive sale price—they simply engaged in 'a contrived transaction performing no economic or business function other than to generate tax benefits.'

  *Id.* at 28 (internal citation omitted).

- The small fixed annual fees charged by ACR had no "non-tax purpose whatsoever." 939 F.3d at 1329.

- ACR had "no evidence that it ever 'reasonably expected' to generate any profit apart from the tax credits.'" *Id.* at 1330.

30

- ACR's business transactions with its digester customers "were not bona fide sales supported by consideration." 137 Fed. Cl. at 28.

- ACR is liable for excessive claim penalties under Section 6675 because it did not have reasonable cause to claim the credit, "judged in light of the taxpayer's experience, knowledge, and education." *Id.* at 31.

- ACR did not reasonably rely on advice about the structure of its "sales" to digester customers. *Id.* at 32.

- IRS approval of ACR's registration to claim the credit did not constitute any advice that ACR's activities qualified for the alternative fuel mixture credit. *Id.* at 32-33. The IRS also did not provide any advice on whether ACR's mixture was used as a fuel. *Id.* at 35.

- ACR's attorney Mr. Lewis provided no independent advice to ACR on its sales or the mixture's use as a fuel. *Id.* at 33, 35.

- ACR's consultant, Dr. Zitomer, did not provide ACR advice on whether ACR's mixture was used as a fuel. *Id.* at 36.

- Greg Sanderson gave ACR qualified advice on limited information and it was not reasonable for ACR to rely on such advice for whether their transaction structure constituted a sale or resulted in use as a fuel. *Id.* at 33, 36.

- ACR never obtained a formal tax opinion from Sanderson and a "<u>reasonable and ordinarily prudent person, claiming millions of dollars in tax credits would have sought a formal tax opinion.</u>" *Id.* at 34 (internal citation omitted)(emphasis added).

- ACR's reliance on any purported "advice" about its qualification for the federal tax credit was not objectively reasonable. *Id.* at 31, 33-37.

These determinations, which were affirmed on appeal, on the Fuel Issue, Sale Issue, and Penalty Issue are the same facts relevant to many non-exclusive factors at issue in the claims here.

31

### a. Facts and issues determined in the Refund Suit are relevant to the United States' veil piercing claim in this case.

One of the non-exclusive veil piercing factors is whether ACR was a "sham" business. The Sale Issue involved examining whether ACR even engaged in a business transaction with *any* economic substance. The Claims Court found that there was no economic substance to the business's core transactions, the transactions involved no sale of mixture, and the transactions had no non-tax purpose. 137 Fed. Cl. at 27-29; 939 F.3d at 1329. These findings are relevant to whether ACR was a "sham" business, and the Defendants should be estopped from disputing the prior determination of the very same issues about the substance of ACR's operations.

Further, a broader veil piercing factor is whether a business was used to promote fraud, illegality, or an injustice. Many of the Refund Suit findings would go to this issue – that the members did not reasonably rely on any advice from attorneys and other advisors, that it was unreasonable to never seek a written tax opinion while claiming millions in federal tax credits, and that their transaction with customers was structured to create "wash" fees that resulted in no sales taking place, to name a few.[29] The matters litigated to conclusion on Fuel Issue, Sale Issue,

---

[29] As recognized by the Court here in its October 2, 2023 Order, "To the extent there is overlap between the [Refund Suit] and the present case, it is just as likely to work against the [] Defendants as in their favor. Although it was not asked to decide the issue of fraud penalties, the Court of Federal Claims made findings" that ACR's mixture was not used as a fuel, its transactions were not bona fide sales and "these findings are suggestive of fraud." *Huyser*, __ F. Supp. 3d ___, 2023 WL 6476532, at *5.

and, most notably, Penalty Issue, are all relevant to whether ACR was used to promote fraud, illegality, or resulted in an injustice.

> **b.  Facts and issues determined in the Refund Suit are relevant to the United States' alternative fraudulent transfer claims in this case.**

On its fraudulent transfer claim, the United States seeks to prove (among other factors) that ACR "reasonably should have believed" it may incur debts beyond its ability to pay. In the Refund Suit, the Claims Court found that, as early as summer 2011, ACR received notice that IRS had issued guidance that its business model did not qualify for the credit, that from the outset ACR did not reasonably rely on *any* advice on its availability to claim the credit, and that the Defendants *specifically* should have known "receiving millions of dollars in tax credits for transferring feedstock from one entity to another—while mixing in a meaningless amount of diesel along the way—was 'too good to be true.'" 939 F.3d at 1334; 137 Fed. Cl. at 31-38 (finding ACR, and its members, did not reasonably rely on any advice in claiming the credit). Again, the resolution of this issue does not decide whether the transfers to the Defendants were fraudulent under the UFTA. Even so, the Court's findings are relevant to issue of whether ACR (and its members) reasonably should have known it may have a large debt to the United States.

These discrete matters were fully litigated and finally determined in the Refund Suit. While the Defendants may continue to litigate the ultimate issue of whether they can be held personally liable for ACR's debts, the Defendants should be collaterally estopped from seeking any do-over on the Fuel Issue, Sale Issue, and

33

Penalty Issue involving the same facts relevant to the United States' claims in this case.

### 3.   Element 3 - The issues subject of preclusion were actually litigated in the Refund Suit.

The Fuel Issue, Sale Issue, and Penalty Issue were "actually litigated" in the Refund Suit. ACR and the United States cross-moved for summary judgment and the Court of Federal Claims granted summary judgment for the United States and denied ACR's motion. 137 Fed. Cl. at 37-38; (SUMF ¶¶ 17-20). "[F]or an issue to be 'actually litigated,' the issue must have been raised, contested, and submitted for determination in the prior proceeding." *Fofana v. Mayorkas*, 4 F.4th 668, 671 (8th Cir. 2021)(internal citation and quotation omitted). Issues decided on summary judgment are considered actually litigated because the issue was "submitted for determination, and [was] determined." *In re Keaty,* 397 F.3d 264, 272 (5th Cir. 2005) (citing 2d Restatement of Judgments § 27 cmt.).[30] These are the circumstances here.

The issues of whether ACR's mixture was "used as a fuel," ACR "sold" this "fuel," and whether ACR reasonably claimed the credits were presented by both the Plaintiff ACR and the Defendant United States in the Refund Suit and ultimately decided by the Claims Court, and affirmed by the Federal Circuit on appeal. 137

---

[30] *See also Gen. Elec. Med. Sys. Eur. v. Prometheus Health*, 394 F. Appx. 280, 284 (6th Cir. 2010)*; see also Twin City Pipe Trades Serv. Ass'n, Inc. v. Wenner Quality Servs., Inc.,* 2015 WL 5165350, at *3 (D. Minn. 2015), *aff'd,* 869 F.3d 672 (8th Cir. 2017)(finding issue subject of summary judgment was actually litigated).

Fed. Cl. 1 *aff'd,* 939 F.3d 1320 *passim*; (SUMF ¶¶ 21). The "actually litigated" element is therefore satisfied.

### 4.   Element 4 - The issues subject of preclusion here were determined by a valid and final judgment in the Refund Suit.

A final judgment was issued in the Refund Suit. ACR appealed the judgment of the Claims Court, and the Federal Circuit affirmed the judgment in the United States' favor. In addition, the record in the Claims Court and Federal Circuit opinions reflect that ACR (through the Defendants) and the United States presented evidence at summary judgment and litigated each of the three issues. Therefore, the finality element is satisfied. *See John Morrell & Co. v. Loc. Union 304A of United Food & Com. Workers, AFL-CIO,* 913 F.2d 544, 564 (8th Cir. 1990) (finding further basis to deem determination of an issue final when "[b]oth parties presented abundant evidence on the issues [] and had strong incentives to litigate the issue fully.").

### 5.   Element 5 - The determination of the issues subject of preclusion were essential to the judgment in the Refund Suit.

Element 5 for the application of collateral estoppel is satisfied where, as here, an issue, subject of a prior judgment, was essential to the prior court's ruling. *See Mandich v. Watters,* 970 F.2d 462, 466 (8th Cir. 1992); *Walker v. Maschner,* 2005 WL 8141553, at *5 (S.D. Iowa 2005).[31] The Refund Suit judgment found ACR liable

---

[31] *See e.g.*, *Milligan v. City of Red Oak,* 1999 WL 33457826, at *7 (S.D. Iowa 1999)(citing Restatement (Second) of Judgments § 27 and discussing issues are not "essential" when issues were "immaterial or unessential to the determination of the real and decisive issue" in the prior case)(internal citations and quotations omitted).

for all $19 million in federal tax credits that it had no right to claim and receive and liable for a 200% penalty for unreasonably claiming the credits. Essential to this judgment was the Claims Court's determination that ACR's waste / diesel mixture was not used as a "fuel," that ACR's business transactions had no economic substance and resulted in no actual "sale" of the mixture, and that the purported advice of ACR's advisors did not provide a reasonable basis to claim the credits. As described *supra* Section III.B.2., all of these essential issues are also relevant to the claims here.

### 6.   In conclusion, all five elements of issue preclusion are present with respect to the Defendants.

As described above, all five elements for application of issue preclusion are present here, and there is no unfairness in application of offensive non-mutual estoppel against the Defendants. The undisputed material facts show that the Defendants (the only members of ACR), actively participated in the Refund Suit litigation, disputed and lost on issues of how ACR operated and structured its business and its liability for the tax credits and penalties, and those matters were finally determined. The Fuel Issue, Sale Issue, and Penalty Issue overlap with facts here which involve examining how ACR operated, whether it was a sham business, and whether ACR reasonably should have known it may owe a large debt to the United States. The Defendants were closely and actively involved in the prior litigation and held the same interests as ACR in being held not liable. The doctrine of issue preclusion bars relitigation in precisely these circumstances. Therefore,

granting partial summary judgment is proper to preclude Defendants from relitigating the same facts here.

**B.  Defendant JWC is the alter ego of Defendant Jeffrey W. Carter and, because of this, Carter and JWC should be treated as one and the same in this litigation and for purposes of issue preclusion in this case.**

**1.  Carter and JWC have jointly, and conclusively, admitted that Carter individually served as a member of ACR.**

In their Joint Answer to the United States' Complaint, <u>Carter and JWC made binding judicial admissions that Carter served as a member of ACR and directed ACR to make distributions to him payable to his investment entity, JWC</u>. (SUMF ¶¶ 2-3, 131, 137.) Carter and JWC further admitted in their Joint Answer in this suit that:

- "Huyser, Carter, Kinley, and Boyle served as the only members of ACR during its time in operation." (SUMF ¶ 3; Cmplt. ¶ 29 at Appx. 509; Joint Ans. ¶ 29 at Appx. 652.)

- "While defendant Carter served as a member of ACR, Carter directed that all of the distributions payable to him personally were paid to defendant JWC, an entity that Carter organized and controlled." (SUMF ¶¶ 131, 137; Cmplt. ¶ 94 at Appx. 525; Joint Ans. ¶ 94 at Appx. 661.)

- "Defendants Huyser, Carter, Kinley, and Boyle were members of ACR throughout the Refund Suit and the appeal to the Court of Federal Claims." (SUMF ¶ 22; Cmplt. ¶ 123 at Appx. 531; Joint Ans. ¶ 123 at Appx. 663.)

Carter and JWC's admissions in their Joint Answer are binding judicial admissions that conclusively remove this factual issue from dispute. *Missouri Hous. Dev. Com'n v. Brice,* 919 F.2d 1306, 1314 (8th Cir. 1990)(answers to complaint are binding despite admitting party later producing evidence to the contrary); *see also*

*Crest Hill Land Development LLC v. City of Joliet,* 396 F.3d 801, 805 (7th Cir. 2005)
(answer to complaint is a binding judicial admission with "the effect of withdrawing
the question…from contention").[32] Based on Carter and JWC's judicial admissions,
the Court should enter partial summary judgment finding that Carter, individually,
served as a member of ACR because that matter has been conclusively determined.

>    **2.   JWC is the alter ego of Carter and the Court should find there
>    is no legal distinction between Defendants Carter and JWC for
>    application of both issue preclusion here and liability at trial.**

Carter served as a member of ACR, but he chose to funnel his ACR
distributions to JWC. For this reason and because Carter had complete control over
JWC, JWC should be treated as Carter's alter ego for application of issue preclusion
here and any later determination of liability in this case (holding both Carter and
JWC jointly and severally liable for the debts of ACR).

Under Iowa law, the alter ego test is whether:

>    (1) the person influences and governs the entity; (2) a
>    unity of interest and ownership exists such that the
>    corporate entity and the person cannot be separated; and
>    (3) giving legal effect to the fictional separation between

---

[32] If Carter and JWC were to try to present evidence contradictory to their binding
judicial admissions to oppose this motion for partial summary judgment, that such
attempt would not create a genuine dispute of material fact and would fail. *See
Missouri Hous. Development Com'n v. Brice,* 919 F.2d 1306, 1314 (8th Cir. 1990)
(affirming grant of summary judgment)("[A]dmissions contained in pleadings are
binding where, as here, the admitting party later produced evidence contrary to
those admissions. We hold that [the party's] admissions in his answer are
binding.")(citing *Davis v. A.G. Edwards and Sons, Inc.,* 823 F.2d 105, 108 (5th
Cir.1987)); *see also Grynberg v. Bar S Services, Inc.*, 527 Fed. Appx. 736, 739-40
(10th Cir. 2013).

> the corporate entity and the person would "sanction a
> fraud or promote injustice."

*HOK Sport, Inc. v. FC Des Moines, L.C.*, 495 F.3d 927, 935 (8th Cir. 2007).[33] In

determining whether an entity is the alter ego of an individual under this test,

Courts look at the totality of the circumstances and examine a number of objective

and non-exclusive factors. *Hinson v. United States*, 994 F.2d 843 (Table) (8th Cir.

1993); *United States v. Rigler,* 885 F. Supp. 2d 923, 932-33 (S.D. Iowa 2012). Some

federal courts recognize also that state law (such as the above Iowa test) and federal

common law alter ego factors are similar and these courts use the same factors

interchangeably.[34]

─────────────────────────

[33] The Eighth Circuit and courts within the Circuit have looked to state law to determine whether an entity is an alter ego of an individual taxpayer. *United States v. Scherping,* 187 F.3d 796, 802 (8th Cir. 1999)(applying Minnesota law of alter ego in federal tax case).

[34] *See, e.g., Century Hotels v. United States,* 952 F.2d 107, 110 n.4 (5th Cir. 1992) ("State and federal alter ego tests are essentially the same. Our non-diversity alter ego cases rarely state whether a state or federal standard controls, and apply state and federal cases interchangeably."); *see also United States v. Shaw*, 2018 WL 4682333, at *9 (D. Nev. 2018) ("There is no true, uniform standard for determining whether a corporation is simply the alter ego of its owners,'")(quoting *Valley Fin., Inc. v. United States*, 629 F.2d 162, 172 (D.C. Cir. 1980), and adding "given the similarities between the federal and Nevada standard [of alter ego], the use of the federal standard should not disrupt commercial relationships.") (citations omitted); *United States v. Wolff*, 2010 WL 6238029, at * 7 (D. Wyo. 2010) ("The Court need not decide whether Wyoming law or federal common law applies regarding the alter ego claim, as both tests are satisfied in this case.").

In *Horton Dairy, Inc. v. United States*, 986 F.2d 286 (8th Cir.1993), the Eighth Circuit applied the factors below in its alter ego analysis without distinguishing between state and federal common law: "the absence of corporate formalities, the commingling of corporate and personal funds and expenses, and the family

(continued...)

These non-exclusive factors include:

- An absence of corporate formalities;[35]

- A close relationship between the individual and the entity;[36]

- Complete control of an entity by an individual;[37]

- Use of the corporate entity to further an individual's "personal goals";[38]

- Commingling of personal and corporate funds and expenses;[39]

---

relationship between corporate officers and the taxpayer." *Id.* at 289 (*citing United States v. Walton*, 909 F.2d 915, 928 (6th Cir.1990) & *Shades Ridge Holding Co. v. United States*, 888 F.2d 725, 729 (11th Cir.1989)); *cf. HOK Sport, Inc.,* 495 F.3d at 936 (Eighth Circuit applying Iowa law and examining virtually identical factors). In *United States v. Scherping,* 187 F.3d 796 (8th Cir.1999), without citing *Horton, supra,* the Eighth Circuit stated "[g]enerally federal courts will look to state law to determine whether an entity is an alter ego of a taxpayer." *Id.* at 802 (citations omitted). In any event, whether Iowa state or federal common law is used is not outcome determination because the factors considered are substantially similar if not identical.

[35] *Horton Dairy,* 986 F.2d at 289; *United States v. Scherping*, 187 F.3d at 802; *United States v. Walton,* 909 F.2d 915, 928 (6th Cir. 1990) (lack of corporate formalities).

[36] *Horton Dairy, Inc.,* 986 F.2d at 289; *Rigler,* 885 F. Supp. 2d at 933; *Hinson,* 1993 WL 172848, at *1; *Towe Antique Ford Foundation v. IRS,* 999 F.2d 1387, 1391 (9th Cir. 1993).

[37] *HOK Sport,* 495 F.3d at 941;); *Towe Antique,* 999 F.2d at 1391 (individual controls entity without need to consult others).

[38] *HOK Sport,* 495 F.3d at 941; *Rigler*, 885 F. Supp. 2d at 933 ("use of entity assets for personal purposes); *Walton,* 909 F.2d at 928 (entity "façade for personal operations of dominant stockholder"); *Towe Antique,* 999 F.2d at 1391 (use of entity for personal financial benefit).

[39] *Horton Dairy,* 986 F.2d at 289; *Rigler*, 885 F. Supp. 2d at 933; *Hinson,* 1993 WL 172848, at *1; *Walton,* 909 F.2d at 928 (commingling); *Towe Antique,* 999 F.2d at 1391 (commingling).

- Siphoning of funds from an entity to an individual;[40]

- Failure to keep appropriate corporate records;[41]

- Transfer of entity assets to an individual for little or no consideration; [42] and

- Upholding the individual-entity distinction would promote fraud or injustice.[43]

Applying these objective factors to the undisputed material facts here, the relationship between Carter and JWC was one of an alter ego.[44] As described below, Carter and JWC had a close relationship, Carter held complete control over JWC, JWC failed to follow corporate formalities, JWC failed to keep appropriate corporate records, Carter and JWC commingled personal and business funds, Carter

---

[40] *Scherping*, 187 F.3d at 802 (8th Cir. 1999); *Eckhardt v. United States,* 463 Fed. Appx. 852, 857-58 (11th Cir. 2012)(finding individual alter ego of corporation when transferred corporate funds to personal accounts).

[41] *Horton Dairy,* 986 F.2d at 289; *Scherping,* 187 F.3d at 802.

42 *Rigler*, 885 F. Supp. 2d at 933; *Hinson*, 1993 WL 172848, at *1.

[43] *Scherping,* 187 F.3d at 804; *Adam v. Mt. Pleasant Bank & Tr. Co.,* 355 N.W. 2d 868, 872 (Iowa 1984).

[44] Under Iowa law, fraud is not a prerequisite for piercing the veil or an alter ego finding. *Adam v. Mt. Pleasant Bank & Tr. Co.,* 355 N.W. 2d 868, 872 (Iowa 1984); *see also HOK Sport, Inc.,* 495 F.3d at 936.

Further, the fact that JWC was a limited liability company rather than a corporation is legally irrelevant. Limited liability companies and individuals can be alter egos of one another. *See, e.g.*, *United States v. Cornwell,* 2020 WL 674092, at *12-13 (M.D. Fla. 2020) (LLC was individual taxpayer's alter ego and was a shell entity used to hide taxpayer's property); *Politte v. United States,* 2012 WL 965996, at *9-11 (S.D. Cal. 2012)(individuals and entity (LLC) were alter egos of corporate taxpayer), *aff'd*, 587 Fed. Appx. 406 (9th Cir. 2014).

transferred JWC assets to himself for no consideration, and upholding the
individual-entity distinction between Carter and JWC would result in an injustice.

### a. Carter and JWC had a close relationship.

Carter founded JWC, served as its registered agent, and held 99.1%
ownership interest in the company. (SUMF ¶¶ 134-136.) He used JWC as a vehicle
to make "high risk" investments in businesses and real estate. (*Id.* ¶¶ 138.) Carter
alone made decisions for JWC, could sign checks for JWC, access JWC bank
accounts, and initiate any transfer of JWC funds. (*Id.* ¶¶ 141-151.) JWC never had
employees, but Carter's administrative assistant performed work for JWC. (*Id.* ¶¶
155-156.) Carter's personal residence was titled in the name of JWC for decades.
(*Id.* ¶¶ 160-162, 165.) This type of close relationship between a business owner and
his business has been supportive of an alter ego finding, as it should here. *See, e.g.*,
*Walton,* 909 F.2d at 917, 923-24, 928 (entrepreneur taxpayer was sole owner of an
entity and entity owned taxpayer's purported personal residence).

### b. Carter held complete control over the operations of JWC.

Carter founded JWC and at all times held 99.1% ownership of the entity.
(SUMF ¶¶ 134-136.) He personally contributed funds to JWC. (*Id.* ¶ 141) Carter
made decisions for JWC and did not have to consult anyone else to make decisions
for JWC. (*Id.* ¶ 142.) Carter alone could sign JWC checks and access JWC bank
accounts. (*Id.* ¶ 143.) When JWC bought real estate, Carter decided what real estate
JWC would buy and when it would sell the real estate. (*Id.* ¶¶ 145-146.) Carter
transferred JWC funds to his personal accounts. (*Id.* ¶¶ 149-151.) Carter stopped
operating JWC in 2021 and directed office staff (of his other business ventures) to

shred all of the records of JWC. (*Id.* ¶¶ 148, 158-159.) Carter decided to title his personal residence, the Lincoln Avenue Property, in the name of JWC (and a predecessor investment entity JWC, Inc.), but he continued to reside there and enjoy the use of the home. (*Id.* ¶¶ 160-165.) In 2021, Carter decided to quitclaim the Lincoln Avenue Property from JWC back to himself personally and decided not to pay any consideration to JWC for the transfer. (*Id.* ¶¶169-170.) In these circumstances, individuals that exerted such day-to-day control of an entity are rightfully considered to have an alter ego relationship, as the Court should here. *See, e.g.*, *Towe Antique Ford Foundation v. IRS,* 999 F.2d 1387, 1392 (9th Cir. 1993).

### c. JWC failed to follow corporate formalities.

JWC failed to follow corporate formalities. JWC never had any employees, but employees of other business operated by Carter performed work for JWC. (*Id.* ¶¶ 155-156.) As detailed below, neither Carter nor JWC maintained adequate corporate records and destroyed those that may have existed.

Carter also contributed personal funds and funds ostensibly owned by JWC to be a member of ACR. (*Id.* ¶ 130.) Carter also directed that all ACR distributions were to be made payable to JWC. (*Id.* ¶ 131, 137.) All these facts are undisputed and all show that there was a lack of corporate formality in the operation of JWC's "business" and Carter's own personal affairs.[45]

---

[45] *See also United States v. Walton*, 909 F.2d 915, 928 (6th Cir. 1990) (alter ego relationship found when "corporation is merely a façade for the personal operations of the dominant stockholder")(citations omitted); *Valley Fin., Inc. v. United States,*

(continued...)

### d.  JWC failed to keep corporate records.

JWC failed to maintain and keep adequate corporate records. In a 2018 state court proceeding in Polk County Iowa, *Carter v. Carter*, Carter admitted he knew about the large ACR tax liabilities <u>and</u> admitted to the Iowa state court that JWC and Carter were both personally jointly and severally liable for at least $15 million of the Refund Suit judgment. (*Id.* ¶¶ 124-127.) In 2019 and 2021, the IRS filed public notices of transferee federal tax liens against JWC with respect to ACR's tax liabilities. (*Id.* ¶¶ 167-168.) With knowledge of the ACR liability (and after admitting in open court he may be liable for those liabilities), Carter directed his employees (of his other businesses) to <u>shred</u> all the existing records of JWC which included:

- Any records of board meetings or memoranda of JWC business decision-making;

- Internal accounting records;

- Documents sufficient to show Carter's role, responsibilities, and duties as founder and member of JWC;

- Loan agreements or other agreements entered into between Carter and JWC;

- All documents memorializing the 2021 transfer of the Lincoln Avenue Property from JWC to Carter; and

---

629 F.2d 162, 172 (D.C. Cir. 1980) (finding entity alter ego of taxpayer when "there is no evidence that a major corporate decision was ever made by anyone other than [the taxpayer].")

- All insurance policies JWC maintained for the Lincoln Avenue Property.[46]

(*Id.* ¶¶ 124-127, 158-159, 167-168, 171-172.) In December 2022, Carter, through his attorney, filed a Statement of Termination for JWC with the Iowa Secretary of State.[47] (*Id.* ¶ 152.)

Not only has JWC failed to maintain adequate corporate records, Carter directed that JWC records be destroyed *after* he publicly admitted in state court that he and JWC were liable for the ACR debt and *after* the IRS had filed notices of federal tax liens against JWC as a transferee of ACR. The intentional destruction (i.e., spoliation) of JWC's corporate records should also support the finding of an alter ego relationship between Carter and JWC. [48]

---

[46] On December 15, 2023, the Court issued an order compelling Carter and JWC to fully respond to the United States Rule 34 requests for documents by January 8, 2024. (ECF No. 72.) As reflected in SUMF ¶¶ 158-159, 171-172 and in their supplemental written responses (at Appx. 1087 & 1104) issued on January 8, 2024, Carter and JWC maintain that broad categories of records were destroyed in closing JWC and shredding its records in 2021. (SUMF ¶¶ 158-159, 172.)

[47] While JWC has filed a Statement of Termination, Iowa law provides that a dissolved LLC continues to exist while winding up its affairs. *See* Iowa Code Ann. §§ 489.702 (winding up activities include "prosecut[ing] and defend[ing] actions"). Further, Iowa law provides claims may proceed against a dissolved LLC (against its undistributed assets or assets distributed to members). *See* Iowa Code Ann. § 489.704(4); *Flanagan Corp. v. Lake Cabin Partners, LLC,* 2019 WL 13254093, at *1 (Iowa Dist. May 23, 2019)(declining to dismiss suit brought against administratively dissolved LLC because Iowa Code permits suits may proceed against dissolved LLCs to extent of their undistributed assets).

[48] *See and compare Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605-608 (6th Cir. 2005). The Sixth Circuit upheld a judgment piercing the veil of a business under Ohio law (which included the alter ego factor of "absence of corporate records")

(continued...)

**e. Carter and JWC commingled personal and business funds and expenses.**

When he decided to close JWC, Carter transferred funds held by JWC to himself personally. (SUMF ¶¶ 150-151.) He also transferred personal funds to fund JWC. (*Id.* ¶¶ 141.) And, as described above, in making the initial capital contribution to ACR, Carter used $1,000 in personal funds and $1,000 in JWC funds to fund the contribution. (*Id.* ¶¶ 130-131.) Carter also used other businesses he operated to provide services for JWC such as use of the Grant Street Suite, a suite of offices Carter owned, and use of Carter's administrative assistant Deb Harre. (*Id.* ¶¶ 153-157.) Carter's other businesses paid for the office staff and other costs of the office suite. (*Id.* ¶ 157.)

---

when sole shareholder refused and failed to produce business records. The Court found the "situation presented here is somewhat analogous to spoliation of evidence, 'the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for the production.'" *Id.* at 607-08 (*quoting United States v. Copeland,* 321 F.3d 582, 597 (6th Cir. 2003) & at 607 *citing and quoting State of Ohio, ex rel. Tri-State Group, Inc.,* 2004 WL 1882567, at *12 (Ohio App. 7 Dist. 2004)("failure to produce [] corporate records after being requested to do so demonstrates an absence of corporate records.").) The Sixth Circuit found that evidence of individual's failure to keep corporate records and failure to produce records sought in discovery reflected the alter ego factor of "failure to maintain corporate formalities." *Taylor Steel,* 417 F.3d at 607–08. *See also Horton Dairy,* 986 F.2d at 289 (in support of alter ego finding, determining business failed to keep records recording what expenses were business expenses and what were personal); *Scherping,* 187 F.3d at 805 (no separate financial records); *see also, Columbine Shipping, Inc. v. China Metallurgical Imp. & Exp. Corp.,* 1998 WL 23229, at *3 (S.D.N.Y. 1998)(existence of no corporate records was evidence in support of alter ego determination).

Carter titled his personal residence in the name of JWC. (*Id.* ¶¶ 160-162, 165.) Carter used JWC funds to pay for personal housing expenses like utility bills, property taxes, and renovations to the Lincoln Avenue Property. (*Id.* ¶ 166.) He also used JWC funds to pay for personal expenses, such as car insurance and water bills. (*Id.* ¶¶ 139 & 140 (Carter testifying for personal bills "generally speaking, everything was paid through the company – or by the company [JWC].") This evidence of personal and business funds moving back and forth has been found as evidence of an alter ego relationship. *See Horton Dairy,* 986 F.2d at 289 (finding corporate and personal money moving and back and forth supported alter ego finding).

### f. Carter transferred JWC funds and assets to himself and transferred assets for little or no consideration.

Since 1986, Carter has lived at the Lincoln Avenue Property, a single-family home. (*Id.* ¶¶ 160, 162, 173.) From 1990 through 2021, Carter titled the Property in the name of JWC (or a predecessor entity JWC, Inc.) and continued to live there. (*Id.* ¶¶ 160-162, 165.) In 2021, Carter decided to quitclaim the Property back to himself individually. (*Id.* ¶ 169.) He did not pay any consideration for the transfer of title from JWC to his name. (*Id.* ¶¶ 169-170.) Carter also transferred JWC funds to himself for no consideration. (*Id.* ¶¶ 150-151.) These types of transfers, and use of entity property for personal purposes, is further evidence of the alter ego relationship.

### g.  Upholding the individual-entity distinction between Carter and JWC would promote fraud or an injustice.

Finally, an injustice would result if Carter and JWC were not treated as one and the same in this case. *Adam,* 355 N.W.2d 868, 871; *Keith Smith, Inc. v. Bushman,* 873 N.W. 2d 776 (Table), 2015 WL 8364910, *10 (Iowa Ct. App. 2015). The United States seeks to collect ACR's tax liabilities from Carter personally, but also from JWC, the business entity he operated as an extension of himself and to which he funneled millions in ACR distributions.

Carter has publicly admitted in the *Carter v. Carter* Polk County Iowa case (*supra*), that he and JWC are both liable for the debts of ACR. (SUMF ¶¶ 124-127.) At the same time, Carter further represented to the Polk County Court that he planned to take efforts to pay some of the outstanding ACR liabilities. (*Id.* ¶ 122.) These public statements were false because Carter has also admitted under oath he never undertook such efforts nor paid any part of the ACR liabilities. (*Id.* ¶ 129.) Since the Refund Suit judgment, neither Carter nor any of the other ACR members have made any payments towards ACR's large outstanding liabilities. (*Id.* ¶¶ 24, 129.)

*After* the Refund Suit judgment and *after* he had publicly acknowledged both JWC and his own personal liability for the ACR debts in *Carter v. Carter*, Carter chose to close JWC, transfer JWC's cash to himself personally, transfer real property held by JWC to himself personally, *and* order the shredding of all of JWC's business records held in his office. (*Id.* ¶¶ 112, 114, 124-127, 148, 150-151, 158-159, 167-172.) The Eighth Circuit has found there are "strong policy reasons for reverse

piercing [in this context], that is, avoiding fraud and collecting delinquent federal taxes." *United States v. Scherping,* 187 F.3d 796, 804 (8th Cir. 1999).[49] An injustice would result if Carter could simply close his business and walk away from millions in federal tax debts that he may claim JWC alone might owe. For these reasons, and based on the undisputed material facts, Carter and JWC should be treated as one and the same in this suit for any later determined liability for the ACR debts (on either the veil piercing or fraudulent transfer claims).

## IV.   CONCLUSION

In conclusion, the Court should enter partial summary judgment under Fed. R. Civ. P. 56(a) because there are no genuine disputes of material fact and these matters should be resolved before trial. As described above, all five elements required for issue preclusion are present here and the Defendants should be estopped from relitigating the Fuel Issue, Sale Issue, and Penalty Issue finally determined in ACR's Refund Suit. Further, the undisputed material facts show that Carter operated JWC as his alter ego and partial summary judgment is proper.

The United States respectfully requests entry of partial summary judgment on these two matters on the basis of its Statement of Undisputed Material Facts

---

[49] "The Government's inability otherwise to satisfy legitimate tax debts clearly may form a sound basis for such disregard of corporate form." *Valley Fin., Inc. v. United States*, 629 F.2d 162, 171-72 (D.C. Cir. 1980)(alter ego suit); *accord Wolfe v. United States*, 798 F.2d 1241, 1244 (9th Cir. 1986) (alter ego doctrine applied and corporate form disregarded where corporation was used to "evade a public duty, such as the paying of taxes."), *partially amended on other grounds*, 806 F.2d 1410 (9th Cir.1986).

49

and for the reasons set forth above. In addition, should the Court not grant all the relief sought in this motion, under Fed. R. Civ. P. 56(g), the United States requests that the Court enter an order stating any material fact that is not genuinely in dispute and treating those facts as established in the case.


Dated: June 26, 2024                              Respectfully submitted,

                                                  RICHARD D. WESTPHAL
                                                  United States Attorney

                                                  DAVID A. HUBBERT
                                                  Deputy Assistant Attorney General

                                                  /s/ Gretchen Ellen Nygaard
                                                  GRETCHEN ELLEN NYGAARD
                                                  D.C. Bar No. 1006292
                                                  ALLISON RICE
                                                  D.C. Bar No. 1671160
                                                  WILLIAM CHANG
                                                  D.C. Bar No. 1030057
                                                  Trial Attorneys, Tax Division
                                                  Department of Justice
                                                  P.O. Box 7238, Ben Franklin Station
                                                  Washington, D.C.
                                                  Telephone: 202-305-1672
                                                  Fax: 202-514-6770
                                                  Gretchen.E.Nygaard@usdoj.gov