UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:23-cv-00144-SHL-WPK |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANT KENNETH BOYLE'S** |
| | ) | **APPENDIX IN SUPPORT OF HIS** |
| JAMES HUYSER; MATTHEW KINLEY; | ) | **RESISTANCE TO PLAINTIFF'S** |
| KENNETH BOYLE; JEFFREY W. CARTER; | ) | **MOTION FOR PARTIAL SUMMARY** |
| and JWC INVESTMENTS, L.C., | ) | **JUDGMENT** |
| | ) | |
| Defendants. | ) | |

## <u>TABLE OF CONTENTS</u>

Defendant Boyle's Answers to Plaintiff's Third Set of Interrogatories ..........................001

Compilation of Deposition Transcripts in Refund Suit Where Huyser Attended
    Personally…...............................................................................................009

United States' Cross-Motion for Summary Judgment.....................................................019

United States' Brief in Support of Motion for Summary Judgment.................................021

Deposition Exhibit 8 (Bates stamped KINLEYM000558)......................................... ....070

THE WEINHARDT LAW FIRM

By:_____/s/ Todd M. Lantz_____
  Todd M. Lantz          AT0010162
  Jason R. Smith         AT0014862
2600 Grand Avenue, Suite 450
Des Moines, IA  50312
Telephone: (515) 244-3100
tlantz@weinhardtlaw.com
jsmith@weinhardtlaw.com

ATTORNEYS FOR DEFENDANT KENNETH
BOYLE

PROOF OF SERVICE
The undersigned certifies that the foregoing instrument was
served upon the parties to this action by serving a copy upon
each of the attorneys listed below on August 12, 2024 by
CM/ECF.

      /s/ Maura McNally-Cavanagh
Signature:  _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) | Case No. 4:23-cv-00144-SHL-WPK |
| v. | ) ) | |
| JAMES HUYSER; MATTHEW KINLEY; KENNETH BOYLE; JEFFREY W. CARTER; and JWC INVESTMENTS, L.C., | ) ) ) ) ) | **DEFENDANT KENNETH BOYLE'S ANSWERS TO PLAINTIFF'S THIRD SET OF INTERROGATORIES** |
| Defendants. | ) ) | |

The Defendant, Kenneth Boyle, hereby provides his answers to the Plaintiff's Third Set of Interrogatories.

10.     Do you contend that in 2011 you believed that ACR qualified to claim the alternative fuel mixture credit and that such personal belief serves as a defense to one or more of the United States' claims against you in this action? If so, state the material facts that serve as the basis for your personal belief that ACR qualified to claim the alternative fuel mixture credit and identify each document in support of your contention.

**ANSWER:**  Mr. Boyle objects that this is an improper contention interrogatory.  To quote the Plaintiff's own discovery responses, "Court's recognize that such '[s]o-called 'blockbuster' or 'contention' interrogatories (i.e., those that demand disclosure of each and every fact supporting a claim or defense) are disfavored…[n]or should an interrogatory purport to require that the answering party provide a narrative account of its entire case.' *Cmty. Voice Line, LLC v. Great Lakes Commc'n Corp.*, 2013 WL 4048495, at *8 (N.D. Iowa 2013)."    This interrogatory,

phrased in terms of "material facts" (which is facially vague and unduly burdensome), asks Mr. Boyle to explain all facts that may be deemed "material" to Mr. Boyle's defenses in this case.

Mr. Boyle further objects to the demand for identification of documents on the basis that it is derived from an improper contention interrogatory and it is unduly burdensome and disproportionate to the needs of this case because it directs Mr. Boyle, improperly, to essentially provide a detailed index of every single document that may be used to support a defense in this case.

Without waiving these objections, Mr. Boyle responds that he did believe in 2011 that ACR qualified to receive the alternative fuel mixture tax credit. Mr. Boyle refers to his prior declaration, discovery responses, and deposition testimony.[1] To summarize, and without limitation as to further explanation, Mr. Boyle states the following:

A. Mr. Boyle understood from James Huyser that the IRS approved ACR's registration to receive the alternative fuel mixture tax credits. Mr. Huyser explained that this process involved interaction with and vetting by the IRS, and Mr. Boyle believed that IRS' approval of the tax credit registration was an indication that ACR qualified for the alternative fuel mixture tax credits. Additionally, Mr. Boyle personally attended the end of a meeting with an IRS agent in 2011 at the Schuring & Uitermarkt accounting firm in which ACR's business operations were explained to the IRS agent, and Mr. Boyle received a summary of the meeting from Mr. Huyser and Ms. Albers. Mr. Boyle's impression was that the meeting with the IRS went well and that there was no

---

[1] Insofar as this interrogatory asks Mr. Boyle to repeat statements he has made in prior responses, testimony, or declaration, he objects that this request is cumulative, unduly burdensome, and disproportionate to the needs of this case.

suggestion that ACR did not qualify for the tax credits it had claimed and received.

B.    Mr. Boyle understood from James Huyser and Jeff Carter that ACR (through Mr. Huyser and Mr. Carter) had consulted with experienced legal professionals, including Jeff Lewis, Bill Smith, and Greg Sanderson, to confirm that ACR qualified to receive the alternative fuel mixture tax credits.  Mr. Boyle received some of the written communications from Mr. Sanderson and also personally communicated with Mr. Sanderson to confirm his opinion that ACR qualified for the credits.  Mr. Boyle also personally communicated with Jeff Lewis about the formation of ACR and the business processes.

C.    Mr. Boyle also believed that ACR qualified for the alternative fuel mixture tax credits because multiple CPAs reviewed and approved ACR's tax returns, which were signed under penalty of perjury.  Mr. Boyle's belief was reinforced by the fact that Matt Kinley (a CPA with significant business experience), Matt Juffer (an experienced CPA and lawyer), and Brad Smerage (an experienced CPA), had reviewed the tax advice from Sanderson and agreed that ACR qualified for the tax credits.

D.    Mr. Boyle believed that the use of ACR's alternative fuel mixture in anaerobic digesters had tremendous potential for the net production of energy.  This was based on his conversations with many people, including Dr. Daniel Zitomer (who had performed tests on samples of substrate), and results achieved with actual digesters.  This conclusion was also based upon Mr. Boyle's own research and knowledge about the renewable energy industry, as described in his deposition in

this case.  Furthermore, Mr. Boyle met with Larry Hare before becoming a member of ACR, and Mr. Hare confirmed the importance and value of ACR's high-strength biologic substrates and the tremendous increases in biogas production when ACR's substates were added.

E.      By the time Mr. Boyle became a member of ACR, the company was already delivering alternative fuel mixture to a client and preparing and/or submitting claims for tax credits.  Shortly after or around the time that Mr. Boyle became a member of ACR, the company began receiving payments for the tax credits, which reinforced Mr. Boyle's belief that ACR was entitled to receive the tax credits.

F.      Mr. Boyle understood that the other owners of ACR had each performed their own due diligence before becoming owners of ACR.  Mr. Boyle understood at the time that the other owners had significant experience in business investments and in alternative energy industry.  The due diligence performed by the other owners, as Mr. Boyle understood it, buttressed his own belief that ACR was entitled to receive the tax credits.

Mr. Boyle does contend that that his personal belief is relevant to the Plaintiff's claims in this case (and to his defense of those claims on the merits).


11.     Do you contend that you relied upon the advice of other individuals (such as attorneys, accountants, or any other individual) regarding whether ACR qualified to claim the alternative fuel mixture credit and that this reliance serves as a defense to one or more the United States'

claims against you in this action? If so, state the material facts that describe the advice you contend you relied upon and identify each document in support of your contention.

**ANSWER:** Mr. Boyle objects that this is an improper contention interrogatory. To quote the Plaintiff's own discovery responses, "Court's recognize that such '[s]o-called 'blockbuster' or 'contention' interrogatories (i.e., those that demand disclosure of each and every fact supporting a claim or defense) are disfavored…[n]or should an interrogatory purport to require that the answering party provide a narrative account of its entire case.' *Cmty. Voice Line, LLC v. Great Lakes Commc'n Corp.*, 2013 WL 4048495, at *8 (N.D. Iowa 2013)." This interrogatory, phrased in terms of "material facts" (which is facially vague and unduly burdensome), asks Mr. Boyle to explain all facts that may be deemed "material" to Mr. Boyle's defenses in this case.

Mr. Boyle further objects to the demand for identification of documents on the basis that it is derived from an improper contention interrogatory and it is unduly burdensome and disproportionate to the needs of this case because it directs Mr. Boyle, improperly, to essentially provide a detailed index of every single document that may be used to support a defense in this case.

Mr. Boyle further objects that the word "advice" is vague and ambiguous. It is unclear what is necessary for a statement or communication to qualify as "advice."

Without waiving these objections, Mr. Boyle responds that he did rely upon statements from other individuals (such as attorneys, accountants, or any other individual) regarding whether ACR qualified to claim the alternative fuel mixture credit. Mr. Boyle refers to his prior declaration, discovery responses (including his response to the previous interrogatory), and

Boyle App. 005

deposition testimony.[2]    To summarize, and without limitation as to further explanation, Mr.
Boyle states the following:

A.    Mr. Boyle relied directly or indirectly on statements and actions by the IRS,
including its approval of the alternative fuel mixture tax credit registration.

B.    Mr. Boyle relied directly or indirectly on statements and actions by Messrs.
Huyser, Carter, and Kinley.

C.    Mr. Boyle relied directly or indirectly on statements and actions by CPAs,
including the Hamilton Juffer accounting firm and the Schuring & Uitermarkt
accounting firm.

D.    Mr. Boyle relied directly or indirectly on statements and actions by attorneys,
including Greg Sanderson and Jeff Lewis.

E.    Mr. Boyle relied directly or indirectly on statements and actions by scientific
experts, including Dr. Daniel Zitomer and Dr. Hans van Leeuwen.

Mr. Boyle does contend that that his personal belief is relevant to the Plaintiff's claims in
this case (and to his defense of those claims on the merits).

---

[2]    Insofar as this interrogatory asks Mr. Boyle to repeat statements he has made in prior
responses, testimony, or declaration, he objects that this request is cumulative, unduly
burdensome, and disproportionate to the needs of this case.

THE WEINHARDT LAW FIRM

By:    Todd M. Lantz

    Todd M. Lantz          AT0010162
    2600 Grand Avenue, Suite 450
    Des Moines, IA  50312
    Telephone:  (515) 244-3100
    E-mail:  tlantz@weinhardtlaw.com

ATTORNEYS FOR DEFENDANT KENNETH BOYLE

PROOF OF SERVICE

The undersigned certifies that the foregoing instrument was served upon the parties to this action by serving a copy upon each of the attorneys of record on June 13, 2024 by Email.

Signature:   /s/ Todd Lantz

## VERIFICATION

I certify under penalty of perjury and pursuant to the laws of the State of Iowa that the above

Answers to Third Set of Interrogatories are true and correct.


_6 / 13 / 2024_     BY:     _Kenneth Boyle_

Date                   Kenneth Boyle

Boyle App. 008

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALTERNATIVE CARBON          )
RESOURCES, LLC,             )
                            )
            Plaintiff,      ) No. 15-155 T
                            )
vs.                         ) DEPOSITION OF
                            )
THE UNITED STATES,          ) KENNETH CROSLAND
                            ) BOYLE
            Defendant.      )
_____ )


        THE DEPOSITION OF KENNETH CROSLAND

BOYLE, taken before Brittney L. Sposeto,

Certified Shorthand Reporter of the State of

Iowa, commencing at 9:35 a.m., July 27, 2016,

at 110 East Court Avenue, Suite 286,

Des Moines, Iowa.


        Reported by:  Brittney L. Sposeto, CSR

Boyle App. 009

## Page 2

A P P E A R A N C E S

Plaintiff by:  WILLIAM SIDNEY SMITH
Attorney at Law
Suite 3700
801 Grand Avenue
Des Moines, Iowa 50309
(515) 246-5884
wss@smithkramerlaw.com

Defendant by:  MIRANDA BUREAU
Attorney at Law
P.O. Box 26
Ben Franklin Station
Washington, D.C. 20044
(202) 353-9171
miranda.j.bureau@usdoj.gov

Also Present:  James Huyser

## Page 4

INDEX OF EXHIBITS

| Exhibits | Referred to on page |
|----------|---------------------|
| Exhibit 1 | 26 |
| Exhibit 2 | 36 |
| Exhibit 3 | 37 |
| Exhibit 4 | 43 |
| Exhibit 5 | 44 |
| Exhibit 6 | 59 |
| Exhibit 7 | 59 |
| Exhibit 8 | 77 |
| Exhibit 9 | 78 |
| Exhibit 10 | 81 |
| Exhibit 11 | 86 |
| Exhibit 12 | 89 |
| Exhibit 13 | 91 |
| Exhibit 14 | 93 |
| Exhibit 15 | 96 |
| Exhibit 16 | 97 |
| Exhibit 17 | 97 |
| Exhibit 18 | 107 |

## Page 3

INDEX OF EXAMINATION

| Examination by | Page |
|----------------|------|
| Ms. Bureau | 5 |
| Mr. Smith | 113 |

INDEX OF ATTORNEY REQUESTS

| Request by | Page | Line |
|------------|------|------|
| Ms. Bureau | 108 | 4 |
| Ms. Bureau | 108 | 22 |
| Ms. Bureau | 113 | 9 |

## Page 5

KENNETH CROSLAND BOYLE,
called as a witness, having been first duly
sworn, testified as follows:

DIRECT EXAMINATION

BY MS. BUREAU:

Q.   Good morning.  We're on the record in
Alternative Carbon Resources, LLC, versus
United States.

     Could you state your full name for
the record, please.

A.  My name is Kenneth Crosland Boyle.

Q.   And how do you spell Crosland?

A.  C-r-o-s-l-a-n-d.

Q.   Have you ever had your deposition taken
before?

A.  I have.

Q.   On how many occasions?

A.  I believe it was just one occasion.

Q.   When was that?

A.  It was with -- I was with Maytag
Corporation, and I want to say it was around
2003, 2004.

Q.   And were you testifying for the
plaintiff or defendant in that case?

A.  We were the plaintiff.

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
ALTERNATIVE CARBON      )
RESOURCES, LLC,         )
                        )
          Plaintiff,    ) No. 15-155 T
                        )
vs.                     ) DEPOSITION OF
                        )
THE UNITED STATES,      ) JEFFREY CARTER
                        )
          Defendant.    )
_____ )
```

THE DEPOSITION OF JEFFREY CARTER,

taken before Brittney L. Sposeto, Certified

Shorthand Reporter of the State of Iowa,

commencing at 9:04 a.m., July 29, 2016, at

110 East Court Avenue, Suite 286, Des Moines,

Iowa.

Reported by:  Brittney L. Sposeto, CSR

Boyle App. 011

**2**

APPEARANCES

Plaintiff by:  WILLIAM SIDNEY SMITH
              Attorney at Law
              Suite 3700
              801 Grand Avenue
              Des Moines, Iowa 50309
              (515) 246-5884
              wss@smithkramerlaw.com

Defendant by:  BRIAN J. SULLIVAN
              MIRANDA BUREAU
              Attorneys at Law
              P.O. Box 26
              Ben Franklin Station
              Washington, D.C. 20044
              (202) 616-3339
              brian.j.sullivan@usdoj.gov
              miranda.j.bureau@usdoj.gov

Jeff Carter
by:        SHAYLA L. MCCORMALLY
          Attorney at Law
          Suite B
          2501 Grand Avenue
          Des Moines, Iowa 50312
          (515) 281-1475
          smccormally@2501grand.com

Also Present:  James Huyser

**3**

INDEX OF EXAMINATION

Examination by        Page
Mr. Sullivan            6
Mr. Smith             292

**4**

INDEX OF EXHIBITS

Exhibits   Referred to on page
Exhibit 1        165
Exhibit 2        166
Exhibit 3        168
Exhibit 4        170
Exhibit 5        172
Exhibit 6        176
Exhibit 7        180
Exhibit 8        184
Exhibit 9        189
Exhibit 10       204
Exhibit 11       206
Exhibit 12       225
Exhibit 13       229
Exhibit 14       240
Exhibit 15       242
Exhibit 16       243
Exhibit 17       245
Exhibit 18       249
Exhibit 19       251
Exhibit 20       253
Exhibit 21       255
Exhibit 22       258
Exhibit 23       259

**5**

INDEX OF EXHIBITS CONTINUED

Exhibits   Referred to on page
Exhibit 24       262
Exhibit 25       266
Exhibit 26       267
Exhibit 27       269
Exhibit 28       271
Exhibit 29       272
Exhibit 30       273
Exhibit 31       278
Exhibit 32       280
Exhibit 33       282
Exhibit 34       285
Exhibit 35       287

1

              IN THE UNITED STATES COURT OF FEDERAL CLAIMS


- - - - - - - - - - - - - - - - - - X
ALTERNATIVE CARBON RESOURCES, LLC,:
                                   :
          Plaintiff,               :
                                   :
vs                                 :   No. 15-155 T
                                   :
THE UNITED STATES,                 :
                                   :
          Defendant.               :
- - - - - - - - - - - - - - - - - - X



            DEPOSITION OF ROYCE HAMMITT,

taken by the Defendant before Julie M. McCurnin,
Certified Shorthand Reporter of the State of Iowa,
at 110 East Court Avenue, Suite 286, Des Moines,
Iowa, commencing at 12:25 p.m., Monday,
March 27, 2017.



APPEARANCES:

For the Plaintiff:    WILLIAM SIDNEY SMITH, ESQ.
                      Smith & Kramer, PC
                      801 Grand Avenue, Suite 3700
                      Des Moines, Iowa  50309
                      (515) 246-5845
                      wss@smithkramerlaw.com


For the Defendant:    BRIAN J. SULLIVAN, ESQ.
                      US Department of Justice
                      Court of Federal Claims Section
                      PO Box 26
                      Ben Franklin Station
                      Washington, DC  20044
                      (202) 353-9171
                      brian.j.sullivan@usdoj.gov

Also Present:         James Huyser


     JULIE M. McCURNIN - CERTIFIED SHORTHAND REPORTER

Boyle App. 013

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - X
ALTERNATIVE CARBON RESOURCES, LLC,:
                                  :
            Plaintiff,            :
                                  :
vs                                :  No. 15-155 T
                                  :
THE UNITED STATES,                :
                                  :
            Defendant.            :
- - - - - - - - - - - - - - - - - X


            DEPOSITION OF LARRY HARE,

    taken by the Defendant before Julie M. McCurnin,

    Certified Shorthand Reporter of the State of Iowa,

    at 110 East Court Avenue, Suite 286, Des Moines,

    Iowa, commencing at 9:26 a.m., Friday,

    January 27, 2017.

APPEARANCES:

For the Plaintiff:    WILLIAM SIDNEY SMITH, ESQ.
                      Smith & Kramer, PC
                      801 Grand Avenue, Suite 3700
                      Des Moines, Iowa  50309
                      (515) 246-5845
                      wss@smithkramerlaw.com

For the Defendant:    MIRANDA BUREAU, ESQ.
                      US Department of Justice
                      Court of Federal Claims Section
                      PO Box 26
                      Ben Franklin Station
                      Washington, DC  20044
                      (202) 353-9171
                      miranda.j.bureau@usdoj.gov

Also Present:         James Huyser

    JULIE M. McCURNIN - CERTIFIED SHORTHAND REPORTER

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS


- - - - - - - - - - - - - - - - - X
ALTERNATIVE CARBON RESOURCES, LLC,:
                                  :
        Plaintiff,                :
                                  :
vs                                :   No. 15-155 T
                                  :
THE UNITED STATES,                :
                                  :
        Defendant.                :
- - - - - - - - - - - - - - - - - X



            DEPOSITION OF AL KADUCE,

taken by the Defendant before Julie M. McCurnin,
Certified Shorthand Reporter of the State of Iowa,
at 110 East Court Avenue, Suite 286, Des Moines,
Iowa, commencing at 9:03 a.m., Monday,
February 27, 2017.


APPEARANCES:

For the Plaintiff:      WILLIAM SIDNEY SMITH, ESQ.
                        Smith & Kramer, PC
                        801 Grand Avenue, Suite 3700
                        Des Moines, Iowa  50309
                        (515) 246-5845
                        wss@smithkramerlaw.com


For the Defendant:      BRIAN J. SULLIVAN, ESQ.
                        US Department of Justice
                        Court of Federal Claims Section
                        PO Box 26
                        Ben Franklin Station
                        Washington, DC  20044
                        (202) 353-9171
                        brian.j.sullivan@usdoj.gov

Also Present:           James Huyser


    JULIE M. McCURNIN - CERTIFIED SHORTHAND REPORTER

Boyle App. 015

1

```
        IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALTERNATIVE CARBON       )
RESOURCES, LLC,          )
                         )
            Plaintiff,   ) No. 15-155 T
                         )
vs.                      ) DEPOSITION OF
                         )
THE UNITED STATES,       ) MATTHEW PATRICK
                         ) KINLEY
            Defendant.   )
_____ )
```

            THE DEPOSITION OF MATTHEW PATRICK

KINLEY, taken before Brittney L. Sposeto,

Certified Shorthand Reporter of the State of

Iowa, commencing at 9:38 a.m., July 28, 2016,

at 110 East Court Avenue, Suite 286,

Des Moines, Iowa.

            Reported by:  Brittney L. Sposeto, CSR

Boyle App. 016

**Page 2**

APPEARANCES

Plaintiff by: WILLIAM SIDNEY SMITH
    Attorney at Law
    Suite 3700
    801 Grand Avenue
    Des Moines, Iowa 50309
    (515) 246-5884
    wss@smithkramerlaw.com

Defendant by: MIRANDA BUREAU
    BRIAN J. SULLIVAN
    Attorneys at Law
    P.O. Box 26
    Ben Franklin Station
    Washington, D.C. 20044
    (202) 353-9171
    miranda.j.bureau@usdoj.gov
    brian.j.sullivan@usdoj.gov

Matthew Patrick Kinley
  by:   MARK E. WEINHARDT
    Attorney at Law
    Suite 450
    2600 Grand Avenue
    Des Moines, Iowa 50312
    (515) 564-5270
    mweinhardt@weinhardtlogan.com

Also Present:  James Huyser

**Page 4**

INDEX OF EXHIBITS
Exhibits    Referred to on page
Exhibit 1          32
Exhibit 2          35
Exhibit 3          45
Exhibit 4          52
Exhibit 5          56
Exhibit 6          60
Exhibit 7          64
Exhibit 8          82
Exhibit 9          88
Exhibit 10         90

**Page 3**

INDEX OF EXAMINATION
Examination by          Page
Ms. Bureau            5
Mr. Smith            97

INDEX OF ATTORNEY REQUESTS
Request by        Page   Line
Ms. Bureau         92     2
Ms. Bureau         93     1

**Page 5**

MATTHEW PATRICK KINLEY,
called as a witness, having been first duly
sworn, testified as follows:
    DIRECT EXAMINATION
BY MS. BUREAU:
  Q.   Good morning, Mr. Kinley.  My name is
Miranda Bureau, and we are here in a
deposition in the case Alternative Carbon
Resources, LLC, versus United States.
    Could you state your full name for
the record.
  **A.   Matthew Patrick Kinley.**
  Q.   And what is your current address?
  **A.   Home address is 185 58th Court,
West Des Moines, Iowa 50266.**
  Q.   Have you ever had your deposition taken
before?
  **A.   Yes.**
  Q.   On how many occasions?
  **A.   I think once.  I believe once.**
  Q.   When was that?
  **A.   More than ten years ago, I'd say, ten to
fifteen years ago.**
  Q.   And can you tell me about just the
nature of the case?

Boyle App. 017

1

            IN THE UNITED STATES COURT OF FEDERAL CLAIMS


- - - - - - - - - - - - - - - - - - X
ALTERNATIVE CARBON RESOURCES, LLC,:
                                    :
          Plaintiff,                :
                                    :
vs                                  :   No. 15-155 T
                                    :
THE UNITED STATES,                  :
                                    :
          Defendant.                :
- - - - - - - - - - - - - - - - - - X



            DEPOSITION OF R. JEFFREY LEWIS,

taken by the Defendant before Julie M. McCurnin,
Certified Shorthand Reporter of the State of Iowa,
at 110 East Court Avenue, Suite 286, Des Moines,
Iowa, commencing at 9:04 a.m., Wednesday,
March 1, 2017.


APPEARANCES:

For the Plaintiff:      WILLIAM SIDNEY SMITH, ESQ.
                        Smith & Kramer, PC
                        801 Grand Avenue, Suite 3700
                        Des Moines, Iowa  50309
                        (515) 246-5845
                        wss@smithkramerlaw.com


For the Defendant:      BRIAN J. SULLIVAN, ESQ.
                        US Department of Justice
                        Court of Federal Claims Section
                        PO Box 26
                        Ben Franklin Station
                        Washington, DC  20044
                        (202) 353-9171
                        brian.j.sullivan@usdoj.gov

Also Present:           James Huyser


     JULIE M. McCURNIN - CERTIFIED SHORTHAND REPORTER

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

No. 15-155 T
(Judge Margaret M. Sweeney)

ALTERNATIVE CARBON RESOURCES, LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

_____

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

_____

Pursuant to Rules 56 and 7.2(b)(1) and (c) of the United States Court of Federal Claims,

Defendant cross-moves for summary judgment and opposes Plaintiff's motion, which was filed

on September 27, 2017. (Dkt. No. 39.) Defendant requests that this court grant judgment in its

favor, and grant its counterclaim in the amount of $59,320,179, less payments made, plus

statutory interest and additions accruing according to law.

In support of its motion and response, Defendant relies on the memorandum submitted in

support of its motion, together with the Appendix of exhibits.

Respectfully submitted,

October 25, 2017

*s/Miranda Bureau*
MIRANDA BUREAU
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
Tel: (202) 353-9171
Fax: (202) 514-9440
Miranda.j.bureau@usdoj.gov

DAVID A. HUBBERT
 Acting Assistant Attorney General
DAVID I. PINCUS
 Chief, Court of Federal Claims Section
G. ROBSON STEWART
 Assistant Chief
BRIAN J. SULLIVAN
 Trial Attorney

October 25, 2017

*s/G. Robson Stewart*
 Of Counsel

No. 15-155 T
(Judge Margaret M. Sweeney)

_____

_____

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

ALTERNATIVE CARBON RESOURCES, LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

_____

MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT

_____

DAVID A. HUBBERT
Acting Assistant Attorney General

DAVID I. PINCUS
G. ROBSON STEWART
BRIAN J. SULLIVAN
MIRANDA BUREAU
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 353-9171
(202) 514-9440 (facsimile)
Miranda.j.bureau@usdoj.gov

_____

_____

Page(s)

**TABLE OF CONTENTS**

Memorandum In Support of Cross-Motion for Summary Judgment and
   Opposition to Plaintiff's Motion for Summary Judgment ............................................1

Introduction ................................................................................................................1

Statement of Facts ......................................................................................................2

ACR Begins Claiming Alternative Fuel Mixture Credits ..........................................4

ACR Pays Wastewater Treatment Plants to Dispose of Its Waste Materials ............5

The Anaerobic Digestion Process ..............................................................................6

ACR Forms a New Company to Add Water to Other Forms of Solid Wastes ...........9

Sanderson Questions ACR's Operations ..................................................................10

Standard of Review ..................................................................................................12

Argument ..................................................................................................................13

    I.  ACR's Substances Were Not Alternative Fuel Mixtures ...............................14

        A. ACR's Substances Were Not Liquid Fuels Derived from Biomass
           Because They Were Solids Dissolved or Suspended in Water ...........................15

            i.    *ACR's Mixtures Contained Large Amounts of Added Water – An
                Inorganic Substance* ..........................................................................15

            ii.   *Solids in Water Do Not Constitute a "Liquid Fuel."* ...................16

        B. Plaintiff Cannot Show That Its Mixture Was Sold For Use as a Fuel ...............19

            i.    *ACR's mixtures were not used as a fuel by anaerobic digesters* ..............20

i

**Boyle App. 022**

**Page(s)**

       ii.     *The water and diesel were not used as a fuel* ............................................22

       iii.    *ACR cannot prove that its mixtures were used as a fuel*.........................23

   C.  ACR Did Not Sell Its Mixtures...............................................................................24

       i.     *Nominal Amounts Paid in Purported Consideration Were Sham Transactions*..................................................................................24

       ii.     *Disposal Was Not Consideration in this Case* .........................................27

II.    Defendant Is Entitled to Judgment On Its Counterclaim ............................................28

III.   ACR Cannot Show Reasonable Cause In Order to Avoid the § 6675 Penalty...........29

   A.  ACR Cannot Show Reasonable Reliance on the Advice of an Adviser ...............31

       i.     *ACR Cannot Show Reasonable Reliance on Greg Sanderson's Advice*..................................................................................33

       ii.     *ACR Cannot Show Reasonable Reliance on Any Other Advice* ..............35

       iii.    *ACR Knew Its Transactions Were Too Good to be True*...........................36

   B.  ACR Cannot Show Reasonable Caused Based on Receipt of an Excise Tax Registration from the IRS ............................................................................36

   C.  ACR Cannot Show Reasonable Cause Because Its Activities Were Purely Motivated by the Tax Credit ................................................................................40

Conclusion ............................................................................................................................40

ii

Page(s)

## TABLE OF AUTHORITIES

**Cases:**

*Affordable Bio Feedstock, Inc., v. United States,*
Case No. 16-1926, 2017 WL 3616894 (M.D. Fl. June 28, 2017) ....................................24

*Amergen Energy Co., LLC v. United States,*
94 Fed. Cl. 413 (2010) ................................................................................................27

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ...................................................................................................12

*Applegate v. United States,*
35 Fed. Cl. 406 (1996) ..........................................................................................13, 40

*Bank of Commerce v. Tennessee,*
161 U.S. 134 (1986) ...................................................................................................13

*Basque Station v. United States,*
53 Fed. Appx. 829 (9th Cir. 2002) ..............................................................................25

*Bond v. United States,*
134 S. Ct. 2077 (2014) ...............................................................................................18

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ..........................................................................................12, 13, 40

*Coltec Indus., Inc. v. United States,* 454 F.3d 1340 (Fed. Cir. 2006), *cert denied,*
549 U.S. 1206 (2007) .................................................................................................26

*Conway v. United States,*
326 F.3d 1268 (Fed. Cir. 2003) ...................................................................................30

*Doe v. United States,*
58 Fed. Cl. 479 (2003) ................................................................................................23

*H.J. Heinz Co. and Subsidiaries v. United States,*
76 Fed Cl. 570 (2007) ................................................................................................26

*Intersport Fashions West, Inc. v. United States,*
84 Fed. Cl. 454 (2008) ...............................................................................................29

iii

Boyle App. 024

**Page(s)**

**Cases (continued):**

*J.J. Powell, Inc. v. United States,*
   125 Fed. Cl. 73 (2016) ...................................................................................30

*Juniper Investment Co. v. United States,*
   168 Ct. Cl. 160 (1964) ..................................................................................26

*Knetsch v. United States,*
   364 U.S. 361 (1960)......................................................................................26

*Estate of Liftin v. United States,*
   111 Fed. Cl. 13 (2013), *affirmed,* 754 F.3d 975 (Fed. Cir. 2014) ..................31

*Estate of Liftin v. United States,*
   754 F.3d 975 (Fed. Cir. 2014)...............................................................30, 32

*Haggar Co. v. Helvering,*
   308 U.S. 389 (1940).....................................................................................18

*Inhabitants of Montclair v. Ramsdell,*
   107 U.S. 147 (1883).....................................................................................17

*Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,*
   755 F.2d 158 (Fed. Cir. 1985)......................................................................23

*National Labor Relations Bd. v. Jones & Laughlin Steel Corp.,*
   301 U.S. 1 (1937).........................................................................................17

*New Colonial Ice Co. v. Helvering,*
   292 U.S. 435 (1934).....................................................................................13

*Novinger v. Comm'r,*
   61 T.C.M. (CCH) 3024 (1991) ....................................................................40

*Papillon Airways, Inc. v. United States,*
   105 Fed. Cl. 154 (2012) ...............................................................................31

*Robinson v. Shell Oil Co.,*
   519 U.S. 337 (1997)......................................................................................18

*Schumacher v. United States,*
   931 F.2d 650 (10th Cir. 1991) ....................................................................13

iv

**Boyle App. 025**

**Page(s)**

**Cases (continued):**

*Stine v. United States,*
    106 Fed. Cl. 586 (2012) .................................................................................30

*Stobie Creek Investments LLC v. United States,*
    608 F.3d 1366 (Fed. Cir. 2010)................................................30, 31, 35, 36

*Stobie Creek Investments, LLC v. United States,*
    82 Fed. Cl. 636 (2008) *aff'd,* 608 F.3d 1366 (Fed. Cir. 2010)................................ *passim*

*Sunoco, Inc. v. United States,*
    129 Fed. Cl. 322 (2016) *appeal docketed,* No. 17-1402
    (Fed. Cir. Dec. 22, 2016) .........................................................................13, 19

*Sweats Fashions, Inc. v. Pannill Knitting Co.,*
    833 F.2d 1560 (Fed. Cir. 1987)................................................................12

*Tallman v. Brown,*
    105 F.3d 613 (Fed. Cir. 1997)..................................................................17

*Thomas v. United States,*
    166 F.3d 825 (6th Cir. 1999) ...................................................................26

*Timex V.I. Inc. v. United States,*
    157 F.3d 879 (Fed. Cir. 1998)................................................................18, 20

*United States v. Boyle,*
    469 U.S. 241 (1985).................................................................................30, 31

*United States v. Wells Fargo Bank,*
    485 U.S. 351 (1988).................................................................................13

*Valley Ice & Fuel Co., Inc. v. United States,*
    30 F.3d 635 (5th Cir. 1994) ....................................................................30

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.,*
    200 F.3d 795 (Fed.Cir.1999)................................................................23, 35

*Yates v. United States,*
    135 S. Ct. 1074 (2015)............................................................................18, 22

**Boyle App. 026**

**Page(s)**

**Statutes**

Internal Revenue Code of 1986 (26 U.S.C.):

§ 40 ...................................................................................................27

§ 45 ...................................................................................10, 14, 15

§ 4083 ...............................................................................14, 19, 22

§ 4101 ...............................................................................36, 37

§ 6110 ...............................................................................27

§ 6206 ...............................................................................11, 14, 28, 29

§ 6402 ...............................................................................14

§ 6404 ...............................................................................36, 38, 39

§ 6420 ...............................................................................28

§ 6421 ...............................................................................28

§ 6426 ...............................................................................*passim*

§ 6427 ...............................................................................13, 28, 29, 36

§ 6436 ...............................................................................18

§ 6651 ...............................................................................30

§ 6661 ...............................................................................40

§ 6662 ...............................................................................30, 31, 32

§ 6664 ...............................................................................30

§ 6675 ...............................................................................*passim*

§ 7701 ...............................................................................26

Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for
    Users, Pub. L. 109-59, 119 Stat. 1144 ...............................................................................21

vi

**Page(s)**

**Miscellaneous:**

*Black's Law Dictionary* (10th ed. 2014) ........................................................................24

H.R. Rep. No. 109-203 (2005) (Conf. Rep.) ..................................................................21

Private Letter Rulings

     963102........................................................................................................................33

     9229038......................................................................................................................28

Rules of the Court of Federal Claims Rule 56 .......................................................12**,** 34, 35

Treas. Reg. (26 C.F.R.):

     § 1.6664-4..................................................................................................................32

     § 48.4101-1................................................................................................................38

     § 301.6404-3..............................................................................................................39

 Uniform Commercial Code, § 2-106(1)..........................................................................24

Boyle App. 028

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
_____

No. 15-155 T
(Judge Margaret M. Sweeney)

ALTERNATIVE CARBON RESOURCES, LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.
_____

MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
_____

## INTRODUCTION

In 2011, a tax credit was available to producers of alternative fuel mixtures who used the mixture as a fuel or sold the mixture for use as a fuel in a trade or business. Alternative Carbon Resources, LLC ("ACR" or "plaintiff") obtained substances such as corn syrup, thin stillage, and wheat starch from suppliers. After obtaining these products (which contained a large volume of water), ACR alleges that it added a splash of diesel fuel, and then "sold" the mixtures to wastewater treatment plants and other facilities operating anaerobic digesters. ACR argues that its mixtures resulted in increased production of biogas, which contains methane, a greenhouse gas. ACR argues that the anaerobic digester facilities then produced electricity by burning some of the biogas, and that, as a result, ACR is entitled to an alternative fuel mixture credit.

ACR cannot show that it is entitled to alternative fuel mixture credits under § 6426(e). First, ACR cannot show that its mixtures contained "liquid fuels derived from biomass" because they were solids dissolved or suspended in water. Second, ACR has not established that its

1

materials were sold for *use as fuels* – a requirement of § 6426(e). Third, ACR cannot show that

its materials were *sold* for use as a fuel, because, in fact, ACR paid facilities operating anaerobic

digesters over $1 million to dispose of its mixtures. Finally, ACR cannot show that it is not liable

for the excessive claims penalty due to reasonable cause.

## STATEMENT OF FACTS

In 2011, ACR purchased food products and food waste materials such as corn syrup,

wheat starch, and thin stillage from various suppliers, including ethanol and food production

plants. (Dkt. No. 39-1, "PSOF" ¶¶ 4, 6; Def.'s App. ("App."), Ex. 9, A106-7, Huyser Tr.

108:19-23, 108:25-109:5; Ex. 5, A0053-4, Boyle Tr. 18:18-23; 23:1-24:2; Ex. 7, A074-6, Kinley

25:14-26:22; 28:9-15.) These plants used water to facilitate their production processes and to

wash down production equipment. (App., Ex. 15, A288-90, Daniels Tr. 16:1-17:8; 18:2-11; *see*

*also* Ex. 13, A264, Zitomer Tr. 33:3-20.) The plants then captured the remaining water, which

contained biosolid pieces, and sold it, often as food for cattle and other animals. (App., Ex. 7,

A076, Kinley Tr. 28:9-15; Ex. 15, A288-91, Daniels Tr. 16:1-17:8; 18:2-19:22.) These

substances were mostly water and were not combustible. (App., Ex. 9, A108, Huyser Tr. 110:5-

9.) ACR alleges that it mixed in "at least 0.1%, based on volume, taxable diesel fuel." (App., Ex.

1, A011, Compl. ¶ 37.) ACR added this "splash" of diesel for the purpose of qualifying for the

alternative fuel mixture credits. (App., Ex. 6, A066, Carter Tr. 97:13-17.) ACR then delivered its

mixture to wastewater treatment plants and other owners of anaerobic digesters. (PSOF ¶ 26.)

ACR engaged in these activities for the sole purpose of claiming alternative fuel mixture credits

under 26 U.S.C. § 6426(e). (App., Ex. 9, A103, Huyser Tr. 22:5-17.) ACR did not make a profit

without the tax credits. (App., Ex. 5, A056, Boyle Tr. 77:2-8; Ex. 9, A105, A107, Huyser Tr.

107:11-20; 109:9-11.)

Boyle App. 030

In 2010, Jeffrey Carter ("Carter") and James Huyser ("Huyser") had begun to explore ways to qualify for energy-related tax credits that they expected to be available in 2011. Huyser, who later became the managing member of ACR, has a bachelor's degree in finance. (App., Ex. 9, A097, Huyser Tr. 14:13-14; Ex. 6, A068, Carter Tr. 230:14-15.) Huyser has been involved in energy-related companies since the mid-1970s. (App., Ex. 9, A098-99, Huyser Tr. 15:10-13; 15:21-16:5.) During his time at Star Coal Company, he worked on experimental mining and reclamation techniques. (*Id.* A098, Huyser Tr. 15:14-15.) He was the owner of Iowa Coal Mining Company from 1978 through the 1990s. (*Id.* A098-99, Huyser Tr. 15:25-16:5.) He later worked as a sales manager for Chamness Technology, which was involved in recycling agricultural waste through composting and carbon-based fuels. (*Id.* A100-1, Huyser Tr. 17:9-17; 18:20-22.)

Carter was a long-time client of attorney Greg Sanderson ("Sanderson"), who has been involved in alternative energy credits since the 1990s. (App., Ex. 2, A26, Sanderson Tr. 12:3-8; 15-22.) Since that time, Sanderson has had an ownership interest in multiple companies that have received millions in alternative energy credits, and he has been heavily involved in advising clients regarding a substance called black liquor. (*Id.* A26-29, Sanderson Tr. 12:12-14; 14:10-22; 15:4-7; 78:7-10.)

Later in 2010, Huyser formed ACR, determining that ACR would apply for the alternative fuel mixture credit under § 6426. Sanderson advised ACR to have a scientist evaluate its process and "sign off on it" as meeting the "use as a fuel" standard in § 6426. (*See id.* A30-31, Sanderson Tr. 90:11-12; 91:9-13.) Sanderson also told ACR to test its biomass for its BTU value and warned that the "fuel itself should be in a liquid state, not just solids suspended in water." (*Id.* A34, A30, Sanderson Tr. 106:20-24; 90:9-11; Ex. 21, A334.) According to Sanderson, either

Boyle App. 031

Carter or Huyser told him that they knew experts in the Midwest and were consulting with them. (App., Ex. 2, A31, A33, Sanderson Tr. 91:18-20; 95:8-9.) In fact, ACR did not hire a scientist to review its process and approve it for use as a fuel prior to claiming alternative fuel mixture credits. (*Id.* A32, Sanderson Tr. 94:8-10; *see* Ex. 13, A268, Zitomer Tr. 46:7-11.)

In 2010, ACR submitted a Form 637, Application for Registration to the IRS. The Form 637 provides information to the IRS about certain excise tax activities. Ultimately, in a letter dated January 14, 2011, the IRS issued a Letter of Registration (Letter 3689) awarding ACR the registration number: 2010-001305-M-AM. (Dkt. No. 39-2, "Pl.'s App." 80.) The Letter states that the IRS approved the Form 637, and describes the two suffixes in ACR's registration as follows:

> The "AM" suffix in your registration number signifies an alternative fueler that produces an alternative fuel mixture that is sold for use or used in the alternative fueler's trade or business. The "M" suffix in your registration number signifies a blender of gasoline, diesel fuel (including a diesel-water fuel emulsion), or kerosene, producing a taxable fuel outside the bulk transfer/terminal system, including blenders of alcohol fuel mixtures, biodiesel mixtures, and renewable diesel mixtures.

(Pl.'s App. 80.)

**ACR Begins Claiming Alternative Fuel Mixture Credits.**

Despite not having hired a scientist to evaluate its proposed activities, ACR began claiming alternative fuel mixture credits in January of 2011. ACR did not file any Excise Tax Returns (Form 720) in 2011. (App., Ex. 8, A087, Albers Tr. 70:21-23.) ACR claimed alternative fuel mixture credits by filing Forms 8849 with the IRS. ACR filed the forms periodically, ultimately receiving almost $20 million from the IRS in 2011. (App. Ex. 1, A004, Compl. ¶12.) ACR's claims were based on the total number of gallons of waste that it sent to wastewater treatment plants, which consisted of solids dissolved or suspended in as much as 75% to 90%

4

water. (*see* App. Ex. 13, A264, Zitomer Tr. 33:13-15;[1] Ex. 15, A290-2, A297-8 Daniels Tr. 18:4-5; 19:24-20:2; 34:24-35:1; Ex. 12, A181-5, Cooney Rep. 9-13.) ACR hired Schuring & Uitermarkt, an accounting firm, to file Forms 8849 for ACR and provide bookkeeping services. (App., Ex. 8, A085-6, Albers Tr. 25:14-18; 46:10-14.) The refund claim forms were prepared by Wendy Albers, who became a CPA in 2010. (*Id.* A083, Albers Tr. 7:8-9.) Ms. Albers has no background or experience in renewable energy credits and was not hired to provide, nor does she recall providing, advice to ACR. (*Id.* A084-5, Albers Tr. 15:22-24; 25:17-23.)

**ACR Pays Wastewater Treatment Plants to Dispose of Its Waste Materials.**

The facilities operating anaerobic digesters charged ACR disposal or "tipping" fees for taking ACR's wastes, and ACR paid over $1 million in disposal fees in 2011. (App., Ex. 3, A039, Hare Tr. 16:12-24; Ex. 34, A330, Smerage Tr. 18:14-25.) For example, ACR executed an Authorization to Discharge form with Des Moines Metropolitan Wastewater Reclamation Authority, ("Des Moines WRA") in 2011, allowing it to dispose of up to 50,000 gallons per day for a disposal fee of $0.02634 per gallon. (App., Ex. 4, A46; Ex. 3, A39, A41-42, Hare Tr. 16:6-8; 84:22-85:8.) But, because § 6426 requires a "sale," ACR asked Des Moines WRA to sign an agreement requiring it to make one payment to ACR in 2011 in the amount of $950. (App., Ex. 10, A113; Ex. 4, A47.) Larry Hare, a manager of Des Moines WRA, described the transaction as a "wash:"

---

[1] Defendant took Dr. Zitomer's fact deposition in March of 2017. (App., Ex. 13, A258, "Zitomer Tr.") Dr. Zitomer incorporated his fact deposition testimony in his expert report. (Pl.'s App. 99). After Dr. Zitomer was disclosed as an expert witness, Defendant took his expert deposition in August of 2017. (App., Ex. 14, A271, "Zitomer II Tr.")

Boyle App. 033

| From: | Hare, Larry D. |
|---|---|
| To: | Hammitt, Royce W. |
| Subject: | FW: Forms - Authorization to Discharge |
| Date: | Monday, January 31, 2011 3:45:53 PM |
| Attachments: | AGREEMENT With DSM WRF – Attachment 1.doc |
| | AGREEMENT with DSM WRF – Attachment 2.doc |

Royce,

This is for their tax credit stuff.  A once a year charge of $950 for us
to "buy" product (AD feedstock).  We turn around and charge them $950 for
admin fees, so it is a wash.  Any problem with me signing this?

Larry

(App., Ex. 10, A113.) According to Hare, Des Moines WRA did not make this payment to ACR

in consideration for its waste materials. (App., Ex. 3, A39, Hare Tr. 16:12-15; Ex. 10, A113.)

Some wastewater treatment plants did not make any payment to ACR at all. (Dkt. No. 39, "Pl.'s

Br." 19.) ACR did not charge sales tax on the wastes that were disposed of at the wastewater

treatment plants. (App., Ex. 8, A088-9, Albers Tr. 76:23-77:2.)

**The Anaerobic Digestion Process.**

Anaerobic digesters[2] are often found at wastewater treatment plants and farms in the

United States. Wastewater treatment plants produce clean water through physical, chemical, and

biological processes. (App., Ex. 11, A118, Hammitt Tr. 19:3-22:4.) An anaerobic digester is a

tank used to process wastewater in absence of oxygen. (*Id.* A124, Hammitt Tr. 28:2-10.) An

anaerobic digester stabilizes solid wastes contained in water. (App. Ex. 14, A275, Zitomer II Tr.

41:16-17). Wastewater is pumped into the tank, and bacteria within the tank then break down

and metabolize organic portions of the wastewater substances. (App. Ex. 12, A187, Cooney

Report at 15; Ex. 11, A124-5, Hammitt Tr. 28:2-29:2.) The byproducts of the metabolic reactions

---

[2] At no time were ACR's wastes placed in a generator or combustion engine, and plaintiff admits
that its wastes were not combustible.

6

in an anaerobic digester are biogas (carbon dioxide and methane), and digestate, which contains solids and water. (App., Ex. 11, A124, A126-7, A165, A169-70, Hammitt Tr. 28:11-15; 43:8-44:20; 177:6-12; 184:16-185:2; Ex. 12, A188-90, Cooney Rep. 16-18.) The remaining solids are sent to farm fields and used as fertilizer, and the remaining water is sent back through the wastewater treatment plant again, and ultimately discharged in rivers and streams. (*Id.* A127-8, A169-70, Hammitt Tr. 44:10-21; 46:16-19; 184:16-185:2.)

The biogas produced by anaerobic digesters contains methane, a greenhouse gas. Therefore, wastewater treatment plants often burn, or "flare off" the biogas in order to reduce odor and the amount of methane released into the atmosphere. (App., Ex. 14, A275, Zitomer II Tr. 41:3-11.) Some of the digesters that received ACR's mixtures used some of the biogas produced by the anaerobic digester after further processing, or, sent the biogas to other entities. For example, Des Moines WRA flared off a significant portion of its biogas each month – as much as 43% was flared off in May 2011. (*See* App., Ex. 17 at 6, A314, (noting in May 2011 that 20,969,433 cubic feet of biogas was wasted out of a total of 48,140,350 cubic feet of captured biogas); *see also* Ex. 11, A157-60, Hammitt Tr. 168:12-171:4.)) Further, it sold as much as 55% of its biogas, per month, to a third-party. (*See* App., Ex. 17 at 7, A315, (in June 2011, 22,336,257 cubic feet of biogas was sold to Cargil out of a total of 40,087,372 cubic feet of captured biogas); *see also* Ex. 11, A129, A157-60, Hammitt Tr. 49:8-25; 168:12-171:4.)) The Des Moines WRA used only a fraction of its monthly biogas accumulation for electricity generation. (App., Ex. 11, A157-9, Hammitt Tr. 168:12-170:24; Ex. 17, A310-21.)

Only a small fraction of substances put into an anaerobic digester are capable of producing biogas. This portion is called "volatile solids." (App., Ex. 11, A160-2, Hammitt Tr. 171:20-173:16.) For example, according to a monthly digester gas report, in January 2011, Des

Boyle App. 035

Moines WRA received approximately 97.4 million pounds of substances for its anaerobic digesters, only some of which was from ACR. (App., Exs. 17 & 32, A310-21, A378-89; Ex. 11, A157, A164, A167, Hammitt Tr. 168:9-21; 176:16-25; 180:11-23.) Of that 97.4 million pounds,[3] 95.5% was water, and 4.5% was solids, with a portion of those solids being volatile solids capable of producing biogas. (App. Ex. 11, A162, 169, Hammitt Tr. 173:3-19; 184:16-20.) Just over half of those volatile solids were actually converted to biogas. (*Id.* A168, Hammitt Tr. 181:2-4.) Thus, approximately 2.3%, or less, of the volume of all waste added to the WRA digesters in January 2011 resulted in some biogas. (*Id.* A169-70, Hammitt Tr. 184:16-185:2.) After the digestion process was complete, over 95 million pounds—97% of the substances added to the digester, including solids and water—remained.

In 2011, Des Moines WRA received substances for its digester from a variety of sources: hauled waste; sewage system waste; settled sludge (from sewage and wastewater system); and sludge from biotanks. (*Id.* A122-23, Hammitt Tr. 26:6-27:14.) The Des Moines WRA received hauled waste from ACR and 30 to 40 other companies, equaling 50 to 75 loads of hauled waste a day. (*Id.* A143, Hammitt Tr. 89:10-20.) The Des Moines WRA mixed hauled waste from those multiple sources before they added the hauled waste to the anaerobic digester. (*Id.* A130-4, A137, Hammitt Tr. 61:8-63:5; 64:10-65:21; 68:14-24.) And as new sources of waste came into the facility, this waste was added into the digester with wastes that had been digesting for hours or days. (*Id.* A135-6, Hammitt Tr. 66:4-67:17.) It was not possible for Des Moines WRA to attribute a certain amount of gas to a certain type or source of waste (such as ACR) in 2011. (*Id.* A137-8, A148-51, Hammitt Tr. 68:25-69:11; 94:12-95:9; 95:15-96:12; 101:6-12.)

---

[3] Converting a gallon of liquid by volume to pounds requires multiplying the number of gallons by 8.34. (App., Ex. 11, A161-2, Hammitt Tr. 172:23-173:2.)

8

ACR did not tell recipients that its mixtures contained a small amount of diesel. (*See* App., Ex. 4, A046; Ex. 3, A043, Hare Tr. 87:3-8; Ex. 11, A1400, Hammitt Tr. 77:5-23; Ex. 16, A306-8.) Wastewater treatment plants do not normally accept diesel fuel in anaerobic digesters. (App., Ex. 3, A043, Hare Tr. 87:11-15; *see also* Ex. 14, A278, Zitomer Tr. 84:16-24.)[4]

**ACR Forms a New Company to Add Water to Other Forms of Solid Wastes.**

In March of 2011, Des Moines WRA stopped accepting corn wastes, such as ACR's corn syrup, in its anaerobic digesters, because the substance caused a problem called "foaming." (App., Ex. 11, A141, 145, 153, Hammitt Tr. 87:21-25; 91:15-17; 124:11-14; Ex. 6, A067, Carter Tr. 116:11-23.) Des Moines WRA determined that at least one foaming incident was the fault of ACR, and charged ACR over $11,000 for the cleanup. (Ex. 11, A154-6, Hammitt Tr. 136:17-138:16; Ex. 18, A323-4.)

ACR approached Larry Daniels, of Midwest Livestock Resources LLC ("Midwest") for assistance in converting soy hulls, a solid material, into a pumpable substance. (App., Ex. 15, A293, 295, 299, Daniels Tr. 21:6-25; 32:1-22; *see* 38:15-18.) ACR and Daniels formed a new company, "Engineered Biofuels," to mix dry food waste with water so that ACR could create more substances for disposal at anaerobic digesters—and thus, obtain more credits. (*Id.* A292-5, Daniels Tr. 20:3-21:2; 31:22-32:25.) The new company purchased equipment in order to suspend the solids in water. (*Id.* A301, Daniels Tr. 44:22-25.)  Engineered Biofuels then purchased soy hulls from Midwest, and, with Daniels's assistance, used a big tank where they mixed dry soy

---

[4] At least one witness states that, had he known diesel was included, he would not have accepted ACR's waste products. (App., Ex. 3, A043, Hare Tr. 87:7-15.) ACR did not list diesel on the Authorization to Discharge that it signed with the City of Des Moines or its agreement with Amana Farms, another facility. (App., Ex. 4, A046; Ex. 16, A306-8.) The manager of the Des Moines WRA noted that some of the microbes that live in anaerobic digesters can be stunted by certain toxins, such as petroleum-based diesel. (App., Ex. 3, A040, Hare Tr. 30:7-10).

9

hulls, xantham gum, and water. (*Id.* A296, A300, A302, Daniels Tr. 33:4-25; 39:5-12; 50:19-23). This process turned "one load of soy hulls [into] five to ten loads[.]" (*Id.* A297, Daniels Tr. 34:17-20.)  And in these loads, the solids are not dissolved in the water, they are suspended in the water, "physical little pieces of pure . . . soy hulls that are floating[.]" (*Id.* A298, Daniels Tr. 35:6-22.) The resulting substance was approximately 80% water. (*Id.* A297, A302-3, Daniels Tr. 34:21-25; 50:24-51:4.)

In March of 2011, Dr. Daniel Zitomer, a professor at Marquette University, responded to a request from Carter and e-mailed copies of two publications that he had co-authored on anaerobic digestion. (App., Ex. 33, A391-4.) Dr. Zitomer also performed one lab test on a sample of ACR's soy hull substance in the summer of 2011, providing ACR with biochemical methanogenic potential results. (App., Ex. 34, A396-99; Ex. 13, A267,  Zitomer Tr. 45:15-23.) Dr. Zitomer does not recall either he or his lab performing any other work for ACR beyond performing that lab test in 2011. (App., Ex. 13, A268, Zitomer Tr. 46:7-11.)

**Sanderson Questions ACR's Operations.**

Even after ACR began its activities and started claiming alternative fuel mixture credits, Sanderson still had questions about ACR's activities. At one point, he informed Huyser by e-mail that "he did not have a full understanding of the economics." (App., Ex. 21, A334-6.) He also warned ACR that "[t]he fuel itself should be in a liquid state, not just solids suspended in water." (*Id.*) And, he stated that "the Btu value should be sufficient to create heat or energy when combusted or oxidized to be consider[ed] 'fuel." (*Id.*)

In April of 2011, nearly four months after ACR began claiming credits, Huyser contacted Sanderson with questions about using cheese whey as a source of biomass. (App., Ex. 22, A338-9.) In a May 2, 2011 response, Sanderson reiterated the definition of biomass in § 45(k)(c)(3)

10

and stated: "I do not have enough facts or understand your operations well enough to give you any more specific advice." (*Id.*)

ACR, for its part, did not understand its operations very well either. In early 2012, after ACR had ceased taking the credits, ACR was audited by the IRS. On March 6, 2012, Huyser contacted Sanderson about the audit, and made a telling request:

```
Greg, we would request that you frame the question we would like to pose to a
professor at Iowa State University (ISU). The question we would like the
professor to answer would be how our biomass produces energy in the anaerobic
digestion process. We would like a clearly defined question that fits the legal
definition of "producing energy" that you would feel comfortable defending,
should the issue ever come up.
```

(App., Ex. 23, A341.) Thus, well after ACR claimed the credits, ACR was asking Sanderson to assist in posing a question to a scientist in order to defend against the IRS audit. By that point, ACR had received $19,773,393 – nearly $20 million in alternative fuel mixture credits. (App., Ex. 1, A4, Compl. ¶ 12.) ACR operated only for the 2011 year, and ACR ceased its business operations after the Congress did not extend the alternative fuel mixture credit. (*See Id.* ¶ 19; Ex., 9, A104, Huyser Tr. 77:9-25.)

On April 18, 2014, the IRS assessed excise tax against Alternative Carbon Resources, LLC, 26 U.S.C. § 6206,[5] for the following quarters and in the following amounts:

| Quarter Ending | Amount of Tax Assessed |
|---|---|
| March 31, 2011 | $ 1,013,240.00 |
| June 30, 2011 | $ 2,354,501.50 |
| September 30, 2011 | $ 5,730,312.50 |
| December 31, 2011 | $10,675,339.00 |

(App., Exs. 24-27, A343-60.) On April 18, 2014, the IRS also assessed an excessive claims penalty against ACR under § 6675 for the following quarters and in the following amounts:

---

[5] As will be discussed below in Section II, Section 6206 of the Internal Revenue code allows the IRS to assess excise tax against a person who makes a claim for excessive amounts of credits as defined under 26 U.S.C. § 6675(b).

11

| Quarter Ending | Amount of Penalty Assessed |
|---|---|
| March 31, 2011 | $ 2,026,480.00 |
| June 30, 2011 | $ 4,709,003.00 |
| September 30, 2011 | $11,460,625.00 |
| December 31, 2011 | $21,350,678.00 |

(App., Exs. 28-31, A362-76.) The IRS timely issued notice to ACR and made demand for payment of these assessments, but ACR has not fully paid the amounts owed. (App., Exs. 24-31, A343-76.)

## STANDARD OF REVIEW

Under Rule 56 of the Rules of the Court of Federal Claims, a moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A genuine issue of material fact is one that could change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247-248 (1986). "Summary judgment is a salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed. Cir. 1987) (internal quotations and citations omitted).

Plaintiff will bear the burden of proof at trial on its refund claims. On cross-motions for summary judgment, both parties have the burden of establishing that no genuine issues of material fact are present. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Rule 56, however, does not require "the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' –that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case" *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986). Thus, Plaintiff must show that it has sufficient evidence to meet its burden of proof at trial. *See id.* at 326-327 (1986). If the party bearing the burden of proof at trial completely fails to prove an essential element of its claim, all other facts are rendered immaterial. *Applegate v. United States*, 35 Fed. Cl. 406, 423 (1996) (citing *Celotex*, 477 U.S. at 323).

## ARGUMENT

The alternative fuel mixture credit, like all tax credits, is a matter of legislative grace, and taxpayers bear the burden of showing that they are entitled to tax credits. *Sunoco, Inc. v. United States,* 129 Fed. Cl. 322, 331 (2016) *appeal docketed,* No. 17-1402 (Fed. Cir. Dec. 22, 2016) (citing *Schumacher v. United States*, 931 F.2d 650, 652 (10th Cir. 1991) (citing *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934)). Further, courts expect that Congress, in conferring a tax benefit, will expressly state its intention to convey such a benefit. *Sunoco, Inc. v. United States,* 129 Fed. Cl. 322, 332 (2016); *see also Bank of Commerce v. Tennessee,* 161 U.S. 134, 146 (1986) (stating that any claim for exemption of the full payment of taxes must be "clearly defined and founded upon plain language.") Credits, like exemptions from taxation must be "unambiguously proved." *Sunoco, Inc. v. United* States, 129 Fed. Cl. 322, 331 (2016) (citing *United States v. Wells Fargo Bank,* 485 U.S. 351, 354 (1988) (citations omitted).

Section 6426(e)(1) provides for an alternative fuel mixture credit in the amount of "the product of 50 cents and the number of gallons of alternative fuel used by the taxpayer in producing any alternative fuel mixture for sale or use in a trade or business of the taxpayer." Section 6427(e) provides that if a person uses an alternative fuel to produce a mixture described in § 6426 in such person's trade or business, the Secretary shall pay such person "an amount equal to . . . the alternative fuel mixture credit with respect to such mixture."

13

As discussed below, ACR was not entitled to alternative fuel mixture credits in 2011 because its mixtures did not meet the definition of alternative fuel mixtures under § 6426(e). As a result, Defendant is entitled to judgment in its favor in the amount of the alternative fuel credits improperly paid to ACR. *See* 26 U.S.C. § 6206. Further, because ACR cannot show reasonable cause for claiming alternative fuel mixture credits that it was not entitled to, ACR is also liable for the excessive claims penalty under 26 U.S.C. § 6675. [6]

### I.   ACR's Substances Were Not Alternative Fuel Mixtures.

Section 6426(e) defines an alternative fuel mixture as follows:

**(2) Alternative fuel mixture.**--For purposes of this section, the term "alternative fuel mixture" means a mixture of alternative fuel and taxable fuel (as defined in subparagraph (A), (B), or (C) of section 4083(a)(1)) which--
>      (A) is sold by the taxpayer producing such mixture to any person for use as fuel, or
>      (B) is used as a fuel by the taxpayer producing such mixture.

The definition of "alternative fuel" is found in § 6426(d)(2), and it offers seven possible qualifying alternative fuels. Here, ACR argues that its alternative fuel was a "liquid fuel derived from biomass." § 6426(d)(2)(G). Biomass, in turn, is defined as "any organic material other than –(A) oil and nature gas (or any product thereof), and (B) coal (including lignite) or any product thereof." § 45K(c)(3). Section 6426 requires that the alternative fuel is mixed with "taxable fuel," which includes diesel, defined as "any liquid (other than gasoline) which is suitable for use as a fuel in a diesel-powered highway vehicle, or a diesel powered train." § 4083(a)(3)(A)(i).

---

[6] In its request for relief, ACR asks this Court to abate the assessments for civil fraud penalties, and the failure to file and failure to pay penalties, as well as to refund amounts paid for these respective penalties. As plaintiff admits in its brief, the government conceded these claims in November of 2016. To the extent that ACR made any payments towards those penalties, those payments were applied to ACR's outstanding liabilities and subject to any offsets under 26 U.S.C § 6402. Thus, this Court should dismiss these claims as moot.

Next, § 6426 requires that an alternative fuel mixture is either "(A) sold by the taxpayer producing such mixture to any person for use as a fuel, or (B) is used as a fuel by the taxpayer producing such mixture." Section 6426(e) does not define the term "use as a fuel."

ACR cannot show that it produced an alternative fuel mixture because (1) even if its mixtures contained "fuels" they were not "liquid fuels derived from biomass" and thus cannot meet the definition of an alternative fuel under the Internal Revenue Code; (2) ACR has not shown that its mixtures were sold for "use as a fuel;" and (3) ACR's mixtures were not sold.

A. ACR's Substances Were Not Liquid Fuels Derived from Biomass Because They Were Solids Dissolved or Suspended in Water.

ACR contends that its materials contained alternative fuels because they were "liquid fuels derived from biomass." *See* § 45(k)(c)(3). Here, ACR's mixtures fail under § 6426(e) because they consisted of solids in a large volume of water, which is not organic and is not a fuel.

i. *ACR's Mixtures Contained Large Amounts of Added Water – An Inorganic Substance.*

ACR's substances were not liquid fuels derived from biomass. Rather, they were biosolid pieces dissolved or suspended in water, an inorganic compound. (App., Ex. 14, A279-80, Zitomer II Tr. 61:21-62:8; 62:15-23; Ex. 13, A264, Zitomer Tr. 33:3-20; Ex. 12, A181-6, Cooney Rep. 9-14.) It is undisputed that ACR's substances were byproducts obtained from ethanol and food production plants, and that the liquid portion of these substances consisted of water from the production and cleaning processes used at those plants. And inorganic substances like water are not derived from biomass. Not only that, but the water was a result of ethanol and food producers *adding* water to biomass, then recapturing the water from the production process or equipment cleaning. But ethanol and food production producers were not the only ones to add water to biomass.

15

ACR did too. ACR formed a new company, "Engineered Biofuels," to mix dry food waste with water so that ACR could create more substances for disposal at anaerobic digesters—and thus, obtain more credits. Engineered Biofuels's process turned "one load of soy hulls [into] five to ten loads" that resulted in a substance that was mostly water. Thus, the only aspect of ACR's substances that rendered them a liquid—water—resulted from using water to clean particles off of food-processing equipment, and ACR adding water to biomass; none of these are liquids derived from biomass.

## ii. Solids in Water Do Not Constitute a "Liquid Fuel."

For many of the same reasons, ACR's substances were not liquid fuels. As noted, ACR's substances were solids either dissolved or suspended in a large volume of water.[7] Only the solids contained in the wastewater produce biogas during anaerobic digestion. (App., Ex. 11, A152, Hammitt Tr. 104:2; *see* Ex. 14, A281, Zitomer II Tr. 63:5-11 (solid portions of corn stillage are fuel.)) Indeed, because only the volatile solids are capable of being broken down into biogas, the liquid portion of ACR's wastes was not converted to biogas. Even assuming, for the purposes of this motion, that the biosolid portions of ACR mixtures were potential fuels, plaintiff's expert testified that the water portion of plaintiff's substances was *not* fuel. (App., Ex. 14, A281, Zitomer II Tr. 63:2-4.) Plaintiff's expert also agrees that if ACR's mixtures were dewatered, the remaining ingredients are solids. (App., Ex. 14, A279-80, Zitomer II Tr. 61:24-62:18 ("If you take the water out of the stillage, then it's a solid.")

---

[7] Whether a solid is dissolved or suspended depends on whether it passes through a filter of some nominal pore size opening. (App., Ex. 13, A263, Zitomer Tr. 22:6-10). Regardless of whether ACR's wastes were dissolved or suspended in water, they cannot meet the liquid fuel requirement because water does not meet the definition of biomass, and without the water, ACR's wastes were solids.

16

In fact, ACR disposed of its substances at facilities designed to separate solids from water – wastewater treatment plants that treat wastewater through several processes, including anaerobic digestion, which processes the solid wastes contained in wastewater. At the end of the digestion process three primary substances remain: solids, which are separated from the water and used as fertilizer; water, which is then sent back through the wastewater treatment system before being discharged into rivers and streams; and biogas.

Plaintiff, meanwhile, appears to ignore these points. Instead, plaintiff urges this Court to look at only at the the term liquid, and stop there. (Pl.'s Br. 13.) Section 6426(d)(2) lists several types of substances that constitute "alternative fuel" for the purposes of the statute. The statute describes two types of fuel derived from biomass, one involving compressed or liquefied gas, and, the other, described as a liquid. § 6426(d)(2)(F), (G). Thus, in defining one type of alternative fuel derived from biomass as a *liquid* fuel, the word liquid modifies the word fuel, and Congress is specifying that the fuel itself must be liquid. § 6426(d)(2)(G). "The cardinal principle of statutory construction is to save and not to destroy . . . and the court must 'give effect, if possible, to every word and clause of a statute.'" *Tallman v. Brown,* 105 F.3d 613, 616 (Fed. Cir. 1997) (citing *National Labor Relations Bd. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30 (1937) and *Inhabitants of Montclair v. Ramsdell,* 107 U.S. 147, 152 (1883)). Here, even if ACR's mixture, as a whole, was a liquid, it was not a *liquid fuel.* Put another way, even if ACR's mixtures contained biosolids that were fuels, those biosolids were solid fuels, not liquid fuels.

Plaintiff's interpretation, however, would not give full effect to the word "liquid." Under ACR's proposed reading, the volume of any alternative fuel could be exponentially increased, and thus the payout exponentially increased, by the artificial addition of water, a substance that fails to add any fuel value. For instance, a taxpayer could fling a corn kernel into a 4,000-gallon

17

tank of water, squirt in a few gallons of diesel fuel, and call it a liquid fuel. ACR attempts to

parse the statute to the point of absurdity – a result to be avoided. *Timex V.I. Inc. v. United

States*, 157 F.3d 879, 886 (Fed. Cir. 1998) (citing *Haggar Co. v. Helvering*, 308 U.S. 389, 394

(1940)). Furthermore, the term "liquid fuel" is not ambiguous. But, even if it were, in

determining whether a term is ambiguous, a court looks not only to "the language itself, [but also

to] the specific context in which that language is used, and the broader context of the statute as a

whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). Here a contextual reading also

leads to the conclusion that plaintiff's interpretation of "liquid fuel" is incorrect.

Indeed, the purpose of § 6426, based on its plain language, is to promote the *use* as a fuel

of alternative fuel mixtures. If one could add any amount of water to a solid fuel in order to make

it liquid, that would defeat the purpose of the statute because, as is the case here, water is not a

fuel and even under plaintiff's theory of the case, there is no dispute that the water does not

produce biogas. *See also Bond v. United States*, 134 S. Ct. 2077, 2091 (2014) (holding that a

defendant's application of irritating chemicals to a mailbox did not constitute the use of a

chemical weapon, rejecting a broad interpretation of the term that would brush aside the ordinary

meaning of the term and purpose of the statute at issue).

Moreover, the terms that accompany "liquid fuels derived from biomass" in the statute's

list of alternative fuels all concern substances that can be ignited and combusted in an engine,

generator, or boiler. § 6426(d)(2) (including liquefied petroleum, liquefied hydrogen, and

compressed natural gas); *see Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (relying on the

principle *noscitur a sociis*, in that a term is known by the company it keeps to "avoid ascribing to

one word a meaning so broad that it is inconsistent with its accompanying words, thus giving

unintended breadth to the Acts of Congress") (internal citations omitted).  Further, the alternative

18

fuel mixture credit provision requires the alternative fuel be mixed with a portion of taxable fuel, another substance that is commonly used for combustion. § 6436(e); § 4083 (requiring, in fact, that diesel fuel be capable of being used in a diesel vehicle or train engine).

In sum, ACR's mixtures contained pieces of biomass dissolved or suspended in water that food and ethanol producers—and ACR itself—added to solid biomass. Because the plain language of the statute makes clear that the fuel must be a liquid fuel, and water is not a fuel, ACR did not have a liquid fuel. ACR has failed to "unambiguously prove" its substances were liquid fuels derived from biomass under the statute, and it is not entitled to alternative fuel mixture tax credits. *See Sunoco, Inc. v. United States*, 129 Fed. Cl. 322, 331 (2016).

B. Plaintiff Cannot Show That Its Mixture Was Sold For Use as a Fuel.

Plaintiff must not only show that its mixes contained a "liquid fuel" but it also must show that its mixtures were sold for *use as fuel*, (or so used by ACR). *See* 6426(e)(2)(A), (B). ACR argues that its mixtures were sold to wastewater treatment plants, such as Des Moines WRA. ACR further claims that "[a]ll of ACR's customers used the alternative fuel mixture in their anaerobic digesters to increase the methane production from the digesters which was used to generate power and heat by the customers as well as obtaining heat to increase the efficiency of the digesters." (Pl's Br. pp. 12-13; PSOF ¶ 39.) Notably, even if these activities constituted "use as a fuel" under the statute, Plaintiff's assertion is supported only by the affidavits of James Huyser and Kenneth Boyle, two of the members of ACR. Even if ACR had proper evidence supporting its claims, ACR's theory fails for three reasons: (1) neither the statute nor legislative history supports the idea that disposal of alternative fuel mixtures in an anaerobic digester constitutes "use as a fuel" under 6426; (2) the water and diesel were not used as fuels; and (3)

19

even under plaintiff's interpretation of "use as a fuel," only a sliver of ACR mixtures was converted to biogas and ACR cannot prove this amount.

        *i.     ACR's mixtures were not used as a fuel by anaerobic digesters.*

ACR cannot prove that the disposal of food waste products mixed with diesel in anaerobic digesters constitutes "use as a fuel" under § 6426(e)(2)(A), (B). Although Des Moines WRA may have used as much as half of the *biogas* produced by its anaerobic digesters as a fuel by combusting it in a generator, ACR must show that its purported *alternative fuel mixture*[8] was used as a fuel – not that the resulting biogas was used as a fuel. ACR admits that it calculated its credit based on the amounts of corn stillage and other purported items of alternative fuel that it disposed at anaerobic digesters – and there is no dispute that its mixtures were not combusted.

Although § 6426 does not define the term "use as a fuel," it does not evidence any intent to allow a credit for the disposal of food wastes and diesel in anaerobic digesters. Plaintiff contends that its activities increased the digesters' production of biogas,[9] but, even if that were true, because biogas contains methane, Congress did not display any intent to create an alternative fuel mixture credit in order to encourage the production of a greenhouse gas. Under plaintiff's theory, Congress implausibly incentivized the production of a pollutant. *See Timex V.I. Inc. v. United States*, 157 F.3d 879, 886 (Fed. Cir. 1998).

---

[8] Because oil and water don't mix, ACR's mixtures of dissolved solids and water and diesel were arguably not even mixtures.

[9] In order for biogas to qualify for an alternative fuel credit under the statute, it would have to be compressed or liquefied biogas. § 6426(d)(2)(G). Thus, Congress has incentivized businesses engaging in activities that produce biogas to undertake the additional processing required to produce compressed or liquefied biogas, which can then be combusted as a fuel. Because Congress excluded uncompressed biogas from the definition of "alternative fuel" in § 6426(d)(2)(G), there is no authority for plaintiff's apparent argument that Congress intended to incentivize the production of uncompressed biogas.

20

As noted above, in the definition of "alternative fuel," the term "liquid fuel derived from biomass" is surrounded by substances all capable of combustion. § 6426(d)(2) (including liquefied petroleum, liquefied hydrogen, and compressed natural gas). The legislative history also supports the idea that Congress, although not limiting the term "use as a fuel" to use in a motor vehicle, nevertheless intended "use as a fuel" to mean the combustion of the alternative fuel mixture. The alternative fuel mixture credit was enacted as part of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. 109-59, 119 Stat. 1144 ("SAFETEA") in 2005. The Conference Agreement underlying SAFETEA provided one example of "use as a fuel" in a footnote: "For example, the taxpayer produces fish oil in its trade or business. The taxpayer uses this fish oil to make a blend of 50 percent fish oil and 50 percent diesel fuel to run in a generator that is part of the taxpayer's trade or business. This use of the fish oil-diesel blend made by the taxpayer qualifies as use of an alternative fuel mixture for purposes of the requirement that the fuel be used in the blender's trade or business." H.R. Rep. No. 109-203, at 1121, n. 36 (2005) (Conf. Rep.).

ACR's mixtures were not sold for use as a fuel because an anaerobic digester is merely a location where bacteria breakdown organic compounds into smaller compounds. In fact, the Des Moines WRA plant manager, Hammitt, who studied and worked in the wastewater field for decades, calls waste in a digester "feed," not fuel. (App., Ex. 11, A139, A146-7, Hammitt Tr. 70:4-15; 92:14-93:15.) A byproduct of this metabolic activity is biogas, comprised of methane and carbon dioxide. Combustion does not occur in an anaerobic digester. (App., Ex. 13, A262, Zitomer Tr. 10:21-23). Further, no useful work is produced in a digester, no heat is captured, and no electricity is produced. (App., Ex. 12, A190, A195, Cooney Report at 18, 23.) If anything,

21

**Boyle App. 049**

energy is consumed, or lost, during the anaerobic digestion process. (*Id.* A194, Cooney Report at 22; *see also* Ex. 13, A265, Zitomer Tr. 38:22-39:13.)

> ii. *The water and diesel were not used as a fuel.*

Furthermore, even assuming ACR's interpretation of 6426(e) were correct, ACR must show that the entirety of its alternative fuel *mixture* was used as a fuel. Thus, ACR must show that both the water and the diesel portion of its mixture were used as a fuel, not just the biosolids contained within the mixture. But, as discussed above, water is another product of the anaerobic digestion process, and the water portion of the mixture did not produce biogas.

Further, it is undisputed that the "splash" of diesel in ACR's mixtures had no measurable impact on the biogas production process of the anaerobic digesters. (Zitomer Rebuttal Rep. ¶ 14; App., Ex. 12, A202, Cooney Report at 30.) Under § 6426, an alternative fuel mixture requires a mixture of alternative fuel and taxable fuel. Taxable fuel includes diesel fuel, defined, in part, as that which "is suitable for use as a fuel in a diesel-powered highway vehicle, or a diesel-powered train[,]" systems requiring combustion. § 4083. In other words, to qualify diesel fuel *must* be combustible. Here, plaintiff's proposed use as a fuel, in an anaerobic digester, involves bacteria breaking down organic compounds, *not* combustion. The diesel added nothing to the anaerobic digestion process, and the only reason ACR added diesel was to qualify for the tax credit. If the addition of diesel had no non-tax related purpose to ACR, and contributed nothing to the anaerobic digestion process, the diesel portion of ACR's mixtures was definitely not used as a fuel. Because the diesel portion of ACR's mixture was not used as a fuel, under plaintiff's interpretation of the statute, Congress's requirement to add taxable fuel to alternative fuel would be superfluous. *See Yates*, 135 S. Ct. at 1084-85 (resisting an interpretation of a term that would render superfluous an entire provision passed in proximity as part of the same Act).

22

iii.    *ACR cannot prove that its mixtures were used as a fuel.*

ACR sought and received nearly $20 million in alternative fuel mixture credits based on the volume—nearly 40 million gallons—of substances ACR purportedly sold for use as a fuel. Even if ACR's interpretation of "use as a fuel" is correct (it is not) ACR must meet its burden to demonstrate that all of the nearly 40 million gallons of substances were sold for use as a fuel. The only "evidence" put forth by ACR consists of conclusory statements supported only by the affidavits of Huyser and Boyle, two of ACR's members, which are self-serving statements that are not sufficient to preclude summary judgment. *See Doe v. United States*, 58 Fed. Cl. 479, 484 (2003); *see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 164 (Fed. Cir. 1985) ("mere allegations by declaration or otherwise do not raise issues of fact needed to defeat a motion for summary judgment"); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.,* 200 F.3d 795, 812 (Fed.Cir.1999) ("Factual assertions by counsel in motion papers, memoranda, briefs, or other such 'self-serving' documents are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment.") (internal citations and quotations omitted).

Even if ACR could show that the disposal of its mixtures in anaerobic digesters constituted use as a fuel under the statute, ACR cannot establish how much of the purported alternative fuel mixture was returned through the wastewater treatment plant again; how much of it resulted in biogas; how much of it resulted in electricity; how much of it resulted in biogas sold to third parties; or how much of it resulted in wasted (flared) biogas.[10] As plaintiffs can only ask this Court to assume that some portion of its mixture[s], at some point, resulted in some

---

[10] Plaintiff's expert testified that he would not regard ACR's substances as fuel if the resulting biogas is not used to generate electricity or heat – "if they were fed to a digester that had no beneficial use to generate heat or power, then they are not fuels." (App., Ex. 14, A276, Zitomer II Tr. 46:20-24.)

electricity generation, plaintiffs cannot meet their burden to establish that the volume of "alternative fuel mixture"—purportedly containing "alternative fuel" for which they sought and received nearly $20 million in credits—was sold for use as a fuel. *See* § 6426(e)(2)(A).

Thus, even under plaintiff's theory of the case, given mixed waste sources, and given that significant portions of biogas were clearly *not* used to generate electricity, Plaintiff cannot prove an essential element of its claim.

### C. ACR Did Not Sell Its Mixtures.

To meet the statutory definition of an alternative fuel mixture, the combination must be sold for use as a fuel or used as a fuel. *Affordable Bio Feedstock, Inc., v. United States*, Case No. 16-1926, 2017 WL 3616894, at *3 (M.D. Fl. June 28, 2017) (citing 26 U.S.C. § 6426(e)(2)). The term "sale" is not defined in § 6426. According to Black's Law Dictionary, a sale is: "the transfer of property or title for a price." *Black's Law Dictionary* (10th ed. 2014) (citing UCC § 2-106(1)). Here, ACR did not provide its waste materials to wastewater treatment plants for a price. Rather, ACR paid wastewater treatment plants and farms to dispose of its mixtures. Thus, ACR's activities in 2011 did not qualify for the alternative fuel mixture credit because ACR did not sell its mixture to a person for use as a fuel.

#### i. *Nominal Amounts Paid in Purported Consideration Were Sham Transactions.*

ACR has not shown that it delivered its mixtures to facilities housing anaerobic digesters for a price – consideration. First, as ACR acknowledges, it paid wastewater treatment plants over $1 million in tipping fees as consideration for the plants' disposal of its mixtures in anaerobic digesters. While ACR argues that some wastewater treatment plants paid a small fee for the mixtures, it admits that some wastewater treatment plants did not pay anything for its mixtures. (Pls. Br. at 19). And at least one wastewater treatment plant that did sign a contract with ACR to

Boyle App. 052

pay a $950 "fee," only did so because it was for "ACR's tax credit stuff" – not because the plant was buying anything from ACR. Indeed, Des Moines WRA did not need to buy ACR's mixtures because ACR was in fact paying the wastewater treatment plant to dispose of the mixture. In the case of the Des Moines WRA, the manager considered the $950 transaction "a wash" because it simultaneously charged ACR a $950 administrative fee. Thus, Des Moines WRA's payment of $950 was not consideration in exchange for the receipt of ACR's mixtures.

ACR relies on *Basque Station v. United States* in support of its argument that these small sums constituted consideration. 53 Fed. Appx. 829 (9th Cir. 2002). In *Basque Station,* the Ninth Circuit found that a sale took place even though the seller did not make a profit, where a taxpayer resold a portion of fuel that it had purchased from another seller for the same price that it paid for the fuel. *Basque Station,* 53 Fed. Appx. at 831. Notably, however, the Court concluded that there was still consideration in the transaction because the buyer paid the taxpayer for the right to the portion of the fuel – the taxpayer was not giving the fuel away. *Id.* Here, by contrast, even if some of the wastewater treatment plants paid a nominal sum to ACR, ACR was, in reality, giving its mixtures away, and was paying the wastewater treatment plants disposal or "tipping" fees to take it. *Basque Station* does not support ACR's position.

In the tax context, "[t]he Federal Circuit has adopted a disjunctive test for determining whether a transaction should be disregarded as an economic sham: the doctrine should apply and a transaction should be disregarded either if the transaction lacks objective economic substance or if it is subjectively shaped solely by tax avoidance motivations." *Stobie Creek Investments*, *LLC v. United States*, 82 Fed. Cl. 636, 697 (2008) *aff'd,* 608 F.3d 1366 (Fed. Cir. 2010) (internal citations omitted). Under the Federal Circuit's approach, "a taxpayer must prove that its transaction was both purposeful and substantive– if proof in either regard is lacking, the

25

transaction is a sham." *H.J. Heinz Co. and Subsidiaries v. United States*, 76 Fed Cl. 570, 584 (2007) (citing *Coltec Indus. Inc. v. United States*, 454 F.3d 1340, 1355 n. 14 (Fed. Cir. 2006)), *cert denied,* 519 U.S. 1206 (2007)); *see also Juniper Investment Co. v. United States*, 168 Ct. Cl 160, 167 (1964) (declining to find a corporation distinct from its shareholders based on exception for "sham transactions and situations involving transactions or matters  that lack a business purpose and are a mere formality.") That is, "a lack of economic substance is sufficient to disqualify the transaction without proof that the taxpayer's *sole motive* is tax avoidance." *Stobie Creek* at 697, (citing *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1355 n. 14 Fed. Cir. 2006), *cert. denied* at 549 U.S. 1206). Thus, once a transaction is determined to be a sham, the Court need not look to the taxpayer's motive. *See Knetsch v. United States,* 364 U.S. 361, 365, 367 (1960). Courts apply the sham transaction doctrine to cases involving tax credits – the doctrine is not limited to the reporting of income. *See e.g., Thomas v. United States*, 166 F.3d 825, 831–32 (6th Cir. 1999) (evaluating a transaction in the context of deductions and investment tax credits).

Congress codified the economic substance doctrine for transactions after 2010 in 26 U.S.C. § 7701(o). The subsection states that, "[i]n the case of any transaction to which the economic substance doctrine is relevant, such transaction shall be treated as having economic substance only if – (A) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and (B) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction." 26 U.S.C. § 7701(o)(1)(A),(B).

Here, where ACR charged a small amount–$950–to *some* wastewater treatment plants for the sole purpose of meeting the "sale" requirement of § 6426(e), ACR cannot show those

26

transactions had economic substance because the transactions did not change ACR's economic position in a meaningful way. Further, because its motive was to meet the requirement of a sale in § 6426(e), and ACR does not dispute that it would not (and did not) engage in its activities without the tax credits, there is no doubt that its motive in charging wastewater treatment plants was solely for the purpose of receiving tax credits. Additionally, the fact that some wastewater treatment plants were not even aware that diesel was a part of ACR's substances further supports the idea that the plants were not "buying" alternative fuel mixtures from ACR. Accordingly, in those instances where ACR charged recipients a small amount, those purported "sales" lacked a business purpose and were a mere formality – sham transactions.

> ii.    *Disposal Was Not Consideration in this Case.*

Plaintiff also claims that, by transferring the mixture to wastewater treatment plants, it was relieved of its obligation to dispose of the mixture, and that the relief of that obligation constitutes consideration. (Pl.'s Br. 19). But the disposal of the materials was not consideration. It was, in fact, a service that the wastewater treatment plant provided in exchange for ACR's payment of disposal fees. Further, the disposal of the materials could only be valuable to ACR if it were engaged in a business that had a duty to dispose of the materials in the first place. But the only reason that ACR obtained the materials was to claim the alternative fuel mixture tax credits.

ACR points to two IRS private letter rulings issued in the 1990s involving a different statute to support its theory that the disposal of the materials was consideration. These private letter rulings do not support Plaintiff's claim for three reasons. First, private letter rulings are not precedential and apply only to the taxpayer that requested them. 26 U.S.C. § 6110(k)(3); *see also Amergen Energy Co., LLC v. United States*, 94 Fed. Cl. 413, 419 (2010) (internal citations omitted). Second, the private letter rulings in question involved 26 U.S.C. § 40, not the statute at

Boyle App. 055

issue here. Finally, the taxpayers in both of the private letter rulings were engaged in businesses, such as waste hauling, that required them to dispose of waste materials. For example, in PLR 9229038, in contrast to the instant case, the taxpayer who sought the ruling was in the business of managing wastes and the PLR noted that the taxpayer conducted its business to make a profit. Here, ACR was not in the waste business, did not make a profit absent the tax credits, and conducted its activities solely for the purpose of qualifying for tax credits. In fact, ACR paid for the food products, and would not have had any obligation to dispose of its mixtures were it not seeking millions in tax credits. Thus, the private letter rulings do not even offer helpful guidance because they interpret a different statute and involve different factual situations.

**II.      Defendant Is Entitled to Judgment On Its Counterclaim.**

ACR was not entitled to the alternative fuel mixture credits that it received in 2011. Section 6206 of the Internal Revenue Code provides that "any portion of a payment made under section 6420, 6421, or 6427 which constitutes an excessive amount (as defined in section 6675(b)), and any civil penalty provided by section 6675," may be assessed and collected as if it were a tax under section 4041 or 4081 and as if the person who made the claim were liable for such tax. 26 U.S.C. § 6206. The IRS made payments to ACR under § 6427 that were excessive under § 6675(b) because ACR was not entitled to the alternative fuel mixture credit. *See* § 6675(b). Accordingly, on April 18, 2014, pursuant to § 6206, the IRS timely assessed excise taxes against ACR for the following quarters and in the following amounts:

| Quarter Ending | Amount of Tax Assessed |
|---|---|
| March 31, 2011 | $ 1,013,240.00 |
| June 30, 2011 | $ 2,354,501.50 |
| September 30, 2011 | $ 5,730,312.50 |
| December 31, 2011 | $10,675,339.00 |

28

(Exs. 24-31, Forms 4340 Certificate of Assessment and Payment, A342-76.) Forms 4340 are

*prima facie* evidence of valid tax assessments. *Intersport Fashions West, Inc. v. United States,* 84

Fed. Cl. 454, 457 (2008) (internal citations omitted).

On April 18, 2014, the IRS also assessed excessive claims penalties against ACR for the

four quarters of 2011 pursuant to §§ 6206 and 6675. Section 6675 of the Internal Revenue Code

imposes a penalty upon a person who makes excessive claims with respect to the use of certain

fuels. Specifically:

> In addition to any criminal penalty provided by law, if a claim is made under section 6416
> (relating to certain sales of gasoline), section 6420 (relating to gasoline used on farms), 6421
> (relating to gasoline used for certain nonhighway purposes or by local transit systems), or
> 6427 (relating to fuels not used for taxable purposes) for an excessive amount, unless it is
> shown that the claim for such excessive amount is due to reasonable cause, the person
> making such claim shall be liable to a penalty in an amount equal to whichever of the
> following is greater:
>
> (1) Two times the excessive amount; or
> (2) $10.

§ 6675(a). "Excessive amount" is defined as "the amount by which the amount claimed under . .

. 6427, as the case may be, for any period, exceeds the amount allowable under such section for

such period." § 6675(b)(1), (2). Here, ACR was not entitled to any of the alternative fuel

mixture credits that it claimed in 2011. Thus, ACR is liable for the § 6675 penalty in the amount

of 200% of $19,773,393 or $39,546,786. *See* §§ 6206, 6675.

As described below, because ACR cannot prove reasonable cause as a defense to the

excessive claims penalty, it is liable for the penalty.

### III.    ACR Cannot Show Reasonable Cause In Order to Avoid the § 6675 Penalty.

ACR alleges that it is not liable for the excessive claims penalty because it had

reasonable cause to claim alternative fuel mixture credits. ACR cannot meet its burden to show

reasonable cause because (1) ACR cannot demonstrate reasonable reliance on the competent

advice of a professional advisor prior to taking the credits; (2) receipt of an excise tax registration from the IRS does not mean that a taxpayer is entitled to an alternative fuel mixture credit; and (3) and ACR is not entitled to the reasonable cause defense because its activities in 2011 were motivated only by the tax credits.

Although § 6675 explicitly states that reasonable cause is a defense to the excessive claims penalty, it does not define the term "reasonable cause." *See* 26 U.S.C. § 6675. Other sections of the Code, however, also allow for a reasonable cause defense, and looking to those sections and related case law may provide guidance in interpreting "reasonable cause" under § 6675. *See e.g., J.J. Powell, Inc. v. United States*, 125 Fed. Cl. 73, 87 (2016) (discussing the nature and scope of reasonable cause exception in § 6675); *Estate of Liftin v. United States*, 754 F.3d 975, 978-979 (Fed. Cir. 2014) (borrowing the IRS's formal regulatory implementation of "reasonable cause" in § 6664(c)(1) in applying the "reasonable cause" provision of § 6651(a)(1) of the IRC); *Valley Ice & Fuel Co., Inc. v. United States*, 30 F.3d 635, 640 (5th Cir. 1994) (citing *United States v. Boyle,* 469 U.S. 241, 251 (1985)).

ACR bears the burden to show that it had reasonable cause to claim the alternative fuel mixture credits and is therefore not liable for the excessive claims penalty. *See Boyle,* 469 U.S. at 245; *Conway v. United States,* 326 F.3d 1268, 1278 (Fed. Cir. 2003). Whether a taxpayer had reasonable cause is a question of fact that is reviewed for clear error. *Stobie Creek Investments LLC v. United States*, 608 F.3d 1366, 1381 (Fed. Cir. 2010) (regarding reasonable cause as a defense to 26 U.S.C. § 6662 accuracy-related penalties.) In the Federal Circuit, a taxpayer's assertions as to the invalidity of a tax penalty may be ruled upon as a matter of law on summary judgment, although some cases may require a trial. *Stine v. United States,* 106 Fed. Cl. 586, 589, 598 (2012) (finding that plaintiff had not offered sufficient evidence of incapacity to show

reasonable cause under § 6651 and granting summary judgment in favor of government); *see also e.g., Estate of Liftin v. United States,* 111 Fed. Cl. 13 (2013), *affirmed,* 754 F.3d 975 (Fed. Cir. 2014); *Papillon Airways, Inc. v. United States,* 105 Fed. Cl. 154, 164 (2012).

In determining whether a partnership is entitled to the reasonable cause defense, courts look to the conduct of the managing partner. *See Stobie Creek Investments LLC v. United* States, 82 Fed. Cl. 636, 658. Here, the managing partner was James Huyser.

### A.  ACR Cannot Show Reasonable Reliance on the Advice of an Adviser.

"One way to show reasonable cause is to show reasonable reliance on the advice of a competent and independent professional adviser." *Stobie Creek Investments LLC v. United States*, 608 F.3d at 1381 (internal citations omitted).[11] Reliance on professionals as a form of "reasonable cause" appears to have evolved from defenses to the negligence penalty and accuracy related penalties, and often appears in cases involving late filed returns or errors or omissions on forms. In *United States v. Boyle*, the Supreme Court found that a taxpayer could not avoid a negligence penalty by claiming that the failure to timely file a return was based on reasonable reliance on advice from an attorney. *Boyle*, 469 U.S. at 250. The Court noted, however, that some courts have held that "reasonable cause" is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney that it was unnecessary to file a return, and distinguished the case before it with a case in which the taxpayer relied on the erroneous advice of counsel concerning a question of law. *Id.* at 250-251.

---

[11] In determining whether reasonable cause is a defense to accuracy related penalties under § 6662, the Court of Federal Claims noted a significant overlap between the defense to the negligence penalty based on reasonable reliance on the advice of professionals and the reasonable cause and good faith exception, which is often met by showing reasonable reliance. *Stobie Creek*, 82 Fed. Cl. at 709 (2008).

31

The key of course, is that the reliance must be *reasonable.* Reliance alone does not automatically provide a defense to a taxpayer's actions. For example, 26 U.S.C. 6662 imposes accuracy-related penalties for various types of understatements and misstatements. Treasury Regulation 1.6664-4 provides for a reasonable cause and good faith exception to § 6662 penalties based on certain facts and circumstances. Treas. Reg. § 1.6664-4 (b)-(h). The regulation specifies that one must take into account all pertinent facts and circumstances, and, in particular, it notes that reliance on a professional tax advisor does not necessarily demonstrate reasonable cause and good faith. Treas. Reg. § 1.6664-4(b)(1). Cases involving the negligence penalty are in line with this limitation. *See e.g., Estate of Liftin,* 754 F.3d at 978-979 (finding executor lacked reasonable cause because his reliance on the advice of counsel was unreasonable.)

Ultimately, the reasonable reliance defense is a narrow one. As noted in *Stobie Creek*:

> [T]he defense of reliance on professional advice prevails only if, under all the circumstances, (1) the advice itself is reasonable (because it is based on accurate information and representations supplied by the taxpayer, follows reasonable investigation into the transactions, and does not make unreasonable or unsupported assumptions), and (2) the taxpayer's reliance thereon is reasonable (because the professional is not tainted with a conflict –of-interest, and, given the taxpayer's knowledge and experience, the transactions are not "too good to be true.")

*Stobie Creek*, 82 Fed. Cl. at 711. ACR cannot meet any of these requirements. ACR claims to have relied upon the advice of Greg Sanderson in all aspects of claiming the alternative fuel mixture credits in 2011. In doing so, ACR appears to go far beyond the narrow reasonable reliance defense seen in the cases. To a lesser extent, ACR also claims to have relied on other individuals, but, for the reasons described below, ACR cannot show reasonable reliance on the advice of any of these individuals.

32

*i. ACR Cannot Show Reasonable Reliance on Greg Sanderson's Advice.*

First, ACR does not present any evidence that Sanderson advised it that its activities would qualify for the alternative fuel mixture credit prior to 2011. *See* (PSOF ¶¶ 12, 16, 20, 37.) ACR submits an affidavit of Greg Sanderson with its motion, but Sanderson does not assert that he advised ACR that its activities would qualify for the alternative fuel mixture prior to 2011. (Pl.'s App. 57-66.) Instead, Sanderson asserts that, on January 14, 2011, it was his *opinion* that "their business model would permit them to qualify for the alternative fuel mixture credit when the mixture is consumed to fuel a process in a trade or business under IRC Section 6426(e)." (Pl.'s App. 6, ¶12.) Notably, he does not state that he ever advised ACR that its substances were liquid fuels derived from biomass or that disposal of ACR's mixes in anaerobic digesters constituted "use as a fuel" under § 6426(e). In fact, the e-mails sent by Sanderson belie any possibility that he gave such advice.

Sanderson does state that he advised ACR that "the IRS had ruled that a qualifying 'sale' of fuel means passing of title from buyer to seller for a price, which includes a transaction where the seller pays the buyer a tipping fee for the buyer to acquire a waste by-product fuel and where the seller is relieved of the obligation to dispose of the waste by-product." (Pl's App. at 60, ¶10.) He also states that he provided ACR with PLR 963102. *Id.* As discussed above in Part I.C.ii., however, this PLR is distinguishable from ACR's situation. Sanderson also states that he reviewed "fuel sale agreements" between ACR and its customers. *Id.* at ¶11. Even so, Sanderson's affidavit does not address whether he was aware that not all of ACR's purported customers entered into fuel sale agreements or paid anything for ACR's mixes or that in at least one instance the purported agreement was considered "a wash."

33

Second, to the extent Sanderson did advise ACR with regard to the alternative fuel mixture credit ACR's purported reliance was not reasonable because it appears that Sanderson had an incorrect understanding of ACR's activities. For example, on January 24, 2011, Sanderson told Huyser that he expected that ACR's fuel was to be "combusted or oxidized" – not broken down in the absence of oxygen, as occurs in the anaerobic digester process. (App., Ex. 21, A333.) Thus, even if Sanderson advised ACR prior to it claiming credits that he thought their activities qualified for the credit, his advice was based on an incorrect understanding of the facts. Later, in the spring of 2011, Sanderson told Huyser that he did not have enough facts to understand his activities. Moreover, Sanderson told Huyser on at least two occasions that water would not qualify for the alternative fuel mixture credit, yet ACR's supposed alternative fuel mixtures contained 75-90% water. Additionally, neither Carter nor Huyser – the two principals of ACR in 2010 – hired a scientist prior to taking the alternative fuel mixture credits in 2011, even though Sanderson advised them to do so. [12] This shows a lack of reasonable investigation by ACR – because there was no investigation at all. Thus, Sanderson's advice was based on incorrect information, and, to the extent he did provide advice, ACR disregarded it.

Third, ACR cannot show that it reasonably relied on Sanderson because Sanderson was not a disinterested source of information or advice. "Courts also do not credit reliance as reasonable when the professional dispensing advice is tainted by a conflict-of-interest." *Stobie Creek*, 82 Fed. Cl. at 711. A conflict of interest exists where a person is a promoter, or is simply

---

[12] In his affidavit, Sanderson states that he spoke with Dr. Robert Harris, who told him that "such biomass mixture uses should meet the scientific definition of use as a fuel, and so I advised ACR representatives Jeff Carter and Jim Huyser." (Pls. App. at 62-63, ¶16). This statement, which Sanderson alleges took place between January and March of 2011 – after ACR began claiming the credits – is hearsay and it is irrelevant. *See* RCFC 56(c)(2).

34

"not a disinterested source." *Id.* at 711. "Advice hardly qualifies as disinterested or objective if it comes from parties who actively promote or implement the transactions in question." *Stobie Creek Investments LLC v. United States*, 608 F.3d at 1382 (internal citations omitted). Here, Sanderson was not merely a lawyer who had experience with renewable energy credits. Rather, he personally has invested in companies that have received millions of dollars in renewable energy credits. But ACR nevertheless claims to have relied on this advice because it sought out advice that it wanted to hear, and expected that Sanderson's advice would be positive.

                  *ii.    ACR Cannot Show Reasonable Reliance on Any Other Advice.*

       Similarly, ACR also cannot claim that it reasonably relied on the advice of Wendy Albers. Ms. Albers was not hired to provide advice to ACR. Rather, Albers's work consisted of bookkeeping – calculating the amount of the alternative fuel mixture credits based on the number of gallons of ACR's purported alternative fuel and electronically filing ACR's claims for refund. Moreover, any reliance on Albers would not be reasonable because she had no background in renewable energy and had only recently become a CPA. *See Stobie Creek*, 82 Fed. Cl. at 711.

       In its brief, ACR claims, without any evidentiary support in the record, that "Dr. Zitomer advised that the mixture was a fuel and advised on increasing energy production from the fuel." (Pl.'s Br. 33.) This self-serving statement is unsupported and insufficient. *See* RCFC 56(c)(2); *see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.,* 200 F.3d 795, 812 (Fed.Cir.1999). In fact, Dr. Zitomer's lab performed one test for ACR after March of 2011.

       ACR also claims to have relied on attorney Jeffrey Lewis, but Lewis's "advice" was nothing more than a "rubber stamp" of approval of Sanderson. (*See* PSOF ¶¶ 9, 11.) He provided no substantive advice upon which ACR could rely. Ultimately, ACR cannot show that it received

any advice given by an individual with accurate and complete knowledge of the facts before 2011, when it began claiming the credits.

       *iii.*    *ACR Knew Its Transactions Were Too Good to be True.*

Finally, reliance is not reasonable if the taxpayer knew or should have known that a transaction was too good to be true. *Stobie Creek Investments LLC v. United States*, 608 F.3d at 1382 (internal citations omitted). ACR should have known that taking nearly $20 million in tax credits for disposing of mixtures that largely consisted of water in anaerobic digesters was too good to be true. Additionally, Huyser, who was experienced in the energy industry, knew that ACR's mixtures would not be combusted in anaerobic digesters. Moreover, by entering into sham transactions solely for the purpose of meeting the "sale" requirement of § 6426(e), ACR knew it wasn't truly selling its substances to wastewater treatment plants.

      B.  ACR Cannot Show Reasonable Cause Based on Receipt of an Excise Tax Registration from the IRS.

ACR points to its receipt of an excise tax registration in support of its argument that it had reasonable cause to claim nearly $20 million in alternative fuel mixture credits. But the IRS's issuance of a Letter of Registration ("the Letter") to ACR does not provide ACR with reasonable cause because (1) the Letter does not state that ACR qualified for the alternative fuel mixture credit; (2) the Letter reflected information that should have caused ACR to question its eligibility for the registration; (3) under the applicable regulations, the IRS does not determine whether registrants produce, use, or sell alternative fuel mixtures; and (4) the Letter is not written advice subject to § 6404(f).

To be sure, § 6427(e) states that "the Secretary shall not make any payment under this subsection to any person with respect to any alternative fuel credit or alternative fuel mixture credit unless the person is registered under section 4101." § 6427(e)(4). That does not mean,

however, that a taxpayer who registers under § 4101 has met all of the requirements for the alternative fuel mixture credit. Nevertheless, plaintiff incorrectly argues that because ACR received the Letter and the IRS did not revoke it, the IRS made a "written determination" that "the alternative fuel mixture produced and distributed by ACR qualified for the alternative fuel tax credits."[13] (Pl.'s Br. 5.) Plaintiff also asserts that "the IRS determined that ACR produced an alternative fuel mixture and that it sold that product for use as a fuel and issued the AM registration to ACR" (Pl.'s Br. 20.) Plaintiff's assertions are incorrect.

In order to receive a registration, ACR filled out a Form 637, application for certain excise tax activities. The Form 637 does not state that applicants are or will be eligible for a tax credit upon receiving a registration, and the Letter does not state that the IRS had determined that ACR qualified for the alternative fuel mixture credit. (*See* Pl.'s App. 80.) Rather, the Letter describes the meaning of the two suffixes in ACR's registration number, one of which was "AM" and the other was "M." First, the IRS indicated that the "AM" suffix "signifies an alternative fueler that produces an alternative fuel mixture that is sold for use or used as in the alternative fueler's trade or business." Next, however, the Letter notes that the M suffix is meant for a blender  producing a "taxable fuel outside the bulk transfer/terminal system. . ." *Id.* Notably, ACR was not producing a taxable fuel – it was adding taxable fuel (diesel) to corn syrup and other food products or wastes.

The Letter does not describe the facts of ACR's operations, apply any law or precedent to those facts, and it does not make any statements with regard to ACR's eligibility for a credit.

---

[13] The "alternative fuel tax credit" is a separate credit not at issue in this case. Presumably, plaintiff meant to assert that the IRS determined that ACR qualified for the alternative fuel mixture credit. Regardless, the IRS made no such determination.

Boyle App. 065

Thus, ACR's assertion that the IRS determined that ACR was eligible for the tax credit is plainly incorrect. Moreover, ACR's claimed reliance on the issuance of the Letter is also unreasonable because the Letter states that the registration includes both an "AM" and an "M" suffix. Because ACR was not producing a taxable fuel, the "M" suffix does not apply to ACR, as ACR itself admits. (Pl.'s Br. 5.) The reference to an "M" suffix in this registration letter should have caused ACR to question whether it was correctly registered.

While ACR incorrectly asserts that the "the IRS determined that ACR produced an alternative fuel mixture and that it sold that product for use as a fuel . . ." (Pl.'s Br. 20), the activity test in the regulations does not contemplate that the IRS will conduct that type of evaluation in issuing an excise tax registration letter. Under the applicable Treasury Regulations, an applicant is registered if it meets three registration tests. *See* § 48.4101-1(f)(1)(i)(A), (B), (C) (2005). One of those tests is an activity test. *Id.* at (A). Under sub paragraph (f)(2) an applicant meets the activity test if the district director determines, for example, that the taxpayer is, "likely to be . . . in the course of its trade or business, regularly engaged as an operator of a bus or train or *in the characteristic activity of a person described in paragraph (c)(1) or (d) of this section*. . ." § 48.4101-1(f)(2)(ii) (emphasis added). Subparagraphs (c)(1) and (d), in turn, describe persons such as blenders, feedstock users, gasohol blenders, and industrial users. § 48.4101-1(c)(1), (d).[14] Thus, the regulations do not state that, in issuing an excise tax registration, the IRS would first determine whether a taxpayer is producing an alternative fuel or an alternative fuel mixture.

Finally, Plaintiff's attempt to mischaracterize the Letter as "written advice" under § 6404(f) is incorrect. Section 6404(f) of the Internal Revenue code requires the Secretary to

---

[14] This version of the regulations was in effect October 24, 2005 through July 5, 2011.

38

abate any "penalty or addition to tax attributable to erroneous advice furnished to the taxpayer in writing by an officer or employee of the Internal Revenue Service, acting in such officer's or employee's official capacity" if "the written advice was reasonably relied upon by the taxpayer and was in response to a specific written request of the taxpayer, and the portion of the penalty or addition to tax did not result from a failure by the taxpayer to provide adequate or accurate information." § 6404(f)(A), (B).

The regulations underlying § 6404 define the term "advice" for purposes of § 6404. A written response issued to a taxpayer by the Service constitutes advice "if, and only if, the response applies the tax laws to the specific facts submitted in writing by the taxpayer and provides a conclusion regarding the tax treatment to be accorded the taxpayer upon the application of the tax law to those facts." Treas. Reg. § 301.6404-3(c)(1)  Here, the letter does not apply any tax laws to the particular facts. Indeed, there is no discussion of the facts of ACR's activities. Rather, as discussed above, the Letter notes that ACR has been granted a registration, and describes the meaning of each of the two designations included in ACR's registration number. The Letter also does not provide a conclusion that ACR is eligible for the alternative fuel mixture credit. Thus, the Letter does not constitute "advice" under § 6404. Further, ACR does not allege, and cannot show, that the Letter was made in response to a written request for advice made by the taxpayer. ACR applied for an excise tax registration on a Form 637 – the Form 637 is not a written request for advice from IRS. Thus, the IRS's issuance of an excise tax registration to ACR does not mean that ACR had reasonable cause to claim alternative fuel mixture credits that it was not entitled to claim.

C.  ACR Cannot Show Reasonable Cause Because Its Activities Were Purely Motivated by the Tax Credit.

Finally, the United States Tax Court has found no reasonable cause where a taxpayer enters into a transaction purely for tax benefits. *Novinger v. Comm'r*, 61 T.C.M. (CCH) 3024 (1991). In *Novinger*, the Tax Court found that the IRS did not abuse its discretion in refusing to waive the § 6661 penalty where the taxpayers "were singularly unconcerned with the purported profit aspects of the transactions." *Id.* Here too, ACR's lack of a profit motive undercuts its claim of reasonable cause. ACR admits that its activities were not profitable absent the tax credits, and that it did not engage in its activities before or after 2011. Thus, because ACR was motivated only by a desire for multi-million dollar tax credits, ACR cannot show reasonable cause.

## CONCLUSION

ACR cannot meet its burden of proof because ACR cannot show that disposing of mixtures containing solids, large amounts of water, and a small amount of diesel, satisfies the requirements of an alternative fuel mixture of § 6426(e). Because ACR cannot prove the essential elements of its claim for refund, ACR's claim fails as a matter of law. *See Applegate v. United States*, 35 Fed. Cl. 406, 423 (1996) (citing *Celotex*, 477 U.S. at 323). Moreover, since ACR's activities were solely motivated by the tax credits and it cannot show reasonable reliance, it cannot show reasonable cause, and is liable for the excessive claims penalty under § 6675. Accordingly, this Court should grant summary judgment in Defendant's favor, and deny Plaintiff's motion for summary judgment.

40

Respectfully submitted,

October 25, 2017

*s/Miranda Bureau*
MIRANDA BUREAU
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
Tel: (202) 353-9171
Fax: (202) 514-9440
Miranda.j.bureau@usdoj.gov

DAVID A. HUBBERT
 Acting Assistant Attorney General
DAVID I. PINCUS
 Chief, Court of Federal Claims Section
G. ROBSON STEWART
 Assistant Chief
BRIAN J. SULLIVAN
 Trial Attorney

October 25, 2017

*s/G. Robson Stewart*
 Of Counsel

**Matt Kinley**

---

| | |
|---|---|
| **From:** | Ken Boyle ACR [ken@alternativecarbonresources.com] |
| **Sent:** | Monday, May 02, 2011 2:52 PM |
| **To:** | Matt Kinley |
| **Cc:** | Jim Huyser |
| **Subject:** | Re: items to discuss |

Just out of the Chicago mtg. Went well. They want 10 TL/day. Gulp?

Wesselmann calls me before he calls on a prospect and it is working so far. Jim has him calling on Iowa and i asked he prepare for California and Florida. Jim has another consulting calling on Nashville. I called South Bend and they were a "NO, at capacity.". I'll send the google docs link again for pipeline.

Il talk to Jim about Zach's payment due and see how he wants to handle that and how much seed/dev capital we are going to seed the company.

How about a deal with Zach similar to Wesselmann's for the small ADs ($20/TL delivered).

I'll call in a bit.

Ken Boyle
515.865.3271

Sent from iPhone

Begin forwarded message:

On May 2, 2011, at 11:37 AM, "Matt Kinley" <Kinley@pappajohn.com> wrote:

> Ken:
>
> A few items to discuss when you & Jim have time:
>
> - New opportunities - e.g. TN and South Bend. I reviewed my files and did more research over the weekend and a few questions. For example, Nashville looks great. I have the name of a contact and I can keep trying to call. I stopped calling when Jim his friend with a contact there. Is Jim referring to John Wessleman for Nashville?? Do we have a list of ADs he is calling so we don't duplicate. I am 100% in favor of him calling if has a relationship but I also want to be calling if an account is not being pursued. Same for Florida (Ocala) and CA. I recall you discussing a worksheet to update but I can't locate on google docs. Maybe I am logging in wrong.
> - We owe a check to Zach today - $4,500. I am ready to put $$ in ACR (Did we decide on how much??) once the LLC agreement is done. Jim's thoughts?
> - Zach's deal. He is looking for something on the low end. Our deal is drafted as $8,000 once he hit 14 TL in a 7 day period. He is getting the drift that a lot of small players only take it 5 or 6 days a week and 2 TL a day is tough. I always had in mind we would do something on the low end. He also mentioned a flat amount per TL for all accounts - I am open to a per TL amount to simplify the math. Based on the

5/2/2011

GOVERNMENT
EXHIBIT
8
PENGAD 800-631-6989

KINLEYM000558

**Matt Kinley**

| | |
|---|---|
| **From:** | Matt Kinley |
| **Sent:** | Monday, May 02, 2011 11:37 AM |
| **To:** | 'Kenneth Boyle' |
| **Subject:** | items to discuss |

Ken:

A few items to discuss when you & Jim have time:

- New opportunities - e.g. TN and South Bend. I reviewed my files and did more research over the weekend and a few questions. For example, Nashville looks great. I have the name of a contact and I can keep trying to call. I stopped calling when Jim his friend with a contact there. Is Jim referring to John Wessleman for Nashville?? Do we have a list of ADs he is calling so we don't duplicate. I am 100% in favor of him calling if has a relationship but I also want to be calling if an account is not being pursued. Same for Florida (Ocala) and CA. I recall you discussing a worksheet to update but I can't locate on google docs. Maybe I am logging in wrong.
- We owe a check to Zach today - $4,500. I am ready to put $$ in ACR (Did we decide on how much??) once the LLC agreement is done. Jim's thoughts?
- Zach's deal. He is looking for something on the low end. Our deal is drafted as $8,000 once he hit 14 TL in a 7 day period. He is getting the drift that a lot of small players only take it 5 or 6 days a week and 2 TL a day is tough. I always had in mind we would do something on the low end. He also mentioned a flat amount per TL for all accounts - I am open to a per TL amount to simplify the math. Based on the current structure, he is highly incented to focus only on big accounts and ignore smaller. I can pencil some number if you and Jim are open but I wanted to get your feedback before I spend time.

Call me when you want to discuss. I have a 4 pm call, otherwise wide open today.

Matt

5/2/2011

KINLEYM000559

**Boyle App. 071**