IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES HUYSER; MATTHEW KINLEY; KENNETH BOYLE; JEFFREY W. CARTER; and JWC INVESTMENTS L.C.,<br><br>Defendants. | 4:23-cv-00144-SHL-WPK<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART UNITED STATES' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT KINLEY'S MOTION FOR SUMMARY JUDGMENT** |

In a tax refund suit in the Court of Federal Claims, Alternative Carbon Resources, LLC ("ACR") failed to satisfy its burden of proving that it was entitled to more than $19 million in alternative fuel mixture tax credits, resulting in a large judgment against ACR and in favor of the United States. The United States is now trying to collect that judgment from ACR's members under piercing the corporate veil and fraudulent transfer theories. It seeks partial summary judgment in two respects: (i) establishing that issue preclusion precludes the re-litigation of certain matters litigated in the Court of Federal Claims; and (ii) establishing, as to Defendants Jeffrey W. Carter and JWC Investments L.C. ("JWC"), that either that Carter (and not JWC) is the member of ACR or that JWC and Carter are alter egos. Defendant Matthew Kinley cross-moves for partial summary judgment on the United States' piercing the corporate veil claim against him.

The Court will not give preclusive effect to conclusions of law or mixed questions of law and fact from the refund suit because ACR bore the burden of proof in that proceeding, whereas the United States bears the burden here. The Court will, however, give preclusive effect to findings of undisputed facts in the Court of Federal Claims because the *United States* bore the burden of proving those facts. The Court further concludes as a matter of law that Carter, not JWC, is a member of ACR. The Court therefore GRANTS IN PART and DENIES IN PART the United States' Motion for Partial Summary Judgment. (ECF 83.) With respect to Kinley, there are too many factual disputes in the record to rule in his favor as a matter of law, and thus the Court DENIES his Motion for Partial Summary Judgment. (ECF 90.)

## I.   FACTS RELATING TO THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT.[1]

### A.  *ACR's Formation and Operations in 2011 and 2012.*

On May 19, 2010, James Huyser, or his agent, filed a Certificate of Organization for Alternative Carbon Resources, LLC ("ACR"), with the Iowa Secretary of State. (ECF 95-2, ¶ 1; ECF 97-1, ¶ 1; ECF 103-1, ¶ 1; ECF 101, ¶ 1.) Sometime around or after March 1, 2011, Huyser, Carter, Kinley, and Kenneth Boyle executed an Amended Operating Agreement for ACR through which all four became members of the entity. (ECF 95-2, ¶ 2; ECF 97-1, ¶ 2; ECF 101, ¶ 2.) Carter asserts, however, that JWC is the true member of ACR, not himself personally. (ECF 103-1, ¶ 2.) Huyser, Kinley, Boyle, and either Carter or JWC served as members of ACR from 2011 to 2021 when the entity was administratively dissolved by the Iowa Secretary of State. (ECF 95-2, ¶ 3; ECF 97-1, ¶ 3; ECF 103-1, ¶ 3; ECF 101, ¶ 3.)

During its operations in 2011, ACR's business involved the purchase of organic biomass and the facilitation of transportation of alternative fuel mixtures to anaerobic digester customers. (ECF 95-2, ¶ 4; ECF 97-1, ¶ 4; ECF 103-1, ¶ 4; ECF 101, ¶ 4.) Although the parties quibble about semantics, it appears to be undisputed that organic biomass is a byproduct (or, in the United States' terminology, "waste") from the ethanol manufacturing process. (ECF 95-2, ¶ 4; ECF 97-1, ¶ 4; ECF 103-1, ¶ 4; ECF 101, ¶ 4.) ACR hired a trucking company to transport the biomass, blend (or "splash") 0.1% diesel into it at a gas station, and transfer the mixture to anaerobic digester customers. (ECF 95-2, ¶ 5; ECF 97-1, ¶ 5; ECF 103-1, ¶ 5; ECF 101, ¶ 5.) ACR submitted alternative fuel mixture credit claims to the United States Department of Treasury for payment of $0.50 per gallon of the mixture transferred to the anaerobic digester customers. (ECF 95-2, ¶ 6; ECF 103-1, ¶ 6; ECF 101, ¶ 6.) Huyser disputes whether ACR submitted claims for *every* gallon, or merely *some* of the gallons. (ECF 97-1, ¶ 6.) The fuel mixture tax credits were available until December 31, 2011, but not renewed for the year 2012. (ECF 95-2, ¶¶ 7–8; ECF 97-1, ¶¶ 7–8; ECF 103-1, ¶¶ 7–8; ECF 101, ¶¶ 7–8.) ACR largely ceased active operations on or around December 31, 2011, although it pursued other business activities like a potential compressed

---

[1] The United States and Kinley have filed cross-motions for summary judgment. When cross-motions are filed, the Court must view the facts in the light most favorable to the plaintiff on the defendant's motion and in the light most favorable to the defendant on the plaintiff's motion. *See Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606, 614 (N.D. Iowa 2019). Consistent with this dichotomous standard, this section deals with genuine factual disputes between the United States and Kinley by separately stating what each side asserts to be true. As to the remaining Defendants, this section interprets all genuine factual disputes in the light most favorable to the Defendant(s).

renewable gas project with the City of Des Moines. (ECF 95-2, ¶ 8; ECF 97-1, ¶ 8; ECF 103-1, ¶ 8; ECF 101, ¶ 8.) After December 31, 2011, ACR never again engaged in operations relating to the purchase or transportation of biomass (waste). (ECF 95-2, ¶ 9; ECF 97-1, ¶ 9; ECF 103-1, ¶ 9[2]; ECF 101, ¶ 9.)

ACR's books and records show three categories of income in 2011: (i) $8,950 from the sale of alternative fuel mixture to digester customers; (ii) $19,773,393 from federal tax credits claimed and received; and (iii) $135,800 from the sale of freight services. (ECF 95-2, ¶ 10; ECF 97-1, ¶ 10; ECF 103-1, ¶ 10; ECF 101, ¶ 10.) In 2012, ACR had one category of recorded income: $37,200 in freight income. (ECF 95-2, ¶ 11; ECF 97-1, ¶ 11; ECF 103-1, ¶ 11; ECF 101, ¶ 11.) In 2011 and 2012, ACR made $4,332,000 in distributions to Huyser and $830,000 in distributions to each of Kinley and Boyle. (ECF 95-2, ¶ 52; ECF 97-1, ¶¶ 52, 81, 109; ECF 103-1, ¶¶ 52, 81, 109; ECF 101, ¶¶ 52, 81, 109.) Boyle and Kinley personally received and deposited checks from ACR. (ECF 97-1, ¶¶ 82, 110; ECF 103-1, ¶¶ 82, 110; ECF 101, ¶¶ 82, 110.[3]) In 2011, JWC received $2,592,000 in distributions from ACR. (ECF 97-1, ¶ 131; ECF 103-1, ¶ 131; ECF 101, ¶ 132.) In 2012, JWC received $1,740,000 in distributions from ACR. (ECF 97-1, ¶ 132; ECF 103-1, ¶ 131; ECF 101, ¶ 133.) These distributions were made by check payable to JWC but delivered to Carter. (ECF 97-1, ¶ 130; ECF 103-1, ¶ 130; ECF 100, ¶ 131.) Huyser decided the amount and timing of all distributions from ACR. (ECF 95-2, ¶ 53; ECF 97-1, ¶ 53; ECF 103-1, ¶ 53; ECF 100, ¶ 53.) From 2013 to 2019, ACR had no income or revenue, and its expenses consisted primarily of professional fees to attorneys and accountants. (ECF 95-2, ¶ 12; ECF 97-1, ¶ 12; ECF 103-1, ¶ 12; ECF 101, ¶ 12.)

  *B.  Involvement of Each Member in ACR's Operations.*

During ACR's start-up phase in 2010, Huyser submitted ACR's registration to the IRS to claim federal excise tax credits; communicated with an attorney, Greg Sanderson, about how to register to claim the credit; located and communicated with potential digester customers who would receive ACR's biomass mixture and deposit it into their digesters; sought out sources of ethanol biomass (or "waste") that could be used to make the mixture; and communicated with

---

[2] Carter/JWC purport to deny this fact but do not explain why or provide record citations. The Court considers the fact undisputed.

[3] Huyser did not respond to paragraphs 54 through 173 of the United States' Statement of Undisputed Facts, presumably because those Paragraphs were largely directed at Defendants other than him. The Court interprets this to mean he does not dispute those facts.

digester customers about terms for them to accept the mixture. (ECF 95-2, ¶ 27; ECF 97-1, ¶ 27; ECF 103-1, ¶ 27; ECF 101, ¶ 27.) In 2011, Huyser worked sixty hours per week on ACR's business. (ECF 95-2, ¶ 28; ECF 97-1, ¶ 28; ECF 103-1, ¶ 28; ECF 101, ¶ 28.) During that year, Huyser oversaw ACR's recordkeeping and documentation of the transport and mixing of the mixture by outside accountants; negotiated and signed contracts for ACR; deposited credit payments from the Department of Treasury into ACR's accounts; managed the delivery of the mixture; reviewed monthly financial reports from ACR's accountants; determined the amount and frequency of cash distributions made by ACR to its members; and personally delivered distribution checks to each ACR member. (ECF 95-2, ¶ 29; ECF 97-1, ¶ 29; ECF 103-1, ¶ 29; ECF 101, ¶ 29.)

Boyle became a member of ACR in 2011. (ECF 97-1, ¶ 83; ECF 103-1, ¶ 83; ECF 101, ¶ 83.) Boyle's duties with ACR included undertaking research and business development with potential digester customers, setting up ACR email accounts for the entity's members, meeting with and traveling to potential digester customers outside of Iowa and visiting their facilities, meeting with feedstock specialists, and earning commissions from ACR for finding customers. (ECF 97-1, ¶ 84; ECF 103-1, ¶ 84; ECF 101, ¶ 84.) In 2011, Boyle spent thirty to forty hours per week on ACR business. (ECF 97-1, ¶ 85; ECF 103-1, ¶ 85; ECF 101, ¶ 85.)

In 2011, Kinley contributed to ACR's operations by communicating with suppliers (i.e., feedstock providers), researching digesters operating outside Iowa, and communicating with digesters. (ECF 97-1, ¶ 54; ECF 103-1, ¶ 54; ECF 101, ¶ 54.) He also traveled out of state on a few occasions to visit potential customers and suppliers, attended meetings related to ACR, and gave presentations about ACR using a "pitch deck." (ECF 97-1, ¶ 54; ECF 103-1, ¶ 54; ECF 101, ¶ 54.) In total, Kinley traveled to seven states and spent between ten and twenty hours per week on ACR business in 2011. (ECF 97-1, ¶¶ 55–56; ECF 103-1, ¶¶ 55–56; ECF 101, ¶¶ 55–56.)

In 2010 and 2011, Carter contributed to ACR's startup and operations by communicating with ethanol companies about procuring their biomass (waste) for ACR's operations; working with representatives from a digester called Des Moines Wastewater to test whether ACR's mixture could be deposited in their digester; finding new digester customers; and communicating with ACR attorneys and accountants. (ECF 97-1, ¶ 111; ECF 103-1, ¶ 111; ECF 101, ¶ 111.) Carter spent about twenty to thirty hours per week on ACR's business. (ECF 97-1, ¶ 111; ECF 103-1, ¶ 111; ECF 101, ¶ 111.)

*C. IRS Tax Assessment and Court of Federal Claims Litigation.*

In January 2012, the Internal Revenue Service contacted ACR via Huyser as part of an audit into whether the entity was properly eligible to receive the federal excise tax credits it claimed in 2011 and received in 2011 and 2012. (ECF 95-2, ¶ 13; ECF 97-1, ¶ 13; ECF 103-1, ¶ 13; ECF 101, ¶ 13.) Huyser clarifies, however, that this audit did not appear to involve any sort of criminal investigation. (ECF 95-2, ¶ 13.) In any event, ACR incurred legal expenses associated with the audit and (according to Defendants other than Huyser) a subsequent criminal investigation. (ECF 97-1, ¶ 13; ECF 103-1, ¶ 13; ECF 101, ¶ 13.) At some point in 2013, attorney William Smith represented ACR in connection with the IRS audit. (ECF 95-2, ¶ 14; ECF 97-1, ¶ 14; ECF 103-1, ¶ 14; ECF 101, ¶ 14.)

In April 2014, a delegate of the Secretary of the Treasury made excise tax assessments of over $19 million against ACR, which represented the amount of the alternative fuel mixture cash credits that ACR received. (ECF 95-2, ¶ 15; ECF 97-1, ¶ 15; ECF 103-1, ¶ 15; ECF 101, ¶ 15.) The delegate also assessed over $39 million in civil excessive claim penalties against ACR. (ECF 95-2, ¶ 16; ECF 97-1, ¶ 16; ECF 103-1, ¶ 16; ECF 101, ¶ 16.) An assessment is not, however, a judicial determination. (E.g., ECF 95-2, ¶¶ 15–16.)

In March 2015, ACR filed a complaint against the United States in the Court of Federal Claims seeking a refund of a partial payment ACR made against excise tax assessments in order to challenge its assessed excised tax liability. (ECF 95-2, ¶ 17; ECF 97-1, ¶ 17; ECF 103-1, ¶ 17; ECF 101, ¶ 17.) The case was styled as *Alternative Carbon Resources, LLC v. United States*, Case No. 15-155. (ECF 95-2, ¶ 17; ECF 97-1, ¶ 17; ECF 103-1, ¶ 17; ECF 101, ¶ 17.) The United States responded to ACR's complaint and asserted a counterclaim for money judgment against ACR in the full amount of the assessed excise taxes plus excessive claim penalties, less any prior payments made by ACR. (ECF 95-2, ¶ 18; ECF 97-1, ¶ 18; ECF 103-1, ¶ 18; ECF 101, ¶ 18.) The counterclaim did not seek any judgment on civil fraud penalties, failure-to-file penalties, or failure-to-pay penalties assessed against ACR. (ECF 95-2, ¶ 18; ECF 97-1, ¶ 18; ECF 103-1, ¶ 18; ECF 101, ¶ 18.) Before the (eventual) entry of judgment against ACR in that proceeding, the IRS abated the fraud penalties it had assessed against ACR. (ECF 97-1, ¶ 18.) None of ACR's members were individually named as plaintiffs or defendants. *See generally Alt. Carbon Res., LLC v. United States*, 137 Fed. Cl. 1, 11 (2018), *aff'd*, 939 F.3d 1320 (Fed. Cir. 2019) (hereinafter, the "Refund Suit").

Huyser, Boyle, and Kinley hired Attorney Smith to represent ACR in the Refund Suit in the Court of Federal Claims. (ECF 95-2, ¶ 31; ECF 97-1, ¶ 31; ECF 101, ¶ 31.) Carter and JWC were not involved in this decision. (ECF 103-1, ¶ 31.) Huyser, Kinley, Boyle, and either Carter or JWC were members of ACR throughout the litigation, including during the appeal. (ECF 95-2, ¶ 22; ECF 97-1, ¶ 22; ECF 103-1, ¶ 22; ECF 101, ¶ 22.) Huyser, Kinley, and Boyle contributed their own money to fund ACR's accounting and legal expenses from 2013 through 2019, although Kinley asserts that this was done in response to a capital call from ACR, not in his personal capacity. (ECF 95-2, ¶ 23; ECF 97-1, ¶ 23; ECF 103-1, ¶ 23; ECF 101, ¶ 23.) Kinley and Boyle signed an agreement through which they and Huyser jointly retained Smith as ACR's counsel. (ECF 97-1, ¶¶ 60, 88; ECF 103-1, ¶¶ 60, 88; ECF 101, ¶¶ 60, 88.)

From 2013 to 2019, Huyser personally contributed at least $429,687 to help pay for ACR's legal and accounting expenses, including: (i) $42,000 in 2013; (ii) $57,000 in 2014; (iii) $40,000 in 2015; (iv) $60,050 in 2016; (v) $165,000 in 2017; (vi) $199,000 in 2018; and (vii) $65,637 in 2019. (ECF 95-2, ¶¶ 33–34; ECF 97-1, ¶¶ 33–34; ECF 103-1, ¶¶ 33–34; ECF 101, ¶¶ 33–34.) During the same period, Kinley personally contributed $99,680 toward ACR's legal and accounting expenses, including: (i) $8,000 in 2013; (ii) $10,850 in 2014; (iii) $4,761 in 2015; (iv) $9,905 in 2016; (v) $23,812 in 2017; (vi) $30,181 in 2018; and (vii) $12,171 in 2019. (ECF 97-1, ¶ 58; ECF 103-1, ¶ 58; ECF 101, ¶ 58.) During the same period, Boyle contributed $76,732 toward ACR's legal and accounting expenses, including: (i) $8,000 in 2013; (ii) $10,850 in 2014; (iii) $4,761 in 2015; (iv) $9,905 in 2016; (v) $23,812 in 2017; (vi) $15,024 in 2018; and (vii) $4,380 in 2019. (ECF 97-1, ¶¶ 86–87; ECF 103-1, ¶¶ 86–87; ECF 101, ¶¶ 86–87.) Huyser made sure Smith's fees were paid, asked fellow ACR members to contribute to the payment of those fees, and issued a capital call asking Carter and JWC to pay its share as well. (ECF 95-2, ¶¶ 35–36; ECF 97-1, ¶¶ 35–36; ECF 103-1, ¶¶ 35–36; ECF 101, ¶¶ 35–36.)

Huyser, Carter, Boyle, and Kinley all participated to some degree or another in the Refund Suit. Huyser located counsel, located expert witnesses, responded to discovery, contributed funds for legal fees, executed an affidavit that was used to support two motions for summary judgment, sat for a deposition, traveled to Atlanta and Washington, D.C., and helped make strategic decisions. (ECF 95-2, ¶¶ 30, 39–45; ECF 97-1, ¶¶ 30, 39–45; ECF 103-1, ¶¶ 30, 39–45); ECF 101, ¶¶ 30, 39–45.) Huyser also communicated with Carter and Kinley about the progress of the suit. (ECF 95-2, ¶ 32; ECF 97-1, ¶ 32; ECF 103-1, ¶ 32; ECF 101, ¶ 32.)

6

Kinley located documents during the discovery process, executed an affidavit that was used to support two motions for summary judgment, sat for a deposition after attending a preparation session with Smith, and produced documents pursuant to a subpoena. (ECF 97-1, ¶¶ 62, 66–69; ECF 103-1, ¶¶ 62, 66–69; ECF 101, ¶¶ 62, 66–69.) Before and during the Refund Suit, Kinley also attended meetings with Smith and corresponded with ACR's accounting firm, Hamilton Juffer, about tax returns and legal expenses. (ECF 97-1, ¶¶ 63–64; ECF 103-1, ¶¶ 63–64; ECF 101, ¶¶ 63–64.)

During the Refund Suit, Boyle, too, attended meetings with Smith, participated in the discovery process by searching his personal records for responsive materials, sat for a deposition after attending a preparation session with Smith, and executed an affidavit that was used to support two motions for summary judgment. (ECF 97-1, ¶¶ 93, 96, 98–100; ECF 103-1, ¶¶ 93, 96, 98–100; ECF 100, ¶¶ 93, 96, 98–100.) Boyle also reviewed documents prepared by Smith and received updates from Smith regarding bills for legal expenses, legal invoices, and case status updates. (ECF 97-1, ¶¶ 94–95; ECF 103-1, ¶¶ 94–95; ECF 101, ¶¶ 94–95.) Boyle communicated with an expert witness on at least two occasions, once on a conference call and once to let the expert know about a potential subpoena from the Government. (ECF 97-1, ¶ 97; ECF 103-1, ¶ 97; ECF 101, ¶ 97.) Boyle disputes, however, any inference that he had authority to make decisions for ACR about litigation strategy or any other matter. (E.g., ECF 101, ¶ 97.) Moreover, on the whole, Boyle characterizes his involvement in the Refund Suit as "minimal," noting that he attended fewer than five meetings, did not attend any depositions except his own, and funded only a small portion of ACR's legal fees, consistent with his ownership interest in the entity. (ECF 101-1, ¶¶ 28–32.) Nonetheless, Boyle wanted ACR to file the suit. (ECF 97-1, ¶ 89; ECF 103-1, ¶ 89; ECF 101, ¶ 89.)

Carter and JWC participated in the Refund Suit as witnesses and were represented by separate counsel from Smith. (ECF 97-1, ¶ 112.) Carter also sat for a deposition pursuant to a subpoena, responded to a document subpoena, and executed an affidavit that was used to support two motions for summary judgment by ACR. (ECF 97-1, ¶¶ 114, 116[4]; ECF 103-1, ¶¶ 114, 116–

---

[4] In his Response to the United States' Statement of Undisputed Facts, Kinley mistakenly combined and responded to paragraphs 116 and 117 in one paragraph, labeled as paragraph 116. (*Compare* ECF 97-1, ¶ 116 *to* ECF 83-1, ¶¶ 116–17.) As a result, the numbering of the remaining Paragraphs in his Response is off by one (i.e., Kinley responds to United States paragraph 118 in paragraph 117, and so on), but it is obvious in context which paragraph he was responding to in each of his remaining responses.

17; ECF 101, ¶¶ 114, 116–17.) Some Defendants dispute whether Carter and JWC or any other ACR member were "agents" of ACR or had the "same interests" as ACR during the case. (ECF 97-1, ¶¶ 113, 115; ECF 103-1, ¶¶ 113, 115; ECF 101, ¶¶ 113, 115.) It is undisputed, however, that Carter had his own counsel, Shayla McCormally, during the Refund Suit but also signed a "Contract for Legal Services" with Smith in which Smith agreed to assist Carter and McCormally in a limited fashion by reviewing documents and pleadings as they relate to Carter's deposition. (ECF 97-1, ¶¶ 118–19; ECF 103-1, ¶¶ 119–20; ECF 101, ¶¶ 119–20.) The Contract further stated that Carter had a "common interest" with ACR and its principals. (ECF 97-1, ¶ 120; ECF 103-1, ¶ 121; ECF 101, ¶ 121.) After the Court of Federal Claims issued an adverse ruling against ACR, Carter discussed with McCormally the possibility of an appeal. (ECF 97-1, ¶ 121; ECF 103-1, ¶ 122; ECF 101, ¶ 122.) Carter agreed with the decision to appeal that ruling because he did not want there to be a money judgment against ACR. (ECF 97-1, ¶ 122; ECF 103-1, ¶ 123; ECF 101, ¶ 123.)

Kinley and Boyle emphasize that the ACR Operating Agreement gave Huyser sole authority to make decisions relating to the Refund Suit. (ECF 97, ¶ 18; ECF 101-1, ¶ 27.) Moreover, given Huyser's voting power, the other members could not have overridden him in directing ACR's course of action. (ECF 97, ¶ 19; ECF 101-1, ¶ 27.) Huyser directed ACR's counsel and was the primary client contact. (ECF 97, ¶ 20.) He also traveled out of state for a moot argument and to participate in court proceedings. (Id., ¶ 21.) Kinley did not travel for court proceedings or serve as ACR's representative. (Id., ¶ 22.) In fact, the United States had to subpoena Kinley to compel his participation in the discovery process. (Id., ¶ 23.) Kinley hired separate counsel to represent him as a fact witness. (Id., ¶ 24.)

In the Refund Suit, ACR bore the burden to prove eligibility for the tax credits. (Id., ¶ 25.) The United States argued that ACR could not meet this burden for several reasons, including that the mixtures were not "alternative fuel mixtures" or "liquid fuels derived from biomass" and were not "sold for use as a fuel" pursuant to governing law. (Id., ¶¶ 27–29.) The United States also argued, in the alternative, that ACR could not prove the mixtures were sold by ACR to customers consistent with 26 U.S.C. § 6426(e)(2)(A). (Id., ¶ 30.) Finally, the United States argued that ACR could not meet its burden to show "reasonable cause" to claim the credits, with the United States encouraging the Court of Federal Claims to "look to the conduct of [ACR's] managing partner . . . James Huyser" in determining the presence or absence of reasonable cause. (Id., ¶¶ 31–32.) The

United States' brief in support of its motion for summary judgment did not mention Kinley. (Id., ¶ 33.)

On March 22, 2018, the Court of Federal Claims entered summary judgment in favor of the United States and against ACR on the excise tax and penalty assessments. (ECF 95-2, ¶ 19; ECF 97-1, ¶ 19; ECF 103-1, ¶ 19; ECF 101, ¶ 19.) The Court of Federal Claims granted summary judgment in favor of ACR and against the United States to the extent any civil fraud, failure-to-file, and failure-to-pay penalties had not been abated by the IRS. (ECF 95-2, ¶ 19; ECF 97-1, ¶ 19; ECF 103-1, ¶ 19; ECF 101, ¶ 19.) On March 28, 2018, the Court of Federal Claims reduced the federal excise tax and penalty assessments to judgment and entered an amended judgment against ACR in the amount of $59,320,179.00 (the "Federal Claims Judgment"), less payments made and plus statutory interest and additions. (ECF 95-2, ¶ 20; ECF 97-1, ¶ 20; ECF 103-1, ¶ 20; ECF 101, ¶ 20.) The Judgment consisted of $19,773,393.00 in excise taxes assessed pursuant to 26 U.S.C. §§ 6206 & 6427 and $39,546,786.00 in excessive claims penalties assessed pursuant to 26 U.S.C. §§ 6206 & 6675. (ECF 95-2, ¶ 20; ECF 97-1, ¶ 20; ECF 103-1, ¶ 20; ECF 101, ¶ 20.) After the Court of Federal Claims entered summary judgment against ACR, Kinley participated in meetings with Huyser and Boyle about whether to appeal and voluntarily contributed his pro rata share of legal expenses for the appeal. (ECF 97-1, ¶ 70; ECF 103-1, ¶ 70; ECF 101, ¶ 70.) Boyle asserts, however, that he did not have authority to make decisions for ACR. (ECF 101, ¶ 70.) The appeal was, in any event, unsuccessful, as the United States Court of Appeals for the Federal Circuit affirmed the judgment on September 26, 2019. (ECF 95-2, ¶ 21; ECF 97-1, ¶ 21; ECF 103-1, ¶ 21; ECF 101, ¶ 21.) ACR has not made any payments toward the Federal Claims Judgment since the date it was affirmed by the Federal Circuit. (ECF 95-2, ¶ 24; ECF 97-1, ¶ 24; ECF 103-1, ¶ 24; ECF 101, ¶ 24.) After the Federal Circuit affirmed the judgment against ACR, the members who had been contributing to ACR legal expenses stopped doing so, although Kinley and Boyle point out that there was little, if any, need for any such expenses. (ECF 95-2, ¶ 45; ECF 97-1, ¶¶ 45, 71; ECF 103-1, ¶¶ 45, 71; ECF 101, ¶¶ 45, 71.)

### D. Members' Awareness of Potential Personal Exposure for ACR Debts Before and During the Refund Suit.

In Fall 2011, Attorney Smith informed Huyser and Kinley that ACR members theoretically could be personally liable for ACR tax assessments under theories of "transferee liability and piercing the veil," although Smith said "[a]t this point I have not seen anything to reflect personal liability." (ECF 95-2, ¶ 46; ECF 97-1, ¶¶ 46, 74; ECF 103-1, ¶¶ 46, 74; ECF 101, ¶¶ 46, 74; ECF

83-5, p. 246.) As of October 6, 2011, Boyle knew that Kinley raised "questions about veil piercing of the ACR, LLC." (ECF 97-1, ¶ 102; ECF 103-1, ¶ 102; ECF 101, ¶ 102.) On April 28, 2014, Smith told Huyser, Kinley, and Boyle via letter that "at this point there is significant risk that the IRS would ultimately assert individual liability for the penalty against some or all of the members of ACR for the [26 U.S.C.] § 6675 penalty." (ECF 95-2, ¶ 47; ECF 97-1, ¶¶ 47, 75, 103; ECF 103-1, ¶¶ 47, 75, 103; ECF 101, ¶¶ 47, 75, 103; ECF 83-5, p. 250.) Boyle points out that liability under 26 U.S.C. § 6675 is different than liability for fraudulent transfer or piercing the corporate veil. (ECF 101, ¶¶ 47, 75, 103.)

In any event, on May 22, 2014, Smith wrote another letter advising Huyser, Boyle, and Kinley that the "principals of ACR have a common interest in defeating the assessment and varying degrees of 'danger' as it relates to ultimate personal liability for the various penalties and credits." (ECF 95-2, ¶ 49; ECF 97-1, ¶¶ 49, 78, 106; ECF 103-1, ¶¶ 49, 78, 106; ECF 101, ¶¶ 49, 78, 106; ECF 85-2, p. 253.) Smith stated that proceeding on a "unified front contesting the claim for the return of the credits and the reasonableness of the reliance by the entity on experts advise (and thus the wrongness of the penalty assertions) is a consistent defense that all of you have and for which all of you (and Jeff Carter) receive direct potential personal benefit from the assertion of those defenses" to the Refund Suit. (ECF 95-2, ¶ 50; ECF 97-1, ¶¶ 50, 79, 107; ECF 103-1, ¶¶ 50, 79, 107; ECF 101, ¶¶ 50, 79, 107; ECF 83-5, pp. 256–57.) Again, Boyle points out that Smith's letter was referring to possible personal liability under 26 U.S.C. § 6675, as well as criminal exposure. (ECF 101, ¶¶ 50, 79, 107.) Personal liability under section 6675 is different from personal liability under fraudulent transfer or piercing the corporate veil theories. (E.g., ECF 101, ¶ 47.) Regardless, as early as May 22, 2014, Huyser, Kinley, and Boyle knew they would be protected from personal liability if ACR successfully challenged the tax assessments. (ECF 95-2, ¶ 51[5]; ECF 97-1, ¶¶ 51, 80, 108; ECF 103-1, ¶¶ 51, 80, 108; ECF 101, ¶¶ 51, 80, 108.)

Kinley ended up being separately represented in the Refund Suit. (ECF 97-1, ¶ 79.) After the Federal Circuit affirmed the judgment against ACR in the Refund Suit, Kinley participated in conversations with other ACR members about what the Government might do to collect the judgment, although Boyle disputes that these discussions involved anything more specific than

---

[5] Huyser disputes the admissibility of the letter. (E.g., ECF 95-2, ¶ 51.) He does not, however, appear to dispute that there could not have been personal exposure for himself and his partners if there was no valid assessment against ACR in the first place.

statements like "where's it go[ing] from here" or "what's the next step on this for collection and fighting it?" (ECF 97-1, ¶ 72; ECF 103-1, ¶ 72; ECF 101, ¶ 72.) Huyser or his agent continued to file the Biennial Report for ACR with the Iowa Secretary of State through 2019. (ECF 95-2, ¶ 25; ECF 97-1, ¶ 25; ECF 103-1, ¶ 25; ECF 101, ¶ 25.) On September 7, 2021, ACR was administratively dissolved by the Iowa Secretary of State based on failure to timely file the 2021 Biennial Report. (ECF 95-2, ¶ 26; ECF 97-1, ¶ 26; ECF 103-1, ¶ 26; ECF 101, ¶ 26.)

     *E. Collateral Litigation During the Refund Suit.*

     During the Refund Suit, a dispute developed among ACR's members because Carter either failed or refused to contribute to ACR's legal and accounting expenses. Boyle met and corresponded with Carter to ask Carter to contribute to ACR's expenses. (ECF 97-1, ¶ 90; ECF 103-1, ¶ 90; ECF 101, ¶ 90.) When these discussions were unsuccessful, Boyle and Huyser, in their personal capacities, sued Carter and JWC in the Iowa District Court for Polk County seeking to force them to contribute to ACR's legal expenses. (ECF 95-2, ¶ 37; ECF 97-1, ¶¶ 37, 91; ECF 103-1, ¶¶ 37, 91; ECF 101, ¶¶ 37, 91.) The case proceeded to a bench trial on the theory that an e-mail from Carter to Huyser on September 30, 2013, created a contract requiring Carter and/or JWC to contribute capital. (ECF 83-6, pp. 210–12.) The parties agreed that ACR's Operating Agreement did not require ACR members to participate in the capital call, so the district court did not analyze the Agreement's applicability. (Id., p. 212.) After trial, the Iowa District Court ruled in favor of Carter and JWC, concluding the e-mail did not create a contract for capital contributions. (Id., pp. 214–17.)

     In addition to the Refund Suit and Polk County litigation regarding ACR, Carter was a party to a third lawsuit that apparently involved the dissolution of his marriage or some dispute relating thereto. (ECF 97-1, ¶ 123; ECF 103-1, ¶ 124; ECF 101, ¶ 124.) During that lawsuit, Carter testified that he and JWC would be responsible for the judgment against ACR if ACR was unable to pay it. (ECF 97-1, ¶ 124; ECF 103-1, ¶ 125; ECF 101, ¶ 125.) In addition, his attorney submitted briefs stating that Carter and JWC were both personally jointly and severally liable for at least $15 million of the judgment and suggesting that Carter might be "liable for the debts of ACR." (ECF 97-1, ¶¶ 125–26; ECF 103-1, ¶¶ 126–27; ECF 101, ¶¶ 126–27; ECF 83-5, pp. 194–95, 200.) To date, Carter has not paid any portion of the judgment. (ECF 97-1, ¶ 128; ECF 103-1, ¶ 129; ECF 101, ¶ 129.) Boyle and Kinley dispute whether any of Carter's or his attorney's statements in the

Polk County dissolution proceeding are admissible or binding against them. (ECF 97-1, ¶¶ 125–27; ECF 101, ¶¶ 126–28.)

### F. Other Facts of Potential Relevance to Issue Preclusion.

None of Kinley's assets were titled in ACR's name or otherwise held by ACR, nor did Kinley serve as the entity's registered agent. (ECF 97, ¶¶ 36–37.) ACR did not commingle funds with Kinley, nor did it pay Kinley's personal obligations. (Id., ¶¶ 41–42.) Kinley did not receive any distributions relating to ACR's Iowa operations. (Id., ¶ 43.) Huyser unilaterally determined when distributions would be made and in what amount. (Id., ¶ 44.)

### G. Facts Relating to Carter and JWC.

JWC is an Iowa limited liability company formed by Carter and for which Carter serves as registered agent and member. (ECF 97-1, ¶ 133; ECF 103-1, ¶ 134[6]; ECF 101, ¶ 134.) Carter is the 99.1% owner of JWC. (ECF 97-1, ¶ 135; ECF 103-1, ¶ 135; ECF 101, ¶ 136.) In early 2011, Carter and JWC each made capital contributions of $1,000 to ACR via cashier's check. (ECF 97-1, ¶ 129; ECF 103-1, ¶ 130; ECF 101, ¶ 130.) Carter directed that his membership distributions be payable to JWC, so for that and other reasons, Carter asserts JWC was a member of ACR and not him personally. (ECF 97-1, ¶ 136; ECF 103-1, ¶ 136; ECF 101, ¶ 137; ECF 109-2, ¶¶ 1–2.) The United States disagrees. (ECF 109-2, ¶¶ 1–2.)

## II.   ADDITIONAL FACTS RELATING TO KINLEY'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT.

In connection with Kinley's cross-motion for partial summary judgment, both sides have included facts identical or similar to those described above in Section I. The Court will not repeat those facts in their entirety here; rather, for the most part, the Court will limit this section to additional facts—keeping in mind that disputed issues of fact must be resolved in favor of the United States on Kinley's motion, but in favor of Kinley on the United States' motion.

### A. Background Regarding Alternative Fuel Mixture Tax Credit.

Throughout 2010, Congress debated a package of renewable energy tax credits that it had enacted for 2011, including a per-gallon refundable tax credit for certain alternative fuel mixtures.

---

[6] Carter's and JWC's Responses to the United States' Statement of Undisputed Facts inadvertently provided a single response (labeled as paragraph 131) to two separate Statements of Undisputed Facts (paragraphs 131 *and* 132). As a result, the numbering of many of the remaining paragraphs in their Response is off by one, starting with their paragraph 132 (which is paragraph 133 as numbered by the United States). It is obvious in context which allegations Carter and JWC are denying and which they are admitting.

(ECF 99-1, ¶ 1.)[7] The tax credits were available for the calendar year 2011. (Id., ¶ 2.) The alternative fuel mixture was required to contain at least 0.1% taxable fuel by volume. (Id., ¶ 3.) A taxpayer was eligible to claim the credit if the alternative fuel mixture was "sold by the taxpayer producing such mixture to any person for use as fuel" or was "used as a fuel by the taxpayer producing such mixture." (Id., ¶ 4.) The Internal Revenue Code does not define the word "sale." (Id., ¶ 5.)

Before a taxpayer may qualify for the credit, it must register as an alternative fueler under 26 U.S.C. § 4101 by filing a designated form. (Id., ¶ 6.) The IRS would issue a designation and registration number when certain prerequisites were satisfied, although the parties disagree on how to characterize those prerequisites. (Id., ¶ 7.) Kinley says the IRS was determining whether the "filer's activity qualifies for the relevant tax credit," whereas the United States says the IRS merely was determining whether the applicant was current on its taxes and that the "representations made in its application for registration satisfied the criteria set forth in the regulation." (Id.) Regardless, the taxpayer may claim the credit by filing a timely claim with Form 720, Quarterly Federal Excise Tax Return. (Id., ¶ 8.)

*B. ACR's Origination and Business Model.*

ACR's business model was premised in substantial part on the use of anaerobic digesters to produce energy. Anaerobic digesters are processing systems that break down organic biomass (or "waste"), producing methane gas ("biogas") as a byproduct. (Id., ¶ 9.) At least some anaerobic digesters are operated by municipal water utilities. (Id., ¶ 10.) Some utilities had anaerobic digesters that produced methane gas which was then used to help power water treatment plants. (Id., ¶ 11.) The Des Moines wastewater treatment plant produced methane gas. (Id., ¶ 12.)

Huyser and Carter came up with the idea to start ACR after purportedly learning about other businesses that used anaerobic digesters to produce energy, although Huyser and Carter could not name those other businesses. (Id., ¶¶ 13–14.) Huyser had previously worked for a company that used aerobic digestion facilities to process liquid biomass products from industrial facilities. (Id., ¶ 15.) In early 2010, Huyser began working with Carter to explore business models involving the conversion of liquid biomass to methane or natural gas within anaerobic digester facilities. (Id.,

---

[7] The United States objects to many of Kinley's putative facts on the basis that they are not truly "facts" at all and/or are designed to relitigate the Court of Federal Claims judgment. The Court does not need to rule on these objections to decide the parties' cross-motions for summary judgment.

¶ 16.) At that time, Carter worked for a company that operated a waste-to-energy biofuel electric power point in Cedar Rapids, Iowa. (Id., ¶ 17.) Huyser and Carter contacted Attorney Greg Sanderson, who specialized in renewable energy tax credits. (Id., ¶ 14.)

Huyser formed ACR as a single-member limited liability company, with the Articles of Incorporation providing that he was the "sole and initial member." (Id., ¶¶ 18–19.) Throughout 2010, ACR explored business models that involved renewable energy sources that would be eligible for the alternative fuel mixture credit. (Id., ¶ 21.) Carter and Huyser testified that they were aware of other companies claiming the credit in connection with supplying organic biomass to anaerobic digesters, although, again, they were not able to identify those companies. (Id., ¶ 22.)

In their respective summary judgment filings, the United States and Kinley clash on whether Carter and Huyser believed they had a legitimate and viable business plan or were simply engaged in contortions to try to qualify for the alternative fuel mixture tax credit in the context of what was otherwise an infeasible business model. The details of the business model are not in dispute: Carter and Huyser developed a plan for ACR to take biomass from ethanol or food manufacturing facilities, blend it with 0.1% diesel by volume to create an anaerobic digester feedstock, and transport it to anaerobic digesters. (Id., ¶ 24.) According to Kinley, Carter and Huyser genuinely believed that byproducts from ethanol and food plants could be used as fuel to increase the amount of energy generated by anaerobic digesters. (Id., ¶ 23.) The United States disputes the sincerity of their belief and the overall legitimacy of ACR's business model. For example, the United States points out that ACR *paid* digesters to accept the product that ACR was supposedly *selling* to those digesters. (Id., ¶ 24.) In any event, from Kinley's perspective, what matters is that Carter and Huyser purportedly believed the business model would be eligible for the alternative fuel mixture tax credit, although the United States points out that the United States Court of Appeals for the Federal Circuit said ACR's partners "should have recognized that receiving millions of dollars in tax credits for transferring feedstock from one entity to another— while mixing in a meaningless amount of diesel along the way—was 'too good to be true.'" (Id. (quoting *Alt. Carbon Res., LLC v. United States*, 939 F.3d 1320, 1334 (Fed. Cir. 2019).)

It is undisputed that Carter and Huyser researched whether ACR would qualify for the tax credit. (Id., ¶ 26.) For example, they sought and obtained guidance from Sanderson, who provided information and legal advice. (Id., ¶¶ 27–28, 33–34.) Sanderson later testified that ACR was not the only client he advised on the tax credit. (Id., ¶ 29.) The parties sharply dispute whether

Sanderson truly understood ACR's proposed business model, with Kinley asserting that he did (ECF 90-2, ¶ 30) but the United States asserting otherwise and pointing out, among other things, that Sanderson sent an email asking: "How do you make money from this business if you pay the digester company to take the liquid? Does this business cash flow without the 50 cent per gallon credit?" (ECF 99-1, ¶ 30; ECF 99-7, p. 44.) Ultimately, Sanderson apparently advised Carter and Huyser that ACR's activities would qualify for the tax credit, although, again, the United States disputes the validity of that advice. (ECF 99-1, ¶ 32.) For its part, the Court of Federal Claims criticized Sanderson, saying he "repeatedly hedged his advice and demonstrated an incomplete understanding of [ACR's] business." (Id., ¶ 28.) Moreover, ACR did not follow some aspects of Sanderson's advice; for example, the company did not adopt his advice in January 2011 to hire a scientist to validate ACR's characterization of the mixture as a "fuel." (ECF 112, ¶¶ 98–99.)

From Kinley's perspective, the *fact* and *substance* of Sanderson's advice is more important than the *quality* of that advice. He notes, for example, that Sanderson told Carter and Huyser that it was "straightforward" that ACR could pay someone a fee to take the mixture and yet still consider it a "sale." (ECF 99-2, ¶ 35.) Similarly, Sanderson told Carter and Huyser that ACR did not need to generate revenue outside of the tax credits and that the credits themselves could create the profit motive. (Id., ¶ 36.) Sanderson later said he thought Carter and Huyser wanted to ensure compliance with the law and believed there were no business risks for ACR with respect to the tax credits. (Id., ¶¶ 37–38.) The United States asserts, in not so many words, that Sanderson was incompetent and did not understand ACR's business model. (Id., ¶¶ 35–36.)

In any event, in 2010, Huyser and Carter also communicated with Jeffrey Lewis, a Des Moines attorney who had practiced law for thirty-eight years. (Id., ¶ 39.) There are genuine disputes about whether Lewis provided independent advice regarding the definition of a "sale" under Iowa law, or if he simply relied on Sanderson's expertise. (Id., ¶ 40.) For purposes of Kinley's motion, the Court must assume the latter. The United States asserts, in any event, that Lewis warned ACR on January 31, 2011, that it needed to "create more cash flow and business activity in ACR" to assuage potential concerns about whether the alternative fuel mixture "was actually sold in a commercial sense and [] whether ACR is a bona fide business operating to make a profit." (ECF 112, ¶ 94.) Ultimately, 99% of ACR's revenue came from tax credits. (Id., ¶ 97.)

Kinley testified that he "understood" ACR eventually would generate a profit from its business activities, although the United States disputes the relevance and sincerity of this belief.

(ECF 99-1, ¶ 48.) Huyser worked on sourcing biomass from suppliers. (ECF 99-1, ¶ 49.) He also located customers in Iowa. (Id.) Huyser negotiated a "price" with one putative customer that ACR would pay *to* the customer in exchange for the customer receiving ACR's mixture. (Id., ¶ 50.) Huyser also gathered biomass from suppliers and had it tested to determine the positive energy value. (Id., ¶ 51.)

Although Boyle did not move for summary judgment, he submitted a Statement of Additional Material Facts that was substantially similar to Kinley's in asserting that Boyle believed ACR's business model—and eligibility for alternative fuel mixture tax credits—had been legitimately vetted by internal and external experts by the time Boyle became involved with the company. (ECF 101-1, ¶¶ 1–9, 13–17.) Boyle also performed his own investigation, including discussions with a scientist and Larry Hare. (Id., ¶¶ 10, 12.)

*C.   ACR's Application to the IRS.*

After communicating with Sanderson and Lewis, ACR applied to register with the IRS as a blender. (ECF 99-1, ¶ 41.) Huyser communicated with IRS field agent Kevin Kresic regarding ACR's forthcoming registration. (Id., ¶ 42.) The registration involved ACR completing a Form 637 and meeting with an excise tax agent. (Id., ¶ 43.) Huyser met with Kresic on two occasions and shared at least some information about ACR's operations, although the United States disputes that the IRS performed a "substantive review" of those operations. (Id., ¶ 44.)

ACR applied for the "M" activity letter designation in August 2010, informing the IRS that ACR will "take possession of corn oil/syrup from a variety of ethanol companies [and] blend this with a portion of diesel fuel equal to 1/10 of 1%[, then] sell this alternative liquid fuel  . . . to a variety of customers for fuel." (Id., ¶ 45.) Kresic told ACR to apply for the "M" designation, but Sanderson later encouraged ACR to apply for the "AM" designation. (Id., ¶ 46.) ACR followed Sanderson's advice, using the same language as before to describe its operations. (Id., ¶ 47.)

On January 14, 2011, the IRS approved ACR's application for registration under the "AM" designation, with the "AM" suffix signifying "an alternative fueler that produces an alternative fuel mixture that is sold for use or used in the alternative fueler's trade or business" and the "M" suffix indicating that ACR was blending certain fuels, including diesel fuel, to produce a taxable fuel that included renewable diesel mixtures. (Id., ¶ 55.) After receiving this designation, ACR commenced operations and began applying to receive the alternative fuel mixture credit. (Id., ¶ 58.)

D. *ACR's Operations.*

Huyser paid ACR's startup expenses from 2010 to early 2011, including ACR's laboratory tests and travel expenses. (Id., ¶ 52.) ACR opened bank accounts at Bank of the West and Wells Fargo. (Id., ¶ 53.) Huyser was the only signatory, and Kinley had no access to the accounts. (Id., ¶¶ 53–54.)

ACR first purchased feedstock from Golden Grain Energy and delivered it to Des Moines Wastewater Reclamation Authority on or around January 25, 2011. (Id., ¶ 56.) ACR delivered six more loads of feedstock the same week. (Id., ¶ 57.) The IRS thereafter began issuing tax credits to ACR. (Id., ¶ 59.)

The parties dispute when Kinley became involved in ACR's operations, although it appears to have been sometime between late-December 2010 and mid-January 2011. (Id., ¶ 60.) As early as January 14, 2011, Kinley was working on profitability models for ACR. (ECF 112, ¶ 5.) By late January and early February 2011, Kinley was holding himself out as a "Partner" of ACR and contacting and meeting with digesters. (Id., ¶¶ 7, 9.) Kinley is a former Certified Public Accountant who has worked in venture capital and private equity since 1995, during which time he reports having invested in eight renewable energy businesses. (ECF 99-1, ¶¶ 61, 63.) Kinley met Huyser and Carter through that work. (Id., ¶ 64.) Kinley knew the government provided incentives and subsidies to support renewable energy activities. (Id., ¶ 65.) Kinley was employed full-time for a venture capital firm between 1995 and 2016, although he also worked twenty to thirty hours per week for ACR during the first half of 2011. (Id., ¶ 62; ECF 99-2, ¶ 4.)

Kinley first learned of ACR in the second half of 2010. (ECF 99-1, ¶¶ 66–67.) His understanding was that Huyser and Carter conducted independent research into whether ACR qualified for the alternative fuel mixture tax credit in 2010. (Id., ¶ 68.) Kinley also undertook his own investigation into whether ACR would be a good investment. (Id., ¶ 69.) He discussed ACR's business model with Huyser and Carter and gathered information about their communications with Sanderson, Lewis, and Kresic. (Id., ¶¶ 70, 72.) He also reviewed ACR's submissions to the IRS. (Id., ¶ 71.) Kinley claims to have understood Sanderson, in particular, to be a "leading national expert in renewable energy tax credits," although the United States disputes the accuracy and sincerity of this belief. (Id., ¶ 73.)

Kinley also performed independent research into anaerobic digesters, concluding they constituted a large and underutilized source of potential renewable energy. (Id., ¶¶ 74–75.) He

consulted with Matt Juffer, a tax accountant and attorney, although the Court must conclude for present purposes that Juffer did not provide advice as to ACR's eligibility for the alternative fuel tax credits or do anything to investigate ACR's business operations. (Id., ¶ 76.) Accordingly, the significance of Kinley's consultation with Juffer is quite limited.

Kinley knew that by early 2011 ACR had started operations and had been issued a blender's registration by the IRS. (Id., ¶ 77–78.) He also knew ACR began claiming tax credits shortly thereafter. (Id., ¶ 78.) Kinley says he would not have joined ACR but for the blender's registration having been issued. (Id., ¶ 79.) He also says he thought ACR was already cash-flow positive at the time he joined and did not need to raise outside capital. (Id., ¶ 80.) He says he thought his contribution to ACR would be in the form of business contacts and "sweat equity" and that the entity eventually could succeed even without the tax credits. (Id., ¶¶ 81, 83.)

Kinley became an ACR member effective March 1, 2011, although he actively participated in the company's operations prior to that date. (Id., ¶ 84.) For example, he sent samples for testing to laboratories, none of which contained diesel fuel. (ECF 99-2, ¶¶ 14–15.) He also helped draft ACR's responses to a request for information from the IRS. (Id., ¶ 16.)

E.  *Incongruities in ACR's Business Model.*

The United States emphasizes the counterintuitive nature of ACR's business plan, which involved the company paying digesters to take biomass but recording the transaction as a "sale." (ECF 112, ¶ 72.) In total, ACR paid over $1.6 million in disposal fees in 2011, which included payments to digesters for taking the product that ACR was supposedly "selling." (Id., ¶ 74.) The United States also asserts that the addition of diesel fuel to the mixture served no functional purpose; indeed, ACR did not even disclose to some digesters that the mixture included diesel. (Id., ¶ 75.) At least one digester representative said he would not have accepted ACR's product if he had known it contained diesel, and another said he "typically" would not put fuel into the digester. (Id., ¶ 76.) This is because adding diesel fuel to anaerobic digesters can have negative consequences. (Id., ¶ 78.) Kinley admitted that when digesters wanted a sample, it "usually" came straight from the ethanol or food plant, with no diesel added. (Id., ¶ 77.) The inference the United States draws is that adding a "splash" of diesel fuel accomplished nothing beyond making ACR eligible for the alternative fuel mixture tax credit. (Id., ¶ 79.)

To further illustrate the problems with ACR's business model, the United States asserts that corn syrup waste from ethanol companies—which was part of what ACR was transporting to

digesters—had no market value. (Id., ¶ 82.) Ethanol companies were spending money to ship it long distances just to get rid of it. (Id., ¶ 83.) Huyser had no prior experience with liquid biowaste being purchased from producers until he started investigating ACR. (Id., ¶ 84.) From as early as December 2010, ACR's business model anticipated that its only revenue would come from tax credits, not actual sales of the mixture. (Id., ¶ 85.)

ACR found ways to charge a small fee to at least one utility, but the fee was counterbalanced by an administrative fee charged by the utility to ACR; meaning, the transaction was a "wash." (Id., ¶¶ 87–88.) For fiscal year 2011, ACR only issued nine invoices to digesters, all of which were issued on either December 29 or 31, 2011. (Id., ¶¶ 89–90.) Eight of the invoices were for $1,000, and the ninth was for $950. (Id., ¶ 91.) ACR did not collect anything on about half of those invoices, which it later wrote off. (Id., ¶ 92.) Some facilities, like the one in Sheboygan, never anticipated paying anything to ACR. (Id., ¶ 93.)

### F.  ACR's Adherence (or Lack Thereof) to LLC Formalities.

ACR's Operating Agreement contemplated two divisions, one for operations within Iowa (Division A) and the other for operations outside Iowa (Division B). (ECF 99-1, ¶ 86.) It also divided membership units into voting and non-voting categories, although no recorded votes were ever taken. (Id., ¶ 87.) ACR's revenue and expenses were allocated by division, and Kinley received no distributions corresponding to Iowa operations, which comprised two-thirds of the entity's revenue in 2011. (Id., ¶¶ 88–90.) Huyser held a majority of voting units at all relevant times, including 100% of the Series A voting units and 56% of the Series B voting units. (Id., ¶¶ 91–92; ECF 97, ¶ 5.) Kinley and Boyle owned no Series A units and the same Series B units as Huyser and Carter. (ECF 99-1, ¶ 91.)

In addition to holding the majority of voting units, Huyser was the only Authorized Member Representative of ACR. (Id., ¶ 93.) As such, he purportedly possessed sole authority to act on ACR's behalf, although Kinley sometimes executed contracts on behalf of ACR and held himself out as an "Authorized Member." (Id., ¶ 94.) ACR did not pay any of Kinley's personal obligations. (Id., ¶ 104.) Kinley did not have authority to prepare or sign ACR's tax returns or tax credit filings, although he was involved in the preparation, review, and approval of those filings. (Id., ¶ 108.) ACR contracted with an outside accounting firm, Schuring & Uitermarkt, for bookkeeping and accounting services. (Id., ¶¶ 107, 109.)

The parties dispute the impact of ACR's work, although one witness testified that ACR's feedstock improved the production of biogas at the Sheboygan (Wisconsin) wastewater treatment facility. (Id., ¶ 106.) For his part, Kinley says he thought ACR's liabilities would consist of operational costs relating to the acquisition of raw materials; trucking, handling, and processing; disposal costs; and personnel. (Id., ¶ 113.)

On or around January 31, 2011, ACR submitted a request to the IRS for the first time for an alternative fuel mixture tax credit. (ECF 112, ¶ 29.) It sought a refund in the amount of $18,553. (Id., ¶ 29.) On February 5, 2011, ACR received an invoice in the amount of $4,356.10 from a company ACR used to haul and mix biomass. (Id., ¶ 30.) Carter expressed concern about how long the company could cover expenses if it did not start receiving checks from the IRS. (Id., ¶ 31.) The United States Treasury submitted the first check, for $18,553, on or around March 15, 2011. (Id., ¶ 32.) On or around March 8, 2011, ACR submitted its second request for the tax credit, this time in the amount of $395,366.50. (Id., ¶ 35.) On or around March 23, 2011, the United States Treasury submitted a check for $395,366.50. (Id., ¶ 36.) In the first quarter, the only inflows to the ACR account besides the Treasury checks were four $1,000 checks from Huyser, JWC, and Carter. (Id., ¶ 38.) ACR never had lines of credit, loans, or other third-party financing. (Id., ¶ 39.)

The first recorded expense on ACR's general ledger was the purchase of gift cards in late January 2011 for use by drivers to pay for the diesel fuel to add to the biomass. (Id., ¶ 40.) ACR's other first quarter expenses included purchasing biomass, hiring a transportation company to transport it, and paying digesters to take it. (Id., ¶ 41.) ACR's expenses exceeded its available funds on February 5, 2011. (Id., ¶ 42.) Even after ACR received the first Treasury check in March 2011, its expenses far exceeded its available funds. (Id., ¶ 43.) Nonetheless, when Kinley formally became a member on March 1, 2011, he merely contributed $250. (Id., ¶¶ 44–45.) This was his only contribution to ACR in 2011. (Id., ¶ 47.)

Although ACR's Operating Agreement had an effective date of March 1, 2011, it was not executed until at least June 14. (Id., ¶ 53.) ACR never provided written notice of any meetings, nor did the members take or maintain meeting minutes. (Id., ¶¶ 54–57.) ACR also never held any votes about distributions even though the Operating Agreement required a member vote. (Id., ¶¶ 59–60.) ACR arguably commingled its funds with another entity, Iowa Coal Mining, that was connected to Huyser. (Id., ¶¶ 62–64.) ACR also sent two ACH transfers in the amount of $100,000 each to an

investment account at Edward Jones, where Huyser had a personal investment account. (Id., ¶¶ 65–66.)

### G. *IRS Guidance Regarding Eligibility for the Alternative Fuel Mixture Credit.*

On August 19, 2011, the IRS issued a memorandum stating that the transfer of an alternative fuel mixture to anaerobic digesters did not qualify for the alternative fuel tax credit because the digesters do not use feedstock as "fuel." (ECF 99-1, ¶ 114.) Sanderson told ACR members this memorandum was unexpected and "there was no way to see it coming." (Id., ¶ 115.) Sanderson subsequently spoke with someone at the IRS, who allegedly told him it was ok for ACR to continue to claim credits. (Id., ¶ 116.) Sanderson passed this along to ACR, although he also cautioned in an email dated September 8, 2011, that "IRS may come back to you with a negative assessment. So you should plan accordingly (*i.e.*, don't spend your credit payments until we get clarification)." (Id., ¶ 117.) The IRS did not revoke ACR's AM registration, and ACR continued operations for a few more months. (Id., ¶ 118.)

ACR ceased active operations on December 31, 2011, after Congress declined to renew alternative fuel tax credits. (Id., ¶¶ 120–21.) At the time, ACR possessed significant sums of cash and receivables. (Id., ¶ 124.) At Huyser's sole discretion, ACR distributed $10.5 million to its members. (Id., ¶ 125.) Kinley received $830,000.00 in distributions between July 28, 2011, and April 2, 2012. (Id., ¶ 126.) He received no other compensation from ACR. (Id., ¶ 127.)

On or around January 17, 2012, the IRS contacted ACR to conduct an audit of the company's tax credit receipts. (Id., ¶ 128.) Kinley was aware of the contact from the IRS and knew it related to whether ACR was qualified to receive the alternative fuel mixture credits. (ECF 112, ¶ 20.) Huyser and someone from Schuring & Uitermarkt met with IRS representatives on March 6, 2012. (Id., ¶ 130.) Huyser told ACR's other members that the meeting went "fairly smoothly." (Id.)

Although ACR stopped active operations on December 31, 2011, it incurred fuel expenses and meal and entertainment expenses in 2012 and 2013. (ECF 112, ¶ 67.) Huyser said the 2012 fuel expenses were "probably" his. (Id., ¶ 70.) Some of ACR's members explored other possible ventures involving renewable energy after December 31, 2011. (ECF 99-1, ¶¶ 122–23.)

## III.  PROCEDURAL BACKGROUND.

The United States asserts claims for piercing the corporate veil and fraudulent transfer against each of Huyser (Count I), Kinley (Count II), Boyle (Count III), and JWC and Carter (Count

IV). (ECF 1, ¶¶ 161–72, 182.) Count IV further alleges that JWC is Carter's "alter ego." (Id., ¶¶ 174–82.) The United States moves for partial summary judgment on two issues: (i) whether the Court of Federal Claims judgment should be given preclusive effect as to all Defendants because they are in privity with ACR; and (ii) whether Carter is liable for any judgment the United States might obtain either because he personally (and not JWC) was a member of ACR or he and JWC were alter egos. (ECF 83.) Kinley cross-moves for summary judgment on the Government's veil-piercing claim. (ECF 90.)

## IV.    LEGAL STANDARDS.

Summary judgment is appropriate when there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine factual issue exists where the issue "can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Plaintiff "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (omission in original) (quoting a prior version of Fed. R. Civ. P. 56(e)).

"When cross-motions for summary judgment are presented to the Court, the standard summary judgment principles apply with equal force." *Wright v. Keokuk Cnty. Health Ctr.*, 399 F. Supp. 2d 938, 945–46 (S.D. Iowa 2005). "[T]he court views the record in the light most favorable to plaintiff when considering defendant's motion, and the court views the record in the light most favorable to defendant when considering plaintiff's motion." *Thompson-Harbach*, 359 F. Supp. 3d at 614.

## V.    LEGAL ANALYSIS.

### A.  The Court GRANTS IN PART and DENIES IN PART the United States' Motion for Partial Summary Judgment on Issue Preclusion.

The United States moves, first, for partial summary judgment against all Defendants establishing that they are "collaterally estopped from relitigating the issues and facts actually litigated and determined in the prior lawsuit titled *Alt. Carbon Resources LLC v. United States*,

Case No. 15-155T, 137 Fed. Cl. 1 (Fed. Cl. 2018), *aff'd*, 939 F.3d 1320 (Fed. Cir. 2019)." (ECF 91, p. 9[8].)

Issue preclusion, or collateral estoppel, "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001)). The purpose of issue preclusion is to protect against the time and expense of multiple lawsuits, conserve judicial resources, and reduce the potential for inconsistent decisions. *Id.* (citing *Montana v. United States*, 440 U.S. 147, 153–54 (1979)). Issue preclusion applies when the following elements are satisfied:

> (1) The party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit; (2) the issue sought to be precluded must be the same as the issue involved in the prior action; (3) the issue sought to be precluded must have been actually litigated in the prior action; (4) the issue sought to be precluded must have been determined by a valid and final judgment; and (5) the determination in the prior action must have been essential to the prior judgment.

*Robinette v. Jones*, 476 F.3d 585, 589 (8th Cir. 2007). When, as here, a party wants to use collateral estoppel offensively—i.e., to help the party meet its burden of proof—trial courts have "broad discretion to determine when it should be applied." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979). For reasons explained below, the Court will apply this "broad discretion" by giving preclusive effect to findings of fact in the Refund Suit but not legal conclusions or adjudications of mixed questions of law and fact. To explain why, the Court will evaluate each element of issue preclusion.

### 1. The Privity Requirement Is Satisfied Because ACR Adequately Represented Defendants' Interests in the Refund Suit.

Defendants argue, as a threshold matter, that issue preclusion does not apply because the United States cannot satisfy the first element: that the parties in the first case were the same (or in privity with) those in the second case. *See Robinette*, 476 F.3d at 589 (listing factors). Defendants point out that ACR was the plaintiff in the Refund Suit, not the entity's members individually.

Issue preclusion can apply to non-parties in narrow circumstances, one of which is when non-parties were "adequately represented" by a party in the earlier suit. *Sturgell*, 553 U.S. at 894–95. *Sturgell* holds that a non-party is adequately represented for preclusion purposes "only if, at a

---

[8] All ECF citations are to the page number auto-populated by the ECF system and found in the upper righthand corner of the page. This is different than the page number placed by the parties on the bottom of the page.

minimum: (1) The interests of the nonparty and her representative are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Id.* at 900 (cleaned up). "In addition, adequate representation sometimes requires (3) notice of the original suit to the persons alleged to have been represented." *Id.*

The requirements of *Sturgell* are satisfied here. Defendants' interests were perfectly aligned with ACR's in the Refund Suit because both wanted the Court of Federal Claims to conclude that ACR's activities qualified for the alternative fuel mixture tax credit—or, at least, to conclude that ACR had "reasonable cause" to *believe* its activities qualified. *See Daley v. Marriott Int'l, Inc.*, 415 F.3d 889, 897 (8th Cir. 2005) (holding that privity existed between parties who had identical interests in earlier case). Furthermore, ACR understood itself to be acting in a representative capacity to protect the interests of its members. Indeed, the record shows that ACR would not have filed the Refund Suit *but for* the interests of its members, as ACR itself had no ongoing business operations, no meaningful assets to protect, and no money to use to fund the litigation. The only reason ACR filed the suit was to help protect its members from potential personal liability. Finally, to the extent it is a relevant factor, it is undisputed that each of ACR's members had notice of the Refund Suit and participated substantially in it, including through written discovery, depositions, and strategic decision-making. In these circumstances, ACR's members were "adequately represented."

The Supreme Court has found privity to exist in similar circumstances. In *Montana v. United States*, the United States financed a contractor's lawsuit against the State of Montana seeking a declaration that a state tax unconstitutionally discriminated against the United States and companies with which it contracted. 440 U.S. 147, 151 (1979). Approximately one month after the contractor filed suit, the United States pursued the same relief in a second lawsuit in its own name. *Id.* The Supreme Court held that issue preclusion applied to the United States in the second case, explaining that "[O]ne who prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own . . . is as much bound . . . as he would be if he had been a party to the record." *Id.* at 154 (quoting *Souffront v. Compagnie des Sucreries*, 217 U.S. 475, 486–87 (1910)). *See also Iowa Elec. Light & Power Co. v. Mobile Aerial Towers, Inc.*, 723 F.2d 50, 52 (8th Cir. 1983) (concluding that privity existed between utility company and employees where company paid for

expenses and participated in depositions in employees' personal injury action against alleged tortfeasors). The link between ACR and its members in the Refund Suit is at least as strong as the one between the United States and the contractor in *Montana*, and stronger than the one in *Iowa Electric Light & Power*. It follows that ACR's members were "adequately represented" in the Refund Suit to the degree necessary to satisfy the privity requirement for issue preclusion.

      2.   <u>The Second Element of Issue Preclusion Is Satisfied as to Findings of Fact in the Refund Suit but Not as to Legal Conclusions or Adjudications of Mixed Questions of Law and Fact.</u>

The Court next must determine whether "the issue[s] sought to be precluded" were the same in the Refund Suit as they are here. *Robinette*, 476 F.3d at 589. Given the procedural and substantive differences between the Refund Suit and the present action, this is not a straightforward task. In the Refund Suit, the ultimate question was whether ACR could satisfy its burden of proving that it was entitled to the alternative fuel mixture tax credits. Here, the ultimate question is whether the United States can satisfy *its* burden of proving the personal liability of one or more ACR members through veil-piercing or fraudulent transfer theories. As the Court explained in a prior ruling, these are "analytically distinct questions." *United States v. Huyser*, 697 F. Supp. 3d 873, 885 (S.D. Iowa 2023); *see also id.* at 884 ("[T]he Government's veil-piercing and fraudulent transfer claims are not the same as the earlier claim to establish ACR's tax liability.").

Nonetheless, the United States argues that there is considerable overlap in the facts underlying the two cases. It further notes that issue preclusion can apply to factual findings and legal conclusions alike. *See In re Cochrane*, 124 F.3d 978, 983 (8th Cir. 1997) (precluding party from relitigating findings of fact from earlier proceeding); *see also First State Bank of Roscoe v. Stabler*, 914 F.3d 1129, 1136 (8th Cir. 2019) ("Our court employs a flexible and pragmatic approach when assessing the preclusive effect of a court's order."). To that end, the United States identifies three main issues for which it seeks preclusion: (i) "ACR's mixture did not qualify as being 'used' as fuel (the "Fuel Issue"); (ii) "ACR's mixture transactions had no economic substance and resulted in no 'sale' of fuel (the "Sale Issue"); and (iii) "ACR (through its members) did not reasonably rely on any professional advice that ACR qualified for the credit and was liable for the excessive claims penalties (the "Penalty Issue")." (ECF 91, pp. 14–15.) The United States asserts that these issues "were litigated in the Refund Suit and involve the same facts relevant to the United States' veil piercing and (alternative) fraudulent transfer claims." (Id.) The United States also identifies a plethora of other facts underlying these issues that it argues should not have

to be litigated again. (Id., pp. 28–31; *see also* ECF 116, p. 10 n.4.) *See also Sturgell*, 553 U.S. at 892 (recognizing that issue preclusion can apply to "'an issue *of fact . . .* actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim" (quoting *Maine*, 532 U.S. at 748)) (emphasis added).

To evaluate the United States' position, it is helpful to start with legal principles underlying a veil-piercing claim. Under Iowa law, "[a] court may disregard a corporate structure by piercing the corporate veil only under circumstances 'where the corporation is a mere shell, serving no legitimate business purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice.'" *In re Marriage of Ballstaedt*, 606 N.W.2d 345, 349 (Iowa 2000) (quoting *C. Mac Chambers Co. v. Iowa Tae Kwon Do Acad., Inc.*, 412 N.W.2d 593, 597 (Iowa 1987)). "The burden is on the party seeking to pierce the corporate veil to show the exceptional circumstances required." *Id.* "Factors that would support such a finding include (1) the corporate is undercapitalized; (2) it lacks separate books; (3) its finances are not kept separate from individual finances, or individual obligations are paid by the corporation; (4) the corporation is used to promote fraud or illegality; (5) corporate formalities are not followed; and (6) the corporation is a mere sham."[9] *Id.* "An abuse of the corporate privilege may justify piercing the corporate veil as to persons who actively participate in the conduct of corporate affairs and have provided inadequate capitalization." *Briggs Transp. Co. v. Starr Sales Co.*, 262 N.W.2d 805, 810 (Iowa 1978). Personal liability also exists if an officer/owner of the entity is willfully blind to the inadequate capitalization and illegitimacy of the business operations. *Id.* at 811.

With these principles in mind, there is indeed overlap between the facts at issue in the Refund Suit and those at issue here. For example, in evaluating whether ACR was entitled to claim the tax credits, it was of course necessary for the Court of Federal Claims to make factual findings about ACR's operations, among other topics. Those same findings are material to whether, for veil-piercing purposes, ACR was "used primarily as an intermediary to perpetuate fraud or promote

---

[9] In 2008, the Iowa legislature amended Iowa's Uniform Limited Liability Company Act to provide that the "failure of a limited liability company to observe formalities relating to the exercise of its powers or management of its activities and affairs is not a ground for imposing liability on a member or manager for a debt, obligation, or other liability of the company." Iowa Code § 489.304(2). This amendment arguably abrogates the formality factors of the common law test, but the Iowa Supreme Court has yet to say so. *See Keith Smith Co. v. Bushman*, 873 N.W.2d 776, *11 (Iowa Ct. App. 2015) (McDonald, J., concurring in part) (citing Iowa Code § 489.304(2) and concluding that "[b]ecause the entity at issue is an LLC, it is largely immaterial whether FGP followed formalities"). The Court can decide the parties' motions without determining the exact dimensions of the veil-piercing claim, so it maintains all six factors for now.

injustice." *In re Marriage of Ballstaedt*, 606 N.W.2d at 349. Similarly, there is at least arguable overlap as to legal conclusions like whether ACR "sold" the fuel mixture, as the conclusion in the Refund Suit that the transactions were not legitimate "sales" is potentially probative of whether ACR served a "legitimate business purpose." *See id.*

Still, for two reasons, the Court concludes that the legal conclusions in the Refund Suit do not involve the "same issues" as the legal questions in the veil-piercing and fraudulent transfer claims and therefore should not be given preclusive effect. First, in the Refund Suit, ACR bore the "ultimate burden of proving it properly claimed the alternative fuel mixture credits," *Alt. Carbon Res.*, 939 F.3d at 1328. By contrast, the United States bears the burden on the veil-piercing and fraudulent transfer claims. The Supreme Court has recognized that the "failure of one party to carry the burden of persuasion on an issue should not establish the issue in favor of an adversary who otherwise would have the burden of persuasion on that issue in later litigation." *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 200 (2014) (quoting 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4422, p. 592 (2d ed. 2002)). This principle squarely applies here.

Second, and relatedly, a party seeking to pierce the corporate veil under Iowa law must prove "exceptional circumstances." *In re Marriage of Ballstaedt*, 606 N.W.2d at 349. No similar showing is required in a tax refund case. Instead, at most, the Federal Circuit and Court of Federal Claims had to decide whether ACR established by a preponderance of the evidence that it had "reasonable cause" to believe its activities qualified for the tax credits. It would stretch the doctrine of issue preclusion too far to give preclusive effect to ACR's inability to meet its burden of proof on that issue to the "very different" question of whether the United States can prove exceptional circumstances to pierce the corporate veil as to ACR's owners. *See Huyser*, 697 F. Supp. 3d at 881 (describing the legal issues in the two cases as "very different" and "entirely distinct"). The Court therefore concludes that the legal conclusions in the Refund Suit are not the "same issues" as those that must be decided in the veil-piercing and fraudulent transfer case. *See Setter v. A.H. Robins Co., Inc.*, 748 F.2d 1328, 1330–31 (8th Cir. 1984) (affirming district court's refusal to apply issue preclusion where ambiguity in the prior decision would make it difficult to apply it to the new case). It follows that preclusive effect will not be given to those legal conclusions.

The outcome is the same on mixed questions of law and fact, such as whether ACR "sold" its fuel mixture and whether the putative consideration ACR received from the digesters had any

"economic substance." Again, these were issues on which ACR bore the burden of proof in the refund case and for which no showing of "exceptional circumstances" was necessary. The Court will not give preclusive effect to the Federal Circuit's and Court of Federal Claims' resolution of those issues. *See United States v. Gurley*, 43 F.3d 1188, 1198 (8th Cir. 1994) (declining to apply issue preclusion where the issues in the two cases "overlap[ped] to some degree" but were not "identical").

The Court takes a different view as to findings of fact made in the Refund Suit, including (but not limited to) findings involving ACR's business model, operations, interactions with the IRS, and consultations with attorneys and accountants. (By "findings of fact," the Court is referring specifically to the portion of the Court of Federal Claims opinion starting with the heading "**B. Plaintiff Investigates the Feasibility of Alternative Energy Tax Credits**" on page seven and ending just before the heading "**J. Procedural History**" on page twenty. *See Alt. Carbon Res.*, 137 Fed. Cl. at 7–20.) The Court of Federal Claims made those findings at the summary judgment stage, which means the *United States* (as the moving party) "b[ore] the burden of demonstrating the absence of a genuine issue of material fact." *Riley & Ephriam Const. Co. v. United States*, 408 F.3d 1369, 1371 (Fed. Cir. 2005). The United States obviously met that burden as to the facts that were determined to be undisputed. Thus, the burden-shifting problem identified in *Medtronic, Inc. v. Mirowksi Family Ventures, LLC*, is not present here.

Moreover, as noted above, the findings of fact in the Refund Suit are unmistakably relevant here. It would be impossible to decide whether ACR's members abused the corporate form without making findings of fact about (among other things) what ACR's business did in the first place and whether and to what extent ACR obtained guidance from professional advisors in the course of its operations. The Court therefore concludes that the findings of fact in the Refund Suit involve the "same issues" as those present here, and thus the second issue preclusion element is satisfied as to those findings.

      3.   <u>The Third, Fourth, and Fifth Elements of Issue Preclusion Are Satisfied as to the Findings of Fact in the Refund Suit.</u>

The Court has little difficulty concluding that the remaining elements of issue preclusion are satisfied as to the findings of fact in the Refund Suit. It is self-evident that those findings were "actually litigated" in the Court of Federal Claims because the lengthy summary judgment ruling specifically identified the places in the record from which the facts were derived. *See, e.g.*, *Alt. Carbon Res.*, 137 Fed. Cl. at 8 (citing appendix pages and deposition transcripts). Moreover, there

was a "valid and final judgment" in the Refund Suit because the Court of Federal Claims granted summary judgment for the United States, and the Federal Circuit affirmed. *See Alt. Carbon Res.*, 939 F.3d at 1334. Indeed, absent a valid and final judgment, there would be no debt for which the United States could seek to pierce the corporate veil. Finally, the factual findings were "essential to the prior judgment" because the Federal Circuit and Court of Federal Claims could not have decided whether ACR was entitled to the tax credits (or, at least, had reasonable cause to believe it was) without first making findings of fact about, among other things, ACR's history, business model, operations, interactions with the IRS, and consultations with professional advisors. *See id.* All five elements of issue preclusion are therefore satisfied as to the findings of fact.

        4.   There Is Nothing "Unfair" About Applying Issue Preclusion to Findings of Fact From the Refund Suit.

With the elements of issue preclusion having been satisfied, the only remaining question is whether it would be "unfair" to give preclusive effect to the findings of fact from the Refund Suit. *See Shore*, 439 U.S. at 331 (directing trial courts to consider whether offensive collateral estoppel "would be unfair to a defendant"). The answer is "no." Many of those facts came directly from ACR's own filings, as illustrated by the dozens of references in the Court of Federal Claims ruling to ACR's appendix and/or the depositions of ACR's members. *See, e.g.*, *Alt. Carbon Res.*, 137 Fed. Cl. at 8. Indeed, Defendants almost certainly will *rely* on many of those facts in defense of the veil-piercing claims, particularly the ones showing the members' efforts to reach out to professional advisors regarding the validity of ACR's business model and eligibility for the tax credits. Moreover, even as to unfavorable facts, ACR had the chance in the Court of Federal Claims to show the existence of a genuine dispute if it felt there was one. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 806–07 (Fed. Cir. 1999) (explaining that the non-moving party may defeat a motion for summary judgment by showing the existence of "material issues of fact which require resolution at trial"). There is no reason to give the company's members a "do-over" on factual issues here. *See Shore*, 439 U.S. at 332 (describing the relevant question as whether the party had the "full and fair opportunity" to litigate the issues in the prior case).

There are, to be sure, some important limitations to this ruling. First, as noted above, the Court is giving binding effect only to the portion of the Court of Federal Claims opinion starting with the heading "**B. Plaintiff Investigates the Feasibility of Alternative Energy Tax Credits**" on page seven and ending just before the heading "**J. Procedural History**" on page twenty. *See Alt. Carbon Res.*, 137 Fed. Cl. at 7–20. This is far narrower than what the United States is

requesting and arguably cuts out some findings of fact found later in the opinion. This is intentional. The parties' summary judgment briefs do not contain enough analysis of the Court of Federal Claims' opinion to allow the Court to make a reliable determination about which portions of the opinion after page twenty are findings of fact, which are conclusions of law, and which are mixed questions of fact and law. The simplest—and fairest—approach is therefore to give preclusive effect only to the portions of the opinion that are unmistakably findings of fact.

Second, at the risk of stating the obvious, the Court does not interpret the findings of fact to mean that ACR's corporate veil should (or should not) be pierced. Instead, those facts simply provide a backdrop against which the veil-piercing and fraudulent transfer claims will be litigated.

Third, although the Court is treating the findings of fact as binding, this does not mean the parties are precluded from presenting evidence about those facts. Far from it. For example, under Iowa law, piercing the corporate veil requires some level of defendant-by-defendant analysis. *See Briggs Transp.*, 262 N.W.2d at 810–11 (evaluating each owner independently to determine liability for the entity's debts). It follows that the United States and one or more Defendants likely will want to present evidence about whether and to what extent individual Defendants were aware of or involved in ACR's operations and interactions with the IRS and professional advisors. Similarly, one or both sides may wish to provide additional context for some facts beyond what is present in the Court of Federal Claims ruling. This is permitted. Indeed, to ensure appropriate context for the decisions the Court will have to make, the parties will be given considerable leeway to present evidence regarding the facts recited in the Court of Federal Claims opinion. They simply are not *required* to do so, nor can they *dispute* those facts.

Fourth, although the Court is not giving preclusive effect to the legal conclusions and adjudications of mixed questions of law and fact in the refund case, those rulings are not irrelevant. Instead, the Court will consider them the same way it would consider any other non-binding source of authority: by giving the rulings the persuasive value they deserve in light of all the evidence and arguments. In addition, if the *fact* that the Federal Circuit and Court of Federal Claims made their rulings somehow becomes an issue—e.g., if a party denies the existence of a valid judgment—the Court of course will give the rulings preclusive effect for the limited purpose of defeating the party's argument.

Fifth, and finally, the Court will leave an escape hatch. If there are specific findings of fact from the refund case that a party contends are erroneous—keeping in mind, again, that the Court

is referring only to the designated sections from page seven through page twenty of the Court of Federal Claims ruling—the party may object to the treatment of that fact as binding. Any such objection must: (a) specifically identify the fact to which objection is made; (b) explain why the party (or its privy) did not have a full and fair opportunity to dispute the fact in the Court of Federal Claims; and (c) briefly summarize the evidence the party wishes to present to contradict or clarify the fact. **These objections must be filed within thirty (30) days of this ruling. The non-objecting party will then have fourteen (14) days to respond.**

> B. *The Court GRANTS the United States' Partial Motion for Summary Judgment on the Issue of Defendant Jeffrey Carter's Membership in ACR.*

The second part of the United States' Motion for Partial Summary Judgment seeks a ruling as a matter of law that Carter is a member of ACR and/or the alter ego of JCW. As it is undisputed that JCW was dissolved in December 2022, the Court views the United States' position as being designed to ensure that Carter (individually) will be liable for any judgment the Court might enter in favor of the United States on the veil-piercing and fraudulent transfer claims.

The Court concludes as a matter of law that Carter (personally) is the member of ACR, and JWC is not. It does so for a few reasons. <u>First</u>, Carter admitted he "individually served as a member of ACR" in his Answer. (ECF 60, ¶ 175.)[10] This is enough in and of itself for the fact of his membership to be established. *See Mo. Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1315 (8th Cir. 1990) ("[E]ven if the post-pleading evidence conflicts with the evidence in the pleadings, admissions in the pleadings are binding on the parties and may support summary judgment against the party making such admissions.").

<u>Second</u>, even without Carter's admission, the record is sufficient to establish as a matter of Iowa law that he is the member, not JWC. Carter signed the Amended and Restated Operating Agreement in his individual capacity (ECF 83-4, p. 36), and his name appears on the membership page[11] (id., p. 37). He's referred to individually in Section 3.01, as well, which describes James E. Huyser as ACR's founder and lists "Kenneth C. Boyle, Matthew P. Kinley and Jeff Carter" as "Members of the Company." (Id., p. 13.) In these circumstances, it is clear from the face of the

---

[10] Carter admits elsewhere in his Answer that he was individually a member of ACR, although he qualifies this by saying he was "acting in his representative capacity for JWC and not personally." (E.g., ECF 60, ¶¶ 24–25.) This phrasing is contradictory and does not overcome Carter's unqualified admission later in the pleading. (Id., ¶ 175.)

[11] The membership page includes a line with the words "JWG [sic] Investments, LLC" immediately below Carter's name. (ECF 83-4, p. 37.) There is no suggestion, however, that JWC itself was the member. The page does not, for example, provide Carter's title with JWC, nor does it contain language indicating that Carter was signing in a representative capacity on behalf of that entity.

Amended and Restated Operating Agreement that Carter individually is the member of ACR, as opposed to him acting in some sort of representative capacity for JWC. *See Johnson v. Dodgen*, 451 N.W.2d 168, 176 (Iowa 1990) (holding that defendant was acting in a personal capacity when, *inter alia*, he signed agreement in his individual capacity and the agreement referred to him by name).

Granted, Sections 3.03 and 3.05 of the Amended and Restated Operating Agreement contain procedures for transferring units and admitting new members. (ECF 83-4, pp. 13–16.) Carter has presented no evidence, however, that these procedures were ever employed to make JWC a member. Under Iowa law, "[a] limited liability company is bound by . . . the operating agreement." Iowa Code § 489.106(1); *see also Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 687 (Iowa 2020) (same and applying ordinary contract interpretation principles to operating agreements). If the operating agreement's requirements for membership are not satisfied, a purported transferee does not become a member. *See, e.g.*, *Felt v. Felt*, 928 N.W.2d 882, *5–7 (Iowa Ct. App. 2019) (unpublished table decision). Thus, the existence—or nonexistence—of records showing a change in membership can be outcome determinative in determining membership. *See id.* at *7 (without record of a joinder agreement, defendant could not establish it was a member); *see also Celtig, LLC v. Patey*, 326 F. Supp. 3d 1299, 1305–06 (D. Utah 2018) (holding as a matter of law that plaintiff was not an LLC member due to plaintiff's failure show amendment to operating agreement, notwithstanding $750,000 capital contribution). Here, because Carter has submitted no evidence of a change in membership pursuant to Sections 3.03 or 3.05, the Court must conclude as a matter of law that no such change was ever effectuated. In other words, Carter was the member in the first place and remains the member today.

To the extent Carter is suggesting that JWC became a member through some sort of informal transfer of units or acquiescence by ACR's other members, his position again fails as a matter of law. When, as here, an operating agreement prohibits modifications except in writing (*see* ECF 83-4, pp. 33–34), Iowa law prohibits oral amendments. *See* Iowa Code § 489.106(4) ("An operating agreement in a signed record that excludes modification or rescission except by a signed record cannot be otherwise modified or rescinded."). It follows that JWC could not have become a member other than through strict adherence with the requirements of Sections 3.03 and 3.05, including, among other things, the requirement in Section 3.03(d) for the delivery of fully executed documents reflecting the transfer of membership interests. *See* Iowa Code §

489.401(3)(a) (establishing that a person becomes a member of an LLC "[a]s provided in the operating agreement").

The fact that ACR's K-1's were made out to JWC does not alter this conclusion. (E.g., ECF 103-4, pp. 4–15.) A party cannot use a tax form to circumvent the requirements of an operating agreement for identifying or changing members. *See Labby v. Labby Mem'l Enterprises*, LLC, No. 2:18-CV-01388, 2020 WL 5742539, at *2 (W.D. La. Sept. 24, 2020) (sole member did not consent to admission of new member, so individual's receipt of K-1 did not make him a member). Similarly, it is irrelevant that Carter directed his membership distributions to be paid to JWC. Neither Iowa law nor the Amended and Restated Operating Agreement suggests this is enough to make JWC the member in the absence of strict adherence to the operating agreement. *See* Iowa Code § 489.401(3)(a); *Retterath*, 938 N.W.2d at 687 (requiring enforcement of operating agreement). Moreover, Iowa law recognizes that LLC units have economic value separate from their membership component. *See* Iowa Code § 489.502(1)(a) (permitting transfers of transferable interests). Divorcing the two does not make the economic beneficiary a member when the requirements of the operating agreement have not been satisfied. *See id.* § 489.502(7) (transferors of transferable interests retain membership rights).

For these reasons, the Court concludes as a matter of law that Carter (not JWC) is the member of ACR. It therefore GRANTS the United States' Motion for Partial Summary Judgment on that issue. This conclusion renders moot the United States' alternative argument that Carter and JWC are alter egos.

### C. The Court DENIES Kinley's Cross-Motion for Summary Judgment on the Veil-Piercing Claim.

In his cross-motion for partial summary judgment, Kinley asks the Court to rule in his favor as a matter of law on the United States' claim for piercing the corporate veil. Kinley argues that he was not a founding member of ACR and only formally joined the entity after, among other things: (i) the IRS had approved ACR's registration and started paying tax credits; (ii) ACR's founders had consulted with accounting and tax professionals regarding the viability of the company's business model and eligibility for the tax credits; and (iii) Kinley himself had performed due diligence regarding the potential for digesters to use biomass from ethanol and food plants as an energy source. In addition, Kinley points out that he was a mere minority owner who had no authority to dictate ACR's actions, nor did he commingle assets with ACR or engage in other conduct that might suggest the entity was his alter ego. Kinley argues that these facts are enough

to establish as a matter of law that the Court should not take the extraordinary step of piercing the corporate veil as to him.

Kinley's argument highlights the difficulty in applying Iowa Supreme Court precedent on piercing the corporate veil. Although lower courts have consistently been directed to apply six factors when deciding whether to hold individual owners liable for an entity's debts, *see In re Marriage of Ballstaedt*, 606 N.W.2d at 349, there is minimal guidance about how to weigh those factors in any particular case. In the words of the foremost scholar on Iowa corporate law, "it is difficult to make sense of the [Iowa] case law governing disregard of the corporate entity." 5 Matthew Doré, *Iowa Practice Series: Business Organizations* § 15:4 (2023).

In the Court's view, Iowa Supreme Court precedent is best understood as recognizing that veil-piercing is appropriate in two, non-mutually-exclusive scenarios. The first is when there is such a unity of interest and identity between the owner and entity that the corporate form serves only to make it difficult for creditors to determine who owns what assets or allow the owner to avoid what otherwise would be—and, in all fairness, *should* be—personal liabilities. *See, e.g.*, *HOK Sport, Inc. v. FC Des Moines, L.C.*, 495 F.3d 927, 941 (8th Cir. 2007). This is typically referred to as the "alter ego" doctrine, and it is sometimes treated as a separate cause of action from veil-piercing with slightly different elements. *See id.* at 935–36; *Union Ins. Co. v. Hull & Co.*, 831 F. Supp. 2d 1060, 1065 (S.D. Iowa 2011) ("A corporate entity is the alter ego of a person if (1) the person influences and governs the entity; (2) a unity of interest and ownership exists such that the corporate entity and the person cannot be separated; and (3) giving legal effect to the fictional separation between the corporate entity and the person would sanction a fraud or promote injustice."). On other occasions, however, the Iowa Supreme Court has treated "alter ego" claims as a subspecies of veil-piercing claims to which the same factors apply. *See, e.g.*, *Adam v. Mt. Pleasant Bank & Tr. Co.*, 355 N.W.2d 868, 872 (Iowa 1984) (applying six veil-piercing factors to determine "whether a corporation is merely the alter ego of its controlling owner"); *Cemen Tech, Inc. v. Three D Indus., L.L.C.*, 753 N.W.2d 1, 6 (Iowa 2008) (analyzing six veil-piercing factors to determine if corporations "were merely alter egos [of the owners]"). Although the Court did not need to decide the issue, the relationship between Carter and JWC would be a prime example of when the alter ego doctrine might apply, as JWC's activities and finances were so intertwined with Carter's personal activities and finances that it was unclear where one started and the other ended. By contrast, there is no evidence that Kinley's personal activities or finances were intertwined with

ACR's at all, much less to the degree that might warrant application of the alter ego theory to pierce the corporate veil. If the "alter ego" theory were the only basis for piercing the corporate veil under Iowa law, the Court would grant Kinley's motion for partial summary judgment.

This leads, however, to the second scenario in which the Iowa Supreme Court has allowed the corporate veil to be pierced: when an entity was formed without sufficient capital to meet its liabilities and/or is solely or predominantly engaged in fraudulent activity. *See C. Mac Chambers Co. v. Iowa Tae Kwon Do Acad., Inc.*, 412 N.W.2d 593, 598 (Iowa 1987) ("[S]hareholders will not escape personal liability by setting up a corporation which does not have sufficient assets available to meet its debts."); *Briggs Transp. Co.*, 262 N.W.2d at 810. In such circumstances, the corporate veil may be pierced "as to persons who actively participate in the conduct of corporate affairs and have provided inadequate capitalization" or as to an officer-owner who was willfully blind to the same. *Id.* at 810–11.

The United States has submitted sufficient evidence on this veil-piercing theory to prevent the Court from ruling as a matter of law that Kinley is not liable. For example, on the issue of capitalization, ACR's owners did not contribute anything beyond nominal amounts and ACR did not have any third-party financing, yet the entity planned to engage in expensive operations that included, among other things, the payment of hundreds of thousands of dollars of transportation costs and fees to digesters to accept ACR's mixture. This is enough to allow a reasonable factfinder to conclude the entity was undercapitalized.

Similarly, as to the legitimacy of ACR's business, the United States has plausibly argued that someone in Kinley's position should have recognized there was something amiss about ACR's plan to pay digesters to take the mixture yet characterize the transactions as "sales" for purposes of the tax credits. Moreover, ACR apparently did not issue a single invoice for any putative "sales" until late December 2011, by which time the company had already received millions of dollars in tax credits—and even then, the invoices were for tiny amounts in comparison to the credits. In these circumstances, the record contains sufficient indicia of fraud to require the Court to analyze Kinley's familiarity (or lack thereof) with these aspects of ACR's operations to help assess whether he should bear personal liability for the entity's debts. *See, e.g.*, *Briggs Transp.* 262 N.W.2d at 810–11. As the summary judgment record does not contain enough undisputed information to allow the Court to make this assessment as a matter of law, summary judgment is inappropriate.

The same is true for whether Kinley reasonably relied on guidance from professional advisors. Kinley claims to have consulted with Matt Juffer, a tax accountant and attorney, but the United States presented evidence that Juffer denied having provided advice about ACR's eligibility for the tax credits. Similarly, although Kinley says he was aware of interactions between other ACR members and Attorneys Sanderson and Lewis, there are disputes and/or gaps in the record about whether Sanderson truly understood ACR's business model and if Lewis offered any independent assessment about ACR's operations beyond simply relying on Sanderson's purported expertise. The record also reflects important ways in which ACR apparently chose *not* to follow Sanderson's and Lewis's advice, including the company failing to hire a scientist to validate ACR's characterization of the mixture as a "fuel," declining to obtain a formal tax opinion, and not doing much—if anything—to respond to Lewis's observation on January 31, 2011, that ACR needed to "create more cash flow and business activity" to address possible questions about whether the mixture "was actually sold in a commercial sense and [] whether ACR is a bona fide business operating to make a profit." Before the Court can decide whether to pierce the corporate veil as to Kinley, it will need to develop a better understanding of what Kinley knew about these facts and when he knew it.

The fact that Kinley accepted $830,000 in distributions in 2011 and 2012 despite having made only $250 in capital contributions in the first place is particularly important to the Court's decision to deny his motion for summary judgment. This is a remarkable rate of return for a startup company that essentially failed within twelve months, and the record suggests that Kinley accepted some of these distributions after: (a) ACR ceased business operations; (b) Smith warned ACR's members that there was at least some risk of the United States trying to recover from the members personally; (c) the IRS contacted ACR to conduct an audit; and (d) Kinley himself asked other members whether ACR's corporate veil could be pierced. A reasonable factfinder could conclude in these circumstances that Kinley did not sincerely believe ACR's business was above board, but rather understood that the company was manipulating its operations for the illegitimate purpose of grabbing tax credits. This, in turn, might lead to the corporate veil being pierced, particularly considering evidence that ACR did not maintain corporate formalities and was arguably inadequately capitalized. *See In re Marriage of Ballstaedt*, 606 N.W.2d at 349.

Among Iowa Supreme Court cases, *Briggs Transportation Co. v. Starr Sales Co.* is the best illustration of why the Court cannot grant summary judgment in Kinley's favor. In *Briggs*, the

Iowa Supreme Court pierced the corporate veil as to an officer-owner of an entity who had a high-ranking title but did not play "any active part in the incorporation or business of the corporation." 262 N.W.2d at 811. *Briggs* held that the veil nonetheless should be pierced as to that owner because she had a responsibility to know whether the entity was adequately capitalized and engaged in legitimate business operations. *Id.* ("As a major corporate officer she could not avoid liability by emulating the three fabled monkeys, hearings, seeing and speaking no evil."). Here, drawing inferences in favor of the United States as the non-moving party, the evidence shows that Kinley had an ownership interest in ACR, held himself out as a "partner" of the entity, and was actively involved in at least some aspects of the business's operations. This is enough to make him potentially liable under *Briggs*.

To be sure, the record also would allow a reasonable factfinder to rule in Kinley's favor when inferences are resolved in *his* favor. He appears to have been less familiar with the company's operations than Huyser and Carter, and some (or perhaps all) of his information about the advice from professional advisors was being filtered through those two men. It follows that Kinley may have acted reasonably in believing that ACR's operations were legitimate even if the same is not true for Huyser and Carter. If so, it is less likely the veil would be pierced as to Kinley. These are, however, the types of findings that must be made after trial, not on a summary judgment record like this one. The Court therefore DENIES Kinley's motion for partial summary judgment.

## VI.   CONCLUSION.

The Court GRANTS IN PART and DENIES IN PART the United States' Motion for Partial Summary Judgment. (ECF 83.) As it relates to issue preclusion, preclusive effect will be given to the findings of fact in the Court of Federal Claims ruling starting with the heading "**B. Plaintiff Investigates the Feasibility of Alternative Energy Tax Credits**" on page seven and ending immediately before the heading "**J. Procedural History**" on page twenty. Preclusive effect will not be given to the ruling's conclusions of law or adjudications of mixed questions of law and fact.

Any party wishing to object (i.e., genuinely dispute, not provide context) to any fact contained in the designated sections of the Court of Federal Claims ruling must: (a) specifically identify the fact to which objection is made; (b) explain why the party (or its privy) did not have a full and fair opportunity to dispute the fact in the Court of Federal Claims; and (c) briefly summarize the evidence the party wishes to present to contradict or clarify the fact. **These**

**objections must be filed within thirty (30) days of this ruling. The non-objecting party will then have fourteen (14) days to respond.**

As it relates to whether Carter or JWC (or both) is the member of ACR, the Court concludes as a matter of law that Carter is the member, not JWC.

Finally, the Court DENIES Kinley's Cross-Motion for Partial Summary Judgment. (ECF 90.)

IT IS SO ORDERED.

Dated: September 30, 2024 _____

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE