IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | 4:23-cv-00144-SHL-WPK |
| Plaintiff, | |
| vs. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| JAMES HUYSER; JEFFREY W. CARTER; and JWC INVESTMENTS L.C., | |
| Defendants. | |

## I.    INTRODUCTION.

Under Iowa law, "[t]he corporate veil may be pierced under exceptional circumstances, for example, when the corporation is a mere shell, serving no legitimate business purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." *Briggs Transp. Co. v. Starr Sales Co.*, 262 N.W.2d 805, 810 (Iowa 1978). Here, Defendants James Huyser and Jeffrey W. Carter started a company for the sole purpose of pursuing federal alternative energy tax credits and, in furtherance of that purpose, adopted an irrational business plan that no legitimate business would ever follow. At first, the plan worked: the company collected millions of dollars in tax credits, much of which ended up going to Huyser and Carter personally.

Eventually, though, the Internal Revenue Service ("IRS") started asking questions and expressing doubts about the company's eligibility for the credits. When this happened, Huyser and Carter responded with false and misleading statements about the company's operations while also distributing money to themselves at an even faster rate than they had before (despite warnings from their attorneys about liability). These are the kinds of "exceptional circumstances" in which the corporate veil should be pierced under Iowa law. Thus, as explained in full below, the United States has met its burden of proving that Huyser and Carter should be held personally liable for the debts of their company.

## II.    PROCEDURAL HISTORY.

This case arises out of the payment of alternative fuel mixture tax credits by the United States to Alternative Carbon Resources, LLC ("ACR"). The credits were paid to ACR in 2011 and early 2012 based on business operations in 2011. *See generally Alt. Carbon Res., LLC v. United*

*States*, 137 Fed. Cl. 1, 11 (2018), *aff'd*, 939 F.3d 1320 (Fed. Cir. 2019). In total, the United States paid $19,773,393 in tax credits to ACR. *See id.* at 19. In April 2014, following an audit, a delegate of the Secretary of the Treasury concluded that ACR was not entitled to the credits and therefore made an excise tax assessment in the full amount of $19,773,393. *See id.* at 19. The delegate also assessed $39,546,786.00 in excessive claims penalties. *See id.* at 20.

ACR made a partial payment of the excise tax assessment and filed a complaint against the United States in February 2015 seeking a refund. *See id.* The United States asserted a counterclaim in the full amount of the assessed excise taxes plus excessive claim penalties. *See id.* at 21. On March 22, 2018, the Court of Federal Claims entered summary judgment in favor of the United States and against ACR, concluding that ACR did not qualify for the tax credits and did not have "reasonable cause" to believe otherwise. *See generally id.* The Court of Federal Claims entered judgment in favor of the United States and against ACR in the total amount of $59,320,179.00, "less payments made, plus statutory interest and additions accruing according to law." (Ex.[1] 1134.). The United States Court of Appeals for the Federal Circuit affirmed the judgment on September 26, 2019. *See Alt. Carbon Res., LLC*, 939 F.3d at 1334.

On May 1, 2023, the United States filed this veil-piercing action against Huyser, Carter, and the two other owners of ACR, Kenneth Boyle and Matthew Kinley. (ECF[2] 1.) The United States also sued JWC Investments, L.C. ("JWC"), an entity affiliated with Carter, due to uncertainty about whether Carter (individually) or JWC is the member of ACR. (Id.) On September 30, 2024, the Court concluded as a matter of law that Carter individually was the member of ACR, thus rendering JWC's ongoing involvement in the case immaterial. *See United States v. Huyser*, No. 4:23-cv-144, 2024 WL 5054962, at *20–21 (S.D. Iowa Sept. 30, 2024). Boyle and Kinley eventually settled, leaving Huyser and Carter as the only remaining Defendants. The case against Huyser and Carter went to trial for five days without a jury and involved live testimony, hundreds of exhibits, and roughly one dozen deposition transcripts offered in lieu of live witness testimony. The Court now issues these findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

---

[1] All references to "Ex. ___" are to the trial exhibits received as evidence in this veil-piercing case.
[2] All references to "ECF ___" are to the electronic case filing docket in this veil-piercing case. When the ECF references include page numbers, they are usually to the page numbers in the upper-righthand corner of each page, as auto-populated by the electronic case filing system. These numbers may be different than the pagination used by the parties at the bottom of each page. The only exceptions to this protocol are for deposition transcripts, where the pagination will refer to the page and line of the transcript, not the ECF page number.

## III.    FINDINGS OF FACT.

### A.  Background Regarding Alternative Fuel Mixture Tax Credits.

This case revolves around alternative fuel mixture tax credits governed by 26 U.S.C. § 6426(e). The credits were available in the amount of fifty cents per gallon of "alternative fuel used by the taxpayer in producing any alternative fuel mixture for sale or use in a trade or business." § 6426(e)(1). To qualify for the alternative fuel mixture credit, the mixture must be "sold by the taxpayer producing such mixture to any person for use as fuel, or [] used as a fuel by the taxpayer producing such mixture." § 6426(e)(2). Congress made the tax credits available through December 2009 but suspended them in 2010 due to concerns about how they were being applied to a byproduct in the paper industry known as "black liquor." *See Alt. Carbon Res., LLC*, 137 Fed. Cl. at 4–5. In December 2010, Congress renewed the credits through 2011 and provided a one-time opportunity to retroactively claim credits for the 2010 calendar year, but specifically excluded black liquor from the definition of "alternative fuel." *Id.* at 5.

For present purposes, "alternative fuel" means "liquid fuel derived from biomass." § 6426(d)(2)(F). "Taxable fuel" includes gasoline, diesel fuel, or kerosene. *See Alt. Carbon Res., LLC*, 137 Fed. Cl. at 6. A "sale" is "an agreement whereby the seller transfers the property (that is, the title or the substantial incidents of ownership) in goods to the buyer for a consideration called the price, which may consist of money, services, or other things." *Id.* (quoting Treas. Reg. § 48.0-2(a)(5) (2010)). Taxpayers who were entitled to the credits could receive them either as a payment from the United States Treasury or as a credit against excise or income tax liability. *Id.* at 6–7. If taxpayers claimed tax credits to which they were not entitled, they were subject to a civil penalty of 200% of the excessive amount unless they could demonstrate "reasonable cause" for making the claims. *Id.* at 7.

### B.  The Inception and Formation of ACR.[3]

In early 2010, Huyser and Carter began investigating the feasibility of an enterprise that would "convert the waste by-products from ethanol plants into useable alternative fuel." *Alt. Carbon Res., LLC*, 137 Fed. Cl. at 7–8. Huyser has decades of experience owning and running

---

[3] For the most part, this section will provide record citations for each finding of fact. In some instances, however, the Court is making findings of fact by drawing inferences from the evidence. In those situations, no citation will be provided. In addition, the Court sometimes will cite to the findings of fact from the Court of Federal Claims ruling in ACR's refund case, consistent with a pretrial ruling giving conditional preclusive effect to those findings. *See Huyser*, 2024 WL 5054962, at *14–19.

businesses, including running the largest coal mine in Iowa. (Tr.[4] 203:15–204:22; Tr. 207:23–208:3; Tr. 222:3–4.) His experience includes companies that are subject to regulatory scrutiny, such as businesses in energy and waste management. (Tr. 203:15–204:22; Tr. 205:9–25.) He describes himself as being "very familiar" with how to operate a business and says he can read and understand financial statements and accounting records. (Tr. 208:1–10.)

Carter, too, has decades of business experience, often involving energy companies, including companies that recycle waste products for energy production. (Tr. 354:15–355:9; Tr. 356:3–18.) He has a "long history of claiming energy tax credits." (Tr. 356:3–12.) Carter describes himself as a "serial entrepreneur" (Tr. 356:13–15) but admitted that he struggles with the day-to-day details of running a business (Tr. 393:16–22). In his words, "I'm a great guy to start the company, but I'm not a good manager." (Id.)

The enterprise contemplated by Huyser and Carter revolved largely around taking corn syrup or other byproducts of ethanol and food plants and disposing of it in anaerobic digesters used by wastewater treatment plants. *See Alt. Carbon Res., LLC*, 137 Fed. Cl. at 8. Anaerobic digesters break down organic solids and produce methane gas. *Id.*; (Doerr Dep.[5] 31:16–33:3.) The methane, in turn, can be used in generators to produce electricity, in boilers to produce heat, or sold, with any remaining methane then flared (i.e., burned off). *Alt. Carbon Res., LLC*, 137 Fed. Cl. at 8. Methane also can be cleaned and turned into compressed natural gas. *Id.* Besides methane, the other byproduct of the anaerobic digestion process is a "dry cake-like substance," sometimes referred to as a "biosolid," that is similar to dirt and can be used on farm fields as fertilizer. *Id.*; (Hare Dep.[6] 11:19–12:19.) Huyser and Carter believed the by-products from ethanol and food plants could increase usable energy produced by anaerobic digesters, allowing operators of those digesters to power their own businesses, sell energy to others, and potentially power vehicles. *Alt. Carbon Res., LLC*, 137 Fed. Cl. at 8.

Huyser and Carter discussed their potential business venture with, among others, Greg Sanderson, an attorney from Atlanta, Georgia, who specialized in tax issues and had worked with

---

[4] All references to "Tr. ___" are to the trial transcript, which is found (in separate daily volumes) at ECF 197 through ECF 201.

[5] "Doerr Dep. ___" refers to the transcript from Dale Doerr's deposition, which the parties agreed should be admitted in lieu of live testimony. This transcript can be found at ECF 170-10. All page numbers are to the transcript pages, not the page numbers auto-populated by the electronic case filing system.

[6] "Hare Dep. ___" refers to the transcript from Larry Hare's deposition, which the parties agreed should be admitted in lieu of live testimony. This transcript is found at ECF 170-12. All page numbers are to the transcript pages, not the page numbers auto-populated by the electronic case filing system.

Carter on other projects. *Id*. at 7–8. Sanderson also had experience with a business that built and developed power plants and received tax credits. (Sanderson Dep.[7] 13:2–14:12.) On May 17, 2010, Huyser and Carter had a phone call with Sanderson to discuss whether the use of corn syrup in an anaerobic digester would be eligible for the alternative fuel mixture tax credit governed by 26 U.S.C. § 6426(e). *Alt. Carbon Res., LLC*, 137 Fed. Cl. at 8. Sanderson said he believed the idea had merit and sent Huyser and Carter a memorandum he had written in January 2009 that outlined the requirements for alternative energy tax credits. *Id*.; (Ex. 1025, pp. 6–11, 36–37.) Sanderson recommended that Huyser and Carter consult with a scientist regarding their proposed process, particularly with respect to whether using corn syrup in an anaerobic digester constituted "use as a fuel," as this would be one of the requirements to qualify for the credits. (Id., pp. 36–37.) Sanderson said "[t]his due diligence is important, given that IRC Section 6675 provides a penalty equal to twice the amount of excessive excise tax refund claims. This liability applies individually to responsible persons as well as to the company. The penalty does not apply if the taxpayer had reasonable cause to claim the tax credit payment." (Id., p. 37.) In what would become a recurring theme in their interactions with Sanderson, Huyser and Carter did not consult with a scientist in the manner recommended by Sanderson.

On May 19, 2010, Huyser formed ACR as a limited liability company. *Alt. Carbon Res., LLC*, 137 Fed. Cl. at 8. Huyser and Carter were the co-founders of the business, with Boyle and Kinley joining later. *Id*. at 8; (Tr. 385:9–10). Huyser held seventy-eight percent of ACR's voting membership units. (Ex. 1050, p. 32.) He and Carter collectively held the majority of ACR's voting and non-voting membership units. (Id.) Kinley and Boyle were minority interest holders. (Id.) ACR had no capital until January 21, 2011, when Huyser deposited $1,000 to open an account at Wells Fargo. (Tr. 58:9–16; Ex. 136, p. 1.) Carter made a $1,000 capital contribution on February 16, 2011, through his entity, JWC. (Ex. 69, pp. 3–4.) Huyser and Carter (via JWC) made additional capital contributions of $1,000 each in mid-March 2011. (Ex. 70, p. 8; Ex. 69, pp. 5–8; Ex. 136, p. 1.) This brought ACR's total capitalization to $4,000, which was its peak level of capital. In March 2011, Huyser and Carter received distributions of $2,000 each, effectively zeroing out their capital contributions. (Tr. 59:22–24; Ex. 136, p. 1.) Kinley later made a capital contribution of $250; Boyle

---

[7] "Sanderson Dep. ___" refers to the transcript from Greg Sanderson's February 2017 deposition, which the parties agreed should be admitted in lieu of live testimony. This transcript is found at ECF 170-20. All page numbers are to the transcript pages, not the page numbers auto-populated by the electronic case filing system.

did not make the expected $250 contribution. (Tr. 59:2; Tr. 585:21–586:7.) No other capital contributions were ever made. (*See* Tr. 586:8–18.)

Huyser and Carter both have finance backgrounds, although Carter does not have a degree. (Tr. 203:15–17; Tr. 354:10–14.) Kinley holds an accounting degree and a certified public accountant credential. *Alt. Carbon Res., LLC*, 137 Fed. Cl. at 8–9. Boyle holds a Master of Business Administration degree. *Id*. at 9. All four had extensive business experience in the alternative energy industry prior to their involvement with ACR. *Id*.

C.   *The Pre-Operational Phase of ACR's Business.*

Because the tax credits were not available in 2010, *id*. at 11 n.10, ACR did not engage in any actual operations or transactions that year. Huyser and Carter did, however, conceive a three-step business plan that they intended to follow if the credits became available again: <u>Step One</u>: ACR purchases feedstock from a supplier and has a trucking company, Shinn Trucking, pick it up at ACR's expense; <u>Step Two</u>: the trucking company—again at ACR's expense—goes to a gas pump and "splashes" the required amount of diesel fuel to the load to make it an "alternative fuel mixture"; and <u>Step Three</u>: ACR pays an anaerobic digester or other facility to accept the mixture but characterizes the transaction as a "sale." *Alt. Carbon Res., LLC*, 137 Fed. Cl. at 9–10; (Tr. 210:8–18; Tr. 226:17–227:6.)

The sole reason for designing the business plan in this way was to try to make ACR eligible for the tax credits. As Huyser admitted at trial, ACR "had no reason to be in business without the tax credits. . . . We did not enter into the business without the tax credit or continue in business without the tax credits." (Tr. 279:6–12.) Huyser and Carter had no plan for—or interest in—making ACR viable as a business in the absence of tax credits. For example, Huyser told Carter in January 2011 that ACR "cannot send anything" to any putative customers until the tax registration was in place. (Ex. 106, p. 6.) Similarly, an early ACR business model identified tax credits as the company's sole expected source of revenue. (Tr. 554:8–11; Tr. 557:1–9.) Internal emails from August 2011 continued to identify tax credits as the only source of revenue. (Tr. 642:3–9.) ACR was a means to an end for Huyser and Carter, with the "end" being the collection of tax credits from the United States Treasury. (Tr. 279:6–9; Tr. 408:14–409:3; Tr. 761:12–22.)

In mid-2010, Huyser and Carter laid the groundwork for commencing operations if the tax credits were renewed. For example, Huyser emailed federal congressional staff starting in July 2010 to determine whether the tax credits were likely to be renewed and to advocate for Congress

to do so. (Ex. 106, pp. 7–9.) Carter investigated potential sources of waste for ACR to obtain at Step One. (Tr. 220:16–24; Tr. 394:4–398:17); *see also Alt. Carbon Res., LLC*, 137 Fed. Cl. at 9. Carter also communicated with the Des Moines Metropolitan Wastewater Reclamation Authority (the "WRA") and other facilities with anaerobic digesters that might be willing to accept the waste at Step Three. (Tr. 398:18–401:2.)

In May 2010, ACR applied for registration with the IRS using a standardized form known as Form 637. (Ex. 317.) ACR applied for an "M" designation, which applies to "blenders of . . . alternative fuel mixtures." *Alt. Carbon Res., LLC*, 137 Fed. Cl. at 10. ACR's application stated that ACR intended to "take possession of corn oil/syrup from a variety of ethanol companies. It will then blend this with a portion of diesel fuel equal to 1/10 of 1%. ACR will sell this alternative liquid fuel (derived from biomass defined under section 45k(c)(3) to a variety of customers for fuel." (Ex. 317, p. 2; Tr. 215:20–216:22.) The application did not mention that ACR would be paying the ethanol companies for the corn oil/syrup, nor did it mention that the "blend[ing]" would simply be the "splashing" of diesel fuel on the waste at a gas station.

On July 13, 2010, Huyser met with IRS Agent Kevin Kresic, who was processing ACR's application, to give a PowerPoint presentation about ACR's proposed business. (Tr. 674:15–675:13; Ex. N.) In his trial testimony, Huyser characterized the meeting as involving "an outline and a sort of mini business plan of what we intended to do that included the customers; i.e., the anaerobic digesters, the suppliers being the ethanol companies, the transportation companies that would be involved…" (Tr. 675:5–9.) In other words, Huyser characterized the meeting as an attempt to be transparent with the IRS about ACR's plans. The record shows, however, that Carter sent an email to Sanderson the day before the meeting saying that Huyser wanted advice "on what to say or not to say regarding blenders credit." (Ex. 1051, p. 11.) In that regard, it is notable that the presentation refers to the proposed transactions as "sales" to "customers." (Ex. N, pp. 5, 18, 25.) In addition, the presentation referred to the Ben Shinn Trucking Terminal as a "Blending Site" and "Blending Facility." (Id., pp. 22–23.) This language is misleading in a situation where the diesel fuel was simply being "splashed" onto the waste at a gas pump.

In any event, at the advice of Agent Kresic, Huyser amended ACR's requested designation to "AL," which is an "[a]lternative fueler that sells for use or uses alternative fuel as a fuel in a motor vehicle or motorboat." *Alt. Carbon Res., LLC*, 137 Fed. Cl. at 10. This designation did not match ACR's proposed business plan, which did not involve the use of biowaste as fuel in a motor

vehicle or motorboat. Thus, the Court infers that Kresic did not understand the business plan, either because Huyser was opaque in how he described it or Kresic misinterpreted what Huyser was saying (or both). Regardless, on July 15, 2010, at the advice of Sanderson, Huyser wrote a letter to Kresic asking to amend the application from the "AL" designation to "AM." (Ex. 196.) Huyser's letter reiterated that "ACR will be blending the liquid fuel from biomass with taxable fuel and selling the mixture to a third party to use as a fuel in a process to manufacture methane gas." (Id.) On August 27, 2010, ACR's application for an "M" designation was approved. *Alt. Carbon Res., LLC*, 137 Fed. Cl. at 11. ACR's application for an "AM" designation was denied as unnecessary because the alternative fuel mixture credit was not available at that time. *Id*.

On December 17, 2010, Congress passed a bill reinstating the alternative fuel mixture credit of fifty cents per gallon. This prompted Huyser to send an email to Carter and Boyle stating, "If Obama signs we are in business." (Ex. 106, p. 7.) The same day, Carter drafted an email to his contacts at the WRA saying: "'Finally.' the credits got passed last night! ACR should be in a position to start sending syrup material to WRA sometime next week! 'knock on wood[.]' What do we need to do to get the paperwork process moving at WRA?" (Id., p. 5.) Huyser recognized that if ACR could get money to fund its early operations, it could "get back in business in a big way and use the blender's credit to actually make some money." (Id., p. 15.)

The day the legislation passed, ACR reapplied for the "AM" designation by submitting another Form 637 and referring to the "approved file" that was already in the IRS's possession. *Alt. Carbon Res., LLC*, 137 Fed. Cl. at 11. On the new Form 637, ACR again stated that it planned to "take possession" of corn oil/syrup from ethanol companies, "blend the corn oil/syrup with a portion of diesel fuel equal to 1/10 of 1%," and "sell this alternative liquid fuel mixture . . . to a variety[ ]of customers for fuel." (Ex. 58, p. 1.) ACR's application was approved on January 14, 2011, at which point the company was issued a registration number containing both the "M" and "AM" designations. *Alt. Carbon Res., LLC*, 137 Fed. Cl. at 11.

   *D.  ACR's Consultations with Sanderson and Lewis in Early 2011.*

Based on the renewal of the alternative fuel mixture tax credit in December 2010, Carter and Huyser were ready for ACR to begin operations. They were, however, still concerned about whether their proposed transactions would satisfy the "sale" requirement in 26 U.S.C. § 6426(e)(2)(A). As Huyser later admitted, "the method of description of a sale was pretty unconventional from the traditional way you think about a sale, that you deliver a product and they

8

pay you cash back." (Tr. 688:4–7.) On December 27, 2010, Carter sent an email to Sanderson stating that ACR would obtain corn syrup from ethanol plants, take it to a "blending station, where .01% diesel fuel is added to mixture," and transport the mixture to the Des Moines wastewater treatment plant "for use in the[ir] digesters/gas production facility." (Ex. 241, p. 1.) Carter then wrote "(note) ACR is paying a disposal fee for this service. $250" and asked, "Does ACR need to 'sell' this alternative fuel mixture to DM waste water in order to qualify? If so then can we word the transfer documents to show a '$10' sale price and a $260 effluent surcharge 'paid' to DM waste[] water?" (Id., p. 2.) Sanderson responded the same day with a message stating he was "out of town until after year end" but offering four bullet-point "thoughts," one of which was that "[y]ou have to sell or use the mixture as a fuel." (Id., p. 1.) Sanderson said he could provide a formal tax opinion, but it would be expensive. (Id.) Huyser and Carter never obtained a formal tax opinion. In total, according to his firm's invoices, Sanderson provided less than nine hours of services for ACR before ACR commenced active operations. (Ex. 128, pp. 3–6.)

On January 3, 2011, Carter sent another email to Sanderson, this time asking: "Would you have 10 min's tomorrow afternoon to visit with us on the definition of 'Sold' by taxpayer for use as fuel. What is the proper way to structure the contract with Waste Water digester folks? Technically they are charging us a disposal fee of $250. Our thoughts are that there are a number of ways contractually to 'constitute a sale' and that's what we need direction on." (Ex. 242.) It appears that a phone call occurred, following which Sanderson sent an email reiterating the suggestion he made earlier about ACR hiring a scientist from Clemson University to serve as a consultant. (Ex. 1052, p. 106.) Sanderson also sent a separate email the same date attaching a copy of an IRS private letter ruling "defining 'sale' as a transfer for consideration for purposes of the alcohol mixture credit." (Id., p. 108.) Sanderson characterized the private letter rulings as involving "factual situations similar to yours." (Id.) As discussed further below, Sanderson was wrong in saying the private letter ruling involved a "similar" fact situation, as the taxpayer at issue in the private letter ruling was in the waste management business and received money from the supplier to remove the waste in the first instance. Here, by contrast, ACR was *paying* the ethanol supplier for the waste. Thus, unlike the waste management company, ACR generated no revenue outside of tax credits.

In any event, on January 21, 2011, Huyser sent an email to Sanderson, copying Carter and Lewis, asking for guidance and saying, "I want to do things in the correct way" with respect to the

alternative fuel mixture credit. (Id., p. 119.) Huyser explained that ACR would be "<u>buying</u> the bio-diesel fuel and having the trucking company record the additions to each load of the .1 of 1% diesel fuel." (Id., p. 118.) He said "we are basing the 'sale' and its consideration on the service provided by the WRA in disposing of the 'non-combustible' materials. . . . <u>We want to get it right, so for the last time, do our documents fit the requirements of the IRS to claim the tax credit?</u>" (Id.) Huyser explained that the "end user (WRA) will not be paying us for the [Alternative Fuel Mixture]. Both anaerobic digesters, ACR will be contracting with, will both be charging a fee to ACR for disposing of the 'non-combustible materials." (Id., p. 119.) Huyser asked, among other things, whether Agent Kresic would be the IRS agent assigned to an audit, what documentation would be necessary for the audit, and whether ACR had to notify the IRS if it planned to provide products other than corn syrup. (Id., pp. 118–19.)

Sanderson responded the next business day, January 24, 2011, as follows:

> There is no way for us to know who may be assigned to an IRS audit, so I would not assume it would be your current excise agent contact. If you are audited, you will need to provide documentation of each step of the transaction as I outlined in the checklist previously sent. This type of proof is no different from that normally requested in IRS audits. . . . As previously discussed, I think it presents a better case if you charge the user of the mixture for the fuel value, and they charge you a disposal fee. Two private letter rulings indicate that the IRS may consider the transfer as a "sale" even if you do not receive payment for the fuel. However, a private letter ruling is technically only binding to the taxpayer who received it. While private letter rulings indicate the opinion of the [IRS] on a particular set of facts, they may not be technically cited as precedent by other taxpayers.
>
> As far as your AM registration, I think it should cover liquid biofuels in general, not just corn syrup. . . . The fuel itself should be in a liquid state, not just solids suspended in water. . . . Generally, the Btu value should be sufficient to create heat or energy when combusted or oxidized to be consider[ed] "fuel[."] There could be a concern, for example, if the moisture content is too high for the liquid to produce heat or energy in excess of that required to evaporate the moisture.
>
> Currently, I do not have a full understanding of the economics. How do you make money from this business if you pay the digester company to take the liquid? . . . Does this business cash flow without the 50 cent per gallon credit?

(Id., p. 117.) Sanderson's files do not show any response to his questions from Huyser, Carter, or anyone else affiliated with ACR. Instead, it appears that Huyser and Carter simply charged ahead

with their business plan. In that regard, the email exchange is illustrative of Sanderson's relationship with Huyser and Carter more generally. On one hand, Huyser and Carter were candid with him in the sense that they wanted to characterize the transactions with the anaerobic digesters as "sales" even though the money was moving in the wrong direction. On the other hand, however, Huyser and Carter often disregarded Sanderson's warnings, caveats, and follow-up questions like the one he asked about the economics of the business. Huyser and Carter also declined or otherwise failed to act upon Sanderson's suggestions to retain a scientist and/or have a formal tax opinion prepared. Simply put, they accepted the parts of his advice they liked and disregarded the rest.

In addition to Sanderson, Huyser reached out in early 2011 to his personal attorney, R. Jeffrey Lewis, to discuss the tax credits. (Tr. 670:3–13; Lewis Dep.[8] 12:18–13:7, 13:19–22, 14:2–11.) Lewis's area of expertise is "[p]rimarily civil trial practice," although he "dabble[s] in other things." (Lewis Dep. 7:10–14.) Huyser appears to have sought Lewis's input on, among other things, whether ACR's transactions with the digesters would be considered "sales." Lewis reviewed Sanderson's emails, the IRS letter ruling supplied by Sanderson, and a "summary of the proposed IRS regulations." (Ex. 1165.) In a letter to Huyser dated January 31, 2011, Lewis wrote, in part:

> "[I]t seems to me that you should give consideration to finding a way to create more cash flow and business activity in ACR. This would address possible future concerns over: a) whether the AFM was actually sold in a commercial sense and b) whether ACR is a bona fide business operating to make a profit. You will recall the company to whom the private opinion letter was written was in the waste business. My thought was that you should use your creativity to shore up your business activity. I would be happy to discuss this with you further if you believe it might be productive.

(Id.) Huyser and Carter never did anything to "create more cash flow and business activity in ACR." Instead, the only meaningful cash flow came from tax credits.

Shortly after receiving feedback from Sanderson and Lewis in late January 2011, Carter sent an email to Huyser and others that captures his and Huyser's attitudes toward ACR's business. (Ex. 112, pp. 8–9.) The email described Carter's interaction with a company that was "going after" the same alternative fuel mixture credits as ACR. (Id.) The email also referred to a third company, Stratex Energy, that previously claimed tax credits by exploiting a paper mill byproduct called

---

[8] "Lewis Dep. ___" refers to the transcript from Jeffrey Lewis's deposition, which the parties agreed should be admitted in lieu of live testimony. This transcript is found at ECF 170-18. All page numbers are to the transcript pages, not the page numbers auto-populated by the electronic case filing system.

"black liquor." (Id.) As noted above, Congress ended up having to amend the definition of "alternative fuel" to exclude black liquor. *See Alt. Carbon Res., LLC*, 137 Fed. Cl. at 4–5. Carter did not, however, see anything wrong with what Stratex Energy had done. In his words: "And 25 Billion later they closed the loophole. . . . Its going to be a foot race!!!!! Let's play!!!." (Id., p. 9.) Parsing the language, the email shows that, from Carter's perspective, ACR's sole purpose was to join the "footrace" for tax credits, exploiting "loopholes" if necessary, until those credits were no longer available. Huyser shared this viewpoint. ACR had no other goal, plan, mission, or purpose.[9]

  *E. ACR's Operations in Early 2011.*

  ACR's first "customer" was the WRA. (Tr. 399:14–22); *see also Alt. Carbon Res., LLC*, 137 Fed. Cl. at 16. The relationship between ACR and the WRA was governed by an agreement entitled "Authorization to Discharge" that identified the "materials" as an "Alternative Fuel Mixture" containing corn syrup, cheese whey, and wheat starch. (Ex. 329, p. 1.) The document did not mention that the "Alternative Fuel Mixture" would contain diesel fuel. It identified the "dates of discharge" as January 15, 2011, through January 15, 2012, and stated: "DISCHARGE METHOD/LOCATION: Alternative fuel mixture[s] … to be delivered by tanker, sold/transferred to the [WRA] to be used as fuel in [the WRA's] anaerobic digesters. [The WRA] will dispose of noncombustible material in the [alternative fuel mixtures]." (Id..) The document further stated that the alternative fuel mixtures "contain[] bio-mass as defined in Internal Revenue Code §45K(c)(3)." (Id.)

  The Authorization to Discharge did not say anything about the WRA paying money to ACR, notwithstanding Carter's questions to Sanderson in the preceding weeks about how to "structure the contract with the [WRA]" and whether ACR should "word the transfer documents to show a '$10' sale price and a $260 effluent surcharge 'paid' to [the WRA]." (Ex. 242; Ex. 241, p. 2.) In his email to Sanderson on January 21, 2011, Huyser admitted that he "did not feel comfortable with the back and forth payments to [the WRA] and ACR." (Ex. 188, p. 2.) As noted above, Sanderson responded, in part, by saying, "I think it presents a better case if you charge the user of the mixture for the fuel value, and they charge you a disposal fee." (Id., p. 1.)

---

[9] The record does, to be clear, show that Huyser and Carter were working on "new project areas" in late 2011 involving the capture of waste methane from anaerobic digesters. (Ex. 1051, pp. 67–69; Ex. P.) But they formed new companies to pursue this venture, rather than using ACR. (Tr. 761:12–22; Tr. 801:8–17; Tr. 837:7–21; Ex. 1051, pp. 67–69.) Moreover, as with ACR, the new venture revolved around the pursuit of tax credits, as opposed to the development of any sort of self-sustaining business model. (Id.)

Based on Sanderson's advice, ACR negotiated a separate document with the WRA entitled "Attachment # 1 to Authorization to Discharge." *Alt. Carbon Res., LLC*, 137 Fed. Cl. at 16. It stated: "[The WRA] will pay $950 to [ACR] for the alternative fuel mixtures … delivered during the term of the Authorization to Discharge executed on January 21st, 2011 and during all subsequent terms." (Ex. 329, p. 2.) Carter explained that he told Larry Hare, an employee of the WRA, that "nothing would work without having it as a sale. However he could do it internally he could do it internally. I needed to have it show on the books as a sale, period; otherwise, it wasn't worth doing." (Tr. 408:23–409:3.) Hare and Huyser executed Attachment #1 on February 1, 2011, on behalf of the WRA and ACR, respectively. (Ex. 329, p. 2.)

The same day, Hare and Huyser also signed a second document, entitled "Attachment # 2 to Authorization to [D]ischarge." (Ex. 78.) It stated: "[The WRA] will charge $950 to ACR for the administrative costs [to] process Alternative Fuel Mixtures (AFM) during the term of the Authorization to Discharge executed on January 21st, 2011 and during all subsequent terms." (Id.) On January 31, 2011, Hare sent an email to a WRA official asking for permission to sign the Attachments. (Ex. 75.) Hare said: "This is for their tax credit stuff. A once a year charge of $950 for us to 'buy' product (AD feedstock). We turn around and charge them $950 for admin fees, so it is a wash." (Id.) Notwithstanding the language of Attachment #1, Hare testified that the WRA did not pay for the materials that ACR delivered; instead, "we were paid to treat those materials. . . . We were paid through tipping fees. So typically we had a price per pound." (Hare Dep. 16:12–18.) Hare has heard of other wastewater treatment plants that pay for industrial source waste, but the WRA has never done so. (Id., 33:21–35:7.) He might, however, have considered reducing the charge to the waste supplier if the waste produced enough energy to justify such a reduction. (Id., 102:7–103:1.) Another supervisor from the WRA, Royce Hammitt, said ACR did not "sell" anything to the WRA; instead, "[w]e charged them to bring it to us." (Hammitt Dep.[10] 81:1–4.)

Over the life of the agreement with the WRA, ACR delivered an average of nine loads of various types of mixtures per week at a cost to ACR of approximately $125 per load. *Alt. Carbon Res., LLC*, 137 Fed. Cl. at 16. At some point, the WRA stopped accepting loads with corn oil due

---

[10] "Hammitt Dep. __" refers to the transcript from the deposition of Royce Hammitt, which the parties agreed should be admitted in lieu of live testimony. This transcript can be found at ECF 170-11. All page numbers are to the transcript pages, not the page numbers auto-populated by the electronic case filing system.

to an incident that forced the WRA to shut down one of its digesters. *Id*. at 16–17. Overall, however, Hare said that ACR's mixtures were useful as a source of energy, although the WRA lacked the ability to explain exactly how much biogas came from ACR's mixtures. *Id*. at 17; (Hare Dep. 64:16–65:8.) The WRA did say that ACR's mixtures "allowed the WRA to run three gas engines connected with electric generators twenty-four hours per day, seven days per week, whereas previously the WRA only produced enough gas to run two of the engines." *Alt. Carbon Res., LLC*, 137 Fed. Cl. at 17. The WRA also received loads from other companies that it used in anaerobic digesters. *Id*. The WRA produced enough energy from waste to send some to a nearby company, Cargill. (Hammitt Dep. 97:12–24.) The waste from ACR was a particularly good source of energy. (Id., 98:8–24.)

No one from ACR ever told Hare that diesel fuel was being added to the waste that was being delivered to the WRA, nor would Hare have expected diesel to be part of the waste. (Hare Dep. 27:9–27:20.) Hare said he would not have approved ACR's waste if he knew it contained diesel fuel because it can be "toxic. It's not—it's not as organic, as easily broken down…typically we don't let gasoline or diesel fuel generally go into our anaerobic digesters." (Id., 87:3–24.) Hare said, however, that it would not have been a concern if an "incidental" level of diesel fuel, such as one-tenth of one percent, ended up in the WRA's digesters. (Id., 99:7–13.) Hammitt similarly testified that he did not recall being informed by ACR that the waste had diesel fuel in it. (Hammitt Dep. 77:5–11.) He said the WRA occasionally tests waste and may have been able to smell diesel fuel as part of these tests. (Id., 77:17–78:2.) He does not recall hearing anything about ACR's loads smelling like diesel. (Id., 78:3–5.) Like Hare, Hammitt said "we wouldn't . . . knowingly accept diesel fuel as a food for our digesters" but that low levels of diesel fuel would not have had an impact. (Id., 99:13–22). Hammitt is not aware of diesel fuel adding any value to energy production in a digester. (Id., 99:17–22.) When ACR provided samples of its product to the WRA, the samples did not contain diesel fuel. (Tr. 401:18–25.)

Another of ACR's "customers" was Amana Farms, Inc. ("Amana"). (Ex. 330.) ACR's agreement with Amana stated, among other things, that ACR is "in the business of producing and mixing an alternative fuel mixture … which contains bio-mass by-product from corn ethanol production[,] and selling and delivering the [mixture] for use as fuel in anaerobic digesters." (Id., p. 1.) The agreement did not mention that the "mixture" would contain diesel fuel. (Id.) The agreement stated that ACR "has an obligation to properly dispose of non-combustible waste

components of the [mixture]" and that Amana "owns and operates an anerobic digester in Iowa County, Iowa which is capable of using the [mixture] as fuel to produce energy and is in the business of properly disposing of waste products." (Id.) The agreement stated that ACR "shall transfer, sell and deliver [the mixture] to Amana Farms for use as fuel in its anaerobic digester and Amana Farms shall dispose of non-combustible components of the [mixture]." (Id.) It further stated: "Amana shall pay [ACR] the sum of one thousand dollars ($1,000.00) during the term of this Agreement and during each successive term. [ACR] shall pay Amana Farms a handling fee of twenty-five dollars ($25.00) per ton of [mixture] delivered by ACR to Amana Farms pursuant to this Agreement." (Id.) The agreement called for Amana to "bill ACR weekly for accrued handling fees." (Id., p. 2.) The agreement said nothing about ACR billing Amana, whether through the issuance of invoices or otherwise.

Another "customer" was the City of West Lafayette, Indiana. (Ex. 261.) The agreement between ACR and West Lafayette was an "Authorization to Discharge" that identified the materials as "Thin-Stillage," which the agreement characterized as an "alternative fuel mixture." (Id.) The document did not mention the presence of diesel fuel in the "mixture," nor did it say anything about West Lafayette paying money to ACR. (Id.) The document instead stated that West Lafayette "will charge ACR a disposal fee of $0.05 per delivered gallon." (Id.)

Another "customer" was Sheboygan Wastewater Treatment Plant in Sheboygan, Wisconsin. (Doerr Dep., 13:15–14:2.) The former wastewater superintendent in Sheboygan, Dale Doerr, testified that ACR provided "high-strength waste" to the Sheboygan facility. (Id.) He said the material delivered by ACR, which he repeatedly called "waste," significantly improved the facility's biogas production. (Id., 17:10–18:4.) Doerr said Sheboygan Wastewater never would have paid for the waste delivered by ACR and other companies. (Id., 66:5–20.) In his words, "[W]e wouldn't pay for it. The whole point was the benefit for us was to get it free and produce biogas . . . we never paid for anything. . . . Why would we pay someone to dump high-strength waste?" (Id., 65:7 – 66:20.) He said Sheboygan Wastewater was not in the business of purchasing waste and, in fact, "[t]here were city ordinances that would prevent me from paying for materials discharged at the wastewater treatment plant." (Id., 154:8–15.)

At some point, one of Sheboygan Wastewater's employees learned that diesel fuel was being added into the waste stream before it went into the anaerobic digester. (Id., 94:20–95:9.) The employee did not learn this from ACR directly, but rather from one of the drivers who transported

waste to Sheboygan Wastewater. (Id., 95:10–18.) When this information was passed along to Doerr, he "put a stop to it right away … [b]ecause we didn't want to put diesel fuel into our anaerobic digester. It's another potential for upsetting the process or creating other safety hazards that we didn't want to be dealing with at our facility." (Id., 95:17–96:2.) Doerr said he was "not happy about it at all" when he learned about the inclusion of diesel fuel in the biowaste. (Id., 96:22.) He would not have taken waste material if he knew it contained diesel. (Id., 96:3–6.) He later reiterated: "We put a stop to [the inclusion of diesel fuel] as soon as we knew about it. We wouldn't have taken it in . . . it goes against everything that I believe in and that we were trying to do." (Id., 170:6–9.) No one from ACR ever told Doerr about adding diesel fuel to the waste. (Id.,96:7–10.)

ACR provided samples of the biowaste to the anaerobic digester customers for testing. (Tr. 639:1–12.) These samples did not include the splash of diesel fuel. (Id.) Boyle testified that he told anaerobic digesters that diesel fuel would be added. (Tr. 648:11–18.) This testimony is inconsistent with the testimony of representatives from some wastewater facilities who said they did not know about the addition of diesel fuel. Boyle's testimony is also somewhat inconsistent with ACR's contracts, which did not mention the addition of diesel fuel. (E.g., Ex. 1059, pp. 15–17 (Janesville Wastewater Utility), pp. 21–23 (Bach Digester).) In any event, Boyle was primarily responsible for out-of-state facilities and presumably had limited, if any, contact with Iowa wastewater facilities. (Tr. 601:15–17.) In at least some instances, ACR learned that some digesters were not using the biowaste as fuel but rather were simply "flaring off" the product. (Tr. 639:13–16.)

*F. Tax Credit Payments.*

In the first two months of operations in early 2011, ACR incurred hundreds of thousands of dollars in expenses in connection with acquiring waste, splashing it with diesel fuel, transporting it, and paying anaerobic digesters to accept it. (Ex. 136, pp. 1, 20, 21.) During that period, ACR began filing claims for tax credits using Form 8849. (*See, e.g.*, Ex. 13.) ACR was required to certify the truthfulness and accuracy of the information that was being provided. (Tr. 197:20–23.) The IRS does not verify the accuracy of the information at the time the claim is submitted. (Tr. 198:2–7.) Instead, it can only verify that information through an audit. (Tr. 198:8–9.) Even then, the IRS has limited resources and cannot audit every tax return or every claim for tax credits. (Tr. 194:6–16.) The tax system "is built on the principle of voluntary compliance." (Id.)

As of mid-March 2011, ACR had not received any tax credit payments from the United States Treasury. Carter described this timeframe as the "pucker moment" where he asked himself, "is this going to work?" (Tr. 440:20–23.) ACR had very little capital during this period and was, in the words of Government financial expert Frank McGuire, "easily the most thinly capitalized entity I've ever seen" relative to the scope of its operations. (Tr. 60:15–17.) On March 26, 2011, ACR received and deposited the first check from the United States Treasury in the amount of $395,366.50. (Ex. 69, p. 10.) ACR continued to receive Treasury checks on a regular basis for the remainder of 2011, typically hundreds of thousands of dollars at a time. (Ex. 69; Ex. 1251.)

ACR increased its tax credit claims as 2011 went on. In the first quarter of the year, ACR made five claims totaling approximately $1 million. (Tr. 37:15–17.) In the second quarter, ACR made thirteen or fourteen claims totaling approximately $2.5 million. (Tr. 37:18–23.) In the third quarter, the value of the claims rose to approximately $5.5 million. (Tr. 37:24–38:1.) In the fourth quarter, the value of the claims exceeded $10 million. (Tr. 38:1–3.) In total, ACR's financial statements show that the company received $19,773,393 in tax credits for claims submitted in 2011. (Ex. 179, p. 2.) ACR reported only $8,950 in alternative fuel mixture revenue for the same period. (Id.) ACR reported no other source of revenue in 2011 except "Freight Income" in the amount of $135,800. (Id.) At trial, no one explained what "Freight Income" was. (*See* Tr. 39:1–6.) Federal tax credits made up 99.3% of ACR's reported total income for the year 2011 even when "Freight Income" is included. (Tr. 39:7–17; Ex. 179, p. 2.)

In 2011, ACR paid $2,154,568.45 to purchase waste from ethanol plants and other suppliers. (Ex. 179, p. 2.) It also paid $1,678,029.07 in disposal fees to the anaerobic digesters and other "customers" during that year to dispose of the same waste. (Id.) It paid $5,147,648.21 in shipping, freight, and delivery charges. (Id.) Finally, it paid more than $10.4 million in distributions in 2011 and 2012 to its owners, allocated as follows:

| ACR Member | Total Distributions |
| --- | --- |
| Huyser | $4,434,014 |
| Carter | $4,337,433 |
| Boyle | $880,413 |
| Kinley | $835,275 |

(Ex. 1252; Ex. 1253; Ex. 1254; Ex. 1255; Tr. 21:24–25; Tr. 164:2–6.) The last round of distributions was made in April 2012. (Tr. 174:18–24.) Huyser decided when to make distributions

and in what amount. (Tr. 248:3–5; Tr. 302:3–7.) He personally delivered the distribution checks to each of ACR's members. (Tr. 302:20–22.)

ACR engaged an outside accountant, Wendy Albers, to assist with preparing tax credit claims to the IRS and providing other bookkeeping services. (Albers Dep.[11] 11:12–22, 25:14–18, 51:4–10.) For the tax credit claims, Huyser would provide Albers with trucking receipts, scale tickets, and other necessary documentation. (Id., 34:15–36:2.) Her firm was not hired to provide advice to ACR, nor does she recall providing advice to ACR. (Id., 25:19–23.) Huyser did, however, explain ACR's proposed operations to her. (Id., 12:11–22.) In addition, Albers performed at least some level of research into the tax credits. (Id., 19:12–23.) She "felt that [ACR] qualified for the tax credits" based on the requirements of the Internal Revenue Code. (Id., 21:1–18.) Albers testified that she believed the mixture was being "sold" based on contracts and invoices provided to her by Huyser. (Id., 22:8–23:2.) She admitted, however, that she has never seen a "sale" structured like ACR's sales here. (Id., 24:7–9.)

An accountant named Brad Smerage prepared ACR's tax return in late 2011. (Smerage Dep.[12] 10:11–15.) Smerage had no prior knowledge of ACR's business. (Id., 10:19–11:9.) Smerage provided advice to ACR on whether the tax credit payments were themselves taxable, but not on whether the company qualified for those tax credits in the first instance. (Id., 11:10–17, 15:25–16:6.) He did, however, form the opinion that ACR indeed qualified after reviewing information from Greg Sanderson, among other materials. (Id., 25:6–26:8.)

G. *Mid-2011: Concerns Arise About ACR's Eligibility for Tax Credits.*

On July 6, 2011, ACR received an IRS Questionnaire seeking information about the company's business. (Ex. 353.) Boyle was immediately concerned, saying in an email that he "can't imagine this is a positive event for ACR." (Id., p. 2.) Huyser, Carter, Boyle, and Kinley worked with Sanderson to draft a response (Ex. 1051, pp. 127–40), which was submitted to the IRS on July 27, 2011 (Ex. 204). While working with ACR on the response, Sanderson expressed confusion about which tax credit ACR was trying to claim. (Ex. 1051, p. 130 ("**WHICH CREDIT**

---

[11] "Albers Dep. __" refers to the transcript from the deposition of Wendy Albers, which the parties agreed should be admitted in lieu of live testimony. This transcript can be found at ECF 208-1. All page numbers are to the transcript pages, not the page numbers auto-populated by the electronic case filing system.

[12] "Smerage Dep. __" refers to the transcript from the deposition of Brad Smerage, which the parties agreed should be admitted in lieu of live testimony. This transcript can be found at ECF 170-21. All page numbers are to the transcript pages, not the page numbers auto-populated by the electronic case filing system.

**ARE YOU TRYING TO CLAIM: THE MIXTURE CREDIT FOR LIQUID BIOMASS AND DIESEL, OR COMPRESSED LIQUIFED BIOGAS?**").)

ACR's response to the IRS Questionnaire made false and misleading statements regarding the company's operations. For example, although ACR's business model involved truck drivers "splashing" waste with diesel fuel at a gas pump for the sole purpose of trying to satisfy the requirements of 26 U.S.C. § 6426(e)(2), ACR's response to the IRS Questionnaire described the company as providing "custom-blended" products. (Ex. 204, p. 2.) Similarly, although neither ACR nor its so-called "customers" ever tested any substances that included diesel fuel, the response to the IRS questionnaire described the products as "fully-tested." (Id.) The response further stated that ACR's raw materials "are only picked up by ACR's partner trucking firm (Shinn Trucking of Knoxville, Iowa) whose personnel are trained to ensure the proper blending procedures are followed at an ACR approved blending station." (Id., p. 7.) This implies a level of sophistication that was simply not present. There was no "blending station," just a fuel pump. There was no "custom-blending," just the pointless addition of a "splash" of diesel fuel. There was no "full testing," just limited testing of the biowaste without the diesel fuel.

The response to the IRS Questionnaire also repeatedly referred to ACR as having "customers" even though Huyser and Carter knew that no one was paying ACR for the mixture. (Id., pp. 2–8.) Instead, ACR was making the payments. The response does not mention this. It also does not mention that ACR had no revenue source other than tax credits and no plan for becoming a viable business in the absence of the tax credits. No reasonable person reading the response to the IRS Questionnaire would have understood the true nature of ACR's business.

On August 19, 2011, the IRS published a Chief Counsel Advisory establishing that waste like ACR was transporting to anaerobic digesters was not eligible for the alternative fuel mixture credit. (Ex. 187, p. 2; IRS CCA 201133010 (Aug. 19, 2011).) Specifically, the Chief Counsel Advisory stated that waste "blended with at least 0.1% percent (by volume) of taxable fuel used in the anaerobic digestion process is not eligible for the alternative fuel mixture credit under § 6426(e), because the mixture is not consumed in the production of energy." (Id.) The Chief Counsel Advisory further stated that "[t]o qualify as an alternative fuel mixture as defined in § 6426(e)(2), the taxable fuel must become an integral part of the compressed/liquefied gas prior to being used as a fuel." (Id.) The Chief Counsel Advisory squarely applied to ACR's operations.

On August 26, 2011, Sanderson sent an email to Huyser and Carter to inform them of the Chief Counsel Advisory. (Ex. 187.) The tone of the email was defeatist, and he stated:

> I hate that this happened to you, but there was no way to see it coming. It appeared that everything was okay, given that you received your AM registration and your AM credit payments without issue. There was nothing indicating that you did would [sic.] not qualify until this new CCA was published August 19th. So, you have done nothing wrong as far as I can see, but we need to be prepared to defend your position in the event the IRS excise tax division starts disallowing AM claims.

(Id.)

Sanderson's email set off a flurry of communication between ACR's members and attorneys. For example, on August 31, 2011, Huyser traded emails with his local attorney, Lewis. (Ex. 1166.) Lewis encouraged Huyser to try to determine whether the Chief Counsel Advisory "is retroactive or prospective only." (Id.) "This would let us know whether tax credit payments already made are in jeopardy." (Id.) Huyser responded by telling Lewis that he "discussed in some detail with Greg Sanderson about the retroactivity of the IRS payments. His position is that his firm has appealed several of these rulings and never paid any retroactive fees." (Id.)

On September 7 and 8, 2011, Bill Smith, a tax attorney in Des Moines, sent emails to Huyser and Kinley raising major concerns about the Chief Counsel Advisory. (Ex. 1054.) Smith said it "is pretty clear that if for some reason we are not entitled to the credits that at a minimum, the LLC will owe 2X the credits received back to the IRS with interest (26 U.S.C. 6675)." (Id.) Smith went on to write the following:

> The other issue being raised is whether this project actually qualifies for the credits (despite the previous IRS approval of the Company) and if not, the risk of individual liability to the IRS. In general the LLC provides limited liability and assuming reasonable capitalization piercing the veil is a hard hard shot by the Government. Transferee liability (where forced into bankruptcy is an issue but not a simple one (under both of those theories the IRS would be limited to recovering distributions within a particular period of time (probably a year from the forced bankruptcy but you are out of my area.
>
> I did not research the issue of being qualified as it was my understanding the lawyer from Atlanta (and, in effect, the IRS) had determined it qualified. If you wish me to look into it I will but I fear it will not be before I get back. I can try to have someone else here research it but it is a complex subject and I am uncomfortable relying on someone else to do that. At this point I have not seen anything to reflect personal liability but the section states that recapture is similar to investment tax credit recapture and with a pass

> through entity that recapture normally takes place at the member level rather than the entity level. That said, I find it hard to believe that creates personal liability since the 'credit' is not taken on the 1040. I would think that there would have to be something better than that to create personal liability.

> I am assuming that the addition of the diesel fuel adds some (even if small) 'value' to the biodiesel fuel (and that it is used as required). I would be concerned if it added nothing of value to the product but in the alcohol fuel area that apparently occurs (to make it so it is not a food source) and I am not convinced that it would not qualify as the .1% requirement is out there and clearly a small number. I could not find where the .1% taxable fuel mix had been changed (but I did not spend a lot of time looking).

(Id.) In summary form, Smith raised four red flags: (i) the LLC might have to repay the tax credits times two; (ii) the LLC's owners might face individual liability for repayment under piercing the corporate veil or transferee liability theories; (iii) individual liability also might exist under recapture principles; and (iv) it would be problematic for the company and its owners if the addition of the diesel fuel was done solely to make the "mixture" eligible for the tax credits.

Sanderson, too, raised concerns in early September 2011 about liability for improper tax credits. In an email dated September 8, 2011, he stated, in relevant part:

> On another note, I received a call back from Annette Schirtzinger of the IRS Fuel Policy Group. She was one of the IRS officials involved in Chief Counsel Advice 201133010 regarding the AM credit for suppliers to anaerobic digesters. She said questionnaires went out to all AM registrants, and the IRS excise tax division plans to do assessments of all AM registrants. She said that you should hear something back from the IRS this fall. She gave me her number in case we have questions.

> It looks like we just have to wait and see how the IRS responds. If you continue to claim the AM credit payments, just be aware that the IRS may come back to you with a negative assessment. So you should plan accordingly (i.e., don't spend your credit payments until we get clarification).

(Ex. 1139, pp. 2–3.)

Despite receiving warnings from three different attorneys in late August and early September 2011 about LLC and/or individual liability—not to mention the fact that the Chief Counsel Advisory squarely applied to ACR's operations—Huyser and Carter caused ACR to increase the amount of tax credit claims in the fourth quarter of the year. (Ex. 1251; Tr. 37:24–38:3.) In fact, ACR filed more tax credit claims in the fourth quarter of 2011 than it had in the first three quarters combined. (Id.) Huyser also caused ACR to accelerate the distributions to himself and ACR's members, most of which went to Huyser and Carter themselves (consistent with their

majority interests). (Ex. 1252; Ex. 1253; Ex. 1257; Tr. 93:16–94:25.) Prior to August 26, 2011—the date Sanderson told Huyser and Carter about the Chief Counsel Advisory—ACR had distributed approximately $715,000 to each of Huyser and Carter (via JWC). (Ex. 1252; Ex. 1253.) Over the next eight months, ACR distributed approximately $3.7 million to Huyser and $3.6 million to Carter (via JWC). (Id.) This included well over $1 million in distributions to Huyser and Carter in the weeks immediately following the IRS's commencement of the audit in January 2012. (Id.; Ex. 1051, p. 86.) There is no legitimate justification in the record for these actions. The Court finds that they were undertaken in bad faith and solely out of a desire on Huyser's and Carter part to enrich themselves as much as possible through tax credits before the IRS disallowed them. To that end, it remained true in late 2011 and early 2012 (as it had at all other times) that ACR did nothing to try to become economically viable without the tax credits. Indeed, the company did not even have employees or physical office space. (Tr. 67:12–68:1.) Huyser or Carter did not care about any of this. From their standpoint, the point of the business, from start to finish, was to join the "footrace" to collect tax credits until the IRS "closed the loophole," just as Carter had declared in an email in early February 2011. (Ex. 112, p. 9 ("Let's play!!!").)

Granted, Sanderson testified in 2017 that he talked to someone with the IRS in August 2011 who encouraged ACR to continue claiming the tax credits even after the Chief Counsel Advisory. (Sanderson Depo. 118:3–119:12.) In Sanderson's words: "She said, Well, of course they should continue to claim the credit; . . . it's a valid credit. . . . We're going to audit everyone and then we'll make some audit determinations. But, right, they're – unless they're revoked, they could – should claim the credit." (Id.) Huyser and Carter rely heavily on this conversation to explain why they continued claiming tax credits in the fourth quarter of 2011.

In contemporaneous communications in 2011, Sanderson never gave unqualified advice to Huyser and Carter to keep claiming tax credits. Instead, at most, he warned them that "if" they continued claiming credits, they needed to be prepared for a dispute with the IRS. (Ex. 1139, pp. 2–3 ("If you continue to claim the AM credit payments, just be aware that the IRS may come back to you with a negative assessment. So you should plan accordingly (i.e., don't spend your credit payments until we get clarification).") Accordingly, the Court finds that Huyser and Carter did not reasonably rely on anything Sanderson said to justify their decision to continue claiming tax credits and making distributions in September 2011 and later. Any testimony to the contrary by Huyser and/or Carter is not credible.

In any event, there was other evidence of bad faith in late 2011 and early 2012 separate and apart from the decision to continue claiming credits and making distributions. Although Huyser and Carter claim to have considered the transactions with the digesters to be "sales" from the moment those transactions started in early 2011, the company never issued a single invoice for these so-called "sales" until the end of December 2011, when it suddenly issued invoices to nine wastewater treatment facilities in the total amount of $8,950. (Tr. 249:13–250:14; Tr. 576:18–580:6; Ex. 1107, pp. 3–11; Ex. 179, p. 30.) Even then, ACR did not charge sales tax on those invoices the way one would expect if the transactions were truly "sales." (Ex. 1107, pp. 3–11.) In total, ACR only collected $4,950 in revenue from "customers" despite having paid nearly $1.7 million to those entities to accept ACR's mixture. (Tr. 43:8–45:1; Ex. 179, p. 2.)

Moreover, ACR ended up receiving payments from only five "customers" (Tr. 43:8–45:1; Tr. 579:25–580:6; Ex. 180, pp. 5, 7–8) despite having reported the existence of at least fourteen "customers" in the response to the IRS Questionnaire in late July 2011 (Ex. 204, p. 8). The following table compares what ACR ended up invoicing and collecting in December 2011 against what it reported to the IRS in late July 2011:

| "Customers" Listed in ACR's Response to IRS Questionnaire (Ex. 204, p. 8.) | Did ACR Send an Invoice? (Ex. 1107, pp. 3–11.)[13] | | Amount Collected by ACR (Ex. 180, pp. 5, 7–8.) |
|---|---|---|---|
| 1. Des Moines WRA | Yes | | $950 |
| 2. Amana Farms | Yes | | $1,000 |
| 3. Marshalltown WWTP | | No | $0 |
| 4. Waterloo WWTP | | No | $0 |
| 5. West Lafayette WU | | No | $0 |
| 6. Johnson County WWTP | Yes | | $0 |
| 7. Beaver Dam WWTP | Yes | | $1,000 |
| 8. Sheboygan WWTP | Yes | | $0 |
| 9. Norswiss Farms | | No | $0 |
| 10. Five Star Dairy | | No | $0 |
| 11. Wild Rose Dairy | | No | $0 |
| 12. Bach Farms | | No | $0 |
| 13. Manitowoc WWTP | Yes | | $0 |
| 14. Denver WWTP | Yes | | $1,000 |
| **TOTAL** | **Yes: 7** | **No: 7** | **$3,950**[14] |

---

[13] ACR sent two invoices to "customers" who were not on the IRS questionnaire response: Hill Canyon Wastewater Treatment Plant (Ex. 1107, p. 6) and Janesville Wastewater Treatment (id., p. 9).

[14] ACR also collected $1,000 from Janesville Water Treatment (Ex. 180, p. 7), hence the total amount collected of $4,950.

As shown in the table, ACR only sent invoices to seven of the fourteen "customers" it reported to the IRS and only received payment from four of those customers. <u>Meaning</u>: more than seventy percent of ACR's so-called "customers" never paid the company anything.

ACR terminated operations when the alternative fuel mixture tax credits expired at the end of 2011. (Tr. 563:2–7.) Nonetheless, the company continued to receive tax credit payments in early 2012 based on transactions from 2011. (Ex. 1242.) The IRS began to audit ACR during the same period, starting with a letter dated January 17, 2012, that asked for extensive information about ACR's business. (Ex. 1051, pp. 86–93; Albers Dep. 62:7–63:8.) The audit included, among other things, a meeting between IRS agents and Huyser and Albers on March 6, 2012. (Albers Dep. 65:13–66:11, 74:1–5; Ex. 1051, p. 126.) Huyser described the IRS agents as being "aggressive[]" for at least part of the meeting. (Ex. 1051, p. 126.)

ACR continued making distributions to its members into April 2012 despite the ongoing audit. (Ex. 1252; Ex. 1253; Ex. 1254; Ex. 1255.) This included a series of large distributions totaling more than $1.7 million to Huyser (Ex. 1252) and $1.5 million to Carter (Ex. 1253) in the three weeks after the IRS's January 17, 2012, letter initiating the audit (Ex. 1051, p. 86). Huyser also made distributions to himself (Ex. 1252) and Carter (Ex. 1253) (as well as Boyle (Ex. 1254) and Kinley (Ex. 1255)) in early April 2012, less than one month after the meeting in which the IRS agents acted "aggressively." (Ex. 1051, p. 126). In addition, Huyser charged expenses to ACR for fuel, travel, and meals clear to the end of 2012 even though the company had no active business operations. (Ex. 180, pp. 5–10.) Huyser denied that these were personal expenses, instead testifying that he was "doing things for the corporation, for the LLC, because we still had to wind things up from our business." (Tr. 312:4–8.) This testimony was not credible. The Court finds that Huyser was charging personal expenses to ACR throughout 2012 for reasons having nothing to do with ACR's business.

Given the contrived nature of its business, ACR was insolvent throughout 2011 and 2012. (Ex. 1257; Tr. 87:8–10.) Huyser and Carter had reason to know this at all times, but especially after the Chief Counsel Advisory on August 19, 2011. The commencement of the audit in January 2012 reinforced Huyser's and Carter's awareness that there was a high likelihood of an adverse assessment, and thus that ACR was insolvent. The Court finds that Huyser made the large distributions to himself and ACR's other owners in early 2012 precisely because he knew there

was a high risk of an adverse assessment from the IRS. For the same reason, Carter accepted the large distributions without protest.

### H. Sanderson's Expert Testimony.

In addition to providing advice to Huyser and Carter on an *ad hoc* basis before and during ACR's operations, Sanderson served as an expert witness for ACR in the Court of Federal Claims litigation. The parties cross-designated portions of Sanderson's 2017 depositions from that case to serve as Sanderson's testimony here. For reasons explained in full below, the Court largely finds Sanderson non-credible as a witness, both as to facts and opinions. As to facts, there are too many material deviations between what Sanderson said in 2017 and what is shown in contemporaneous documents and records from 2010 and 2011. As to opinions, Sanderson's testimony is contrived and unpersuasive. His opinion testimony is also largely irrelevant. What matters for veil-piercing purposes is what he communicated to Huyser and Carter in 2010 and 2011, not the opinions he offered several years later as part of litigation.

Sanderson's professional career has involved positions in both accounting and law, as well as experience running a business, Power Management, that built and developed steam-based power plants. (Sanderson Dep. 9:16–14:12.) Power Management bought biogas and sold steam. (Id., 25:1–6.) It also received tax credits. (Id., 24:16–25.) Power Management would have made money even without the tax credits, but Sanderson testified that he was involved in "a number of projects" that would not have been profitable absent tax credits. (Id., 25:19–22.) He said there have been "about a hundred private letter rulings" from the IRS recognizing that companies could receive tax credits even if the projects would lose money without those credits. (Id., 25:19–27:14.) "And the reason for that is Congress intended to encourage noneconomic activity in order to . . . generate alternative – domestic alternative sources of renewable energy." (Id., 27:10–14.)

Sanderson said that in the event of uncertainty about whether a project qualifies for tax credits, a taxpayer may seek a private letter ruling from the IRS. (Id., 33:1–14.) The process "is not a fast one." (Id.) In lieu of a private letter ruling, he often has informal conversations with the IRS because this is "easier and quicker." (Id., 33:15–17.) Sanderson suggested that the registration process associated with the alternative fuel mixture credit serves as a form of "approval" from the IRS. (Id., 33:18–34:3.) Sanderson said the approval process is "pretty detailed" because the taxpayer files Form 637 with the IRS and meets with an excise tax agent to discuss operations.

(Id., 34:4–20.) Other than ACR, Sanderson has never had a client who received a registration designation but was later denied tax credits. (Id., 36:6–9.)

Sanderson described the alternative fuel mixture tax credit as being simple: "It's just, Okay, you get the fuel; you mix it and either sell it or use it as a fuel and trader business – any fuel, any fuel use, so simple." (Id., 51:4–7.) He said the use of biomass in an anaerobic digester is a "perfect example" of what Congress wanted to incentivize because the biowaste will undergo a chemical change in the digester in a way that generates heat (thermal energy) and methane (chemical energy). (Id., 61:4–62:10.) To support this testimony, he cited "the original legislation that started this: The Crude Oil Profit Tax of 1980." (Id., 62:11–63:4.)

To properly advise a client on whether it will qualify for the tax credits, Sanderson first "ha[s] to understand, you know, what they're doing" but reiterated that, in his view, the requirements are simple: "you've got to own all the ingredients and use it or sell it for energy." (Id., 65:4–16.) Sanderson typically would advise clients by email or telephone. (Id., 65:17–66:25.) In his entire career, he has only provided one formal opinion pursuant to IRS Circular 230. (Id.) He described this as an "arduous process" because "I had to have an expert issue a report that I could rely on in my opinion." (Id.) Later, but somewhat incongruently, he said he has "worked on hundreds of these. I've issued maybe a dozen opinion letters." (Id., 66:14–19.) He also admitted that, at most, he provided narrow legal advice to "three to five clients" regarding the alternative fuel mixture tax credits ACR was pursuing, and that this advice was primarily given during phone calls following referrals from one of his partners at his law firm. (Sanderson Dep. II[15] 37:3–39:5.) Whether formal or informal, Sanderson said he will not give an opinion to a client unless he is confident that he understands the client's process. (Sanderson Dep. 67:1–68:22.)

Sanderson said his understanding of the "standard operating practice" for a business like ACR is that the business acquires the waste from an ethanol plant, then will "pump it into a tanker tru[c]k, take it to the gas station, fill it with taxable diesel fuel to the proper ratio, and then deliver it to the ultimate fuel user." (Id., 73:17–74:6.) He said there "is at least one private letter ruling that describes that exact process." (Id.) (This is not an accurate characterization of the private letter ruling.) Sanderson testified that he believed the process proposed by Huyser and Carter was an

---

[15] "Sanderson Dep. II ___" refers to the transcript from Greg Sanderson's July 2017 deposition, which the parties agreed should be admitted in lieu of live testimony. This transcript is found at ECF 170-19. All page numbers are to the transcript pages, not the page numbers auto-populated by the electronic case filing system.

"obvious use" of waste as a fuel. (Id., 89:19–90:7.) Sanderson did, however, tell Huyser and Carter to have the liquid tested for "contents," including BTU value. (Id., 91:2–8.)

Sanderson testified that Huyser and Carter told him in Summer 2010 that they were consulting with "two professors," one of whom was identified as Dr. Daniel Zitomer, regarding the viability of biowaste as a source of energy. (Id., 103:15–104:18, 160:16–161:2.) Sanderson said this was done as part of "their desire to get this right." (Id., 160:17–22) Dr. Zitomer was not, however, retained as a consultant by Carter or anyone else affiliated with ACR in 2010 or at any other time. (Zitomer Dep.[16] 43:15–20.) Instead, at most, ACR had Dr. Zitomer perform narrow testing services in May 2011 to determine the potential for two substances—soybean hulls and oat hulls—to serve as sources of energy as part of a product ACR intended to call "BioBeast." (Id., 45:3–46:14, 57:1–58:19.) This was not the same "product" as the corn syrup that ACR began transporting from ethanol plants to wastewater facilities in January 2011. Dr. Zitomer never tested *that* product. Sanderson's testimony on this issue illustrates his problems as a witness. He either was not telling the truth during this portion of his testimony, or the truth was that Carter and Huyser were giving him inaccurate information in 2010 about their planning and operations. In this instance, the Court finds that it is the latter: Huyser and Carter were not interested in spending money to engage a scientist whose work at least potentially might cast doubt on the validity of what they had already decided to do, so they led Sanderson to believe they had already consulted with one or more scientists.

In any event, Sanderson said he consulted with a colleague of his, Dr. Robert Harris, about ACR's plans "because he's a colleague I worked for decades and worked with him on the black liquor. And he said the same thing: No problem." (Sanderson Dep. 90:13–91:1.) Sanderson equivocated on whether Huyser and Carter talked to Dr. Harris but is certain they did not hire him. (Id., 93:20–94:10.) They told him, however, that they were talking to other experts. (Id., 94:22–24.) Sanderson said he is "sure" that he asked Dr. Harris whether ACR's proposed use of corn syrup in a digester would qualify as "use as a fuel" and received a favorable response. (Id., 94:11–21.)

---

[16] "Zitomer Dep. ___" refers to the transcript from Daniel Zitomer's deposition, which the parties agreed should be admitted in lieu of live testimony. This transcript can be found at ECF 170-23. All page numbers are to the transcript pages, not the page numbers auto-populated by the electronic case filing system.

Sanderson knew that Huyser and Carter intended to pay the "customer" to take the waste product. In Sanderson's words: "It's referred to in the industry as a tipping fee, which is typical when you're selling a waste product to someone. It's – it's simply a matter of the bargaining power. When you – when you acquire a waste product, you have to dispose of it and if someone – if the buyer knows that, they can extract a fee for taking it." (Id., 96:13–20.) Sanderson said he had "worked on other ethanol projects and the IRS ruling position was that transfer of legal title from a buyer to a seller, where the buyer pays the seller a fee to take the product, is a legitimate sale for ethanol excise tax credits." (Id., 97:14–18.) Sanderson's use of the words "buyer" and "seller" in this testimony is difficult to understand because it has ACR's operations backwards. ACR was the putative "seller" in the transactions with the anerobic digesters, but the anaerobic digesters were not paying ACR anything. In addition, as explained in the Legal Analysis section below, Sanderson took IRS private letter rulings well out of context in this testimony.

In any event, Sanderson testified that it was "obvious" to him that "the fifty cents per gallon refundable credit was going to be the economic substance that drove their – their transaction." (Id., 97:22–98:2.) This testimony is not credible because it is inconsistent with, among other things, Sanderson's email dated January 24, 2011, when he said: "Currently, I do not have a full understanding of the economics. How do you make money from this business if you pay the digester company to take the liquid? … Does this business cash flow without the 50 cent per gallon credit?" (Ex. 1052, p. 117.) If Sanderson had to ask in late January 2011 about the economics of ACR's business, it must not have been "obvious" to him that the only economic substance for ACR was the tax credit. The contrast on this issue between Sanderson's testimony in 2017 and his email in January 2011 is another illustration of why Sanderson's testimony is often not credible. His primary goal was to spin his testimony to support ACR's position, not to tell the truth.

To that end, he testified that Huyser and Carter talked about other ways to potentially generate revenue, including "some sort of prospective venture for cleaning up the gas and using it as a … natural gas pipeline or for compressed gas for motor vehicles. I think they had bigger plans than just this, but I don't know if any of that ever materialized." (Sanderson Dep. 98:3–17.) The Court gives this testimony no weight because there is no persuasive contemporaneous evidence that ACR intended to expand or diversify business operations in the manner Sanderson described (or in any other way). Instead, at most, Huyser and Carter eventually considered *creating other entities* to pursue tax credits.

Sanderson testified that he provided "official advice" to Huyser and Carter before August or September 2010 that what ACR intended to do would qualify for the tax credits. (Id., 102:9–103:4.) In his words, "it qualifies, period." (Id., 102:18.) Again, this testimony is not credible because Sanderson said elsewhere that he would not offer definitive advice to a client until he understood the client's operations. As of January 4, 2011, Sanderson did not have "technical information on [ACR's] process you shared with the IRS" in his file. (Id., 231:3–12.) Similarly, as of January 24, 2011, Sanderson "d[id] not have a full understanding of the economics. How do you make money from this business if you pay the digester company to take the liquid?" (Ex. 1052, p. 117.) As late as May 2, 2011, Sanderson could only give a partial response to a question from Carter because, in Sanderson's words, "I do not have enough facts or understand your operations well enough to give you any more specific advice." (Ex. 1025, p. 62.) His willingness to testify that he gave "official advice" to Huyser and Carter several months before he had basic information about their operations is illustrative of his credibility problems.

Sanderson testified that he was unsure whether ACR intended to pay the ethanol plants for the biowaste in the first instance or if the plants intended to pay ACR. (Sanderson Dep. 113:7–114:12.) He "think[s] they were going to do both." (Id.) He knew ACR was going to pay for the requisite amount of diesel fuel at the gas station. (Id., 114:21–24.) He also knew ACR would be paying the digester to take the mixture at the final step. (Id., 114:25–115:3.) He testified, inaccurately, that he did not ask questions of Huyser and Carter regarding how ACR would generate revenue: "We didn't get into that . . . that wasn't my concern. I mean, that's not necessary to – who pays whom what, is not necessary to qualify for the credit. . . . Based on chief counsel's rulings and my own work as an attorney, that was a sale, regardless of who pays whom." (Id., 116:8–117:10.) Sanderson testified that he saw no risks for ACR in terms of eligibility for the tax credits because "it was straight forward." (Id., 117:23–118:2.)

Sanderson said it was "laughable" when the IRS later issued guidance to the effect that the mixture was not "used as a fuel" so he "called Langley, the author of the ruling . . . but he referred me to this lady at the excise tax division. And she told me – I recall the conversation because it was kind of surprising how straight forward she was. She said, Do they have – has their AM designation been revoked? I said, No. She said, Well, of course they should continue to claim the credit; they – it's a valid credit." (Id., 118:5–119:3.) Sanderson says he relayed this conversation to Huyser and Carter but also told them "that was a risk. That's when I saw a risk that you – you

might have a fight." (Id., 119:13–20.) For the most part, the Court finds these aspects of Sanderson's testimony to be non-credible. In contemporaneous written correspondence with Huyser and Carter in September 2011, Sanderson did not encourage ACR to continue claiming tax credits or suggest that the IRS official said that "of course" the company should do so. (Ex. 1139, pp. 2–3.) Instead, he simply reported that he spoke with the IRS official and was told that "questionnaires went out to all AM registrants, and the IRS excise tax division plans to do assessments of all AM registrants. She said that you should hear something back from the IRS this fall." (Id.) He also said: "If you continue to claim the AM credit payments, just be aware that the IRS may come back to you with a negative assessment. So you should plan accordingly (i.e., don't spend your credit payments until we get clarification)." (Id.) Because Sanderson's testimony in 2017 was inconsistent with contemporaneous correspondence from September 2011, the Court finds the 2017 testimony non-credible.

Some of Sanderson's testimony revolved around the economic substance doctrine, which, broadly speaking, establishes that a business or transaction is not eligible for tax benefits if it lacks a meaningful, non-tax business purpose. Sanderson testified that a Congressional committee issued a report saying the "economic substance doctrine," which had recently been codified into law, "was not intended to apply to incentive tax credits . . . and that's in line with case authority that, you know, Congress had created these tax credits as the profit motive for these transactions. And the government is prohibited from using the Economic Substance Doctrine to say that lack of pre-tax profit is a reason for disallowance. The credit is the profit motive." (Sanderson Dep. 126:19–127:14.) Sanderson said he explained this to Huyser and Carter. (Id.) He further testified, in his opinion, that ACR's transactions with the anaerobic digesters constituted "sales" because "it's a transfer for consideration. That's a sale. . . . I can cite you to the rulings where chief counsel said it was a sale and the UCC says it's a sale. It's a waste product. You have it in your tank. You have to dispose of it, whether somebody pays you to take it or you pay them to take it. It's a sale." (Id., 147:14–23.) In his opinion, it did not matter that ACR paid to obtain the waste in the first place and then paid again to get rid of it: "It doesn't make it any less of a sale. So if the – the question is, if it's not a sale, what is it? Is it the buyer agreeing to process your fuel? The buyer never takes title. It has to either be a sale or not." (Id., 148:5–16.) Sanderson insisted that ACR would qualify for the credit even if the transaction was *not* a sale because "[i]f the buyer's not buying the fuel, then the seller retains responsibility and title to it. And the seller is paying its agent to process it,

so it's – it's having its fuel processed in a trade or business. That's what the statute says: either/or." (Id., 148:17–23.) For reasons explained in full in the Legal Analysis section, below, the Court will give no weight to this testimony because it is contrived, misleading, and distorts relevant authority.

During his testimony, Sanderson downplayed—often to the point of rewriting history—the significance of the words of doubt or caution he expressed to Huyser and Carter in 2010 and 2011. For example, in January 2011, Sanderson wrote the following regarding whether ACR's contracts should say something about charging the anerobic digesters for the mixture: "I think it presents a better case if you charge the user of the mixture for the fuel value, and they charge you a disposal fee. Two private letter rulings indicate that the IRS may consider the transfer as a 'sale' even if you do not receive payment for the fuel." (Ex. 1052, p. 117.) In his testimony in 2017, however, Sanderson said something very different when asked about whether he advised ACR to charge the anaerobic digesters for the mixture: "I didn't think it mattered. However, from accounting point of view – reporting, it looks better if you're talking to a banker or someone – if you're trying to get financing, if you have some top line revenue. . . . I didn't recommend it. I said it wasn't a big deal either way, but if you can get some top line revenue, I would er[r] on that side." (Sanderson Dep. 224:4–225:1.) This testimony reiterates the problems with Sanderson's credibility. In context, in January 2011, he was clearly recommending to ACR that they charge something to the anaerobic digester to make the transaction look "better" to the IRS. And yet, in his testimony in 2017, he acted as if he made the recommendation for a totally different reason; namely, to make the business look "better" to a potential lender. In his words, it was "[a]ccounting advice," not legal advice. (Id., 241:7–15.) Sanderson's willingness, under oath, to try to rewrite history in this manner is yet another illustration of why the Court does not find him credible as a fact or expert witness.

Although Sanderson discussed "private letter rulings" repeatedly in his testimony, he implicitly admitted that there is no private letter ruling where a company paid to acquire waste from the originator and then paid again to get rid of it. (Id., 234:23–235:16.) He insisted, however, that this made no difference to whether ACR's transactions were "sales." In his words, "it should be treated the same way on both ends. I mean, they're two analogous transactions just going different directions, one coming in, one going out. The sale going out is a sale. The purchase going in should be a sale too." (Id.) This testimony, too, will be given no weight.

IV.    **LEGAL BACKGROUND: PIERCING THE CORPORATE VEIL UNDER IOWA LAW.**

*A.    General Principles.*

Under Iowa law, "[a] court may disregard a corporate structure by piercing the corporate veil only under circumstances 'where the corporation is a mere shell, serving no legitimate business purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice.'" *In re Marriage of Ballstaedt*, 606 N.W.2d 345, 349 (Iowa 2000) (quoting *C. Mac Chambers Co. v. Iowa Tae Kwon Do Acad., Inc.*, 412 N.W.2d 593, 597 (Iowa 1987)). "The burden is on the party seeking to pierce the corporate veil to show the exceptional circumstances required." *Id.* "An abuse of the corporate privilege may justify piercing the corporate veil as to persons who actively participate in the conduct of corporate affairs and have provided inadequate capitalization." *Briggs Transp. Co.*, 262 N.W.2d at 810. Personal liability also exists if an officer/owner of the entity is willfully blind to the inadequate capitalization and illegitimacy of the business operations. *Id.* at 811.

The Iowa Supreme Court has directed courts to consider six factors when deciding whether to pierce the corporate veil: (1) the sufficiency of the entity's capitalization; (2) whether the entity keeps separate books; (3) the extent to which the entity's finances are intermingled with individual finances; (4) whether the entity is used to promote fraud or illegality; (5) the extent to which corporate formalities are followed; and (6) whether the entity is a "mere sham." *See id.* at 810. In 2008, the Iowa Legislature amended the Iowa Uniform Limited Liability Company Act to establish that the "failure of a limited liability company to observe formalities relating to the exercise of its powers or management of its activities and affairs is not a ground for imposing liability on a member or manager for a debt, obligation, or other liability of the company." Iowa Code § 489.304(2). Although the Iowa Supreme Court has yet to say so definitively, this amendment appears to abrogate the "corporate formalities" factor of the common law test. *See Keith Smith Co. v. Bushman*, No. 15-0347, 2015 WL 8364910, at *11 (Iowa Ct. App. Dec. 9, 2015) (McDonald, J., concurring in part) ("Because the entity at issue is an LLC, it is largely immaterial whether FGP followed formalities."). Accordingly, the Court will not consider the corporate formalities factor.

As for the remaining five factors, the Iowa Supreme Court has provided only minimal guidance on how to weigh them in each case. As a leading commentator puts it, "it is difficult to make sense of the [Iowa] case law governing disregard of the corporate entity. *See* 5 Matthew Doré, *Iowa Practice Series: Business Organizations* § 15:4 (2023). Iowa is not alone in this regard.

"[M]any judicial opinions contain alluring but largely unhelpful rhetorical devices which purport to state a rule, but generally state merely a result." *Amfac Foods, Inc. v. Int'l Sys. & Controls Corp.*, 654 P.2d 1092, 1097 (Or. 1982).

Even so, this Court has interpreted Iowa Supreme Court precedent "as recognizing that veil-piercing is appropriate in two, non-mutually-exclusive scenarios." *Huyser*, 2024 WL 5054962, at *22. "The first is when there is such a unity of interest and identity between the owner and entity that the corporate form serves only to make it difficult for creditors to determine who owns what assets or allow the owner to avoid what otherwise would be—and, in all fairness, *should* be—personal liabilities." *Id.* (citing *HOK Sport, Inc. v. FC Des Moines, L.C.*, 495 F.3d 927, 941 (8th Cir. 2007)). The second is "when an entity was formed without sufficient capital to meet its liabilities and/or is solely or predominantly engaged in fraudulent activity." *Id.*; *see also C. Mac Chambers Co.*, 412 N.W.2d at 598 ("[S]hareholders will not escape personal liability by setting up a corporation which does not have sufficient assets available to meet its debts."); *Briggs Transp. Co.*, 262 N.W.2d at 810. The second scenario is the relevant one here.

### B. Whether the Governing Standard Is Objective or Subjective.

The Iowa Supreme Court has never directly said whether the governing standard in veil-piercing cases is objective, subjective, or mixed. For example, when evaluating whether an entity is a "mere sham" or "used to promote fraud or illegality," should the analysis be performed from the perspective of a reasonable person? Or is the only thing that matters the subjective views of the entity's owner(s)? The answer is relevant here because, as explained below, ACR's business model was absurd from the standpoint of an objectively reasonable observer, and yet Huyser and Carter insist that they *subjectively* believed that what they were doing was legitimate.

After carefully reviewing Iowa Supreme Court precedent and other relevant authority, the Court concludes that veil-piercing under Iowa has both subjective and objective elements. The first factor, adequacy of capitalization, is largely objective because whether a company has sufficient assets to satisfy its debts is a matter of pure mathematics. When, as here, the math depends on uncertain future events like whether the United States will make assessments against ACR for return of the tax credit payments, the relevant question is whether a reasonable person with the same information as the defendant would view the company as having sufficient resources to satisfy its potential obligations. *See, e.g.*, *Briggs Transp. Co.*, 262 N.W.2d at 811 (holding that

officer-shareholder "had a responsibility to know [the entity] was without initial capital and that corporate books were nonexistent").

The second and third factors, whether the entity keeps separate books and intermingles finances, are partly objective and partly subjective. Objectively, the evidence will show that the entity either does or doesn't keep separate books and/or intermingle finances. Little to no interpretation is required. The more important question, however—at least in the case of entities that intermingle finances and do not keep separate books—is *why*. If it is because the owners are trying to keep assets away from creditors or otherwise manipulate the corporate form, then veil-piercing is more likely to be appropriate. If it is because the owners are simply irresponsible, veil-piercing is less likely to be appropriate, particularly if the irresponsible bookkeeping does not cause harm to creditors. *See N.L.R.B. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1055 (10th Cir. 1993) (refusing to pierce corporate veil where there was no causal relationship between owner's careless handling of corporate books and losses suffered by third parties). Either way, some level of subjective analysis is necessary.

The fourth and sixth factors—whether the entity exists to promote fraud or illegality and whether it is a "mere sham"—are mostly subjective. Typically, when "fraud" is used under Iowa law, the governing standard is subjective. For example, common law fraud claims require proof of knowledge (i.e., scienter) and intent to deceive, which can be established through proof of "actual knowledge" or "reckless disregard" for the truth. *Dier v. Peters*, 815 N.W.2d 1, 8–9 (Iowa 2012) (quoting *Rosen v. Bd. of Med. Exam'rs*, 539 N.W.2d 345, 350 (Iowa 1995)). Either way, the inquiry is subjective. The same subjective standard should apply when analyzing whether an entity has been used to "promote fraud or illegality" and/or is a "mere sham" for veil-piercing purposes.

Granted, as used in the veil-piercing context, the word "fraud" does not necessarily have the same meaning as in the context of common-law fraud claims. *Cf. In re Sims*, 994 F.2d 210, 218 n.11 (5th Cir. 1993) ("Delaware requires 'fraud or something like it' [to pierce the corporate veil]" (quoting Presser, *Piercing the Corporate Veil*, § 2.08 at 2–53 (1992)).) Indeed, under Iowa law, fraud is not a necessary element of a veil-piercing claim at all. *See HOK Sport, Inc.*, 495 F.3d at 936 ("[F]raud is a sufficient, but not necessary, condition for piercing the corporate veil."). Even so, when fraud is used as a basis for a veil-piercing claim, treating the inquiry as a subjective one helps strike the balance between (a) piercing the veil in exceptional circumstances where the

corporate form is abused to cheat creditors or other third parties, but (b) not when an entity that is otherwise operated in good faith ends up lacking the resources to satisfy creditor claims.

## V.    LEGAL ANALYSIS: PIERCING THE CORPORATE VEIL CLAIMS.

Iowa Supreme Court precedent establishes that courts must separately evaluate the veil-piercing liability of each defendant. Nonetheless, for the sake of efficiency, the Court will discuss the evidence against each of Huyser and Carter together in light of the considerable overlap in facts relevant to each of them. For reasons explained below, the Court concludes that the Government has met its burden of proving "exceptional circumstances" as to each of Huyser and Carter. The Court therefore will pierce the corporate veil against Huyser in Count I and against Carter in Count IV. Both men are personally liable for ACR's obligations to the United States.

### A.    Both Huyser and Carter Had Sufficient Control Over ACR to Warrant Piercing the Corporate Veil.

Although the Iowa Supreme Court has not included control in the list of factors courts should consider in veil-piercing cases, it is clear from Iowa Supreme Court precedent that control is a relevant part of the analysis. *See* Matthew G. Doré, *Lifting the Veil on Iowa Piercing Jurisprudence and Suggestions for Reform*, 67 Drake L. Rev. 619, 633–35 (2019) (explaining the significance of control to the veil-piercing analysis under Iowa law). This makes sense analytically: it is less appropriate to pierce the corporate veil against a person who had little or no control over the entity's actions.

Here, each of Huyser and Carter had meaningful control over ACR. Huyser held the majority of ACR's voting shares and had primary authority over the company's bank accounts. This meant, among other things, that he determined when ACR would make distributions and in what amounts. Carter had less formal control over the entity and little day-to-day involvement in operations after early 2011. However, he was heavily involved in developing the company's contrived business plan. Moreover, although his shares were non-voting, he was a co-founder of the business and clearly had the ability to influence Huyser's decision-making on key issues. Thus, both he and Huyser had sufficient control over ACR's operations to justify piercing the corporate veil if the relevant factors so warrant.

B. *On the Whole, the Five Factors Weigh in Favor of Piercing the Corporate Veil as to Both Huyser and Carter.*

1. Adequacy of Capitalization.

When evaluating the first factor, adequacy of capitalization, many courts applying Iowa law focus on the time of the entity's inception. *See Algreen v. Gardner*, No. 17-0104, 2018 WL 3057438, at *5 (Iowa Ct. App. June 20, 2018) ("The relevant inquiry is the capital structure of the entity at or near the time of incorporation."); *Torstenson v. Birchwood Estate, L.L.C.*, No. 16-0118, 2017 WL 1086222, at *9 (Iowa Ct. App. Mar. 22, 2017) ("The fact that the Torstensons at some point in time discontinued providing capital . . . is not significant to the issue of whether TL was initially adequately capitalized."). Here, ACR's capitalization in the early stages of its existence was insufficient to cover its obligations. At its peak level, ACR had only $4,000 in capital, yet the company incurred over two hundred thousand dollars in expenses during the first two months of operations before receiving any tax credit money. With such a low level of capital and no loans or lines of credit, the company was not merely undercapitalized; it had literally no ability to satisfy its debts. *See HOK Sport, Inc.*, 495 F.3d at 941 (concluding that entity was undercapitalized when it incurred tens of thousands of dollars in debts but had no capital). In the words of the Government's financial expert, Frank McGuire, ACR "is easily the most thinly capitalized entity I've ever seen." (Tr. 60:16–17.)

At trial, Huyser and Carter testified that they were willing to tap into personal resources to pay ACR's obligations, if necessary. (Tr. 440:22–24.) Even if true, this is beside the point. ACR's creditors had no way to force Huyser and Carter to use their personal assets to pay the entity's debts, nor did ACR have any other assets that could have been used to satisfy those debts. *See Bushman*, 2015 WL 8364910, at *9 (affirming district court's decision to pierce the corporate veil where "the financial life of [the entity] was entirely dependent upon the goodwill of the related . . . entities"). The capitalization factor therefore weighs in favor of piercing the corporate veil. *See Briggs Transp. Co.*, 262 N.W.2d at 810 ("The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts." (quoting Henry W. Ballantine, *Ballantine on Corporations*, § 129, at 302–03 (rev. ed. 1946)).

The fact that tax credits were ACR's only meaningful source of revenue makes the undercapitalization problem particularly acute. Huyser and Carter knew at all relevant times that there were serious questions about ACR's eligibility. Indeed, they peppered Sanderson with

questions about the "sale" requirement and other issues in the weeks immediately preceding the commencement of ACR's operations, including: (a) <u>December 27, 2010</u>: "Does ACR need to 'sell' this alternative fuel mixture to DM waste water in order to qualify? (Ex. 1025, p. 42); (b) <u>January 3, 2011</u>: "Would you have 10 [minutes] tomorrow afternoon to visit with us on the definition of 'Sold' by taxpayer use as fuel? What is the proper way to structure the contract with Waste Water digester folks?" (id., p. 46); (c) <u>January 21, 2011</u>: "We are basing [the] 'sale' and its consideration on the service provided by the WRA in disposing of the 'non-combustible' materials. . . . **<u>We want to get it right, so for one last time, do our documents fit the requirements of the IRS to claim the tax credit?</u>**" (id., p. 54). Similarly, in the weeks after ACR started operations, Carter remained uncertain about ACR's eligibility for the tax credits, describing that period as a "pucker moment" where he wondered, "is this going to work?" (Tr. 440:20–24.) Huyser and Carter knew at the time of these discussions that ACR might be subject to penalties of twice the amount of the excessive tax claims if the IRS determined the company did not qualify for the credits. (Ex. 1025, pp. 36–37.) In the face of these potential penalties and deep-seated uncertainty about whether ACR was eligible to receive money from the only revenue source it ever had, it was reckless for Huyser and Carter to allow ACR to be so undercapitalized. *See, e.g., HOK Sport, Inc.*, 495 F.3d at 941 (affirming veil-piercing verdict where entity's only source of funds was contingent on uncertain future events).

To the extent it is relevant under Iowa law, ACR remained undercapitalized in later months in 2011, notwithstanding the fact that the company began receiving tax credit payments and had sufficient cash on hand to satisfy day-to-day obligations. When ACR learned about the Chief Counsel Advisory in August 2011, for example, it should have reignited the doubts Huyser and Carter felt earlier in the year about ACR's eligibility for the credits. Indeed, the Chief Counsel Advisory essentially said, point-blank, that businesses like ACR did not qualify. This meant that ACR faced substantial risk of an IRS assessment in the amount of the tax credits plus a penalty of twice the amount of those credits. ACR had no ability to satisfy such obligations, yet Huyser and Carter did nothing to increase the company's capital level or retain cash. To the contrary, Huyser caused the company to distribute money to its owners at an even faster rate than it had before. This caused ACR to have "illusory or trifling" capitalization when "compared with the business to be done and the risks of loss." *Briggs Transp. Co.*, 262 N.W.2d at 810 (quoting Ballantine, *Corporations*, § 129).

2. <u>Separate Books</u>.

ACR maintained its own books throughout its existence. Indeed, this was a necessary part of the company obtaining tax credits, which was the sole reason for its existence. Accordingly, the second factor weighs against piercing the corporate veil. *See Midwest Fuels, Inc. v. JP & K, Inc.*, No. 03-0218, 2004 WL 358291, at *2 (Iowa Ct. App. Feb. 27, 2004) (affirming dismissal of veil-piercing claim where, *inter alia*, company maintained separate books).

3. <u>Intermingling of Finances.</u>

The evidence on the third factor is mixed but weighs slightly in favor of piercing the corporate veil as to both Huyser and Carter. On one hand, ACR had its own accounts that it used to pay almost all its obligations. This is consistent with a legitimate business. *See id.* (recognizing that existence of separate corporate bank account weighed against piercing the corporate veil).

On the other hand, Huyser and Carter sometimes engaged in transactions that showed disregard for the corporate form. For example, they made payments on ACR's behalf early in 2011 when the company lacked the resources to do itself. (Tr. 431:16–432:21.) In addition, an entity controlled by Carter paid Sanderson for his legal advice to ACR. (Tr. 462:14–16.) There were also three occasions in September 2011 when Huyser transferred money out of ACR's accounts for no legitimate business reason: once in the amount of $225,000 to his family's inactive coal mining business (Ex. 71, p. 183; Tr. 307:23–308:16) and twice in the amount of $100,000 to one or more accounts he controlled at Edward Jones (Ex. 70, p. 39; Tr. 308:17–310:15). Finally, Huyser used ACR money to pay personal expenses in 2012 after ACR stopped operations. (Tr. 310:21–312:15; Ex. 180, p. 2.) This is the type of "commingling" that weighs in favor of piercing the corporate veil. *See, e.g.*, *C. Mac Chambers Co.*, 412 N.W.2d at 598 (holding that veil-piercing was proper where, *inter alia*, corporate funds were used to pay individual obligations); *HOK Sport, Inc.*, 495 F.3d at 941–42 (affirming veil-piercing verdict where principal "shifted money among the entities at will" and related entities would loan money to each other).

Huyser's explanations for these transactions at trial did more to help the Government's case than his defense. For example, he said he made the large transfers to the Edward Jones and coal mining company accounts in September 2011 because ACR's account balances exceeded the cap for what the Federal Deposit Insurance Corporation ("FDIC") would insure. (Tr. 309:14–20; Tr. 310:10–13.) In his words, he "wanted to put it in another bank to have FDIC coverage." (Tr. 309:20.) There are two problems with this explanation. <u>First</u>, because the money belonged to ACR,

his willingness to move it to non-ACR accounts—for whatever reason—demonstrates that he did not respect the corporate form. *See C. Mac Chambers Co.*, 412 N.W.2d at 598. <u>Second</u>, when he says he moved the money "to have FDIC coverage," what he means is that he wanted to trick the FDIC into believing the cash belonged to the holders of the other accounts, not ACR. This is not a compelling defense to a veil-piercing claim.

Huyser's testimony was similarly unhelpful as to the payments he made from ACR's accounts for fuel, meals, and other personal expenses in 2012. (Ex. 180, p. 2; Tr. 310:21–312:15.) ACR had no operations that year, yet Huyser claimed he incurred $6,000 in fuel expenses "to wind things up from our business." (Tr. 312:5–6.) There is no way Huyser incurred $6,000 in fuel expenses for ACR in 2012. The business had no properties to visit, no vehicles or equipment that needed attention, and no customer relationships that needed to be managed. There was nothing happening after the first quarter of the year. Thus, Huyser was clearly paying for personal expenses from ACR's account. Although the dollar amount is not high in the overall scheme of things, these transactions reinforce Huyser's cavalier attitude toward the corporate form.

The only saving grace for Huyser and Carter on this factor is that the commingling of funds between ACR and other entities did not appear to have any material impact on third party creditors. As a result, the Court gives limited weight to this factor. *See Greater Kansas City Roofing*, 2 F.3d at 1054 (recognizing that owner's careless handling of corporate books did not contribute to losses suffered by third parties). Still, that limited weight is in favor of piercing the corporate veil as to both Huyser and Carter, the former more than the latter. *See C. Mac Chambers Co.*, 412 N.W.2d at 598; *HOK Sport, Inc.*, 495 F.3d at 941–42.

4. <u>Whether the Entity Is Used to Promote Fraud or Illegality and/or is a "Mere Sham."</u>

The fourth and sixth factors—whether the entity is used to promote fraud or illegality and/or is a "mere sham"—are the most significant to the veil-piercing analysis in the circumstances presented here and will be considered together. They are also the most analytically complicated because of the interplay between: (a) the unreasonableness of ACR's business model; (b) the fraud and fraud-like elements of Huyser's and Carter's conduct; (c) the support Huyser and Carter received for their conduct from outside advisors like Sanderson; and (d) the decisions Huyser and Carter made after it became clear the IRS had serious concerns about ACR's eligibility for tax credits. The Court will address these issues in order.

As a threshold matter, there is considerable overlap between the fourth and sixth veil-piercing factors under Iowa law and the tax law doctrine known as the "economic substance doctrine," which "require[s] disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality." *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1352 (Fed. Cir. 2006). The economic substance doctrine is "sometimes called the 'sham' transaction doctrine," and it applies when a taxpayer tries to "disguise . . . economic reality" to obtain tax benefits. *Summa Holdings, Inc. v. Comm'r*, 848 F.3d 779, 785 (6th Cir. 2017). Just as the veil-piercing doctrine is designed to protect against abuse of the corporate form, the economic substance doctrine is designed to protect against "abuse of the tax system." *Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1325–26 (Fed. Cir. 2011). Accordingly, when, as here, the evidence shows that an entity has been created and operated solely to obtain tax benefits, economic substance doctrine cases are helpful in evaluating whether the entity "is a mere shell, serving no legitimate business purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." *Briggs Transp. Co.*, 262 N.W.2d at 810. The Court therefore will rely on economic substance doctrine cases, among others.

### a. Unreasonableness of the Business Model.

ACR's business model was unreasonable from the start. Neither Huyser nor Carter had any interest in starting a renewable fuel business for any purpose other than pursuing tax credits, nor did either of them take meaningful steps to make the business viable in the absence of tax credits. They did not, for example, use tax credit money to explore alternative revenue streams or acquire assets that could be used to bolster the company's balance sheet. Instead, once the tax credit checks started rolling in, Huyser paid creditors and then distributed large amounts of money to himself, Carter, Boyle, and Kinley. For veil-piercing purposes, the complete absence of any larger business strategy makes the company look like the kind of "sham" that veil-piercing is designed to address. *See Ne. Iowa Ethanol L.L.C. v. Drizin*, No. C03-2021, 2006 WL 290517, at *9 (N.D. Iowa Feb. 7, 2006) (piercing the corporate veil of entity that "engaged in no legitimate business transactions whatsoever"), *aff'd sub nom. Ne. Iowa Ethanol, L.L.C. v. Glob. Syndicate Int'l, Inc.*, 247 F. App'x 849 (8th Cir. 2007).

 The contrived nature of ACR's "operations" reinforces the illegitimacy of the business. As described above, ACR's business model had three steps: <u>Step One</u>, pay ethanol plants and other suppliers for biowaste; <u>Step Two</u>, hire a trucking company to take the biowaste, "splash" it with

diesel fuel at a pump to turn it into a "mixture," and deliver it to anaerobic digesters or other third parties; and Step Three, pay the anaerobic digesters or third parties to accept the mixture, but with ACR characterizing the transaction a "sale." This business plan makes no sense. ACR paid the ethanol plants at Step One, paid the trucking company and diesel fuel supplier at Step Two, and paid the anaerobic digester at Step Three. No legitimate, for-profit business would design a three-step business plan in which the company makes significant payments at each step and receives nothing in return. *See Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1379–80 (Fed. Cir. 2010) (holding that company engaged in illegitimate conduct when it formed "unnecessary corporate entities" to make investments that reasonable investors would have avoided); *In re CM Holdings, Inc.*, 301 F.3d 96, 107 (3d Cir. 2002) (holding that company engaged in sham transactions when it engaged in irrational conduct like opting for high-interest loans).

Granted, tax credits are sometimes designed to subsidize businesses that would not otherwise be profitable. This can spur innovation. Here, however, ACR's business model was so far outside the boundaries of rational that no reasonable person could have considered it to be legitimate. It had literally no business purpose except to pursue tax credits. *See Stobie Creek Invs.*, 608 F.3d at 1379–80 (recognizing that tax motivations cannot justify otherwise-unreasonable transactions). It is no wonder that advisors like Sanderson and Lewis expressed confusion about the company's plan. In an email dated January 24, 2011, for example, Sanderson asked, "I do not have a full understanding of the economics. How do you make money from this business if you pay the digester company to take the liquid? … Does this business cash flow without the 50 cent per gallon credit?" (Ex. 1052, p. 117.) Similarly, in a letter one week later, Lewis encouraged Huyser to "give consideration to finding a way to create more cash flow and business activity in ACR." (Ex. 1165.) Lewis said this would help address potential "concerns" about whether the mixture "was actually sold in a commercial sense" and "whether ACR is a bona fide business operating to make a profit." (Id.) These comments should have raised red flags for Huyser and Carter that something was fundamentally wrong with what they were doing.

Speaking of "fundamentally wrong," Huyser and Carter had reason to know from the outset that ACR's business did not match Internal Revenue Code requirements for the tax credits. The core "innovation" in ACR's business was the use of biowaste in anaerobic digesters to create energy. This is a fine idea as far as it goes, and the evidence showed that the biowaste ACR delivered to anaerobic digesters indeed served a role in the production of energy. Still, any

reasonable observer would have understood that the business did not qualify for the tax credits given that there was no reason for taxable "fuel" to be involved and there was no "sale" as required by 26 U.S.C. § 6426(e).

Rather than accept this reality, Huyser and Carter manipulated the business model to try to force-fit it into the requirements of section 6426(e). The manipulation started at Step One when ACR paid ethanol plants for corn syrup that ACR could have received for free. Carter admitted that ACR did so because he thought this was necessary to take legal title to the corn syrup, which, to his understanding, was a requirement to claim the tax credits. Setting aside whether this is correct, the mere fact that ACR acted in a financially irrational way by paying for something that had no (or negative) value shows the sham nature of its business. *See, e.g.*, *Stobie Creek Invs.*, 608 F.3d at 1379–80; *In re CM Holdings, Inc.*, 301 F.3d at 107.

The irrationality continued at Step Two when Huyser and Carter had the truck drivers add the "splash" of diesel fuel. This cost ACR money despite adding nothing to the efficacy of the biowaste as a source of energy. In fact, it made the biowaste *less valuable* to end users because of the potential for diesel fuel to damage anaerobic digesters. This is presumably why ACR did not mention diesel fuel in contracts with wastewater facilities or otherwise inform those facilities that the biowaste would contain diesel fuel.[17] To that end, Dale Doerr, the former wastewater superintendent from Sheboygan Wastewater Treatment Plant, was surprised to learn the biowaste contained diesel fuel and "put a stop to it right away." Larry Hare and Royce Hammitt, both of whom worked as supervisors for the WRA, similarly testified that they did not know about or want diesel fuel in the biowaste that was placed into their anaerobic digesters. A business that adds not one, but two, expensive and counterproductive steps to its business plan for the sole purpose of trying to become eligible for tax credits is the paradigm of a "sham" or "illegitimate" business. *See Stobie Creek Invs.*, 608 F.3d at 1379–80; *In re CM Holdings, Inc.*, 301 F.3d at 107.

The illegitimacy culminated at Step Three when Huyser and Carter insisted on characterizing the transactions as "sales" even though ACR did not get paid. As noted above, it makes no sense for a business to pay for a product, pay to ship the product, pay to add something to the product, and then pay to get rid of the product…and yet call the final transaction a "sale."

---

[17] As noted above, Boyle testified that he told the facilities with whom he had contact about the addition of the diesel fuel. Even if this testimony is accepted as true, Boyle did not have contact with all facilities with whom ACR did business.

### b. Elements of Fraud in ACR's Business.

In addition to the irrationality of the business model, the record shows that Huyser and Carter caused ACR to make misleading statements to, and withhold material information from, the IRS and others. The business therefore had fraud and fraud-like elements.

The misleading statements started with the registration application (i.e., the Form 637) ACR filed with the IRS in May 2010. The application stated that ACR intended to "take possession" of corn oil or corn syrup from ethanol companies, "blend" it with diesel fuel and "sell" it to "customers." (Ex. 317, p. 2.)  The words "take possession" are misleading because they fail to convey that ACR would be *paying* for the corn syrup, which is an important detail in understanding the irrationality of ACR's business plan. Had ACR been more candid, the IRS may have realized from the outset that ACR had no "legitimate, non-tax business purpose" for what it was doing, but rather planned to follow an irrational business model for the sole purpose of pursuing tax credits. *Bank of N.Y. Mellon Corp. v. Comm'r*, 801 F.3d 104, 119 (2d Cir. 2015). The word "blend" is likewise misleading because it implies a scientific or technical process, when in reality truck drivers were merely "splashing" diesel fuel onto biowaste for no scientific or technical reason. Finally, the words "sale" and "customers" were misleading in a situation where ACR never expected to receive meaningful revenue from the end users of the mixture.

Huyser's meeting with IRS Agent Kresic on July 13, 2010, involved many of the same misleading statements. Notably, the day before the meeting, Carter emailed Sanderson to ask for advice on Huyser's behalf "on what to say or not to say regarding blenders credit." (Ex. 1051, p. 11.) The fact that Carter sought this advice shows that ACR's goal was not to be forthright with Kresic, but rather to be strategic. In that regard, the presentation Huyser provided to Kresic referred to the Ben Shinn Trucking Terminal as a "Blending Site" and "Blending Facility." (Ex. N, pp. 22–23.)  This is misleading in a situation where the business involved truckers putting a "splash" of diesel fuel onto the mixture at a gas pump. The presentation also repeatedly referred to "sales" and "customers," which, again, are misleading words.

Speaking of "customers," ACR's contracts with wastewater facilities were misleading because they did not mention that ACR would be adding diesel fuel to the biowaste before delivering it, nor did ACR deliver the true "mixture" (including the diesel) to those facilities for testing purposes. These are material omissions in a situation where the record shows that wastewater facilities did not want diesel fuel in the anaerobic digesters. (Hare Dep. 27:9–20, 87:3–

24; Hammitt Dep. 77:5–11, 99:13–22; Doerr Dep. 95:10–96:22.) Moreover, some of the contracts opaquely said the mixture would be "sold/transferred" or that ACR would "transfer, sell and deliver" it. (E.g., Ex. 330, p. 1.) None of the wastewater facility employees who testified in the case believed they were "buying" anything from ACR. (Hare Dep. 16:12–24; Hammitt Dep. 81:1–4; Doerr Dep. 65:4–66:20.) In fact, one so-called "customer," Sheboygan Wastewater, was legally prohibited from paying for materials discharged at the plant. (Doerr Dep. 154:8–15.) The contract language therefore hid material information from the entities with whom ACR did business.

Huyser and Carter caused ACR to make more misleading statements to the IRS after receiving the IRS Questionnaire in July 2011. ACR's response described the company as providing "custom-blended" and "fully-tested" products. This is false. There was no "custom blending," just the pointless splashing of diesel fuel. Nor was there any "full testing." Instead, ACR deliberately caused the wastewater facilities to test the biowaste without the diesel fuel. ACR's response also reiterated the misleading statements about ACR having "customers" and "sales" even though Huyser and Carter knew that no one was paying ACR for the mixture.

Huyser's and Carter's repeated use of false and misleading material statements—especially to the IRS—weighs strongly in favor of piercing the corporate veil. It means that ACR's business was not just a "sham" in the sense of using an irrational business model for the sole purpose of pursuing tax credits, but also that it was used to "perpetuate fraud." *See Briggs Transp. Co.*, 262 N.W.2d at 811 ("There was little evidence Starr Sales was ever intended to be or operated as a valid corporation. It was a sham, and under the above criteria cannot shield the officers and directors from liability arising out of their conduct."); *Ne. Iowa Ethanol L.L.C.*, 2006 WL 290517, at *9 (piercing the corporate veil against entity that "engaged in no legitimate business transactions whatsoever" and existed solely to "perpetuate fraud").

### c.  Input from Advisors Like Sanderson, Lewis, and Smith.

Notwithstanding the preceding analysis, the record shows that Huyser and Carter received at least some level of support for their conduct from attorneys Greg Sanderson and (to a lesser degree) R. Jeffrey Lewis. Huyser and Carter argue that they relied in good faith on the advice from these attorneys and thus should not be liable for ACR's debts even if the advice turned out to be erroneous.

As a threshold matter, it is important to acknowledge Sanderson's dual role in the case. He provided legal advice to Huyser and Carter in 2010 and 2011 and therefore is part of the factual

narrative. This is important to the veil-piercing claim. Later, in 2017, he served as an expert witness. His work in the latter role is largely irrelevant because what matters for veil-piercing purposes is not the opinions he offered as an expert witness in 2017, but rather the advice he provided in 2010 and 2011. Nonetheless, in the interest of completeness, the Court will evaluate Sanderson's expert legal opinion testimony in its own right.

        i.   Sanderson's Legal Opinion Testimony in 2017 Was Wholly Unpersuasive.

The core of Sanderson's opinion testimony was that ACR qualified for the alternative fuel mixture tax credit because (a) the biowaste from ethanol plants was an "alternative fuel" that was (b) used by ACR in producing an "alternative fuel mixture" that (c) ACR "sold" in its business. *See* 26 U.S.C. § 6426(e)(1) (reciting the requirements for eligibility for the tax credits). His opinion testimony suffered from three fatal flaws that rendered it wholly unpersuasive.

First, and most fundamentally, Sanderson either distorted or misunderstood (or both) the economic substance doctrine, which "require[s] disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality." *Coltec Indus., Inc.*, 454 F.3d at 1352. Under this doctrine, courts ask "whether the taxpayer has a legitimate, non-tax business purpose for entering into the transaction … [or] 'whether the taxpayer's "sole motivation" for entering a transaction was to realize tax benefits.'" *Bank of N.Y. Mellon Corp.*, 801 F.3d at 119 (quoting *Altria Grp., Inc. v. United States*, 694 F. Supp. 2d 259, 281 (S.D.N.Y. 2010)). Here, every aspect of ACR's business was geared toward the tax credits, including irrational decisions at Step One (paying for biowaste that it could have received at no cost), Step Two (paying for a splash of diesel fuel that served no scientific purpose and was disfavored by end users), and Step Three (calling the transactions with end users "sales" even though ACR essentially never got paid). Moreover, ACR commenced operations the day the tax credits went into effect, ended operations the day the tax credits ended, and had no meaningful revenue other than tax credits. It is hard to imagine a clearer example of a business that lacked a legitimate, non-tax purpose. *See Winn-Dixie Stores, Inc. v. Comm'r*, 254 F.3d 1313, 1316 (11th Cir. 2001) ("The [economic substance] doctrine has few bright lines, but '[i]t is clear that transactions whose sole function is to produce tax deductions are substantive shams.'" (quoting *Kirchman v. Comm'r*, 862 F.2d 1486, 1492 (11th Cir. 1989)).

Rather than acknowledge this problem head-on, Sanderson tried to distort the issue by arguing that it is acceptable for tax credits to serve as the profit motive for a business. The premise

of this argument is arguably correct in the sense that an otherwise-legitimate business does not necessarily have to prove that it would have made a profit but for tax credits. *See Sacks v. Comm'r*, 69 F.3d 982, 992 (9th Cir. 1995) (recognizing that Congress may intend for tax credits to incentivize otherwise-unprofitable activity). Here, however, ACR was not otherwise legitimate. To the contrary, the evidence showed that Huyser and Carter formed the business for the sole purpose of pursuing tax credits and designed an irrational business model to help achieve that goal. A business that would not exist but for tax credits and that structures transactions in an irrational way to obtain those credits is a sham. *See Stobie Creek Invs.*, 608 F.3d at 1379 ("Asking whether a transaction has a bona fide business purpose is another way to differentiate between real transactions, structured in a particular way to obtain a tax benefit (legitimate), and transactions *created* to generate a tax benefit (illegitimate)."). Sanderson's legal opinion testimony misunderstood the difference between an entity that has a reason for existing separate and apart from tax credits (even if those credits helped provide a profit motive for some transactions) and an entity that comes into existence solely to pursue tax credits. The former may be legitimate; the latter is clearly a sham. *See Winn-Dixie Stores*, 254 F.3d at 1316.

Second, and relatedly, the authorities Sanderson relied upon to support his position on the economic substance doctrine were incredibly weak. In addition to being a longstanding principle of the common law, *see Gregory v. Helvering*, 293 U.S. 465 (1935), the economic substance doctrine is codified at 26 U.S.C. § 7701(o). In other words, it is literally an Act of Congress. Yet Sanderson tried to rely on a Congressional committee report for the proposition that the economic substance doctrine "was not intended to apply to incentive tax credits." (Sanderson Dep. 126:19–127:14.) As the Federal Circuit explained, "a committee report cannot overcome clear statutory text." *Alt. Carbon Res., LLC*, 939 F.3d at 1330. Moreover, Sanderson's testimony did not accurately capture the committee report anyway. His testimony was based on a footnote that said taxpayers were entitled to tax credits if they participated in transactions that "in form and substance" involved activity the tax credits were designed to encourage. *Id.* at 1331. "This falls far short of instructing courts to ignore the economic substance doctrine just because the taxpayer is trying to claim an energy tax credit." *Id.*

Third, on the question of whether the Step Three transactions between ACR and the end users were "sales," Sanderson's opinion testimony again distorted facts and relevant authority. As a threshold matter, even if those transactions were "sales," the economic substance doctrine would

nonetheless disqualify ACR from claiming tax credits because of the financially irrational steps the company took at Steps One (paying for waste) and Two (expensive-but-pointless "splash" of diesel fuel). Those steps alone show that the company was "creating" transactions to generate a tax benefit, as opposed to "structuring" transactions that would have occurred anyway. *Stobie Creek Invs.*, 608 F.3d at 1375; *see also Winn-Dixie Stores*, 254 F.3d at 1316. Sanderson never acknowledged this in a meaningful way.

Even setting that problem aside, the primary authorities on which Sanderson relied on the "sale" issue were two private letter rulings from the IRS. *See Alt. Carbon Res., LLC*, 939 F.3d at 1332 (citing I.R.S. Priv. Ltr. Rul. 9631012, 1996 WL 433003 (Aug. 2, 1996); I.R.S. Priv. Ltr. Rul. 9229038, 1992 WL 808991 (July 17, 1992)). Anyone with a reasonably clear picture of ACR's business model would have understood why these private letter rulings—which are not precedential anyway—would not apply to ACR. The private letter rulings were directed to waste removal companies who had been paid in the first instance to haul waste away from production facilities. *See* I.R.S. Priv. Ltr. Rul. 9631012, 1996 WL 433003, at *1 ("X operates a trash removal service."); I.R.S. Priv. Ltr. Rul. 9229038, 1992 WL 808991, at *1 ("X is paid by companies to remove their waste materials such as * * *.") In other words, these companies were generating revenue separate and apart from the tax credits in the ordinary course of their businesses. This is a crucial difference from ACR's operations given that ACR was *not* a waste removal service and generated no revenue apart from tax credits.

To that end, I.R.S. Private Letter Ruling 9229038 specifically identified how the taxpayer generated a profit: "X's profit from the production of the Blend is equal to the difference between the payment X receives from its customers to remove their * * * waste and its costs of processing the waste (including the fees X pays to the user of the Blend)." 1992 WL 808991, at *1. The private letter ruling further explained that "it might cost X * * * a gallon to dispose of the Blend in a manner that conforms to environmental standards. However, X can be relieved of this duty by paying a small fee to the * * * producer, who, in turn, disposes of the Blend by using it as a fuel." *Id.* Finally, the private letter ruling stated that "X regularly conducts its business to make a profit. Thus, X's sale of the Blend is in X's trade or business." *Id.* The private letter ruling therefore expressly confirmed the legitimacy of the taxpayer's business operations, including: (a) how the taxpayer made a profit (i.e., the spread between the fee it received to take the waste away from the originating source and the cost of delivering it to the end user); and (b) how the size of that profit

was affected by delivering the waste material to an end user for use as a fuel instead of delivering it to someone else for disposal. The same private letter ruling could not have been written for ACR because ACR did not generate revenue at any point in its process, and thus there was no "spread" between that revenue and the cost of disposal.

This is not the only important difference between ACR's business and the businesses at issue in the private letter rulings. I.R.S. Private Letter Ruling 9631012 explained that the taxpayer, a trash removal service, combined two different waste streams to produce the alternative fuel mixture, one being a liquid fuel that could be used in an internal combustion engine and the other being an "alcohol-based waste stream." 1996 WL 433003, at *1. The taxpayer collected both waste streams from its customers. *Id.* This is different from ACR, which collected only a single waste stream that was then mixed with diesel fuel bought by ACR from a gas station. There is a crucial distinction between a company that gathers two different waste streams from two different places as part of its basic business operations and then combines them to produce a fuel mixture and a company that has to engage in an artificial transaction with a third-party gas station for diesel fuel to produce the fuel mixture. The former company is structuring normal business operations in a particular way to obtain the tax benefit, while the latter is creating transactions to obtain the tax benefit. The former is legitimate; the latter is not. *See Stobie Creek Invs.*, 608 F.3d at 1379. Indeed, the "splash" of diesel fuel is a quintessential example of a sham transaction; i.e., a "transaction[] whose sole function is to produce tax [benefits]." *Winn-Dixie Stores,* 254 F.3d at 1316 (quoting *Kirchman*, 862 F.2d at 1492).

In sum, Sanderson's legal opinion testimony in 2017 misunderstood the economic substance doctrine, relied on weak authorities, and missed obvious differences between ACR and the taxpayers at issue in the private letter rulings. The testimony is therefore wholly unpersuasive.

      ii.  <u>Based on Information Available to Them at the Time, It Was Unreasonable for Huyser and Carter to Interpret the Advice from Sanderson and Other Outside Advisors to Mean ACR Was Entitled to Tax Credits.</u>

Notwithstanding the analysis in the prior section, the persuasiveness of Sanderson's 2017 legal opinion testimony is largely beside the point for veil-piercing purposes because the focus must be on the reasonableness of what Huyser and Carter believed and did in 2010 and 2011, not what a hired expert said several years later. In that regard, Sanderson's legal opinions are relevant only to the extent that (a) he communicated them to Huyser and Carter in 2010 and 2011, and (b) Huyser and Carter reasonably relied on them. For reasons explained below, the Court concludes

that Sanderson did not provide an unqualified opinion to Huyser and Carter in 2010 and 2011 that ACR qualified for the tax credits, but rather included caveats that Huyser and Carter chose to disregard. Moreover, Sanderson's advice was based on an incomplete understanding of ACR's business that Huyser and Carter chose not to correct. The Court further concludes that Huyser's personal attorney, R. Jeffrey Lewis, provided better advice than Sanderson, but Huyser and Carter chose to disregard him in key ways. In these circumstances, it was unreasonable for Huyser and Carter to believe that Sanderson or any other outside advisor provided unqualified advice that ACR was eligible for the tax credits or otherwise had a legitimate business.

As to Sanderson, it is important at the outset to understand the *ad hoc* nature of his relationship with Huyser and Carter. The two men did not employ Sanderson in any long-term or comprehensive sense to help analyze and design ACR's business, but rather consulted with him on isolated issues when they wanted him to "bless" what they already wanted to do. In total, he provided only nine hours of legal services before ACR commenced operations, with most of that work revolving around the narrow issue of whether ACR could call the transactions with end users at Step Three "sales."

When Sanderson raised questions about other aspects of ACR's business, Huyser and Carter largely ignored him. For example, in June 2010, Sanderson asked scientific questions about the so-called "blending" of the diesel fuel with waste and advised Huyser and Carter to engage an outside scientist as a consultant. (Ex. 1052, p. 95.) Huyser and Carter did not act on his advice in any meaningful way, thus apparently preventing Sanderson from understanding the scientific pointlessness of the "splash" of diesel fuel at Step Two. This is a significant gap in his ability to evaluate whether ACR was legitimately entitled to the tax credits. Similarly, when Sanderson offered to prepare a formal tax opinion, Huyser and Carter chose to ignore him. This was a reckless decision in the context of a business that ended up receiving almost $20 million in tax credits in a single year despite an irrational business model. Had Sanderson prepared a formal legal opinion, he may have done more to understand the company's business operations and therefore recognize the illegitimacy of what Huyser and Carter planned to do.

Huyser and Carter were somewhat more direct with Sanderson on the "sale" issue, candidly telling him at various times—including just before ACR's operations started in mid-January 2011—that that ACR would be paying the wastewater facilities and other end users to take the waste. Even so, however, their reliance on his advice was unreasonable. For example, as of January

24, 2011, Sanderson admitted that he still "d[id] not have a full understanding of the economics. How do you make money from this business if you pay the digester company to take the liquid?" (Id., p. 117.) The fact that he did not understand basic aspects of what they planned to do should have raised major concerns for Huyser and Carter about the reliability of his advice.

It was particularly unreasonable for Huyser and Carter to follow Sanderson's advice once they started asking him in late December 2010 and early January 2011 whether ACR "need[ed] to 'sell' this alternative fuel mixture to [the WRA]" and how they should "structure the contract" to make it look like a "sale" even though the money was moving in the wrong direction. (Ex. 1025, pp. 42, 46, 54.) The fact that Carter's emails put words like "sell" and "sold" in quotation marks all but confirms that he and Huyser understood the dishonesty of what they wanted to do. These were not "sales" in any reasonable use of the word, and Sanderson should have told them so. Instead, however, Sanderson encouraged them to include provisions in their contracts with wastewater facilities that distorted the economic reality of the relevant transactions so that the word "sale" would be used to describe non-sale transactions. In other words, Sanderson essentially started helping them commit fraud. From that point forward, Huyser's and Carter's putative reliance on his advice was per se unreasonable. *See Curtis Inv. Co., LLC v. Comm'r*, 909 F.3d 1339, 1353–54 (11th Cir. 2018) (holding that courts should "consider[] all facts and circumstances in evaluating reasonableness and good faith" in the context of advice of counsel).

In any event, Huyser and Carter only partially followed Sanderson's advice anyway. He told them on January 24, 2011, that it would "present a better case if you charge the user of the mixture for the fuel value, and they charge you a disposal fee." (Ex. 1052, p. 117.) Setting aside the dubious nature of this advice, Huyser and Carter did not even fully implement it. Some of ACR's contracts with wastewater facilities did not bother to try to characterize the transactions as "sales" at all, while others used opaque language like "sold/transferred" and "transfer, sell, and deliver." (E.g., Ex. 330, p. 1.) Even in the scenarios where some version of the word "sell" appeared in the contract, ACR made no attempt to collect anything until the very end of 2011, when it sent invoices in the amount of $950 or $1,000 to some (but not all) of the so-called "customers." In these circumstances, Huyser and Carter knew full well that their transactions with wastewater facilities were not "sales" under any legitimate use of the word, regardless of what Sanderson was telling them.

Despite not having a tax background, Lewis did a better job than Sanderson of applying common sense and identifying crucial flaws in ACR's business model. In a letter dated January 31, 2011, Lewis encouraged Huyser to "find[] a way to create more cash flow and business activity in ACR." (Ex. 1165.) Lewis said this "would address possible future concerns over: a) whether the [mixture] was actually sold in a commercial sense and b) whether ACR is a bona fide business operating to make a profit. You will recall the company to whom the private opinion letter was written was in the waste company. My thought was that you should use your creativity to shore up your business activity." (Ex. 1165.) This letter exposed the core problems with ACR's business model: it lacked economic substance. Huyser and Carter did not, however, do anything to implement Lewis's advice. Thus, again, they cannot persuasively claim to have relied in good faith on input from outside advisors regarding the validity of ACR's business.

> ### d. Huyser's and Carter's Decisions in the Second Half of 2011 Confirm Their Fraudulent Intent and the Sham Nature of the Business.

To the extent any doubts remain about the legitimacy of Huyser's and Carter's actions, they are put to rest by what happened in the latter half of 2011, starting with the issuance of the IRS Questionnaire in July. As noted above, Huyser and Carter caused ACR to respond to the Questionnaire with statements describing ACR's products as "custom-blended" and "fully-tested." These statements were false. The response further used the misleading word "customers" to describe companies ACR was paying to accept the mixture, none of whom paid anything material in return (and most of whom never paid anything at all). The response did not mention that ACR had no meaningful source of revenue other than the tax credits. It was an exercise in deception.

The problems got worse in August 2011 when Huyser and Carter became aware of the Chief Counsel Advisory stating that the disposal of waste in anaerobic digesters did not qualify for tax credits. Huyser and Carter knew beyond a shadow of a doubt at this point that there were major concerns with ACR's eligibility for the credits, yet they *accelerated* ACR's operations, claimed *more* tax credits than they had before, and made and accepted *larger* distributions than at any other time. They did so even though they received the following warnings from their attorneys:

- August 26, 2011: Sanderson warned them "to be prepared to defend your position in the event the IRS excise tax division starts disallowing AM claims." (Ex. 187, p. 2.)

- August 31, 2011: Lewis warned Huyser to pay attention to "whether tax credit payments already made are in jeopardy." (Ex. 1166.)

- <u>September 7/8, 2011</u>: Smith warned Huyser and Kinley that it was "pretty clear that if for some reason we are not entitled to the credits that at a minimum, the LLC will owe 2X the credits received back to the IRS with interest (26 U.S.C. 6675)." (Ex. 1054.) Smith further stated: "**The other issue being raised is whether this project actually qualifies for the credits (despite the previous IRS approval of the Company) and if not, the risk of individual liability to the IRS**." (Id. (emphasis added).) Smith told Huyer and Kinley that piercing the corporate veil was a "hard hard shot by the Government" but warned that he was "assuming that the addition of the diesel fuel adds some (even if small) 'value' to the biodiesel fuel." (Id.)

- <u>September 8, 2011</u>: Sanderson sent an email summarizing his phone call with an IRS official regarding the advisory guidance. (Ex. 1139, pp. 2–3.) Contrary to Sanderson's later testimony—which the Court finds non-credible—there is nothing in the email to suggest the IRS official told Sanderson that ACR "of course" should continue claiming the credits. In his email, Sanderson merely reported that she said "the IRS excise tax division plans to do assessments of all AM registrants. . . . It looks like we just have to wait and see how the IRS responds." (Id.) He also said: "**If you continue to claim the AM credit payments, just be aware that the IRS may come back to you with a negative assessment. So you should plan accordingly (i.e., don't spend your credit payments until we get clarification).** (Id. (emphasis added).)

Collectively, these warnings amounted to a five-alarm fire because they called into question everything about ACR's business, including the legitimacy of the business plan, eligibility for tax credits, and possible efforts by the IRS to try to recoup what had already been paid. The fact that Huyser and Carter responded by claiming more money in tax credits and accelerating distributions to themselves confirms what the rest of the record already shows: ACR was a sham business that they "invented" for the sole purpose of chasing tax credits for their own enrichment. To borrow Carter's words, he and Huyser wanted to win the "footrace" for tax credits, not run a legitimate business. These facts overwhelmingly show that ACR was a "mere sham" that existed primarily to "perpetuate fraud." *See Briggs Transp. Co.*, 262 N.W.2d at 810; *HOK Sport, Inc.*, 495 F.3d at 935–36.

Huyser's conduct in early 2012 was particularly egregious. On January 17, 2012, the IRS commenced the audit process with a written request for information. <u>Meaning</u>: the IRS had now begun the formal process of clawing back the tax credits. Had Huyser immediately stopped all distributions at that time, it would have gone a long way toward showing good faith given that ACR had millions of dollars in the bank. But Huyser did the opposite. He caused ACR to make massive distributions to himself ($1.775 million), Carter ($1.55 million), and ACR's other owners

over the ensuing several weeks. This was a blatant attempt to keep the IRS from being able to recoup anything when it inevitably disallowed the tax credits and made an adverse assessment against ACR. It was inexcusable for him to make these distributions and for Carter to accept them.

In arguing otherwise, Huyser and Carter rely on Sanderson's purported "advice" in early September 2011 to keep claiming tax credits despite the Chief Counsel Advisory. For several reasons, this argument is unavailing. First, as noted above, Sanderson had effectively become a participant in fraudulent activity long before September, and thus Huyser and Carter per se should not have been relying on his advice. *See Stobie Creek Invs.*, 608 F.3d at 1381 ("Reliance is not reasonable, for example, if the adviser has an inherent conflict of interest about which the taxpayer knew or should have known."). Second, the Court finds as a matter of fact that Sanderson never gave unqualified advice to Huyser and Carter to keep claiming tax credits. To the contrary, as shown by Sanderson's email dated September 8, 2011, his advice on that topic was equivocal, at best. (*See* Ex. 1139, pp. 2–3 ("**If** you continue to claim the AM credit payments…." (emphasis added).) Huyser and Carter are essentially rewriting history when they suggest that Sanderson strongly encouraged them to keep claiming tax credits after the IRS advisory guidance. Third, even if Sanderson *had* strongly advised Huyser and Carter to keep claiming tax credits, the record shows that the two men had important information Sanderson apparently lacked, including, among other things that ACR made false and misleading statements to the IRS regarding the company's operations. *See Stobie Creek Invs.*, 608 F.3d at 1381 ("[T]he taxpayer must show that the advice was based on 'all pertinent facts and circumstances and the law as it relates to those facts and circumstances.'" (quoting Treas. Reg. § 16664–4(c)(1)(i))). Given their personal awareness of the illegitimacy of ACR's business and the false statements to the IRS, Huyser and Carter cannot claim to have justifiably relied on advice from an attorney who did not have the full picture.

Fourth, and in any event, even Huyser and Carter do not claim that Sanderson advised them to keep making distributions to themselves following the Chief Counsel Advisory. Instead, at most, he allegedly told them that ACR should continue filing claims for tax credits. But he also warned them, "don't spend your credit payments until we get clarification." (Ex. 1139, pp. 2–3.) Huyser and Carter could have—and should have—followed this advice and left the tax credit money in ACR's coffers so there would be resources available in the likely event of an adverse assessment. The fact that they chose not to do so adds an important layer to the veil-piercing analysis because it means they "completely depleted the assets of the [LLC] and left it an empty shell for purposes

of collection by the [entity's] creditors." *Boyd v. Boyd & Boyd, Inc.*, 386 N.W.2d 540, 544 (Iowa Ct. App. 1986). "This situation fulfills the 'exceptional circumstances' requirement of *Briggs* and warrants imposing personal liability upon [Huyser and Carter]." *Id.*

Huyser and Carter also emphasize that the IRS continued issuing tax credit checks in late 2011 and January 2012. This does not, however, mean the IRS "blessed" what ACR was doing. As IRS Revenue Agent Anna Smith explained, the IRS does not have the resources to verify the accuracy of information from taxpayers the moment it is submitted. Instead, it can only verify that information through a later audit. (Tr. 198:5–9.) As experienced businessmen, Huyser and Carter knew or should have known that the issuance of tax credit checks did not mean ACR qualified for the credits or faced no risk of a later adverse assessment.

The outcome does not change even if Huyser and Carter sincerely believed the IRS had already fully vetted their operations as of late 2011 and 2012. The only information the IRS had at that point came from ACR's registration application, presentation to Agent Kresic, and response to the IRS Questionnaire. Each of these documents contained false and/or misleading statements and failed to tell the whole story of ACR's business. Because Huyser and Carter knew this, it was unreasonable for them to conclude that the IRS had somehow definitively confirmed ACR's eligibility for tax credits.

Finally, Huyser and Carter note that the IRS did not issue an adverse assessment until April 2014, arguing that the long delay gave them reason to believe no such assessment was going to occur. This argument is largely irrelevant because Huyser and Carter received the final distributions from ACR in the first quarter of 2012 when the IRS audit had just gotten underway. They therefore did not "rely" on any delay by the IRS in making the decisions that matter to the veil-piercing analysis. *See Stobie Creek Invs.*, 608 F.3d at 1375 (explaining that courts should consider "the information available to a prudent investor at the time the taxpayer entered into the transaction, not what may (or may not) have happened later"). Moreover, and in any event, the fact that Huyser and Carter caused ACR to include false and misleading statements on their submissions to the IRS again makes it unreasonable for them to have relied on any action or inaction by the IRS.

The bottom line is that Huyser and Carter were fully aware by mid-2011 that there were major problems with ACR's eligibility for the tax credits. The fact that they continued claiming

those credits and making large distributions to themselves confirms that they treated the business as a "mere sham" and used it to "perpetuate fraud" for purposes of the veil-piercing doctrine.

### e. *Summary of Factors Four and Six.*

In sum, the record shows that Huyser and Carter formed ACR for the sole and illegitimate purpose of pursuing tax credits, designed an irrational business model to help achieve that purpose, made false and misleading statements to the IRS and others as part of carrying out the plan, and drained the company's accounts when the potential liabilities for their conduct appeared on the horizon. The fourth and sixth factors therefore weigh overwhelmingly in favor of piercing the corporate veil. *See, e.g.*, *Briggs Transp. Co.*, 262 N.W.2d at 811.

### 5. Summary of the Veil-Piercing Factors.

Considered as a whole, the applicable veil-piercing factors definitively show that Huyser and Carter misused the corporate form. ACR was undercapitalized and had no ability to satisfy its obligations. Although Huyser and Carter kept separate books, they intermingled finances. Most importantly, ACR was a "mere sham" and used to perpetuate fraud. The Government has therefore satisfied its burden of showing "exceptional circumstances" to pierce the corporate veil. The Court rules in favor of the Government, and against Huyser and Carter, on Counts I and IV, respectively. Huyser and Carter are personally responsible for ACR's debts to the United States.

## VI.    LEGAL ANALYSIS: TRANSFEREE LIABILITY.

Because the Court has held that the corporate veil should be pierced as against both Huyser and Carter, the Government's alternative theory of transferee liability is moot. Nonetheless, in the interest of completing the record, the Court will analyze the transferee liability claim as well.

### A. *Legal Standards.*

Transferee liability is governed by Iowa Code § 684.4(1), which, as relevant here, states that a transfer is voidable in two scenarios: first, if the debtor made the transfer "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor;" and second, if the debtor made the transfer "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, if . . . [t]he debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." "Creditors have the right to set a fraudulent conveyance aside and collect the proceeds to satisfy the debt owed." *Schaefer v. Schaefer*, 795 N.W.2d 494, 497 (Iowa 2011). "The rationale for the right to reclaim fraudulently conveyed property is, and always has been, to prevent a debtor from 'frustrat[ing] his credit's rights

and avoid[ing] his obligations by changing title to his assets.'" *Id.* at 498 (quoting 37 Am. Jur. 2d *Fraudulent Conveyances and Transfers* § 1, at 520 (2001)).

    *B.  ACR's Distributions to Huyser and Carter Were Fraudulent Transfers.*

    For similar reasons as those described in the veil-piercing section, the Court concludes that the Government has satisfied its burden of proving that ACR's distributions to each of Huyser and Carter constituted fraudulent transfers under each of the theories set forth in Iowa Code § 684.4.

    Under the first theory—"actual intent to hinder, delay, or defraud any creditor of the debtor"—the evidence established that ACR obtained tax credits from the United States (i.e., the "creditor") through false and fraudulent means, including: (a) engaging in operations for the sole and illegitimate purpose of pursuing tax credits; (b) developing an irrational business plan that involved sham transactions; (c) making false and misleading statements to the United States and others; and (d) making distributions to the LLC's owners (i.e., "insiders") of substantially all the debtor's assets despite knowing of the likelihood that the United States would try to recoup the tax credit payments through an audit and assessment. In short, ACR obtained money improperly from the creditor in the first instance and then distributed it to Huyser, Carter, and others to "hinder" and "delay" the creditor from getting the money back.

    Under the second theory—transfers without reasonably equivalent value when the debtor believed or should have believed it would incur debts beyond the ability to pay—the evidence showed that ACR made distributions despite the illegitimate way it obtained the tax credits in the first place and accelerated those distributions even after it became clear that the IRS intended to audit them and recoup the payments. The transfers without reasonably equivalent value were particularly egregious after ACR became aware of (a) the Chief Counsel Advisory in August 2011, and (b) the initiation of the IRS audit in January 2012. By the time of those events, it was highly likely that the Government intended to pursue action against ACR, yet the company immediately distributed substantially all of its assets to its owners to enrich those owners and prevent the Government from having a source of recovery.

## VII.  CONCLUSION.

    The Government has proven the existence of "exceptional circumstances" for piercing the corporate veil against both Huyser and Carter. It has further proven that ACR engaged in fraudulent transfers when it distributed money to Huyser and Carter (and other owners) in 2011 and 2012.

The Court therefore rules in favor of the Government, and against Huyser, on Count I and in favor of the Government, and against Carter, on Count IV. The Clerk of Court is directed to enter judgment accordingly. Costs shall be taxed against each of Huyser and Carter.

**IT IS SO ORDERED**.

Dated: March 6, 2026

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE